

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

AUG – 5 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

| | |
|---|---|
| *In the Matter of:* | Civil Action No. 4:24cv698 JORDAN/ JOHNSON |
| DILIP JANA, *Plaintiff* | |
| v. | PLAINTIFF DEMANDS A **TRIAL BY JURY** |
| WALMART, INC, *Defendant* | |

# PLAINTIFF'S COMPLAINT

## TO THE HONORABLE JUDGE OF THE SAID COURT:

COMES NOW Dr. Dilip Jana ("Dr. Jana", "Plaintiff"), an ex-Director of Data Science employee at WALMART, INC. ("Defendant", "Respondent", "Walmart"), files this Complaint and Jury Demand against Defendant as follows.

## I.   NATURE OF ACTION

1.       Dr. Jana, an Indian immigrant and permanent resident in the United States, is a Data Science leader with over a decade of data science experience in the US Corporate as well as at the European Organization of Nuclear Research (CERN), Geneva, Switzerland. In March 2020, Dr. Jana joined Walmart as a Principal Data Scientist at Walmart's Global Tech organization; working from Walmart's Tech Hub at 603 Munger Avenue, Dallas, TX, 75202.  In April 2023, Dr. Jana was promoted to

Director of Data Science, an Executive level position at Walmart, reporting to a different manager. Dr. Jana had consistent history of making impactful contribution during his tenure at Walmart. Dr. Jana had excellent performance review at Walmart including but not limited to saving Walmart more than $250 million for Fiscal Year 2023. Dr. Jana submitted patent at the US Patent Office on or around March-April 2023.

2.      During August – September 2023 Dr. Jana reported fraud, corruption, embezzlement which Dr. Jana reasonably believed broke federal laws, regulations, and rules designed to prevent fraud against the shareholder, to prevent violation of US Antitrust laws repeatedly to person of Supervisory Authority at Walmart over Dr. Jana and to the US Department of Justice ("DOJ").

3.      In response to Dr. Jana's efforts to address his concerns about Walmart's violation of Federal Antitrust Laws and violations of Federal laws relating to fraud against shareholders, his managers (Supervisory Authority) were dismissive and hostile towards him. Dr. Jana had no choice but to escalate his concerns to Walmart Ethics/Compliance team ("WM Ethics"). In addition to raising concerns about violation of federal laws and misconduct that Dr. Jana believed violated federal laws, Dr. Jana also complained about the retaliation he faced due to his protected activities.

4.      Based on Dr. Jana's allegation, WM Ethics investigated possible fraud/crime related to violation of antitrust laws and Federal laws relating to fraud against shareholders and later closed the investigation on September 27, 2023 and within one week, on October 4, 2023 Walmart decided to dismiss Dr. Jana. Treating Dr. Jana, who was a Walmart Corporate Executive, as a threat, WM Ethics escalated for a threat assessment against Dr. Jana to Walmart's to Walmart's Threat Management group. Records shows Walmart also opened an Ethics investigation against Dr. Jana after Dr. Jana's

whistleblowing activities which was merely a pretext for retaliation because of Dr. Jana's protected activities. Dr. Jana was unaware of threat assessment or ethics investigation against him prior to his termination. After fishing for additional supporting documents for underperformance and insubordination, which is merely a pretext for retaliation because of Dr. Jana's protected activities, finally dismissed him officially on October 19, 2023.

5.      Plaintiff brings this action to remedy **whistleblower retaliation** for his protected activities under Criminal Antitrust Anti-Retaliation Act ("CAARA"), 15 U.S.C. §7a-3(b)(2)(A) and the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. §1514A (to protect employees in publicly traded companies against retaliation in fraud cases), seeking redress for Defendant's retaliatory employment practices.

6.      Plaintiff engaged in protected activities under SOX and CAARA, Walmart knew of plaintiff's protected activities, plaintiff suffered an adverse personnel action and plaintiff's protected activity was a contributing factor for adverse personnel action against him.

7.      There is no other lawsuit against Walmart pending in any Federal/State Court for the same adverse action (Dismissal on October 19, 2023) that Dr. Jana suffered.

8.      This whistleblower case under statute CAARA is the first Antitrust Whistleblower protection claim in the United States in the US Federal District Court, thanks to President Donald Trump who made it as a law in December 23, 2020 "which prohibits employers from retaliating against certain individuals who report criminal antitrust violations"[1]

9.      The plaintiff seeks declaratory and injunctive relief, back pay, front pay, uncapped compensatory and punitive damages, reasonable attorney's fees and cost of this action, pre- and post- judgement interest, and other appropriate relief pursuant to CAARA and SOX.

---

[1] https://www.justice.gov/opa/pr/justice-department-applauds-passage-criminal-antitrust-anti-retaliation-act

## II.   PARTIES, JURISDICTION AND VENUE

10.    Walmart Inc. (NYSE: WMT) is an omnichannel retailer with more than 10,500 stores and numerous eCommerce websites in 19 countries with headquarters based out of Bentonville, AR in the United States. Walmart's revenue for fiscal year 2024 was $648 billion, Walmart employs approximately 2.1 million associates worldwide. Walmart is an employer in the United States within the meaning of 15 U.S.C. § 7a-3 and is a company within the meaning of 18 U.S.C. § 1514A in that it is a company with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l) and is required to file reports under Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)).

11.    Dr. Jana is a resident of Allen, Texas. At the time of his protected activities, he was an employee of Walmart and worked exclusively from Walmart's Dallas Tech Hub at 603 Munger Ave, Dallas, TX, 75202. Dr. Jana is a covered individual within the meaning of 15 U.S.C. § 7a-3 and was an employee within the meaning of 18 U.S.C. § 1514A.

12.    On or around January 3, 2024, Dr. Jana filed a timely (~75 days after the termination) Complaint with the United States Department of Labor's ("DOL") Occupational Safety and Health Administration ("OSHA") alleging that Dr. Jana was discharged on October 19, 2023 after reporting alleged violations of antitrust rules and federal laws against shareholders to the supervisory authority over Dr. Jana at Walmart and the US Department of Justice ("DOJ"), a violation of the employee protection provisions of the Criminal Antitrust Anti-Retaliation Act ("CAARA")  15 U.S.C. §7a-3 and the Sarbanes-Oxley

Act ("SOX"), 18 U.S.C. §1514A, and the implementing regulations at 29 C.F.R. Part 1980. OSHA case number was: 301028782.

13.     On February 28, 2024 Walmart declined OSHA investigator's request to produce any documents which were relevant to this case. On February 29, 2024 OSHA investigator informed Dr. Jana, quote,

> "I received – as expected – an email from Walmart earlier today relating the following: Walmart will not be providing any additional documentation at this time…"

14.     OSHA Region VI was offering an Expedited Case Processing ("ECP") option to allow Whistleblower to request OSHA terminate its investigation and issue a determination on Dr. Jana's complaint if the case had been pending with OSHA for more than 30 or 60 days, depending on the statute.

15.     On or around March 4, 2024 (more than 60 days after initial complaint to OSHA), Dr. Jana requested OSHA to terminate their investigation under the OSHA ECP program and requested to issue OSHA's findings.

16.     On March 5, 2024, OSHA Regional Supervisory Investigator (RSI) dismissed the Dr. Jana's case, quote,

> "Complainant has requested OSHA to terminate its investigation and issue a determination based on the information gathered thus far in its investigation; OSHA is unable to conclude if there is reasonable cause to believe a violation of the statutes has occurred. Consequently, this complaint is dismissed."

17.     On March 5, 2024, after OSHA dismissed Dr. Jana's claim, Dr. Jana appealed OSHA's dismissal to the United States Department of Labor's Office of Administrative Law Judges ("OALJ") without wasting a single day and OALJ docketed the case on March 5, 2024 with OALJ Case Number: 2024-CAR-00004.

18.     On or around June 14, 2024, Walmart requested Honorable Judge Christine Hilleren-Wilkins at OALJ to dismiss Dr. Jana's claim "for failure to state a claim".

19.     On July 23, 2024 Honorable Judge Christine Hilleren-Wilkins ordered to setup a trial date in the event Dr. Jana does not exercise his foregoing right to proceed the case in federal district court:

> "In the event that Complainant does not exercise the foregoing right to proceed in federal district court, the Formal Hearing in this matter will be conducted on February 5-7, 2025 at 9:30 a.m.."

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

20.     As of August 5, 2024, more than 210 days have passed since the filing of the Complaint to OSHA, the US DOL has not issued a final decision in this case and Dr. Jana acted in good faith, all administrative remedies have been exhausted. Accordingly, pursuant to 15 U.S.C. § 7a-3 (CAARA) and 18 U.S.C. §1514A (SOX), Dr. Jana's right to "kick-out" the case to federal court accrued after 180 days from the date Dr. Jana filed complaint with OSHA and Dr. Jana is entitled to seek ***de novo*** review of his claim in this Federal District Court.

21.     This Court has jurisdiction over plaintiff's CAARA and SOX claims under 28 U.S.C. §1331 because those claims arise under federal law.

22.     Venue is proper in this District pursuant to 28 U.S.C. §1331 (b) because Walmart has Corporate Office in Dallas, TX. In addition, the venue is proper as many of the Dr. Jana's protected activities constituting federal law violations happened in the Dallas, TX area and Dr. Jana is a resident at Allen in the State of Texas.

# III.   FACTUAL ALLEGATIONS

## A.    Walmart's Background

23.     Walmart has over 2.5 million employees globally

24.     Walmart is subject to numerous laws, rules, and regulations that prohibit fraud, embezzlement, money-laundering, economic sanctions, and other types of corruption and crimes. Those laws, designed to prevent corruption, to stop fraud against shareholders, and to ensure an accurate financial picture. Include the Securities Exchange Act; Foreign Corrupt Practices Act ("FCPA") etc.

25.     The Security and Exchange Commission ("SEC") also enacted rules and regulations in furtherance of the United States anti-fraud, anti-corruption, anti-money laundering to prevent fraud and corruption and to ensure accurate picture of a company's finances, including mandates to implement internal controls and to maintain accurate books and records.

26.     The Antitrust division of the US DOJ promotes economic competition through enforcing and providing guidance on antitrust laws and principles.

27.     Walmart has a history of violating such laws, rules and regulations. For example, in 2019 after a decade-long investigation, Walmart settled with the DOJ and SEC for FCPA violation. This is just one of those examples:

> "Walmart has entered into a global settlement with the U.S. Department of Justice (DOJ) and the Securities and Exchange Commission (SEC) that resolves a more than seven-year investigation into the company's compliance with the U.S. Foreign Corrupt Practices Act (FCPA)…, Walmart has agreed to a combined payment of **$282.7 million**….Over the past

seven years, Walmart spent **more than $900 million** on FCPA inquiries and investigations, its Global Compliance Program and organizational enhancements."[2]

28.      After a settlement with the DOJ in 2019 for FCPA violation, Walmart hired multiple high-profile Compliance officers (Matt Miner, Jelahan Stewart, etc.) from the US DOJ.

29.      Jelahan Stewart was one of the Walmart Ethics/Compliance officers to whom Dr. Jana blew the whistle for possible fraud to shareholders, antitrust law violations, corruption, bribery, embezzlement, FCPA violations on or around Sept 4, 2023 and within four few weeks Dr. Jana's dismissal decision was taken on October 4, 2023.

## B. Dr. Jana's Academic/Professional Background and Tenure at Walmart

30.      Dr. Jana has a MS degree in Physics and one PhD degree in Nuclear and Particle Physics from University of Oklahoma. While working in the ATLAS Collaboration at the European Organization of Nuclear Research (CERN), Dr. Jana was one of the authors for the experimental Higgs boson discovery (popularly known as "God Particle") that led to the 2013 Physics Nobel prize given to theoreticians who predicted the possible existence of the Higgs boson in 1964.

31.      While Dr. Jana was working at Neiman Marcus, one of the Walmart recruiters reached out to Dr. Jana on or around December 2019 for a Principal Data Scientist position at Walmart. Dr. Jana successfully completed all the interviews in January-February of 2020 and finally joined Walmart on March 2, 2020 as a Principal Data Scientist reporting to Jonathan Sidhu.

32.       Dr. Jana had a very successful career at Walmart. During his tenure at Walmart, Dr. Jana demonstrated a consistent history of making impactful contributions for Walmart. Dr. Jana's Annual

---

[2] https://corporate.walmart.com/news/2019/06/20/walmart-reaches-agreements-with-the-doj-and-the-sec-to-resolve-their-fcpa-investigations

reviews at Walmart show that he helped Walmart save $35 million in gross merchandise value ("GMV") for 2021 fiscal year, $125 million GMV for 2022 fiscal year, and more than $250 million GMV for 2023 fiscal year. His supervisor wrote in his annual review:

> "The more junior members of the team respect the knowledge that Dilip brings to the table and Dilip is generous in sharing that knowledge....Dilip is outstanding technically in his data science, machine learning and statistical skills. He brings innovation to the team …He demonstrates the ability to lead by influence"

33.     Dr. Jana received numerous prizes (Bravo Awards, Teams Awards, etc.) from the Executive Vice President of Walmart for his outstanding performance.

34.     Dr. Jana's supervisor, Jonathan Sidhu, put him in Disciplinary Action ("DA") in a Category RED-3 in November 7, 2022 for a duration of one year ending October 31, 2023 when Jonathan Sidhu, who has no data science background, was threatened by Dr. Jana's raise as an undisputed data science leader, and Dr. Jana's protected activity related to employee rights.  Dr. Jana complained to Walmart's Ethics Department, Walmart Human Resource ("HR") about this DA. After the investigation, Walmart HR forced Jonathan Sidhu to **rescind** the DA on January 12, 2023

34.     On or around December 5, 2022, Dr. Jana filed a complaint against Walmart for this unlawful DA at the National Labor Relation Board ("NLRB")[3], a federal agency at the DOL. In 2023 Dr. Jana participated and co-operated in NLRB's investigation for Coercive Rules and Concerted Activities (Retaliation, Discharge, Discipline).

35.     Around the last week of February, 2023, Dr. Jana applied for two Director of Data Science roles within Walmart, one position was within Walmart's Retail Intelligence group, the other position was in the Solution Design Team. The hiring manager at the Solution Design team was Mr. Milbourne ("Mr.

---

[3] https://www.nlrb.gov/case/16-CA-308476

Milbourne") and Mr. Milbourne reports to Mrs. Mehra ("Mrs. Mehra"), the Vice President.

36.     On or around Wednesday, March 8, 2023, Dr. Jana had a technical interview with Mr. Milbourne's team and on or around Thursday, March 9, 2023 Dr. Jana had an interview with Mrs. Mehra. On Friday, March 10, 2023, Adrian offered Dr. Jana the Director of Data Science position. Mr. Milbourne also offered Dr. Jana to work from Walmart's Dallas Tech hub location despite the original position being for the Bentonville, AR location at Walmart's headquarters. Dr. Jana had been working from the Dallas office since March 2020. Dr. Jana accepted the offer.

37.     Jonathan Sidhu and Adrian came to an agreement that Dr. Jana will start working with Adrian's team starting around the 3rd week of March, 2023 with 10% of his time and would gradually transition to Adrian's team fully by 2nd week of April 2023. Dr. Jana officially joined Adrian's team on April 8, 2023.

38.     Around the middle of March 2023, Mr. Milbourne informed Dr. Jana that they are in the middle of the vendor selection process for Data Science related work. Kamil Bay (Director of Analytics) provided sample data for all competing vendors; Kamil Bay was leading the vendor selection. Adrian asked Dr. Jana to help to select the vendor. Dr. Jana participated in the vendor selection process and provided feedback during March 15, 2023 to April 11, 2023.

39.     Kamil Bay ("Mr. Bay") was a Director of Analytics, reporting to Mr. Milbourne. On or around May 19, 2023, during one of the conversations with Mrs. Mehra, she mentioned to Dr. Jana that Mr. Bay and Mrs. Mehra worked together at Sam's Club and when Mrs. Mehra became the Vice President at Walmart, she brought Kamil to her team.

## C. Violation of Antitrust Laws and Fraud against Shareholders

40.     Dr. Jana participated in the vendor selection process in Adrian's team on or around the 3rd week of March 2023. There were five competing vendors: Deloitte/Google (Deloitte and Google partnered together, both US based), Infogain (India based), MuSigma (India based), Cognizant (US Based), Tredence (India based).

41.     On March 28, 2023 (before officially joining Mr. Milbourne's team on April 8, 2023), Dr. Jana attended an evaluation presentation by Deloitte/Google and Infogain. The initial project, a Proof of Concept ("POC"), was scheduled for 8 weeks, with bid prices of $300,000 and $180,000 respectively. Dr. Jana was the only Data Science leader and Subject Matter Expert (SME) in Mr. Milbourne and Mrs. Mehra's team, with all vendor communication handled by Mr. Milbourne, Mr. Bay and Mrs. Mehra.

42.     On March 28, 2023, Dr. Jana compared Deloitte/Google and Infogain, favoring the former. Dr. Jana expressed concerns about Infogain's credibility during a chat with Kamil Bay. Here is the from Teams chat related to Infogain that Dr. Jana sent to Mr. Bay.

> "I do not see strong data scientists' presence..I see why they are so cheap!...That's bad, we will not get quality of work. We will get good power points, sales slide"

43.     On 03-29-2023, Mrs. Mehra visited the Dallas office where Adrian informed Dr. Jana that Mrs. Mehra wanted to meet him. Dr. Jana, who had recently received a job offer as Director of Data Science in Mrs. Mehra's team, was excited. During the meeting, Mrs. Mehra praised Infogain repeatedly, which raised suspicions for Dr. Jana as they were in the midst of vendor selection process with other reputable vendors like Google/Deloitte. Dr. Jana discreetly recorded the conversation at Walmart's Dallas, TX office with his full consent.

"if it was my personal business, I do like Infogain more, not because of just the cost but I think they understand the problem better...I know Deloitte, because they are consultants, they will deliver something. If you think about POC, get Infogain and then you can use our internal intelligence...My ask to you can you look at industry journals and Gartners ..to see like is if Infogain has credibility in the market."

44.     Mrs. Mehra showed early interest in Infogain before all vendor presentations were completed. She assigned Dr. Jana to verify Infogain's credibility, using her position to influence vendor selection. Dr. Jana found a project awarded to Infogain in a different field, not related to Data Science, and shared with Kamil Bay. Dr. Jana met the Infogain Vice President, Veera, in person multiple times as part of his job duties. Veera mentioned using a sourcer (mediator) during the vendor selection for the POC. Mrs. Mehra met privately with Infogain well before the vendor selection.

45.     In the first week of April, 2023 Kamil Bay developed a vendor evaluation numbering system. Dr. Jana questioned its fairness to all vendors, as it seemed biased towards Infogain. On April 11, 2023 Infogain won the POC contract, which unfairly eliminated very competent US based vendors like Deloitte/Google.

46.     This is Antitrust procurement fraud with unlawful manipulation of a procurement process to obtain an unfair advantage during the procurement process, after eliminating the most competent vendors who participated in the bidding process.

47.     The Statement of Work ("SOW"), the contract between Infogain and Walmart, which was drafted after Infogain won the bid sometimes in middle-end of April, 2023 the clearly stated:

"Total fees under this SOW must not exceed $189, 520. Any fees exceeding $189, 520 must be pre-approved in writing by Walmart in the form of a Project Change Request. The cost includes Travel & Logistics charges"

48.     Infogain proposed an increase in BID amount to $270K for their presence in Bentonville even before starting the work. Kamil Bay, who was communicating with Infogain, on April 11, 2023, asked infogain,

> "I'm somewhat confused. The RFP I got shows 180. Is the 180 POC, and 270 MVP? Is there a typo?"

Infogain raised BID price several times due to time extensions, travel, and logistics costs. POC bid price reached nearly 1 million dollars, much higher than Deloitte/Google's initial bid. Infogain misrepresented their BID to unfairly eliminate the other vendors with approval from Mrs. Mehra, suggesting fraud.

49.     Infogain initially proposed $180,000 for the POC project with 4 on-site members and 5 in India. But during the POC in June-August 2023, they had only 1-2 on-site members and 20+ in India for the same project, suggesting fraud. Dr. Jana asked Greg Cathy, Sr Vice president, a Supervisory Authority over Dr. Jana,

"…are they being compensated properly…I think this may be a violation of few federal labor laws."

50.     SOW had a clause,

> "The tenure of the POC will initially be 8 weeks and Walmart will update if the tenure needs to be extended a month prior to the contract completion. This engagement will be completed on or before July 21, 2023. SOW end date will be January 31, 2024."

51.     An interesting point is, the SOW end date was January 31, 2024, which was kept more than 6 months after the completion of POC. Vendors come with a specific project for a specific time period. SOW end date was extended intentionally to continue fraudulent activities.

52.     As part of his job duties, Dr. Jana came to know that after POC ended, SOW agreements were extended without proper documentation: sometimes for one week, sometimes for one month, sometimes no extension of SOW but Infogain was still working. Infogain was getting delayed payments, even Veera mentioned, Infogain was running credit. Dr. Jana came to know from Veera of Infogain that there are many instances where SOW was signed backdated after Infogain completed

some work. Vendors and Walmart should sign the SOW first, then vendors should start the work. This demonstrates the manipulation of account bookkeeping for a publicly traded company which is a shareholder fraud.

53.     Before winning the bid, On March 28, 2023 Infogain presented, "Leverage NAVIK Signal NLP Algorithms" to "Determine Size and Trends of Defects". The SOW had guidelines for the use of Infogain's proprietary software called "NAVIK". SOW documents states,

> "Consultant will use a combination of custom build components and Consultant's NAVIK AI components…Consultant grants Walmart a limited, worldwide grant to use NAVIK"

54.      Even after multiple repeated requests, Infogain never provided NAVIK software to Walmart even after the completion of POC. This is a text book style of fraud, Infogain did not deliver deliverables as defined in the POC. Despite failing to deliver committed results, Mrs. Mehra and Mr. Milbourne artificially created short due dates and vague projects to award Infogain a few million dollars for the next 6 months with the possibility to renew those contracts for years to come, extending their fraudulent behavior.

55.      Infogain failed to provide NAVIK software to Walmart despite completing POC, engaging in textbook style fraud by not delivering promised results. Mrs. Mehra and Mr. Milbourne made efforts to extend fraudulent behavior by awarding Infogain with vague projects contracts and no competition contract worth millions for six months with option to renew.

56.      Infogain used their fake NAVIK software to win bids falsely and failed to deliver results. Mr. Bay confirmed Infogain completed 0% for the first two projects and 50% for the third project at the end of POC. Mr.

57.     Walmart was trying to build a "Defect Engine" and Mr. Milbourne advertised for Vendor participation which is commonly known as RFP:

> "Identifying, tracking and solving defects is critical for any organization's sustainable success…Problem that negatively impacts member, customer, and/or associate experience"

58.     In the 2023 fiscal year, Walmart generated $82 billion in sales from e-commerce globally, representing approximately 13% of total revenues; Walmart store contributed to approximately 87% of the revenue. In the same fiscal year 2023, Dr. Jana worked on defect detection (anomaly detection) for Walmart's US e-commerce business and Dr. Jana's annual review that Walmart provided showed that Dr. Jana helped Walmart to save more than $250 million-dollar GMV in fiscal year 2023. The defect detection project that vendor Infogain was working on was related to store defects. With over 4,500 Walmart stores in the US, the inability to identify critical defects can lead to significant financial losses. Misidentifying or failing to detect critical defects could result in billions of dollars in lost revenue and wasted resources annually.

59.     On June 28, 2023, Dr. Jana identified a significant defect in a Sam's Club store in Plano, Texas while Dr. Jana was visiting the store: the electrical systems in refrigerator sections were non-functional, leading to potential loss of sales and food waste. Timely identifying those defects will save billions of dollars. Dr. Jana sent few text messages and videos to Mr. Milburne to demonstrate severity of the problem. Mr. Milbourne's response highlighted the severity of the issue, indicating a substantial economic impact:

> "That's crazy! Never seen anything like that! ..A lot of lost sales for sure"

## D.      <u>PLAINTIFF'S PROTECTED WHISTLEBLOWER ACTIVITIES</u>

60.     On August 8, 2023: Dr. Jana reported possible fraud to **SVP Allie Hazelwood**, a Person of Supervisory Authority over Dr. Jana at Walmart (Chain of Command: Greg cathy→ Allie Hazelwood → Mrs. Mehra → Mr. Milbourne → Dr. Jana). Dr. Jana wrote an email to Allie Hazelwood:

> "It has come to my attention that vendor (Infogain) selection was done in an unethical manner, providing projects to vendor despite their very poor performance."

61.     Allie Hazelwood called Dr. Jana on the same day multiple times. During the call, Dr. Jana informed Allie Hazelwood how Mr. Bay created scoring system to favor Infogain during the vendor selection process to eliminate very competent US Vendors like Deloitte/Google, Cognizant. how Infogain raised the bid price after winning the bid for the same work even before starting the work and how the management (Mrs. Mehra and Mr. Milbourne) was trying to give the next big project (MVP) to Infogain, despite Infogain's poor performance and how the vendors SOW and payment related to account bookkeeping for a publicly traded company was manipulated. In many occasions, the SOW was signed after the work was done; which should have been the other way around.

62.     On or around August 14, 2023 Dr. Jana reported possible fraud to Shawn Cohen, Human Resource Vice President (HR VP), a Person of Supervisory Authority over Dr. Jana at Walmart:

> "we are in a verge of big corruption....concern I have is procurement fraud, bid rigging, bid suppression and misrepresentation of low cost to get the POC for the vendor. And this is all orchestrated by VP Ridhi Mehra and I have documented. I have documented this incident from March 28 until last week."

63.     The Complaint was so severe and specific enough that Shawn Cohen escalated to the Walmart

Ethics/Compliance team and Walmart legal and Walmart ethics opened a case following Dr. Jana's

complaint. Shawn Cohen said:

> "..What I'll need to do is partner with our ethics department because of the claims you've raised.
> need to investigate the claims around you said bid rigging procurement fraud, bit suppression
> and misrepresentation of the cost of the proof of concept. So I need, I need to connect with our
> ethics team to launch an investigation into those concerns."

64.     On or around September 4, 2023, in a closed-door meeting with Jelahan Stewart who is a Vice

President of WM Ethics, a person of Supervisory Authority over Dr. Jana, Dr. Jana informed in great

detail possible violations of Antitrust Laws in particular procurement fraud, possible fraud in Corporate

Responsibility for Financial Reports, possible fraud in internal control of issuers for financial reporting,

possible fraud to Shareholders and possible fraud under Foreign Corrupt Practices Act (FCPA) as the

vendor Infogain was based out of India which is a foreign country and the complaint was possible

embezzlement involving Infogain and a Walmart US employee Vice President Mrs. Mehra. Jelahan

Stewart instructed Dr. Jana to provide evidence to Monica Hall, a Sr. Manager who reports to Lori

Chumbler (Sr. Director of Global Ethics), Lori reports to Jelahan Stewart.

65.     On 09-08-2023 Monica Hall and Dr. Jana had conversations about the allegations and Monica

Hall's access to Dr. Jana's confidential files. Following the conversations and accessing confidential

files that Dr. Jana provided, Monica Hall acknowledged she had clear understanding of the allegations

and escalated to "Significant Case Team" within Walmart Legal Department to investigate. Dr Jana

shared his Walmart one drive folder with Monica Hall which included various documents to

substantiate Dr. Jana's allegations of procurement fraud, bid rigging, possible fraud to shareholders.

FCPA violations etc., here are few quotes that Dr. Jana shared:

> "Infogain portrayed of a false image that they are cheaper during the bidding process, later they increased the price because of whatever the reason is for the same job. I believe it is a textbook style of procurement fraud during the contract negotiation phase as Infogain mis-represented cost during negotiations and Google/Deloitte was unfairly eliminated..And all of these are intentionally supported by Ridhi Mehra which I believe violates Federal Antitrust Law. Once Infogain won the bid, Infogain not only increased the price, but also making desperate effort to get more projects despite poor performance due to Ridhi Mehra's favoritism.."

66.     Here is another exact quote from one of the documents that Dr. Jana sent to Walmart Ethics Department through Monica Hall on or around September 8, 2023, the same document was sent to Department of Justice (DOJ) on September 27, 2023 as well, RM refers to Mrs. Mehra:

> "RM's India visit (first week of July 2023) right after signing the contract with Infogain who she favorably selected is suspicious for suspected embezzlement, bribery/corruption. I do not need to provide evidence as defined by Department of Justice/FBI. In good faith, I believe it may be related to suspected embezzlement, bribery/corruption..Infogain is an India based IT company which operates in the US, RM was/is an Indian citizen (I do not know her current citizenship status) and RM works in the US; therefore; U.S. Foreign Corrupt Practices Act (FCRA/fcpa-guide-2020_final.pdf,   https://www.justice.gov/criminal-fraud/file/1292051),   I believe, may be applies in this case. I am aiding lines from page #4 of  U.S. Foreign Corrupt Practices Act, "Foreign bribery is a scourge that must be eradicated. It undermines the rule of law, empowers authoritarian rulers, distorts free and fair markets, disadvantages honest and ethical companies, and threatens national security and sustainable development. This updated Guide is meant not only to summarize the product of the dedicated and hardworking individuals who combat foreign bribery as part of their work for the U.S. government, but also to help companies, practitioners, and the public— many of whom find themselves on the front lines of this fight—prevent corruption in the first instance…I am aiding you from page #35 of U.S. Foreign Corrupt Practices Act, "Under federal law, individuals or companies that aid or abet a crime including an FCPA violation are as guilty as if they had directly committed the offence themselves.""

67.     On September 27, 2023 Monica Hall informed Dr. Jana that Walmart Ethics closed the Investigation and Walmart decided to terminate Dr. Jana around October 3-4, 2023, within one week after the completion of the Ethics Investigation.


68.     On September 27, 2023 after Walmart Ethics closed the investigation, Dr. Jana reported to the Department of Justice, a US Federal Agency, for possible corruption, bribes, embezzlement and violation of other federal laws.

69.     On August 22, 2023 Dr. Jana declined to sign off Infogain's work to Mr. Milbourne, a Person of Supervisory Authority over Dr. Jana at Walmart after completion of POC. Dr. Jana clearly stated Infogain's poor work:

     "poor quality of work…when it comes to data science, I cannot sign off"
because Dr. Jana reasonably believed doing so would constitute a criminal fraud.

70.     On Thursday August 24, 2023 at 12:10:17 AM Dr. Jana declined to approve Infogain's work; Mr. Milbourne (supervisory authority) was cced in that email because Dr. Jana reasonably believed doing so would constitute a criminal fraud,

     "I can not approve any result if I can't validate"

71.     On Friday, September 15, 2023 at 1:44 AM Dr Jana wrote Mr. Milbourne when Mr. Milbourne gave just 25 hours to respond to his email about extra resources Dr. Jana needs for his team so that Adrian can allocate those resources to Infogain for vague and undefined projects for the next six months, worth a few million dollars without any further competition. Dr. Jana declined to provide that

information to Mr. Milbourne; because Dr. Jana reasonably believed doing so would constitute criminal

fraud for an undefined project. Here is some of the lines from that email:

> "....Both Kamil and I have expressed serious concern about the competency of Infogain. I am not confident engaging Infogain given the experience we had during the POC. But I believe the assumption here is to engage Infogain. It's very difficult to estimate FTW based on Infogain's headcount. They had 20+ people during the POC, but only few data scientists.....I requested you to clarify some of the tasks yesterday at 11:25 am, 26 minutes after your email(10:59 AM). I have not received anything response from you, it won't be possible to respond by noon today..You are ready to give the project to Infogain despite their poor performance..You are planning to give the project to Infogain for next 6 months. It's a very tough decision I have to make. I need to get the complete picture of who's the vendor, quality of their data scientists, $ amount etc... This is what Infogain promised before getting the POC. We are working on Generative Al with LLM Models. Infogain promised they have proprietary software NAVIK, we should be able to use it: After end of the POC, I asked where is NAVIK?"

72.    Kamil Bay responded referring to NAVIK:

> "Infogain finally revealed NAVIK!!! It stands for "Not a Very Impressive Koala."

Then Kamil Bay sent a picture of Koala and making it funny:

> "This is NAVIK..There you go, now we finally know what it is"

73.    On Wednesday October 4, 2023 at 12:01 AM, Dr Jana escalated to Mr. Milbourne, Mrs. Mehra

(Supervisory Authority over Dr. Jana) and Wendy Bowman ("Mrs. Bowman"), HR People Partner

when Kamil Bay was approving Infogain's data science related work which Dr. Jana was supposed to

sign off on because Dr. Jana reasonably believed doing so would constitute a criminal fraud. Infogain

manipulated and falsified POC results and Kamil approved it illegally to pave the way for Infogain to

get a few million dollars of projects.

> "I believe Kamil is approving Infogain's work unethically, I need your attention. I'll be happy to explain my findings"

74.     On Friday October 6, 2023 Reported fraud to Greg Cathy (Sr. Vice President) a Person of

Supervisory Authority over Dr. Jana at Walmart. Dr. Jana wrote to SVP Greg Cathy:

> "I am sending it because of the sensitivity of the timings and efforts of awarding MVP to
> Infogain despite their poor performance during the POC....trying to get MVP for 6 month
> (~$1.3M) ..what is the new SOW (Statement of Work) and are they being compensated
> properly? I am really concerned..I think this may be a violation of few federal labor laws…
> Adrian is retaliating and ruthless."

75.     On Saturday October 7, 2023 Greg Cathy responded:

> "We are holding all work with Infogain per my request as we review your concerns. We will
> connect with you post findings of the review. As always, please do not hesitate to reach out if
> you have any questions or concerns.

76.     On Monday, October 9, 2023 Dr. Jana wrote Mr. Milbourne and Mrs. Mehra both of them are
Supervisory Authority over Dr. Jana at Walmart,

> "I believe POC has ended, please correct me if I am wrong. I see Infogain is still working, can
> I get the updated SOW?... @Ridhi Mehra this is urgent. Did we extend the POC? If we did not
> extend the POC and if the POC ended, and Infogain is still working, are they being fairly
> compensated for their post POC work? Please advise. If this is not the case, Infogain should not
> have access to Walmart resources after POC is ended. In case you have updated SOW, I want
> to have a look."

77.     On October 16, 2023 Dr. Jana reported to Walmart Ethics Department about Mr.

Milbourne's retaliation effort and how he was aiding Mrs. Mehra for bid rigging, procurement fraud

and violation of other federal laws and helping Ridhi to give a long-term project to vendor Infogain

despite Infogain's failure to provide POC deliverables.

78.     On Monday October 16, 2023 at 8:33 AM Dr. Jana informed HR Mrs. Bowman that he

submitted formal ethics complaint against Mr. Milbourne and Mrs. Bowman acknowledged

> "Thank you for letting me know"

### E.   __WALMART INVESTIGATED BASED ON PLAINTIFF'S ALLEGATION__

79.     Employer, Walmart, knew Dr. Jana's Whistleblowing activities: paragraphs 60-78.

80.     In addition to Shawn Cohen's acknowledgement of investigation (paragraph 63) based on Dr.

Jana's specific allegations for corruption/fraud/embezzlement, it was alarming enough that Walmart

Ethics/Compliance investigated related to Anti-trust laws (protected under CAARA), fraud against

shareholders (protected under SOX) which Monica Hall acknowledged on or around September 8, 2023

when Dr. Jana was sharing files with her to substantiate his allegations:

> "We have a clear understanding of what the allegations are…...I'll share this information to our
> legal investigation team who actually conduct the investigation…I'm gonna reach back to our
> Significant Case Team…this right here is very helpful…we should be receiving more over the
> weekend or next week…you spent a lot of time on this..I do not want you to consume all of
> your time focusing on this..I realize how important it is..I really appreciate all of your work and
> your efforts to get this information to us..I do not want you to spend, ya know, overwhelm
> yourself..take care of your family, yourself as well"

81.     To be protected under SOX, the employee's report need not "definitively and specifically"

relate to one of the listed categories of fraud or securities violations in Section 806 of SOX.  The focus

is "on the plaintiff's state of mind rather than on the defendant's conduct." *Guyden v. Aetna, Inc.*, 544

F.3d 376, 384 (2d Cir. 2008).

82.     This is the first Whistleblowing protection under statute CAARA after President Trump made it

a law in December 2020; there is no reference available.

83.     Dr. Jana is protected for his whistleblowing activities under CAARA and SOX for Walmart's

retaliatory dismissal of Dr. Jana.

## F.  DEFENDANT  RETALIATES  AND  TERMINATES  PLAINTIFF'S  EMPLOYMENT

84      *(i)* **A hearsay statement taken presumably during/after Dr. Jana's protected whistleblowing activity was utilized to fire Dr. Jana**

85.        After 8 months of withholding, Walmart finally submitted an internal email dated October 4, 2023, 6:08 PM to the DOL on June 14, 2024 that shows that a hearsay statement (attachment "…Concerns Raised") was a basis of Dr. Jana's firing (though the content of the attachment of that email is still in withholding). On or around May 19, 2023, way before Dr. Jana's whistleblower activities, Dr. Jana brought attention to the poor performance of that associate [*name withheld for privacy*], who was hired by Mr. Milbourne but was working with Dr. Jana at that time. In July 2023, before Dr. Jana's whistleblowing activities, Dr. Jana informed Mr Milbourne that the associate often produced incorrect results and claimed someone else's work as his own. Mr. Milbourne and Mrs. Mehra advised Dr. Jana to show empathy and grace to that associate. Dr. Jana rated the associate two levels below his position, which Mr. Milbourne and Mrs. Mehra knew, indicating he was a business analyst rather than a data scientist. In July 2023, Dr. Jana provided detailed feedback, showing the associate was an "Opportunity Associate" with the lowest performance rating at Walmart. Walmart utilized that associate's feedback to fire Dr. Jana. A hearsay statement was used as a basis of termination during and after Dr Jana's whistleblowing activities, which is merely used as a pretext for retaliation: 1)Walmart never told Dr. Jana what concern this associate  raised, 2) Walmart never told Dr. Jana who raised the concern 3) Walmart never asked Dr. Jana to give any form of input on the alleged misconduct. 4) Walmart never brought any of this information up to Dr. Jana as to his alleged wrongful act or the surrounding details.

86.    *(ii)* **One of Dr. Jana's whistleblowing activities was utilized to fire Dr. Jana: Direct evidence of retaliation**

87.    Dr. Jana's whistleblowing activity on October 4, 2023 at 12:01 AM where he escalated Kamil Bay's "[Unethical]: Sign off for POC" to his supervisory authority, Mr. Milbourne and Mrs Mehra were utilized as a reason for Dr. Jana's termination; which is a **Direct evidence of retaliation.**

88.    After multiple extensions, Infogain's POC ended at the end of September 2023. Walmart organized three days of workshop from Sept 26-28, 2023 for Infogain's proposed plan for next 6 months of work which was worth a few million; despite Infogain's failure to deliver POC deliverables and a Mr. Milbourne's vague project plan. Infogain flew a few people from India to attend that workshop at Bentonville, AR. Infogain needed POC sign off from Walmart in order to get the next 6 months of work; with a potential multi-year extension without any more competition; which Dr. Jana reasonably believed a fraud.

89.    During the workshop, Dr. Jana declined to approve Infogain's Data Science related work as Data Science falls under Dr. Jana, he cited Infogain's failure to deliver POC deliverables as the reason for why he was not able to sign off.

90.    Kamil Bay (who is a Director of Data Analytics) approved Infogain's Data Science related work which Infigain falsely claimed as completed and erroneous:

"84% of the defects identified …actionable.."
"Top actionable defects identified for ….WFM"

91.    Kamil Bay's own acknowledgement: Infogain's top defect is "UNKNOWN".

Infogain showed the results were 84% actionable, but Dr. Jana worked tirelessly with his team as well as Leslie Platz, Olan Land and Raymond Pritchett for the last few months and Dr. Jana knew by heart the accuracy was around 50-55% and in some cases accuracy was even ~10%. In a zoom call, Olan Land and Raymond Pritchett and other team members agreed accuracy was 50-55% and Kamil Bay approved Infogain's result where Infogain claimed 84% accuracy to pave the way for Infogain to win few million dollars of project without any competition with other vendors! This is a textbook style fraud.

92.      For WFP, Dr. Jana himself worked and Infogain could not even define a single defect in WFP. For example, on August 9, 2023 Dr. Jana asked Infogain:

> "How frequently a store uses more than 30%, we have ~5K stores in US, what's their distribution looks like? What % of stores are defect based on this definition?"

93.      Infogain never responded; Mr. Milbourne appeared as a rescuer; Mr. Milbourne instead asked Infogain to pause the WFP related work.

94.      Kamil Bay did not work on WFP but still Kamil Bay approved Infogain's claim for completing POC deliverables. Dr. Jana requested Kamil Bay to respond to his email where Dr. Jana raised these issues and how Kamil Bay approved those results; Kamil Bay never responded.

95.      Here's is the recap of some of Kamil Bay's activities during the POC (evidence will be submitted at the Court at a later time) related to vendor Infogain:

- Kamil Bay created a numbering system to favor Infogain to eliminate very competent US Vendors like Google/Deloitte

- Kamil Bay's own acknowledgement, Infogain completed 0% on the first project, 0% second project and 50% of the third project after the POC

- Kamil Bay made fun of Infogain's proprietary NLP software, called NAVIK which they promised before winning the BID to provide Walmart but during the entire POC after repeated requests, Infogain never disclosed what NAVIK was. When Dr. Jana asked where's NAVIK? Kamil Bay responded, NAVIK stands for "Not A Very Impressive Koala" and Kamil Bay sent a humorous Koala picture.

- Infogain is here because of politics and there is a negative consequence that we were facing, Kamil Bay also mentioned Infogain's work as a patch work

- Kamil Bay agreed with Dr. Jana is "100,000% Right" it was not worth spending time with Infogain

- Kamil Bay acknowledged if he was in Allie's position (Allie is Mrs. Mehra's supervisor), "I was in Allie's shoes…I would just do the right thing.. I would just slash" indicating the entire management is corrupt

- Infogain manipulated their POC result and Kamil Bay supported. Kamil Bay's own words:

    > "**It's basically like faking until you make it..**Fake until.. little bit too far, which I don't feel extremely comfortable…And Kyle's team is supporting"

- When Dr. Jana raised the concern of Infogain's changing BID price after winning the bid even before start of the work for the same project, Kamil Bay said,

    > **"**No, but actually, I raised this..red flag...."

- For Kamil Bay, pleasing supervisors is more important than upholding Federal laws and upholding Walmart's own Code of Conduct ("Act with Integrity" and "Strive for Excellence")[4]. This is what Kamil Bay said:

  > "I'm really worried like more to Ridhi. I am worried about her. I don't want to let her down....So I want this to succeed because of her"

  And this is the way to be successful at Walmart: pleasing supervisors[5].

96.    On **Wednesday, October 4, at 12:01 AM** Dr. Jana reported Kamil Bay's unethical approval of Infogain's work to Mr. Milbourne and Mrs. Mehra both of whom were Supervisory Authority over Dr. Jana at Walmart (also cced to Mrs. Bowman) and offered to explain the basis of Dr. Jana's findings as Dr. Jana reasonably believed approving Infogain's manipulated and poor result would constitute a criminal fraud. Here is the email Dr. Jana wrote:

> "Adrian/Ridhi: I believe Kamil is approving Infogain's work unethically, I need your attention. I'll be happy to explain my findings."

97.    On Thursday, October 5, 2023 at 3:52 PM Mrs. Mehra responded to Dr. Jana's previous email:

> "Dilip, Just a quick note to let you know that I have read all your emails and they have been appropriately escalated"

98.    Any Supervisory Authority over Dr. Jana at Walmart **with non-retaliatory intent** would follow Walmart's own Code of Conduct and would make an effort to talk to Dr. Jana as Dr. Jana being the leader of Data Science raised a concern which in fact related to awarding a few million dollar project which is basically a fraud and give opportunity to Dr. Jana to present his evidences (Walmart's listening

---

[4] https://www.walmartethics.com/content/walmartethics/en_us/code-of-conduct.html
[5] https://fortune.com/2024/06/04/walmart-ceo-doug-mcmillon-three-tips-for-success/

Culture- Servant Leadership) as Dr. Jana offered to explain his findings. Instead, Mrs. Mehra contacted Walmart Ethics and recommended Dr. Jana's termination within next 24 hours.

99.   On June 14, 2024 after withholding for more than 8 months, Walmart submitted an EXHIBIT at the DOL which shows Dr. Jana's email was utilized against Dr. Jana to fire him. Dr. Jana provided all Kamil Bay related (paragraph 86-103) audio/video evidence to Walmart Ethics during September 2023; evidence shows that same Walmart Ethics utilized Dr. Jana's October 4, 2023 at 12:01 AM email where he complained about possible crime Kamil Bay did by approving Infogain's result which was another whistleblowing activity; Walmart decided to fire Dr. Jana within 24 hours of this incident: this is a **Direct evidence of Retaliation** due to Dr. Jana's protected whistleblowing activities.

100.     In addition to opening an Ethics case against Dr. Jana at Walmart Ethics after Dr. Jana's whistleblowing activities in September 2023, which was not discussed with Dr. Jana what allegations were against Dr. Jana prior to Dr. Jana's dismissal, evidence showed Shawn Cohen of HR and Monica Hall of Walmart Ethics were engaged throughout the dismissal decision process in the first week of October, 2023 who Dr. Jana reported possible fraud in August-Sept, 2023. Without giving any scope to defend Dr. Jana's concern Walmart egregiously decided to dismiss him; this *substantiates the employer's retaliatory intent.*

101.     Walmart manipulated, misrepresented and falsified during the federal investigation at DOL with an intent to take advantage in this case, representing Kamil Bay as Dr. Jana's fellow Data Scientist colleague:

"..his peer and co-worker, Kamil Bay, another Data Scientist"

102.   Kamil Bay worked at Walmart for more than decade; he never had a data scientist position at

Walmart until the day Dr. Jana was terminated on October 19, 2023.

103. .        Kamil Bay's position as a Director of Data Analytics was not the same or similarly situated to Dr. Jana's position as a Director of Data Science and should not be used for discrimination comparison purposes. There are two different job codes at Walmart as well as DOL for Director of Data Science and Director of Analytics.

104.    *(iii)*    **Walmart provided one of the reasons of the termination was Dr. Jana's meeting disruptions and disrespect to Vice President Mrs. Mehra after calling her a dictator**

105.       Walmart is misrepresenting the facts to mask the true reasons for retaliation. Dr. Jana neither disrupted the meeting nor called Mrs. Mehra a "dictator" during the meeting on October 2, 2023, Dr. Jana spoke up for self-defense when Adrian was demoting and disrespecting Dr. Jana in front of junior/senior team members by changing (demoting) Dr. Jana's roles and responsibilities. Despite Dr. Jana's repeated efforts since 09-15-2023 to understand the cause of the change of Dr. Jana's responsibilities, Adrian ignored Dr. Jana.

106.       On September 15, 2023; Dr. Jana responded to Mr. Milbourne's email where Mr. Milbourne first proposed that the LLM Strategy would be transitioning to Mr. Bay. Dr. Jana wrote,

> "I have already protested during the call yesterday during our 1:1. I am considering it as disrespectful and as an act of retaliation as LLM is purely data science topic and I am the Director of Data Science"

107.     Dr. Jana had one-on-one meeting with Mrs. Mehra where Dr. Jana wanted to talk all these issues with Mrs. Mehra during Sept-October 2023 and asked for an hour time. Mrs. Mehra gave 45 minutes of meeting time, but that meeting was cancelled at least for four times and that meeting never happened before termination.

108.     Dr. Jana has the recording of that meeting, Dr. Jana never called Mehra "a dictator" during the meeting. Dr. Jana asked her (***"Ridhi, one quick question for you"***) whether we are following the leadership principle she laid out for the team in May 2023.  Dr. Jana also clearly explained what the problem was.

> "…Ridhi, one quick question for you during the session the offsite meeting in May, you said this is people led.. If this people led or you are enforcing this to be everybody to follow, even if you don't agree. Because there are a lot of stuff.. it falls on the data science, Generative AI. I don't understand why this Kamil is getting there, despite the fact that this is data analytics team.. I feel like we are enforcing a dictatorship here.. So then let's talk offline first before going to the general audience, because otherwise we have to say this is an authoritative regime or dictatorship that is imposing to follow you. What you said in the month of May that we are people-led, not manager-led."

109.     During the meeting on October 2, 2023 Ridhi said:
> "So Dilip, thank you for raising your concern. I know it's my understanding that the team has reviewed this internally at least three times. ...Okay, again, yes, so thank you for raising that. ....So Dilip, like I said, thank you for sharing your concern. ..let's take it offline and address it if you feel your point of view is not represented."

110.     The promised offline meeting never happened; Mrs. Mehra decided to terminate Dr. Jana within the next 48 hours of this incident; clearly substantiating retaliation due to Dr. Jana's protected whistleblowing activities.

111.   *(iv)*  **Walmart provided the following answer at DOL  as one of the reasons for Dr. Jana's termination, quote in RED was Dr. Jana's email to Mr. Milbourne.**

Jana makes the following comment—with font and color as represented—in response to Milbourne's assessment that a project is late:

Please READ from my previous email, it's simple English, "I propose WFP use case updates and timelines- Due Sept 8th

## provided we get all the answers".

So **this is NOT LATE**…

Apart from belittling and insulting his supervisor by indicating that Milbourne does not understand "simple English," Jana provides no solutions or proposals—his expectation is that Milbourne, his supervisor, "provide[]. . . all the answers." (See Jana's Exhibit 5-S at pages 2-3).  This behavior was emblematic of Jana's overall performance.  Despite repeated efforts by his leadership to help Jana find a path to success, Jana refused to do so.

112.   Walmart not only quoting out of context but falsifying information that "Jana provides no solutions or proposals". Dr. Jana wanted it to be flashing RED to indicate that Dr. Jana understood Mr. Milbourne's retaliatory intent well in advance. Mr. Milbourne, a data science leader with Bible Divinity and Bible Theology degree from Baptist Bible College with absolutely no data science background with 17 years of experience at Walmart who started as an hourly associate, was trying to mask his retaliatory behavior. Dr. Jana, with more than decades of Data Science experience, was alerted early enough to document Mr. Milbourne's retaliation effort due to Dr. Jana's protected whistleblowing activities.

113.   Here is the sequence of events that demonstrates that Dr. Jana provided solutions/proposal which Walmart denies, there was no data to perform the task, it was setup for Dr. Jana's failure. Mr. Milbourne retaliated because of Dr. Jana's protected activities. Adrian asked for the datasets …, which, in an ideal Walmart, would be available.  The reality was that no such datasets exist at Walmart.

However, even though no data exists for the tasks assigned to Dr. Jana, it was destined to fail without supporting data, as Milbourne knew from the start.

114.    On Thursday, July 27, 2023 at 2:44 PM Dr. Jana wrote to Mr. Milbourne which demonstrates the necessity of appropriate data to perform the task and its unavailability; Dr. Jana provided solutions once we have the data:

> "..we need a master table as I mentioned before to identify top attributes that could impact a stores ability to use their hours efficiently and understand causal relationships among attributes. We have few tables related to workforce management, it will take at least few months to create a master table where all attributes and target variable (defect) will be in a single table to perform machine learning models and find causal relationships among attributes. Joining tables are very easy, but joining those tables in a meaningful way to add value is tricky, we need human intelligence and experienced people, like your input. Sometimes we do not have data for all events that happens at store operation that leads to consuming more/less data, that's what Adohree mentioned today… You are an expert on those things, I need your help. I have shared a ppt with you for Credit Default model, my finance business partner's engineering team took ~10 months to create … table from .. and .. table. Once we had the .. table, we utilized it for multiple projects. We had discussion with Adohree's team (they are the SMEs in Workforce Management data) today, they mentioned that they do not know any data sets that can tell us root cause of why store uses more/less hours. … If you know any data sets that will help us to perform this task, please let me know. I'll be happy to hear your opinion/feedback, I need your help."

115.    Thursday, July 27, 2023 at 4:30 PM one of Dr. Jana's direct report Sandeep Golkunda wrote an email to Adrian and Dr. Jana after meeting with WFP project data experts indicating that there was no data to perform the task

> "..we had a quick meeting with Adhoree's team about the root cause for over/under utilization.….Currently there is no real-time data collected for finding exactly what the root cause is from their team."

116.    On August 8 2023 Dr. Jana's protected Whistleblower activities started

---

**Plaintiff's Original Complaint**                                         Page **32** of **55**
*Jana v. Walmart, Inc.*

117.     On August 25, 2023 at 8:30 pm (after returning to Bentonville from Dallas office visit for

just 2-3 hours) Adrian wrote a very well drafted email recapping items which he never discussed with

Dr. Jana during the Dallas visit, indicating a documentation effort to use it to retaliate:

> "Data Access – leveraging Kamil is good if he has access. If he doesn't have, go to Data
> Foundations team access and let me know if we need to escalate when responses are
> delayed or latent"

118.     Dr. Jana made extraordinary efforts to meet WFP project experts and data experts to expose

Mr. Milbourne's retaliatory intent. In addition to meeting Adhoree's team who are WFP data experts,

Dr. Jana met Brandon Gardner, who worked on WFP project for more than 15 years at Walmart,

multiple times. Dr. Jana also met Jeremy Arns of Data Foundation Engineering team multiple times

who Adrian suggested to meet. Both Brandon Gardner and Jeremy Arns told Dr. Jana privately that

there was no data for that task.

119.     Monday, August 28, 2023: Dr. Jana met with Ketan Mudda as per Mr. Milbourne's directive.

120.     Tuesday, August 29, 2023 at 1:56:01 PM:  Dr. Jana emailed Mr. Milbourne asking clarity on

WFP work and data availability.

> *"…I had a meeting with Ketan yesterday. We have lots of questions…you do not have
> time to meet his week. We need to have a discussion for clarity of the work and the data
> sets availability.I appreciate if you can explain what's the use case in WFP, what is
> Ketan's teams' roles and what's our team's role and if there is any intersection. The
> team has a concern that our work may not be presented to the management/Leah/or
> other meetings...* **I propose WFP use case updates and timelines – Due Sept 8th
> provided we get all the answers.**"
> *[Highlighted for emphasis]*

121.     This email clearly demonstrated Dr. Jana's pursuit of the necessary data and the need for "discussion for clarity of the work and the data sets availability" between Dr. Jana and Mr. Milbourne since we had already seen in July that there was no data for the task Mr. Milbourne assigned Dr. Jana to complete, and no alternatives suggested by Mr. Milbourne. Dr. Jana never said Mr. Milbourne "provide[]…all answers". Walmart is lying and misleading. Answers for the data set availability would be coming from the data engineering team, not from Mr. Milbourne, as Mr. Milbourne correctly mentioned, "go to Data Foundations team access". We will see Jeremy Arns's from Data Foundation (Data Engineering Team) response in subsequent paragraphs. The task that was assigned (Data Engineering) to Dr. Jana was outside of his job role (Data Science).

122.     On Tuesday, August 29, 2023 at 2:07 PM Dr. Jana's direct report Sandeep Golkunda wrote to Adrian, ccing to Dr. Jana after meeting Ketan, whom Adrian asked Dr. Jana to meet.  Mr. Milbourne bore the responsibility of defining the project goals for his team; however, this email illustrates that the project details were very vague and never fully understood by Mr. Milbourne or the project participants.

> "The below presentation is what Ketan,Sandeep Mahajan, Eshan's teams are working with 15+ team members. .from the last square you can tell that we are trying to identify the same thing and this square came into their diagram after our last call with Ketan.
> These are some of the questions that are unanswered.
> - What is the deliverable from our team cause we constantly are running into the wall for trying to define our role when we are talking to them
> - We don't have the capacity to pace on a daily basis with 15+ Data Engineers and scientists working on it.
> - If we just build WFP defects from our end, I don't think it would be consumed by them cause we are using the same data sources again.
>
> …Please help us find more clarity on our role and deliverables"

123.     On Tuesday, August 29, 2023 at 2:31 PM Dr. Jana wrote to Mr. Milbourne asking clarity on work but Adrian never responded:

"Adrian, we need little bit more clarity on "Use Case Focus and Delivery – WFP""

124.    Dr. Jana directed Sandeep Golkunda to reach out to Data Foundation team, as suggested by Mr. Milbourne.

125.    On Sept 5, 2023 at 2 PM Dr. Jana attended a team meeting in person at the Walmart's Corporate office at Bentonville, AR where all other team members were present. During the meeting Dr. Jana raised the issue of not having appropriate data for the WFP project that Mr. Milbourne assigned Dr. Jana to do, and that such data did not exist at Walmart; the assignment did not line up with the duties outlined in Dr. Jana's Director of Data Science job application that Mr. Milbourne posted. It appeared as though Adrian was trying to set Dr. Jana up for failure and threatened him in front of all team members.

126.    Adrian told Dr. Jana in front of all team members:

> "... So I feel like...we're going down a rabbit hole that we don't need..I hear your concerns. I do..... I want you guys to see this as an opportunity, not as obstacle after obstacle, after obstacle… . But I wanna make clear to this broader team that you will own a specific piece of this strategy and if in any way you feel like you can't deliver it, then you need to let me know as early as possible. And that it won't be depended on Infogain because we're not gonna use them as a crutch. We're not gonna use them as an excuse to deliver this product to the organization, our customers are too valuable. Our associates are too valuable to make excuses for not delivering a product. And so I wanna make sure that we're clear on, on the expectation for me from the expectation from the organization as well… But what that doesn't mean is that, that's gonna be an inhibitor to you getting your work done or you delivering on your portfolio to your portfolio….. I've never worked in an organization where I don't have data was the excuse never…"

127.    Dr. Jana realized this is nothing but an act of retaliation because of his protected whistleblowing activities. Dr. Jana then organized a meeting with Brandon Gardner who has more than 15 years of experience on the WFP project and data expert Jeremy Arns in VP Aaron Berg's team. Aaron reports to Allie Hazelwood and Aaron's team was responsible for providing information about

data to all teams within Allie's organization.   Dr. Jana kept Mr. Milbourne involved in all those meetings during September 2023.

128.         Tuesday, September 5, 2023 at 3:43 PM: One of Dr. Jana's direct reports reached out to Jeremy Arns of Data Foundations ccing to Dr. Jana and Mr. Milbourne. However, Jeremy Arns did not respond until Sept 20, 2023.

129.         On Wednesday, September 6, 2023, Mr. Milbourne and Dr. Jana had one-on-one meeting at Bentonville, AR where Dr. Jana updated WFP related issues of not having appropriate data

130.         On Thursday, September 7, 2023, Mr. Milbourne, Dr. Jana and Sandeep Golkunda met Jeremy Arns and Brandon Gardner for WFP related data sets. During the meeting, Mr. Milbourne did not agree with Brandon Gardner of data sets unavailability, who had more than 15 years of experience in WFP project.

131.         On Tuesday, September 12, 2023, Dr. Jana met Brandon Gardner via zoom to gather information on WFP related work since Brandon had more than 15 years of experience at WFP to expose Mr. Milbourne's retaliatory intent

132.         Thursday, Sept 14, 2023 at 4 PM:  Dr. Jana met Jeremy Arns via zoom for WFP data

133.         Thursday, Sept 14, 2023 at 4:30 PM:  Dr. Jana met Mr. Milbourne via zoom and updated him about Dr. Jana's conversations with Jeremy, Adhore and Brandon that there was no appropriate data to complete the task

134.          On Thursday, September 14, 2023 at 10:52 PM, Adrian wrote,

"WFP Timelines/Activities – Late – Original Due Sept 8th';

While acknowledging, "As we discussed last week and this week" and he was looped into all

meetings which showed that there was no appropriate data available, still Mr. Milbourne wrote,

**"Late"** for documentation purposes in retaliation.

135.          On Friday, September 15, 2023 at 1:12:53 AM Dr. Jana wrote:

"Please READ from my previous email, it's simple English, "I propose WFP use case updates and timelines – Due Sept 8th **provided we get all the answers**".
So this is NOT LATE. You were looped in throughout the process.. We talked with Brandon and Jeremy on Sept 7, 2023; you do not agree with anybody (see below). They told us very clearly data does not have all the components to find the root cause why some stores are taking more/less hours because lots of manual process are involved and those are not captured in the data. We did not receive any data from them. I talked to you on Thursday, Sept 7 when I was at home office, you asked to extend date after talking to Brandon and Jeremy. I asked Sandeep to extend the date, he did not probably extend…I talked to Brandon, he has 15 years of WFP experience, he sees the same problem that he saw 15 years ago, the difference between demand hours and actual hours and you want to solve it in few weeks. You and I talked today, and you said you would talk to Jeremy; let's get the data first. Once we get the data, there are multiple steps, it all depends on the data quality. There are data cleaning, Exploratory data analysis, and then any modeling activity."

136.          Brandon Gardner who has 15 years of WFP project experience, he acknowledged he

sees same problem what he saw 15 years ago at Walmart, but Mr. Milbourne wanted Dr. Jana to solve

the problem in few weeks; it was designed to fail.

137.          On Tuesday, September 19, 2023 11:30 AM Dr. Jana again met Jeremy Arns, Rory and

Adhoree for WFP data; Dr. Jana was making every effort to document because Dr. Jana realized

retaliation was imminent.

138.          On Wednesday, September 20, 2023 at 4:08 PM, Jeremy Arns responded to Sandeep

Golkunda's data request (paragraph 128) and asked few questions related to data requirements.

139.      On Wednesday, September 20, 2023 at 10:21 PM Dr. Jana got an opportunity to engage Mr. Milbourne directly and Dr. Jana requested Mr. Milbourne to respond to Jeremy's questions:

> "@Adrian Milbourne can you please help!"

140.      On Thursday, September 21, 2023 8:33 AM Mr. Milbourne responded and asked the need for specific data sets to perform the job. Jeremy Arns will provide the data if it is available.

141.      On Monday, September 25, 2023 at 2 PM Dr. Jana organized a meeting between Sandeep Golkunda, Mr. Milbourne, Ketan Mudda and his supervisor, Eric. During the meeting Eric told Mr. Milbourne that they are not interested to collaborate; which Dr. Jana's direct report correctly stated on August 29, 2023. Eric suggested to talk to Eshan. Before talking to Ketan, Mr Milbourne asked Dr. Jana to talked to Eshan, Dr. Jana already talked to Eshan and Eshan told Dr. Jana that they are not the right team to collaborate.  This meeting demonstrated that Mr. Milbourne was using Dr. Jana's assignment as a means to terminate him as the task was not supported or needed by any business entity and was therefore not of high priority to anyone. This demonstrates Adrian's inability to lead a Data Science team where he cannot define a project or identify a final product user. Data Science comes to solve the problem using machine learning/artificial intelligence.

142.      On Tuesday, October 3, 2023 at 8:23 AM Jeremy Arns sent an Excel spreadsheet about the data sources they had which showed that there was no data available that Adrian requested.


143.      On Tuesday, October 3, 2023 at 11:30:38 AM Dr. Jana took a screenshot of Mr. Milbourne's desired WFP project-related datasets to ensure it was readable in an email and sent it back to Jeremy and Adrian to make sure everybody was on the same page and then asked Adrian

whether he agreed with Dr. Jana that there were no suitable datasets (datasets Adrian suggested) available. Adrian never responded; instead he decided to fire Dr. Jana within the next 24 hours.

144.        Adrian's retaliatory intent was exposed after Jeremy Arns email showed that there was no data for WFP project but Adrian assigned that work to Dr. Jana and threatened him on September 5, 2023 (paragraph 126):

**"I've never worked in an organization where I don't have data was the excuse never"**

*[Highlighted for emphasis]*

145.        On Tuesday October 3, 2023 at 10:05 pm Dr. Jana reported Adrian's retaliation to Mrs. Mehra, Adrian's supervisor and also cced to Mrs. Bowman (HR people partner) with a Subject line: "[Retaliation][Changing roles and responsibilities] WFP" where Dr. Jana explained in great details.

146.        On Tuesday October 3, 2023 at 11:37 pm Dr. Jana reported Adrian's retaliation to Mrs. Mehra, Adrian's supervisor and also cc'ed to Mrs. Bowman with the Subject line:  "[Retaliation and Discrimination]: WFP" where Dr. Jana explained in great detail including mentioning, "I promise, I can give you data science results within 1-2 weeks after I get the data"

146.        Walmart's internal documents shows that Mrs. Bowman forwarded those emails to Walmart Ethics to ad into an existing ethics complaint against Dr. Jana (Dr. Jana did not know any ethics complaint against him prior to termination). The irony is that Dr. Jana complained about Adrian's retaliation and Walmart Ethics utilized that complaint to fire Dr. Jana. This is the same Walmart Ethics to whom Dr. Jana blew the whistle for fraud four weeks ago.

147.      *(v)*      **Walmart wrote in their answer to the DOL, "Despite repeated efforts by his leadership to help Jana find a path to success, Jana refused to do so."**

As demonstrated by the evidence presented in this document, Dr. Jana never refused to obey Mr. Milbourne's directives; he instead "went the extra mile" to meet experts that exposed Mr. Milbourne's retaliatory intent because of Dr. Jana's protected activities.  Walmart needs to substantiate what so-called help his leadership offered him, given the fact that his leadership (both Mr. Milbourne and Mrs. Mehra) has no data science knowledge and they never discussed any technical aspect of Data Science. Data science involves complicated mathematics, statistics, artificial intelligence, machine learning and modeling (e.g. Large Language Models, Generative AI, etc.) all based on large amounts of data, hence the name ***Data*** science.

148.   *(vi)*      **Walmart stated one of Dr. Jana's comment on August 23, 2023  "My grandma could do it" was disrespectful to the vendor Infogain.."While constructive criticism is acceptable  and expected in any healthy collaborative business situation, personal attack is not" and it was one of the reasons for Dr. Jana's termination.**

149.      Records show that Vendor Infogain actually was disrespecting Dr. Jana on August 8, 2023 way before August 23, 2023. Infogain not only targeted to disrespect Dr. Jana but also targeted Dr. Jana's team members; multiple incidents happened where Infogain was disrespecting Dr. Jana's team members. Here are some of those documents for substantiation:

150.      Tuesday August 8, 2023: Dr. Jana informed SVP Allie Hazelwood (person of Supervisory Authority) about feeling disrespected by vendors during meetings where Dr. Jana raised concerns about Infogain's poor quality of work:

> "**Vendors are disrespecting me** in front of everybody when I asked questions, when I raised concerns on the quality of the work"

151.         Friday August 11, 2023, Dr. Jana informed Mr. Milbourne that Infogain was disrespecting him:

> "During Tuesday's meeting with Infogain, I was asking a question, Sudeep stopped me by saying, "Let me stop you here". I did not react, I kept quiet. Several of our associates reached out me after the meeting, they were asking me why Sudeep was treating me that way. Going forward, I'll be tracking Sudeep's behavior."

152.         Evidence shows that Dr. Jana made constructive criticism repeatedly when Infogain was producing wrong results, and was not meeting POC expectation but was ignored by the vendor Infogain as well as Mr. Milbourne; exactly opposite to what Walmart is claiming.

153.         The true reason for the termination was not this "My grandma could do it" comment, it was used merely as a pretext to retaliate due to Dr. Jana's protected Whistleblowing activities.

154.         On September 1, 2023 Dr. Jana mentioned to Mrs. Bowman about his innocuous "My grandma could do it" comment and Dr. Jana gave her the context of that comment. Dr. Jana also mentioned that in Nov 2022, Dr. Jana's previous Walmart supervisor put him in Disciplinary Action, how HR was biased and how they took action against Dr. Jana. Within two months, Walmart had to *rescind* that unlawful Disciplinary Action. Dr. Jana also provided its context so that in the event Mr. Milbourne  took any adverse steps against because of that comment (using it as a pretext for retaliation) that she would understand that context beforehand.

155.         Dr. Jana explained his innocuous "grandma" comment to Mr. Milbourne (on 09-15-2023) Dr. Jana provided the context of that comment. Dr. Jana, in fact, demonstrated that Mr. Milbourne actually was violating Walmart's Code of Conduct by blindly approving Infogain's wrong results but it was used against Dr. Jana to fire him:

> "My intention wasn't to disrespect anybody. Walmart is a fortune 1 company and there was a process to select the right vendor. I raised my concern from day 1 when we were selecting Infogain. We are in a professional world; we are paying tons of money to vendor,Infogain, they at supposed to be expert in the field. Throughout the POC, Infogain did numerous mistakes and very poor quality of work that demonstrates Infogain is incompetent for this job."

> "On Friday, **08-18-2022** I asked the same question to Abdur from Infogain during our daily standup. I asked what's the science behind choosing the Volume to 50% and the 25% for the others. This is very critical since it calculates how severe Walmart's problems are (Please check attached email) Abdur said there's no science involved; they just assumed those numbers. I asked, if Infogain changes the number next day, which number to trust?..."

Financial impact of misidentifying defects, economic impact due to fraud, can be found in paragraph 57-59

156.        Evidence shows that management, Mr. Milbourne and Mrs Mehra knew the most critical defects based on their business experience; however, Infogain could not find a single critical defect during the POC. When Dr. Jana asked Mr. Bay what was Infogain's top defect; Mr. Bay responded, "Unknown" indicating Mr. Bay was also aligned with Dr. Jana that Infogain was not able to identify critical defects. However, management, Mr. Milbourne and Mrs. Mehra were blindsided and approved all of Infogain's results to pave the way for MVP project for the next 6 months, worth a few million dollars with the possibility of extension without any fair competition; which Dr. Jana reasonably believed to be a crime.

157.        Here is the sequence of events to substantiate that Walmart is misrepresenting the facts to mask its retaliation:

158.        Friday, August 11, 2023 at 1:26 PM: Dr. Jana made very constructive criticism and showed the root cause of Infogain's problems why they were not able to produce results. Dr Jana wrote

that email to Mr. Milbourne with a subject: "Root Cause of Infogain's problem" and Dr. Jana provided

codes the he developed to substantiate his findings:

> "I met them, based on my understanding I tried to help them, I got the impression that they were very confident. Here is an example: Issue was "Urgent Issue at Walmart Health Center" ..Infogain created lots of duplicates with multiple Level1 for a single ... If this joining is messed up, L3/L4 will be messed up too. I believe they didn't do sanity check before going to modeling stage."

159.        Thursday August 17, 2023 at 5:07 PM: Walmart's data has a severity column but

Infogain decided to produce their own version of severity score to define how critical the defects are.

However, their results were not matching with well-known defects. Dr. Jana made very constructive

criticism and tried to help Infogain to correct their mistakes:

> "..I am not confident presenting Severity Score, as I already expressed concern, this has never been verified. This does not include priority (criticality) that data has, I understand you derived this Severity but you did not substantiate the validity of the definition of Severity..Assuming these three criteria that you used to calculate derived Severity Score are all correct, but still I am having difficulty to understand how these three (# of Stores, Time to Resolve and Momentum) items were added given the fact that # of Stores has no unit, Time to Resolve has an unit in days and Momentum has an unit of ? (not defined here, I do not know). What weightage each individual items has towards Severity Score and what's the scientific logic behind it?"

160.        Friday August 18, 2023: Dr. Jana again asked Infogain:

>        "what's the science behind choosing the Volume to 50% and 25% for the others"
with no answers from Infogain.

161.        08-18-2023 to 08-22-2023: I had multiple meetings with Infogain and Adrian. On one

occasion Dr. Jana did a white board session with Infogain for severity score

162.        August 23, 2023 at 2:45 pm Dr. Jana made very constructive criticism:

> "... data already has a column…which identifies the issue based on criticality. We have lots of issues, but not necessarily all issues are defect. We are trying to develop a defect engine, first

we need to define what is a defect…Current result..failed to capture low volume but very sensitive issues. As an example, Kamil mentioned few times, our management knows wifi, baler, xcover are one of the major defects, they are very critical. I do not care what model …you use, bottom-line is we need to detect the defect correctly…at the end it does not matter if it does not detect defect..My recommendation would be to start something very simple just by using severity column that is already available in ..data and then validate it.. "

163.        Infogain manipulated the result, changing the severity/criticality score for same issue within a week. On 08-23-2023 Dr. Jana wrote:

"As of 08-22-2023, first Ontology …had a severity score of 6.25 out of 10. If I scale up for of 08-22-2023 result to compare result with 08-18-2023 result (make the same range 0-30), we are getting severity score is 18.75 for 08-22-2023 result but original 08-18-2023 severity score was 11. Infogain changed the weight, making it more severe for 08-22-2023 result (18.75) for the same ontology …What's the scientific logic behind it? I need your help to understand this.."

Infogain never responded.

164.        August 23, 2023 During the meeting, Dr. Jana again asked Infogain the scientific logic behind choosing the Volume to 50% and 25% for the others, Infogain's tech lead, Abdur told that there was no science, they just came up random numbers. Infogain was supposed to be expert in the field, they are outside contractors. Dr. Jana had to discover Infogain's mistake just applying his decade long Data Science knowledge without running the code since Infogain made it impossible to run Infogain's code; no Walmart members were able to run Infogain's code at that point of time. Anybody in Dr. Jana's position would find this humorous; this is not disrespectful. Dr. Jana wrote to Adrian,

"Basically, **anybody can come up with any numbers, we do not need any expert. Then I said politely, if you do not mind, can I say my grandma who is 100 years old and who does not have any data science experience, she can come up with some numbers and we can use it.**
We are doing data science; our aim is to use data science to solve problems so that Walmart can benefit out of it. We are building defect engine which will identify defects (things that does not work properly) If we do not follow right approach, the result will be wrong which is the case here and that's not for the best interest of Walmart. I believe some of Walmart's core principles "**Strive for Excellence**" and "**Act with Integrity**" are being violated. **It's not disrespecting the Individual, I raised the concern and that has never been addressed**."

165.   *(vii)*   **On or around September 12, 2023, Mr. Milbourne was fishing for evidence abusing his position to intimidate an analyst, a fresh college graduate who joined Dr. Jana's team just two months prior as a pretext for retaliation**.

166.   Mr. Milbourne hastily arranged a last-minute meeting with a former direct report who was an analyst [*name withheld for privacy*] of Dr. Jana, giving only a 15-minute notice, coercing the analyst to find out any flaws of Dr. Jana with an intent to retaliate. After that confidential call, the analyst called Dr. Jana expressing severe stress and a hostile work environment. During this confidential call, Adrian repeatedly questioned the analyst about Dr. Jana's conduct, including allegations of hindering Analyst's duties and writing emails on behalf of the Analyst. The analyst expressed distress and confusion post-call, affirming she had no issues working with Dr. Jana, and was puzzled by Adrian's line of questioning.

167.   Dr. Jana realized this is nothing but Adrian's act of retaliation effort, Dr. Jana decided to report this incident to Mrs. Bowman. The analyst testified to Mrs. Bowman:

> "one of the ask of that meeting was to keep it confidential I don't know why but I mean …keep it confidential.. like to keep it private like super confidential… the problem with that assignment is like probably there is no solution in data science….there were a couple of questions like if some associate is blocking me from doing my job if some associate is scripting my emails …if anyone is blocking me or if anyone is telling me not to reply to emails… So, what is strange to me because I report to Dilip and Dilip reports to Adrian and if Adrian comes and asked me those questions it's like already very confusing because there is my manager in between and he is not in the conversation.. .I don't know obviously what's being going on with the leadership.. I'm obviously a recent grad… the confusion is like hey **I just joined the company like two three months ago and I am getting a question from a senior director level like this I don't know where this is going**."

168.        The intent of this intimidation was very clear, Walmart decided to terminate Dr. Jana within two weeks of this incident. A fresh college graduate who joined the company 2-3 months ago worried "I don't know where this is going".

169.    *(viii)    Walmart's Ethics Investigation and Threat Investigation against Dr. Jana after Dr. Jana's Whistleblowing activities*

170.        Despite Dr. Jana followed the procedure described in Walmart's Code of Conduct as well as Walmart's internal document on how to report corruption/bribery, Walmart considered Dr. Jana as a threat and investigated and escalated Dr. Jana's conduct to Walmart's threat assessment team.

171.        Mr. Milbourne organized Team Appreciation lunch for Tuesday, Sept 5, 2023 from 12 pm to 1 pm at Bentonville, AR. On or around the 3rd week of August, 2023 Adrian asked all of his team members from Dallas office to attend the team Appreciation Lunch. Dr. Jana informed Mr. Milbourne that he would come to Bentonville, AR for the Team appreciation lunch and he will be at Bentonville for business purposes for the rest of that week. Dr Jana set up multiple in person meetings with Mr. Milbourne during his Bentonville, AR visit.

172.        However, Walmart claims at DOL that Dr. Jana's visit on Sept 5, 2023 to "Company headquarters unannounced, resulting in his referral to the Threat Management Team"

173.        Dr. Jana had extensive training on how to report fraud/corruption at Walmart:

"Suspected corruption or solicitation… shall be reported to one of the following Point of Contacts: 1. Global Ethics Hotline (800-WM-ETHIC (800-963-8442)); 2. A/C Compliance Department; 3. Global A/C Compliance Officer; 4. Walmart's Compliance and Ethics Office; 5. Any officer of the Company; or 6. Home Office Legal Department."

174.          While at the Walmart's Home Office at Bentonville, AR on or around Monday, September 4, 2023; Dr. Jana decided to report this possible corruption/fraud/bribery to one of the Walmart's Officers. Being a Director of Data Science, Dr. Jana was a Walmart Corporate Executive; Walmart gave him unrestricted access to restricted Executive suits.

175.          Dr. Jana used his access card and entered into Executive suits and talked to CEO's Secretary Paula Coil and asked for help on who to report to possible corruption. Paula Coil suggested talking to Matt Miner, Walmart's Global Compliance Officer.

176.          Walmart not only considered Dr. Jana a threat, but also opened an Ethics investigation against Dr. Jana after Dr. Jana's whistleblowing activities which was merely a pretext for retaliation because of Dr. Jana's protected activities. Dr. Jana was unaware of threat assessment or ethics investigation against him prior to his termination.

## G.       <u>PLAINTIFF REASONABLY BELIEVED FRAUD OCCURED</u>

## 177.        Subjective Belief:

Plaintiff repeats and realleges paragraphs 1 to 176 of this Complaint as if fully set forth herein for subjective belief that violation of antitrust laws and fraud against shareholders occurred

### 178.        The Objective Belief – Totality of the Circumstances Test

Any reasonable person in Dr. Jana's position would have believed that the employer's conduct constituted a violation of antitrust laws and fraud against shareholders.

179.        Kamil Bay, Leslie Platz, Olan Land (almost everybody in the team) knew that Infogain's contract was for eight weeks, everybody knew Infogain's poor performance; everybody knew Infogain should have been fired but recieved extension after extension and was about to get MVP for a few million dollars for six months with possibility of renewing years to come without any competition which was a fraud. Dr. Jana's belief was objectively reasonable because any experienced person in this field (Leslie Platz, Kamil Bay, Raymond) would have felt similar under the circumstances. Nobody except Dr. Jana reported this possible fraud to Walmart Compliance/Ethics/Supervisory Authority within Walmart. Everybody has a job at Walmart except Dr. Jana because the Respondent retaliated against Dr. Jana because of his protected activities.

180.        In one of the conversations with Kamil Bay, when Dr. Jana raised the concern about the increase of the BID price even before the start of the POC work:

> "And so far, this is what they promised us...those are the things that we considered before you and I signed off. And then what happened, they did not provide NAVIK. I don't know what the NAVIK is whether it exists or falsifying the information. And then this $180,000 got extension

to you, as you said, travel money another $100,000 the time needs to be extended another $100,000. So the our EDLC dollar also got extension. You know, I didn't know that. Did you know that that's going to happen before we sign off?

181.        Kamil Bay responded, quote, **"**No, but actually, I raised this..red flag....**"**

182.        Before winning the BID, Infogain promised Walmart to provide their proprietary Generative AI software, NAVIK. Even after end of POC, Infogain never provided NAVIK. Towards the end of the POC, when Dr. Jana asked Mr. Bay where's NAVIK? Mr. Bay replied, NAVIK is short form of "Not A Very Impressive Koala"

183.        In another conversation, when Dr. Jana expressed his concern of Infogain's failure to deliver POC deliverables, Kamil Bay acknowledged Infogain completed 0% of the first task, 0% second task and 50% on the third task that they promised to deliver before the end of POC. This demonstrates, it's not only Dr. Jana but also Kamil Bay, who is a Director of Analytics, agrees that Infogain did not deliver POC deliverables.

184.        Kamil Bay also mentioned Infogain's work as a patch work; Kamil Bay and Infogain created a hype surrounding Generative AI.

185.   Mr. Bay also acknowledged, Infogain is here because of politics which is clearly a fraud:

"so the only thing is more like about politics. If there was no politics…if I was ... hypothetically, if I was in Allie's shoes..I would just do the right thing, right? I would just slash.. But there is politics... I'm really worried like more to Ridhi. I am worried about her. I don't want to let her down....So I want this to succeed because of her, …I don't want to her look like oh my god, it didn't work.... that's a politics....honestly, but you're 100,000% Right. And there's just the only politics...Yeah, you're right."

186.        Despite acknowledging Infogain's failure to deliver POC deliverables, on the last week of September, 2023 Kamil Bay approved Infogain's poor Data Science related work which Dr. Jana

was supposed to sign off to pave the way for Infogain few million dollars of projects which was a criminal fraud (86 -103). Instead of raising the concern of fraud, Mr. Bay was aiding to commit crime. Is this an example of Walmart's version of "Act with Integrity" and "Strive for Excellence" which Walmart is very proud of?[6]

187.      Olan Land, a Sr. Manager, who has experience working at Walmart for more than 12 years and very experienced, was talking to Dr. Jana at Walmart's Home Office at Bentonville on September 26, 2023. At some point when Olan started talking about Infogain's performance and deliverables, he started whispering, probably he did not want anybody to listen as he was in the office as everybody is scared of the management. He even mentioned during the meeting that if he can get the result by himself why do we need Infogain? Olan Land also mentioned that he tried to convince Adrian multiple times, but Adrian ignored.

188.      Leslie Platz, a Director in Mrs. Mehra's team once told,

> "We re-got Infogain. I thought they were getting fired… And it feels my brain feels fuzzy like I can't do my best work…"

189.      Even if Leslie Platz knew that Infogain was going to be fired but was getting contracts continuously; she should have complained to Walmart Ethics for fraud; but she did not.

190.      On multiple occasions, Dr. Jana declined to sign off Infogain's poor work; in each case Dr. Jana provided a clear scientific explanation why he was unable to sign off. Dr. Jana's decade long experience as a Data Science leader is sufficient enough to substantiate objective belief that fraud occurred.

---

[6] https://www.walmartethics.com/content/walmartethics/en_us/code-of-conduct.html

## H.  CAUSAL  CONNECTION  BETWEEN  THE  PROTECTED  ACTIVITY  AND  THE ADVERSE ACTION

191.         Dr. Jana's protected whistleblowing activity was a contributing factor in the employer's adverse action of dismissal of Dr. Jana on October 19, 2023, within few weeks after reporting the possible fraud to the supervisory authorities at Walmart over Dr. Jana; it has nothing to do with Dr. Jana's performance or insubordination.

192.         Dr. Jana enjoyed stellar performance reviews at Walmart.   Dr. Jana's performance reviews show Dr. Jana helped Walmart to save more than $250 million in GMV in fiscal year 2023, more than $125 million in GMV in fiscal year 2022 and more than $35 million in GMV in fiscal year 2021.

193.         Dr. Jana received no poor performance reviews nor insubordination reviews after August 8, 2023 the day Dr. Jana reported possible fraud to Allie Hazelwood, a person of Supervisory Authority over Dr. Jana till the firing date October 19, 2023.

194.         **Direct Evidence:**

Paragraphs 86-103 and 169-176 provides Direct Evidences of retaliation because of Dr. Jana's protected Whistleblowing activities.

195.         **Circumstantial Evidence:**

A contributing factor is any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision. Causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.  Walmart's knowledge of Dr. Jana's protected activity and close temporal proximity of termination sufficient enough to prove causation in this case that Dr. Jana's protected whistleblower activities were a contributing factor

for termination.

196.        **Additional Circumstantial Evidences**

- Walmart was so desperate to fire Dr. Jana that Walmart even utilized a hearsay statement (paragraph 84-85) during Dr. Jana's protected activities to fire Dr. Jana

- Mrs. Mehra canceled a one-on-one meeting with Dr. Jana with some excuses for 4-5 times during Sept-Oct, 2023; at the end the meeting did not happen before firing. Dr. Jana's whistleblowing activity was around alleged violation by Mrs. Mehra.

- Walmart's attitude towards Dr. Jana changed after his protected activity. During the Bentonville visit Sept 25-Sept 28, 2023; Dr Jana tried to make an appointment with Mrs. Mehra but failed. However, Mrs Mehra spent more than hours for one of Dr. Jana's direct report, an analyst, who reports to Dr. Jana and took her for lunch

- Employer's explanation of termination to DOL without a single substantiated evidence

## IV.   <u>FIRST CAUSE OF ACTION: CAARA</u>

197.      Plaintiff repeats and realleges paragraphs 1 through 196 of this Complaint as if fully set

forth herein. Plaintiff meets the *prima-facie*: (a) Plaintiff engaged in protected activity or conduct under

Criminal Antitrust Anti-Retaliation Act ("CAARA"), 15 U.S.C. §7a-3(b)(2)(A), (b) Defendant had

actual or constructive knowledge of this protected activity; (c) Plaintiff suffered an adverse personnel

action; (d) Plaintiff's protected activity was a contributing factor in the defendant's decision to take an

adverse personnel action against him.

## V.   <u>SECOND CAUSE OF ACTION: SOX</u>

198.      Plaintiff repeats and realleges paragraphs 1 through 196 of this Complaint as if fully set

forth herein. Plaintiff meets the *prima-facie*, (a) Plaintiff engaged in protected activity or conduct under

Sarbanes-Oxley Act ("SOX"), 18 U.S.C. §1514A, (b) Defendant had actual or constructive knowledge

of this protected activity; (c) Plaintiff suffered an adverse personnel action; (d) Plaintiff's protected

activity was a contributing factor in the defendant's decision to take an adverse personnel action against

him.

199.    As a result of defendant's unlawful, egregious conduct, plaintiff has suffered, is suffering, and

will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress,

humiliation, and other compensable damages until this Court grants relief.

## VI.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Dr. Jana respectfully prays defendant Walmart Inc be summoned to appear and answer herein, and that upon a final hearing of the cause, judgement be entered for Dr. Jana against defendant Walmart Inc

(1)     Declaring that the acts and practices complained of herein violate CAARA and SOX.

(2)     Enjoining and permanently restraining these violations of SOX and CAARA

(3)     Directing defendant to pay plaintiff back pay including lost wages (Base, Bonus, Restricted Stock Options) and benefits that would have been paid from the date of the retaliation until the trial date;

(4)     Directing defendant to pay plaintiff Front Pay (Base, Bonus, Restricted Stock Options, retirement contribution, Medical Contribution, Social Security contribution etc) until retirement age;

(5)     Directing defendant to pay plaintiff uncapped compensatory damages, including damages for loss of earning potential, emotional distress, humiliation, and pain and suffering

(6)     Directing defendant to pay plaintiff uncapped Punitive Damages

(7)     Granting plaintiff, a tax enhancement award to offset adverse tax consequences associated with a lump sum award of damages; and

(8)     Granting such other and further relief as the Court deems necessary and proper

## VII.   DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated:   Allen, TX

August 5, 2024                              Respectfully Submitted,

DILIP JANA, Plaintiff
*Pro Se*
Telephone : 318-243-9743
Email: janadilip@gmail.com
800 Fairlawn St, Allen, TX, 75002