# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | | |
|---|---|---|
| *In the Matter of:* | § | **Civil Action No.  4:24-cv-698-SDJ-KPJ** |
| | § | |
| DILIP JANA, | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | **PLAINTIFF DEMANDS A** |
| | § | **TRIAL BY JURY** |
| WALMART, INC, | § | |
| *Defendant* | § | |
| | § | |



# PLAINTIFF'S  FIRST AMENDED  COMPLAINT

## TO THE HONORABLE JUDGE OF THE SAID COURT:

COMES NOW Dr. Dilip Jana ("Dr. Jana", "Plaintiff"), an ex-Director of Data Science employee at

WALMART, INC. ("Defendant", "Respondent", "Walmart"), files this first amended Complaint and

Jury Demand against Defendant as follows.

# I.    NATURE OF ACTION

1.      Dr. Jana, an Indian immigrant and permanent resident in the United States, is a Data Science

leader with over a decade of data science experience in the US Corporate as well as at the European

Organization for Nuclear Research (CERN), Geneva, Switzerland. In March 2020, Dr. Jana joined

Walmart as a Principal Data Scientist at Walmart's Global Tech organization; working from Walmart's

Tech Hub at 603 Munger Avenue, Dallas, TX, 75202.  In April 2023, Dr. Jana was promoted to

Director of Data Science, an Executive level position at Walmart, reporting to a different manager. Dr. Jana had a consistent history of making impactful contributions during his tenure at Walmart. Dr. Jana had an excellent performance review at Walmart including but not limited to saving Walmart more than $250 million in gross merchandise value ("GMV") for Fiscal Year 2023. Dr. Jana submitted a patent at the US Patent Office on or around March-April 2023.

2.      During August – September 2023 Dr. Jana reported fraud, corruption, embezzlement which Dr. Jana reasonably believed broke federal laws, regulations, and rules designed to prevent fraud against the shareholder, to prevent violation of US Antitrust laws repeatedly to person of Supervisory Authority at Walmart over Dr. Jana and to the US Department of Justice ("DOJ").

3.      In response to Dr. Jana's efforts to address his concerns about Walmart's violation of Federal Antitrust Laws and violations of Federal laws relating to fraud against shareholders, his managers (Supervisory Authority) were dismissive and hostile towards him. Dr. Jana had no choice but to escalate his concerns to the Walmart Ethics/Compliance team ("WM Ethics"). In addition to raising concerns about violation of federal laws and misconduct that Dr. Jana believed violated federal laws, Dr. Jana also complained about the retaliation he faced due to his protected activities.

4.      Based on Dr. Jana's allegation, WM Ethics investigated possible fraud/crime related to violation of antitrust laws and Federal laws relating to fraud against shareholders and later closed the Walmart Ethics investigation on September 27, 2023 and within one week, on October 4, 2023 Walmart decided to dismiss Dr. Jana. Treating Dr. Jana, who was a Walmart Corporate Executive, as a threat, WM Ethics escalated a threat assessment against Dr. Jana to Walmart's to Walmart's Threat Management group. Records show Walmart also opened an Ethics investigation against Dr. Jana after Dr. Jana's whistleblowing activities which was merely a pretext for retaliation because of Dr. Jana's

protected activities. Dr. Jana was unaware of threat assessment or ethics investigation against him prior to his termination. After fishing for additional supporting documents for underperformance and insubordination, which is merely a pretext for retaliation because of Dr. Jana's protected activities, finally dismissed him officially on October 19, 2023.

5.      Plaintiff brings this action to remedy **whistleblower retaliation** for his protected activities under Criminal Antitrust Anti-Retaliation Act ("CAARA"), 15 U.S.C. §7a-3 and the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. §1514A (to protect employees in publicly traded companies against retaliation in fraud cases), seeking redress for Defendant's retaliatory employment practices.

6.      Plaintiff engaged in protected activities under SOX and CAARA, Walmart knew of plaintiff's protected activities, plaintiff suffered an adverse personnel action and plaintiff's protected activity was a contributing factor for adverse personnel action against him.

7.      There is no other lawsuit against Walmart pending in any Federal/State Court for the same adverse action (Dismissal on October 19, 2023) that Dr. Jana suffered.

8.      This whistleblower case under statute CAARA is the first Antitrust Whistleblower protection claim in the United States in the US Federal District Court, thanks to President Donald Trump who made it as a law in December 23, 2020 "which prohibits employers from retaliating against certain individuals who report criminal antitrust violations"[1]

9.      The plaintiff seeks declaratory and injunctive relief, back pay, front pay, uncapped compensatory and punitive damages, reasonable attorney's fees and cost of this action, pre- and post- judgment interest, and other appropriate relief pursuant to CAARA and SOX.

---

[1] https://www.justice.gov/opa/pr/justice-department-applauds-passage-criminal-antitrust-anti-retaliation-act

## II.   PARTIES, JURISDICTION AND VENUE
(Page Number 4 - 6, Paragraph Number 10 - 22)

10.   Walmart Inc. (NYSE: WMT) is an omnichannel retailer with more than 10,500 stores and numerous eCommerce websites in 19 countries with headquarters based out of Bentonville, AR in the United States. Walmart's revenue for fiscal year 2024 was $648 billion, Walmart employs approximately 2.1 million associates worldwide. Walmart is an employer in the United States within the meaning of 15 U.S.C. § 7a-3 and is a company within the meaning of 18 U.S.C. § 1514A in that it is a company with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l) and is required to file reports under Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)).

11.   Dr. Jana is a resident of Allen, Texas. At the time of his protected activities, he was an employee of Walmart and worked exclusively from Walmart's Dallas Tech Hub at 603 Munger Ave, Dallas, TX, 75202. Dr. Jana is a covered individual within the meaning of 15 U.S.C. § 7a-3 and was an employee within the meaning of 18 U.S.C. § 1514A.

12.   On or around January 3, 2024, Dr. Jana filed a timely (~75 days after the termination) Complaint with the United States Department of Labor's ("DOL") Occupational Safety and Health Administration ("OSHA") alleging that Dr. Jana was discharged on October 19, 2023 after reporting alleged violations of antitrust rules and federal laws against shareholders to the supervisory authority over Dr. Jana at Walmart and the US Department of Justice ("DOJ"), a violation of the employee protection provisions of the Criminal Antitrust Anti-Retaliation Act ("CAARA") 15 U.S.C. §7a-3 and the Sarbanes-Oxley

Act ("SOX"),  18 U.S.C. §1514A, and the implementing regulations at 29 C.F.R. Part 1980. OSHA

case number was: 301028782.

13.     February 28, 2024: Walmart declined OSHA investigator's request to produce any documents

which were relevant to this case. On February 29, 2024 OSHA investigator informed Dr. Jana:

> "I received – as expected – an email from Walmart earlier today relating the following: Walmart
> will not be providing any additional documentation at this time…"

14.     OSHA Region VI was offering an Expedited Case Processing ("ECP") option to allow

Whistleblower to request OSHA terminate its investigation and issue a determination on Dr. Jana's

complaint if the case had been pending with OSHA for more than 30 or 60 days, depending on the

statute.

15.     March 4, 2024: More than 60 days after initial complaint to OSHA, Dr. Jana requested

OSHA to terminate their investigation under the OSHA ECP program and requested OSHA's

findings.

16.     March 5, 2024:  OSHA Regional Supervisory Investigator (RSI) dismissed the Dr. Jana's
case:
> "Complainant has requested OSHA to terminate its investigation and issue a determination
> based on the information gathered thus far in its investigation; OSHA is unable to conclude
> if there is reasonable cause to believe a violation of the statutes has occurred. Consequently,
> this complaint is dismissed."

17.     March 5, 2024:  after OSHA dismissed Dr. Jana's claim, Dr. Jana appealed OSHA's dismissal

to the United States Department of Labor's Office of Administrative Law Judges ("OALJ") without

wasting a single day and OALJ docketed the case on March 5, 2024 with OALJ Case Number: 2024-

CAR-00004.

18.     June 14, 2024: Walmart requested Honorable Judge Christine Hilleren-Wilkins at OALJ to

dismiss Dr. Jana's claim:

> "**REQUEST FOR MORE DEFINITE STATEMENT…**This has gone on long enough, and Respondent respectfully asks the Court in the interests of justice and the parties, to dismiss the Complaint… dismiss the Complaint for failure to state a claim and for avoidance of further waste of judicial resources"

19.     July 23, 2024: Honorable Judge Christine Hilleren-Wilkins, instead of dismissing the Complaint, ordered a trial date in February 2025 in the event Dr. Jana does not exercise his foregoing right to proceed the case in federal district court:

> "In the event that Complainant does not exercise the foregoing right to proceed in federal district court, the Formal Hearing in this matter will be conducted on February 5-7, 2025 at 9:30 a.m.."

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

20.     As of August 5, 2024, more than 210 days have passed since the filing of the Complaint to OSHA, the US DOL has not issued a final decision in this case and Dr. Jana acted in good faith, all administrative remedies have been exhausted. Accordingly, pursuant to 15 U.S.C. § 7a-3 (CAARA) and 18 U.S.C. §1514A (SOX), Dr. Jana's right to "kick-out" the case to federal court accrued after 180 days from the date Dr. Jana filed complaint with OSHA and Dr. Jana is entitled to seek ***de novo*** review of his claim in this Federal District Court.

21.     This Court has jurisdiction over plaintiff's CAARA and SOX claims under  28 U.S.C. §1331 because those claims arise under federal law.

22.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because Walmart has a Corporate Office in Dallas, TX. In addition, the venue is proper as many of Dr. Jana's protected activities constituting federal law violations happened in the Dallas, TX area and Dr. Jana is a resident at Allen in the State of Texas.

### III. FACTUAL ALLEGATIONS
(Page Number 7 - 64, Paragraph Number 23 - 216)

#### A. Walmart's Background
(Page Number 7 - 8, Paragraph Number 23 - 28)

23.     Walmart has over 2.5 million employees globally

24.     Walmart is subject to numerous laws, rules, and regulations that prohibit fraud, embezzlement, money-laundering, economic sanctions, and other types of corruption and crimes. Those laws, designed to prevent corruption, to stop fraud against shareholders, and to ensure an accurate financial picture. Include the Securities Exchange Act; Foreign Corrupt Practices Act ("FCPA") etc.

25.     The Security and Exchange Commission ("SEC") also enacted rules and regulations in furtherance of the United States anti-fraud, anti-corruption, anti-money laundering to prevent fraud and corruption and to ensure accurate picture of a company's finances, including mandates to implement internal controls and to maintain accurate books and records.

26.     The Antitrust division of the US DOJ promotes economic competition through enforcing and providing guidance on antitrust laws and principles.

27.     Walmart has a history of violating such laws, rules and regulations. For example, in 2019 after a decade-long investigation, Walmart settled with the DOJ and SEC for FCPA violation. This is just one of those examples:

> "Walmart has entered into a global settlement with the U.S. Department of Justice (DOJ) and the Securities and Exchange Commission (SEC) that resolves a more than seven-year investigation into the company's compliance with the U.S. Foreign Corrupt Practices Act (FCPA)…, Walmart has agreed to a combined payment of **$282.7 million**….Over the past

seven years, Walmart spent **more than $900 million** on FCPA inquiries and investigations, its Global Compliance Program and organizational enhancements."[2]

28.    After a settlement with the DOJ in 2019 for FCPA violation, Walmart hired multiple high-profile Compliance officers (Matt Miner, Jelahn Stewart, etc.) from the US DOJ.

29.    Jelahn Stewart was one of the Walmart Ethics/Compliance officers to whom Dr. Jana blew the whistle for possible fraud to shareholders, antitrust law violations, corruption, bribery, embezzlement, FCPA violations on or around Sept 4, 2023 and within four few weeks Dr. Jana's dismissal decision was taken on October 4, 2023.

## B. Dr. Jana's Academic/Professional Background and Tenure at Walmart
(Page Number 8 - 11, Paragraph Number 30 - 41)

30.    Dr. Jana has a MS degree in Physics and one PhD degree in Nuclear and Particle Physics from University of Oklahoma. While working in the ATLAS Collaboration at the European Organization for Nuclear Research ("CERN"), Dr. Jana was one of the authors for the experimental Higgs boson discovery (popularly known as "God Particle") that led to the 2013 Physics Nobel prize given to theoreticians who predicted the possible existence of the Higgs boson in 1964.

31. While Dr. Jana was working at Neiman Marcus, one of the Walmart recruiters reached out to Dr. Jana on or around December 2019 for a Principal Data Scientist position at Walmart. Dr. Jana successfully completed all the interviews in January-February of 2020 and finally joined Walmart on March 2, 2020 as a Principal Data Scientist reporting to Jonathan Sidhu.

32.    Dr. Jana had a very successful career at Walmart. During his tenure at Walmart, Dr. Jana

---

[2]https://corporate.walmart.com/news/2019/06/20/walmart-reaches-agreements-with-the-doj-and-the-sec-to-resolve-their-fcpa-investigations

demonstrated a consistent history of making impactful contributions for Walmart. Dr. Jana's Annual

reviews at Walmart show that he helped Walmart save $35 million in gross merchandise value

("GMV") for 2021 fiscal year, $125 million GMV for 2022 fiscal year, and more than $250 million

GMV for 2023 fiscal year. His supervisor wrote in his annual review:

> "The more junior members of the team respect the knowledge that Dilip brings to the table and
> Dilip is generous in sharing that knowledge....Dilip is outstanding technically in his data
> science, machine learning and statistical skills. He brings innovation to the team …He
> demonstrates the ability to lead by influence"

33.     Dr. Jana received numerous prizes (Bravo Awards, Teams Awards, etc.) from the Executive

Vice President of Walmart for his outstanding performance.

34. During the summer of 2022, Walmart took anonymous feedback about Dr. Jana with his colleagues

at Walmart which Walmart shared with Dr. Jana, here are few of those feedbacks:

- "Dilip is a brilliant data scientist, as borne out by his academic credentials, prior work
  experience at CERN, and now his work at Walmart. His facility with large data sets and
  complex models is significant.."
- "Dilip is a brilliant data scientist who is very focused on delivering actionable solutions for
  customers…I have noticed Dilip always caring about fellow data scientists.."
- "Sharp data science skills. We've had some sparse but good technical conversations on
  modeling techniques where it was obvious that Dilip is a good thought leader….At times when
  we have discussed past projects, I heard a dual focus on engineering excellence and business
  value."
- "Dilip had strategic thinking like developing a vision of the project.. He always try to
  understand the big picture of the project..how this project going to add value in team and
  Walmart itself..He always encourage people to lead the project and specifically never interfered
  between anyone's ways of working.…In Anomaly Detection project, there was a point where
  we get impatient about the outcome of the project. He was patient enough to give chance to the
  project and it turned out to be very impactful project.. He is nice and humble person to work
  with..He also supports diversity in the team"
- "He is easygoing and friendly. He has excellent rapport with the other data scientists who have
  been helping us. There is clearly a good system built on trust and respect between him and the
  other data scientists.. As a result of Dilip's interpersonal and management abilities, we were
  able to work quickly and efficiently which has accelerated our project's delivery date.. Dilip
  has a strong knowledge of data science tools but was very open and amenable to learning about
  our econometric tools. Dilip has been extremely patient and encouraging throughout the
  process.. One of the things I most appreciated about working with Dilip is that he takes a holistic

approach to the work.. Dilip immediately called out the link..how improvements in the associate experience might lead to a better customer experience"

35.    Despite all success, Dr. Jana's supervisor, Jonathan Sidhu, put him in Disciplinary Action

("DA") in a Category RED-3 in November 7, 2022 for a duration of one year ending October 31, 2023

when Jonathan Sidhu, who has no data science background, was threatened by Dr. Jana's raise as an

undisputed data science leader, and Dr. Jana's protected activity related to employee rights. Dr. Jana

complained to Walmart's Ethics Department and Walmart Human Resource ("HR") about this DA.

After the investigation, Walmart HR forced Jonathan Sidhu to **rescind** the DA on January 12, 2023

36.    On or around December 5, 2022, Dr. Jana filed a complaint against Walmart for this unlawful

DA at the National Labor Relation Board ("NLRB")[3], a federal agency at the DOL. In 2023 Dr. Jana

participated and co-operated in NLRB's investigation for Coercive Rules and Concerted Activities

(Retaliation, Discharge, Discipline). Dr. Jana's termination happened during the NLRB investigation:

> "It is illegal for an employer or union to retaliate against employees for filing charges or participating in NLRB investigation or proceedings."[4]

37.    Around the last week of February, 2023, Dr. Jana applied for two Director of Data Science roles

within Walmart, one position was within Walmart's Retail Intelligence group, the other position was

in the Solution Design Team. The hiring manager at the Solution Design team was Mr. Milbourne ("Mr.

Milbourne") and Mr. Milbourne reports to Mrs. Mehra ("Mrs. Mehra"), the Vice President.

38.    On or around Wednesday, March 8, 2023, Dr. Jana had a technical interview with Mr.

---

[3]  https://www.nlrb.gov/case/16-CA-308476

[4]https://www.nlrb.gov/about-nlrb/rights-we-protect/the-law/employees/how-to-enforce-your-rights-
0#:~:text=It%20is%20illegal%20for%20an,be%20awarded%20appropriate%20remedi
al%20relief.

Milbourne's team and on or around Thursday, March 9, 2023 Dr. Jana had an interview with Mrs. Mehra. On Friday, March 10, 2023, Adrian offered Dr. Jana the Director of Data Science position. Mr. Milbourne also offered Dr. Jana to work from Walmart's Dallas Tech hub location despite the original position being for the Bentonville, AR location at Walmart's headquarters. Dr. Jana had been working from the Dallas office since March 2020. Dr. Jana accepted the offer.

39.     Jonathan Sidhu and Adrian came to an agreement that Dr. Jana will start working with Adrian's team starting around the 3rd week of March, 2023 with 10% of his time and would gradually transition to Adrian's team fully by 2nd week of April 2023. Dr. Jana officially joined Adrian's team on April 8, 2023.

40.     Around the middle of March 2023, Mr. Milbourne informed Dr. Jana that they are in the middle of the vendor selection process for Data Science related work. Kamil Bay (Director of Analytics) provided sample data for all competing vendors; Kamil Bay was leading the vendor selection. Adrian asked Dr. Jana to help to select the vendor. Dr. Jana participated in the vendor selection process and provided feedback during March 15, 2023 to April 11, 2023.

41     Kamil Bay ("Mr. Bay") was a Director of Analytics, reporting to Mr. Milbourne. On or around May 19, 2023, during one of the conversations with Mrs. Mehra, she mentioned to Dr. Jana that Mr. Bay and Mrs. Mehra worked together at Sam's Club and when Mrs. Mehra became the Vice President at Walmart, she brought Kamil to her team.

## C.  Violation of Antitrust Laws and Fraud against Shareholders
(Page Number 12 - 16, Paragraph Number 42 - 61)

42.      Dr. Jana participated in the vendor selection process in Adrian's team on or around the 3rd week of March 2023. There were five competing vendors: Deloitte/Google (Deloitte and Google partnered together, both US based), Infogain (India based), MuSigma (India based), Cognizant (US Based), Tredence (India based).

43.      On March 28, 2023 (before officially joining Mr. Milbourne's team on April 8, 2023), Dr. Jana attended an evaluation presentation by Deloitte/Google and Infogain. The initial project, a Proof of Concept ("POC"), was scheduled for 8 weeks, with bid prices of $300,000 and $180,000 respectively. Dr. Jana was the only Data Science leader and Subject Matter Expert (SME) in Mr. Milbourne and Mrs. Mehra's team, with all vendor communication handled by Mr. Milbourne, Mr. Bay and Mrs. Mehra.

44.      On March 28, 2023, Dr. Jana compared Deloitte/Google and Infogain, favoring the former. Dr. Jana expressed concerns about Infogain's credibility during a chat with Kamil Bay. Here is the from Teams chat related to Infogain that Dr. Jana sent to Mr. Bay.

> "I do not see strong data scientists' presence..I see why they are so cheap!...That's bad, we will not get quality of work. We will get good power points, sales slide"

45.      On 03-29-2023, Mrs. Mehra visited the Dallas office where Adrian informed Dr. Jana that Mrs. Mehra wanted to meet him. Dr. Jana, who had recently received a job offer as Director of Data Science in Mrs. Mehra's team, was excited. During the meeting, Mrs. Mehra praised Infogain repeatedly, which raised suspicions for Dr. Jana as they were in the midst of vendor selection process with other reputable vendors like Google/Deloitte. Dr. Jana discreetly recorded the conversation at Walmart's Dallas, TX office with his full consent.

"if it was my personal business, I do like Infogain more, not because of just the cost but I think they understand the problem better...I know Deloitte, because they are consultants, they will deliver something. If you think about POC, get Infogain and then you can use our internal intelligence...My ask to you can you look at industry journals and Gartners ..to see like is if Infogain has credibility in the market."

46.     Mrs. Mehra showed early interest in Infogain before all vendor presentations were completed. She assigned Dr. Jana to verify Infogain's credibility, using her position to influence vendor selection. Dr. Jana found a project awarded to Infogain in a different field, not related to Data Science, and shared with Kamil Bay. Dr. Jana met the Infogain Vice President, Veera, in person multiple times as part of his job duties. Veera mentioned using a sourcer (mediator) during the vendor selection for the POC. Mrs. Mehra met privately with Infogain well before the vendor selection.

47.     In the first week of April, 2023 Kamil Bay developed a vendor evaluation numbering system. Dr. Jana questioned its fairness to all vendors, as it seemed biased towards Infogain. On April 11, 2023 Infogain won the POC contract, which unfairly eliminated very competent US based vendors like Deloitte/Google.

48.     This is Antitrust procurement fraud with unlawful manipulation of a procurement process to obtain an unfair advantage during the procurement process, after eliminating the most competent vendors like Google/Deloitte who participated in the bidding process.

49.     The Statement of Work ("SOW"), the contract between Infogain and Walmart, which was drafted after Infogain won the bid sometimes in middle-end of April, 2023 the clearly stated:

"Total fees under this SOW must not exceed $189, 520. Any fees exceeding $189, 520 must be pre-approved in writing by Walmart in the form of a Project Change Request. The cost includes Travel & Logistics charges"

50.     Infogain proposed an increase in BID amount to $270K for their presence in Bentonville even before starting the work. Kamil Bay, who was communicating with Infogain, on April 11, 2023, asked infogain,

---

> "I'm somewhat confused. The RFP I got shows 180. Is the 180 POC, and 270 MVP? Is there a typo?"

Infogain raised BID price several times due to time extensions, travel, and logistics costs. POC bid price reached nearly 1 million dollars, much higher than Deloitte/Google's initial bid. Infogain misrepresented their BID to unfairly eliminate the other vendors with approval from Mrs. Mehra, suggesting violation of antitrust laws.

51.     Infogain initially proposed $180,000 for the POC project with 4 on-site members and 5 in India. But during the POC in June-August 2023, they had only 1-2 on-site members and 20+ in India for the same project, suggesting fraud. Dr. Jana asked Greg Cathey, Sr Vice president, a Supervisory Authority over Dr. Jana,

"…are they being compensated properly…I think this may be a violation of few federal labor laws."

52.     SOW had a clause,

> "The tenure of the POC will initially be 8 weeks and Walmart will update if the tenure needs to be extended a month prior to the contract completion. This engagement will be completed on or before July 21, 2023. SOW end date will be January 31, 2024."

53.     An interesting point is, the SOW end date was January 31, 2024, which was kept more than 6 months after the completion of POC. Vendors come with a specific project for a specific time period. SOW end date was extended intentionally to continue fraudulent activities.

54.     As part of his job duties, Dr. Jana came to know that after POC ended, SOW agreements were extended without proper documentation: sometimes for one week, sometimes for one month, sometimes no extension of SOW but Infogain was still working. Infogain was getting delayed payments, even Veera mentioned, Infogain was running credit. Dr. Jana came to know from Veera of Infogain that there are many instances where SOW was signed backdated after Infogain completed some work. Vendors and Walmart should sign the SOW first, then vendors should start the work. This

---

demonstrates the manipulation of account bookkeeping for a publicly traded company which is a shareholder fraud.

55.     Before winning the bid, On March 28, 2023 Infogain presented, "Leverage NAVIK Signal NLP Algorithms" to "Determine Size and Trends of Defects". The SOW had guidelines for the use of Infogain's proprietary software called "NAVIK". SOW documents states,

> "Consultant will use a combination of custom build components and Consultant's NAVIK AI components…Consultant grants Walmart a limited, worldwide grant to use NAVIK"

56.      Even after multiple repeated requests, Infogain never provided NAVIK software to Walmart even after the completion of POC. This is a textbook style of fraud, Infogain did not deliver deliverables as defined in the POC. Despite failing to deliver committed results, Mrs. Mehra and Mr. Milbourne artificially created short due dates and vague projects to award Infogain a few million dollars for the next 6 months with the possibility to renew those contracts for years to come, extending their fraudulent behavior.

57.     Infogain failed to provide NAVIK software to Walmart despite completing POC, engaging in textbook style fraud by not delivering promised results. Mrs. Mehra and Mr. Milbourne made efforts to extend fraudulent behavior by awarding Infogain with vague projects contracts and no competition contract worth millions for six months with option to renew.

58.      Infogain used their fake NAVIK software to win bids falsely and failed to deliver results. Mr. Bay confirmed Infogain completed 0% for the first two projects and 50% for the third project at the end of POC.

59.     Walmart was trying to build a "Defect Engine" and Mr. Milbourne advertised for Vendor participation which is commonly known as RFP:

"Identifying, tracking and solving defects is critical for any organization's sustainable success…Problem that negatively impacts member, customer, and/or associate experience"

60.     In the 2023 fiscal year, Walmart generated $82 billion in sales from e-commerce globally, representing approximately 13% of total revenues; Walmart store contributed to approximately 87% of the revenue. In the same fiscal year 2023, Dr. Jana worked on defect detection (anomaly detection) for Walmart's US e-commerce business and Dr. Jana's annual review that Walmart provided showed that Dr. Jana helped Walmart to save more than $250 million-dollar GMV in fiscal year 2023. The defect detection project that vendor Infogain was working on was related to store defects. With over 4,500 Walmart stores in the US, the inability to identify critical defects can lead to significant financial losses. Misidentifying or failing to detect critical defects could result in billions of dollars in lost revenue and wasted resources annually.

61.     June 28, 2023:  Dr. Jana identified a significant defect in a Sam's Club store in Plano, Texas while Dr. Jana was visiting the store: the electrical systems in refrigerator sections were non-functional, leading to potential loss of sales and food waste. Timely identifying those defects will save billions of dollars. Dr. Jana sent a few text messages and videos to Mr. Milburne to demonstrate the severity of the problem. Mr. Milbourne's response highlighted the severity of the issue, indicating a substantial economic impact:

"That's crazy! Never seen anything like that! ..A lot of lost sales for sure"

## D.    PLAINTIFF'S  PROTECTED  WHISTLEBLOWER  ACTIVITIES
### (Page Number 17 - 22, Paragraph Number 62 - 80)

62.    August 8, 2023: Dr. Jana reported possible fraud to **SVP Allie Hazelwood**, a Person of

Supervisory Authority over Dr. Jana at Walmart (Chain of Command: Greg Cathey→Allie

Hazelwood → Mrs. Mehra → Mr. Milbourne → Dr. Jana):

> "It has come to my attention that vendor (Infogain) selection was done in an unethical manner, providing projects to vendor despite their very poor performance."

63.     Allie Hazelwood called Dr. Jana on the same day multiple times. During the call, Dr. Jana

informed Allie Hazelwood how Mr. Bay created a scoring system to favor Infogain during the vendor

selection process to eliminate very competent US Vendors like Deloitte/Google, Cognizant. how

Infogain raised the bid price after winning the bid for the same work even before starting the work and

how the management (Mrs. Mehra and Mr. Milbourne) was trying to give the next big project (MVP)

to Infogain, despite Infogain's poor performance and how the vendors SOW and payment related to

account bookkeeping for a publicly traded company was manipulated. On many occasions, the SOW

was signed after the work was done; which should have been the other way around.

64.    On or around August 14, 2023 Dr. Jana reported possible fraud to Shawn Cohen, Human

Resource Vice President (HR VP), a Person of Supervisory Authority over Dr. Jana at Walmart:

> "we are in a verge of big corruption….concern I have is procurement fraud, bid rigging, bid suppression and misrepresentation of low cost to get the POC for the vendor. And this is all orchestrated by VP Ridhi Mehra and I have documented. I have documented this incident from March 28 until last week."

65.     The Complaint was so severe and specific enough that Shawn Cohen escalated to the Walmart Ethics/Compliance team and Walmart legal and Walmart ethics opened a case following Dr. Jana's complaint. Shawn Cohen said:

> "..What I'll need to do is partner with our ethics department because of the claims you've raised. need to investigate the claims around you said bid rigging procurement fraud, bit suppression and misrepresentation of the cost of the proof of concept. So I need, I need to connect with our ethics team to launch an investigation into those concerns."

66.     On or around September 4, 2023, in a closed-door meeting with Jelahn Stewart who is a Vice President of WM Ethics, a person of Supervisory Authority over Dr. Jana, Dr. Jana informed in great detail possible violations of Antitrust Laws in particular procurement fraud, possible fraud in Corporate Responsibility for Financial Reports, possible fraud in internal control of issuers for financial reporting, possible fraud to Shareholders and possible fraud under Foreign Corrupt Practices Act (FCPA) as the vendor Infogain was based out of India which is a foreign country and the complaint was possible embezzlement involving Infogain and a Walmart US employee Vice President Mrs. Mehra. Jelahn Stewart instructed Dr. Jana to provide evidence to Monica Hall, a Sr. Manager who reports to Lori Chumbler (Sr. Director of Global Ethics), Lori reports to Jelahn Stewart.

67.     On 09-08-2023 Monica Hall and Dr. Jana had conversations about the allegations and Monica Hall's access to Dr. Jana's confidential files. Following the conversations and accessing confidential files that Dr. Jana provided, Monica Hall acknowledged she had clear understanding of the allegations and escalated to "Significant Case Team" within Walmart Legal Department to investigate. Dr Jana shared his Walmart one drive folder with Monica Hall which included various documents to substantiate Dr. Jana's allegations of procurement fraud, bid rigging, possible fraud to shareholders. FCPA violations etc., here are few quotes that Dr. Jana shared:

"Infogain portrayed of a false image that they are cheaper during the bidding process, later they increased the price because of whatever the reason is for the same job. I believe it is a textbook style of procurement fraud during the contract negotiation phase as Infogain mis-represented cost during negotiations and Google/Deloitte was unfairly eliminated..And all of these are intentionally supported by Ridhi Mehra which I believe violates Federal Antitrust Law. Once Infogain won the bid, Infogain not only increased the price, but also making desperate effort to get more projects despite poor performance due to Ridhi Mehra's favoritism.."

68.   Here is another exact quote from one of the documents that Dr. Jana sent to Walmart Ethics Department through Monica Hall on or around September 8, 2023, the same document was sent to Department of Justice (DOJ) on September 27, 2023 as well, RM refers to Mrs. Mehra:

"RM's India visit (first week of July 2023) right after signing the contract with Infogain who she favorably selected is suspicious for suspected embezzlement, bribery/corruption. I do not need to provide evidence as defined by Department of Justice/FBI. In good faith, I believe it may be related to suspected embezzlement, bribery/corruption..Infogain is an India based IT company which operates in the US, RM was/is an Indian citizen (I do not know her current citizenship status) and RM works in the US; therefore; U.S. Foreign Corrupt Practices Act (FCRA/fcpa-guide-2020_final.pdf,   https://www.justice.gov/criminal-fraud/file/1292051),   I believe, may be applies in this case. I am aiding lines from page #4 of  U.S. Foreign Corrupt Practices Act, "Foreign bribery is a scourge that must be eradicated. It undermines the rule of law, empowers authoritarian rulers, distorts free and fair markets, disadvantages honest and ethical companies, and threatens national security and sustainable development. This updated Guide is meant not only to summarize the product of the dedicated and hardworking individuals who combat foreign bribery as part of their work for the U.S. government, but also to help companies, practitioners, and the public— many of whom find themselves on the front lines of this fight—prevent corruption in the first instance…I am aiding you from page #35 of U.S. Foreign Corrupt Practices Act, "Under federal law, individuals or companies that aid or abet a crime including an FCPA violation are as guilty as if they had directly committed the offence themselves.""

69.   On September 27, 2023 Monica Hall informed Dr. Jana that Walmart Ethics closed the Investigation and Walmart decided to terminate Dr. Jana around October 3-4, 2023, within one week after the completion of the Ethics Investigation.

70.     On September 27, 2023 after Walmart Ethics closed the investigation, Dr. Jana reported to the

Department of Justice, a US Federal Agency, for possible corruption, bribes, embezzlement and

violation of other federal laws.

71.     On August 22, 2023 Dr. Jana declined to sign off Infogain's work to Mr. Milbourne, a Person

of Supervisory Authority over Dr. Jana at Walmart after completion of POC. Dr. Jana clearly stated

Infogain's poor work:

     "poor quality of work...when it comes to data science, I cannot sign off"

because Dr. Jana reasonably believed doing so would constitute criminal fraud.

72.     Thursday August 24, 2023 at 12:10:17 AM:  Dr. Jana declined to approve Infogain's work; Mr.

Milbourne (supervisory authority) was cced in that email because Dr. Jana reasonably believed doing

so would constitute a criminal fraud,

     "I can not approve any result if I can't validate"

73.     Friday, September 15, 2023 at 1:44 AM: Dr Jana wrote Mr. Milbourne when Mr. Milbourne

gave just 25 hours to respond to his email about extra resources Dr. Jana needs for his team so that

Adrian can allocate those resources to Infogain for vague and undefined projects for the next six

months, worth a few million dollars without any further competition. Dr. Jana declined to provide that

information to Mr. Milbourne; because Dr. Jana reasonably believed doing so would constitute criminal

fraud for an undefined project. Here is some of the lines from that email:

> "....Both Kamil and I have expressed serious concern about the competency of Infogain. I am
> not confident engaging Infogain given the experience we had during the POC. But I believe the
> assumption here is to engage Infogain. It's very difficult to estimate FTW based on Infogain's
> headcount. They had 20+ people during the POC, but only few data scientists.....I requested
> you to clarify some of the tasks yesterday at 11:25 am, 26 minutes after your email(10:59 AM).
> I have not received anything response from you, it won't be possible to respond by noon

today..You are ready to give the project to Infogain despite their poor performance..You are planning to give the project to Infogain for next 6 months. It's a very tough decision I have to make. I need to get the complete picture of who's the vendor, quality of their data scientists, $ amount etc… This is what Infogain promised before getting the POC. We are working on Generative Al with LLM Models. Infogain promised they have proprietary software NAVIK, we should be able to use it: After end of the POC, I asked where is NAVIK?"

74.     Kamil Bay responded referring to NAVIK:

"Infogain finally revealed NAVIK!!! It stands for "Not a Very Impressive Koala."

Then Kamil Bay sent a picture of Koala and making it funny:

"This is NAVIK..There you go, now we finally know what it is" (EXHIBIT 12)

75.     Wednesday October 4, 2023 at 12:01 AM: Dr Jana escalated to Mr. Milbourne, Mrs. Mehra

(Supervisory Authority over Dr. Jana) and Wendy Bowman ("Mrs. Bowman"), HR People Partner

when Kamil Bay was approving Infogain's data science related work which Dr. Jana was supposed to

sign off on because Dr. Jana reasonably believed doing so would constitute a criminal fraud. Infogain

manipulated and falsified POC results and Kamil approved it illegally to pave the way for Infogain to

get a few million dollars of projects (EXHIBIT 9).

"I believe Kamil is approving Infogain's work unethically, I need your attention. I'll be happy to explain my findings"

76.     Friday October 6, 2023: Dr. Jana reported fraud to Greg Cathey (Sr. Vice President) a Person

of Supervisory Authority over Dr. Jana at Walmart. Dr. Jana wrote to SVP Greg Cathey:

"I am sending it because of the sensitivity of the timings and efforts of awarding MVP to Infogain despite their poor performance during the POC....trying to get MVP for 6 month (~$1.3M) ..what is the new SOW (Statement of Work) and are they being compensated properly? I am really concerned..I think this may be a violation of few federal labor laws… Adrian is retaliating and ruthless."

77.     Saturday October 7, 2023: Greg Cathey responded:

"We are holding all work with Infogain per my request as we review your concerns. We will connect with you post findings of the review. As always, please do not hesitate to reach out if you have any questions or concerns.

78.   Monday, October 9, 2023:  Dr. Jana wrote Mr. Milbourne and Mrs. Mehra both of them are

Supervisory Authority over Dr. Jana at Walmart:

"I believe POC has ended, please correct me if I am wrong. I see Infogain is still working, can I get the updated SOW?... @Ridhi Mehra this is urgent. Did we extend the POC? If we did not extend the POC and if the POC ended, and Infogain is still working, are they being fairly compensated for their post POC work? Please advise. If this is not the case, Infogain should not have access to Walmart resources after POC is ended. In case you have updated SOW, I want to have a look."

79.    October 16, 2023:  Dr. Jana reported to Walmart Ethics Department about Mr. Milbourne's

retaliation effort and how he was aiding Mrs. Mehra for bid rigging, procurement fraud and violation

of other federal laws and helping Ridhi to give a long-term project to vendor Infogain despite

Infogain's failure to provide POC deliverables.

80.   On Monday October 16, 2023 at 8:33 AM Dr. Jana informed HR Mrs. Bowman that he

submitted formal ethics complaint against Mr. Milbourne and Mrs. Bowman acknowledged:

"Thank you for letting me know" (EXHIBIT 4)

### E.    WALMART INVESTIGATED BASED ON PLAINTIFF'S ALLEGATION
(Page Number 23 - 24, Paragraph Number 81 - 86)

81.    Employer, Walmart, knew Dr. Jana's Whistleblowing activities: paragraphs 62-80.

82.    In addition to Shawn Cohen's acknowledgement of investigation (paragraph 65) based on Dr. Jana's specific allegations for corruption/fraud/embezzlement, it was alarming enough that Walmart Ethics/Compliance investigated related to Antitrust laws (protected under CAARA), fraud against shareholders (protected under SOX) which Monica Hall acknowledged on or around September 8, 2023 when Dr. Jana was sharing files with her to substantiate his allegations:

> "We have a clear understanding of what the allegations are…....I'll share this information to our legal investigation team who actually conduct the investigation…I'm gonna reach back to our Significant Case Team…this right here is very helpful…we should be receiving more over the weekend or next week…you spent a lot of time on this..I do not want you to consume all of your time focusing on this..I realize how important it is..I really appreciate all of your work and your efforts to get this information to us..I do not want you to spend, ya know, overwhelm yourself..take care of your family, yourself as well"

83.    On September 27, 2023 Monica Hall from Walmart Ethics/Compliance informed Dr. Jana that Walmart Ethics closed the Ethics Investigation based on Dr. Jana's allegations:

> "Thank you for speaking up and allowing us to investigate this situation. We have reviewed this matter, and the case is now closed. Out of respect for the individual, and to protect privacy and confidentiality, we cannot release specific details about the outcome. We partnered with the business, as needed, to address these concerns."

84.    To be protected under SOX, the employee's report need not "definitively and specifically" relate to one of the listed categories of fraud or securities violations in Section 806 of SOX.  The focus is "on the plaintiff's state of mind rather than on the defendant's conduct." *Guyden v. Aetna, Inc.*, 544 F.3d 376, 384 (2d Cir. 2008).

85.    This is the first Whistleblowing protection under statute CAARA after President Trump made it a law in December 2020; there is no reference available.

86.     Dr. Jana is protected for his whistleblowing activities under CAARA and SOX for Walmart's retaliatory dismissal of Dr. Jana.

### F. DEFENDANT RETALIATES AND TERMINATES PLAINTIFF'S EMPLOYMENT
(Page Number 24 - 53, Paragraph Number 87 - 188)

87.     Dr. Jana's whistleblowing activities (paragraph 62-80) lasted for about a month during August 8-Sept 5, 2023. Dr. Jana shared documents with the Walmart Ethics/Compliance team during the second and third week of September, 2023. Walmart started retaliating from the third week of August, 2023 by using threats, demotion, changing roles and responsibilities abruptly, harassment, intimidating Dr. Jana's direct reports to coerce any information out of them, and created a hostile work environment so that if Dr. Jana speaks up that could be utilized against Dr. Jana for termination purposes. On September 27, 2023 Walmart closed the Walmart Ethics Complaint related to Dr. Jana's whistleblowing activities and within the next week, on October 4, 2023 Walmart decided to terminate Dr. Jana. Dr. Jana was officially terminated on October 19, 2023.


88.     This case was pending at DOL (OSHA and OALJ) for the last seven months. Walmart provided their Position Statement to OSHA on February 21, 2024 and Answers to the Complaint to OALJ on June 14, 2024.  During the termination call on October 19, 2023, Walmart stated that the cause for the termination was insubordination and underperformance. Walmart disclosed the termination recommendation email (EXHIBIT 1, EXHIBIT 2) to OSHA and OALJ without providing any attachment which had the real reason for the termination. In the last seven months, Walmart could not provide a single substantiated evidence of underperformance or insubordination. Following few sections will expose Walmart's true retaliation, manipulating and falsifying statements; altering evidence etc.

*(i)*  **A hearsay statement taken presumably during/after Dr. Jana's protected whistleblowing activity was utilized to fire Dr. Jana**

89.        After 8 months of withholding, Walmart finally submitted an internal email (EXHIBIT 2) dated October 4, 2023, 6:08 PM to the DOL on June 14, 2024 that shows that a hearsay statement (attachment "…Concerns Raised") was a basis of Dr. Jana's firing (though the content of the attachment of that email is still in withholding). On or around May 19, 2023, way before Dr. Jana's whistleblower activities, Dr. Jana brought attention to the poor performance of that associate [*name withheld for privacy*], who was hired by Mr. Milbourne but was working with Dr. Jana at that time. In July 2023, before Dr. Jana's whistleblowing activities, Dr. Jana informed Mr Milbourne that the associate often produced incorrect results and claimed someone else's work as his own. Mr. Milbourne and Mrs. Mehra advised Dr. Jana to show empathy and grace to that associate. Dr. Jana rated the associate two levels below his position, which Mr. Milbourne and Mrs. Mehra knew, indicating he was a business analyst rather than a data scientist. In July 2023, Dr. Jana provided detailed feedback, showing the associate was an "Opportunity Associate" with the lowest performance rating at Walmart. Walmart utilized that associate's feedback to fire Dr. Jana. A hearsay statement was used as a basis of termination during and after Dr Jana's whistleblowing activities, which is merely used as a pretext for retaliation: 1)Walmart never told Dr. Jana what concern this associate  raised, 2) Walmart never told Dr. Jana who raised the concern 3) Walmart never asked Dr. Jana to give any form of input on the alleged misconduct. 4) Walmart never bought any of this information up to Dr. Jana as to his alleged wrongful act or the surrounding details.

*(ii)* <u>Direct Evidence of Retaliation</u>: **One of Dr. Jana's whistleblowing activities was utilized to fire Dr. Jana**

90.         Dr. Jana's whistleblowing activity on October 4, 2023 at 12:01 AM where he escalated Kamil Bay's "[Unethical]: Sign off for POC" (**EXHIBIT 9**) for the purpose of awarding Infogain few million-dollar project illegally to his supervisory authority, Mr. Milbourne and Mrs Mehra were utilized as a reason for Dr. Jana's termination.  On Thursday, October 5, 2023 at 3:52 PM Mrs. Mehra responded to Dr. Jana related to "[Unethical]: Sign off for POC":

> "Dilip, Just a quick note to let you know that I have read all your emails and they have been appropriately escalated"

91.    The 'appropriately escalated' was the termination decision as seen in EXHIBIT 2,"[Unethical]: Sign off for POC" was an attachment which is a **Direct evidence of retaliation.**

92.         After multiple extensions, Infogain's POC ended at the end of September 2023. Walmart organized three days of workshops during Sept 26-28, 2023 for Infogain's proposed plan for next 6 months of work ("MVP") which was worth a few million; despite Infogain's failure to deliver POC deliverables and a Mr. Milbourne's vague project plan for MVP. Infogain flew a few people from India to attend that workshop at Bentonville, AR. Infogain needed POC sign off before the end of September, 2023 from Walmart in order to get the next 6 months of work; with a potential multi-year extension without any more competition with other vendors because all competent vendors were already eliminated unfairly during the early stage of the procurement process; which Dr. Jana reasonably believed it was a fraud.

93.    During the workshop, Dr. Jana declined to approve Infogain's Data Science related work as Data Science falls under Dr. Jana, he cited Infogain's failure to deliver POC deliverables as the reason

for why he was not able to sign off.

94.     Kamil Bay (who is a Director of Data Analytics) approved Infogain's Data Science related work. Dr. Jana being the Director of Data Science, Dr. Jana's approval was needed for Infogain's data science related work. Infigain falsely claimed it as completed and erroneous; and Kamil Bay approved it illegally so that Infogain could get a few million dollars project with possibility of future extensions. Infogain's final presentation after the completion of POC was:

> "84% of the defects identified …actionable.."
> "Top actionable defects identified for ….WFM"

95.     Infogain showed the results were 84% actionable, but Dr. Jana worked tirelessly with his team as well as Leslie Platz, Olan Land, Raymond Pritchett and the analyst in his team for the last few months and Dr. Jana knew by heart the accuracy was around 50-55% and in some cases accuracy was even ~10%. In a zoom call, Olan Land and Raymond Pritchett and other team members agreed accuracy was 50-55% and Kamil Bay approved Infogain's result where Infogain claimed 84% accuracy to pave the way for Infogain to win few million dollars of project without any competition with other vendors because other vendors have been eliminated illegally at the very stage of the procurement process! This is a textbook style fraud.

96.     Infogain falsely claimed they had identified defects for WFP (Workforce Planning)/WFM(Workforce Management): "Top actionable defects identified for ….WFM", since Kamil Bay approved Infogain's work related to WFP, which Kamil Bay did not work on; Dr Jana asked Kamil Bay, "I did not see any result for WFM throughout the deck. I believe result for WFM is falsely claimed." For WFP, Dr. Jana himself worked and Infogain could not even define a single defect in WFP. For example, on August 9, 2023 Dr. Jana asked Infogain:

"How frequently a store uses more than 30%, we have ~5K stores in US, what's their distribution looks like? What % of stores are defect based on this definition?"

97.     Infogain never responded; Mr. Milbourne appeared as a rescuer; Mr. Milbourne instead asked Infogain to pause the WFP related work.

98.     Kamil Bay did not work on WFP but still Kamil Bay approved Infogain's claim for completing POC deliverables. Dr. Jana requested Kamil Bay to respond to his email where Dr. Jana raised these issues and how Kamil Bay approved those results (EXHIBIT 9); Kamil Bay never responded.

99.     In another conversation with Kamil Bay, Dr. Jana asked Kamil Bay, what was the most important defect Infogain found, Kamil Bay responded,

Infogain's top defect is "UNKNOWN", indicating a lack of specificity and effectiveness in identifying defects; Infogain was retained to identify defects.

100.     Here's is the summary of some of Kamil Bay's activities during the POC (evidence will be submitted at the Court at a later time) related to vendor Infogain:

- Kamil Bay created a numbering system to favor Infogain to eliminate very competent US Vendors like Google/Deloitte

- Kamil Bay's own acknowledgement, Infogain completed 0% on the first project, 0% second project and 50% of the third project after the POC; still Kamil Bay approved Infogain's POC results

- Kamil Bay made fun of Infogain's proprietary NLP software, called NAVIK which they promised before winning the BID to provide Walmart but during the entire POC after repeated requests, Infogain never disclosed what NAVIK was. When Dr. Jana asked

where's NAVIK? Kamil Bay responded, NAVIK stands for "Not A Very Impressive Koala" and Kamil Bay sent a humorous Koala picture.

- Infogain is here because of politics and there is a negative consequence that we were facing, Kamil Bay also mentioned Infogain's work as a patch work

- Kamil Bay agreed with Dr. Jana is "100,000% Right" it was not worth spending time with Infogain

- Because of the incompetence of Infogain's 30+ team members most of them based out of India, Kamil Bay suggested Dr. Jana to have "Speed Date" with Infogain's members and select appropriate data scientists as needed; change them if needed

- Kamil Bay acknowledged if he was in Allie's position (Allie is Mrs. Mehra's supervisor), "I was in Allie's shoes…I would just do the right thing.. I would just slash" indicating the entire management is corrupt

- Infogain manipulated their POC result and Kamil Bay supported. Kamil Bay's own words:

    "**It's basically like faking until you make it..**Fake until.. little bit too far, which I don't feel extremely comfortable…And Kyle's team is supporting"

- When Dr. Jana raised the concern of Infogain's changing BID price after winning the bid even before start of the work for the same project, Kamil Bay said,

    **"**No, but actually, I raised this..red flag...."

- For Kamil Bay, pleasing supervisors is more important than upholding Federal laws and upholding Walmart's own Code of Conduct ("Act with Integrity" and "Strive for Excellence"). This is what Kamil Bay said:

    "I'm really worried like more to Ridhi. I am worried about her. I don't want to let her down....So I want this to succeed because of her"

---

And this is the way to be successful at Walmart: pleasing supervisors[5].

101.    As Dr. Jana mentioned before, Kamil Bay and Ridhi Mehra worked together at Sam's Club and Ridhi Mehra hired Kamil Bay after she became the Vice President; for a reason.

102.    On **Wednesday, October 4, at 12:01 AM** Dr. Jana reported Kamil Bay's unethical approval of Infogain's work to Mr. Milbourne and Mrs. Mehra both of whom were Supervisory Authority over Dr. Jana at Walmart (also cced to Mrs. Bowman) and offered to explain the basis of Dr. Jana's findings as Dr. Jana reasonably believed approving Infogain's manipulated and poor result would constitute a criminal fraud. Here is the email Dr. Jana wrote:

> "Adrian/Ridhi: I believe Kamil is approving Infogain's work unethically, I need your attention. I'll be happy to explain my findings."

103.    On Thursday, October 5, 2023 at 3:52 PM Mrs. Mehra responded to Dr. Jana's previous email:

> "Dilip, Just a quick note to let you know that I have read all your emails and they have been appropriately escalated"

104.    Any Supervisory Authority over Dr. Jana at Walmart **with non-retaliatory intent** would follow Walmart's own people-led propaganda and listening culture would make an effort to talk to Dr. Jana as Dr. Jana being the leader of Data Science raised a concern which in fact related to awarding a few million dollar project which is basically a fraud and give opportunity to Dr. Jana to present his evidence (Walmart's listening Culture- Servant Leadership and **people-led** propaganda) as Dr. Jana

---

[5] https://fortune.com/2024/06/04/walmart-ceo-doug-mcmillon-three-tips-for-success/

offered to explain his findings. Instead, Mrs. Mehra contacted Walmart Ethics and recommended Dr. Jana's termination within the next 24 hours.  Evidence will substantiate that team members showed the accuracy was around 50% and, in some cases, it was even ~10% but Mr. Bay approved Infogain's false claim of 84% accuracy.

105.    On June 14, 2024 after withholding for more than 8 months, Walmart submitted a document EXHIBIT 2 at the DOL which shows Dr. Jana's email (EXHIBIT 9 ) was utilized against Dr. Jana to fire him. Dr. Jana provided all Kamil Bay related (paragraph 86-103) audio/video evidence to WM Ethics during September 2023; evidence shows that same Walmart Ethics utilized Dr. Jana's October 4, 2023 at 12:01 AM email where he complained about possible crime Kamil Bay did by approving Infogain's result which was another whistleblowing activity; Walmart decided to fire Dr. Jana within 24 hours of this incident: this is a **Direct evidence of Retaliation** due to Dr. Jana's protected whistleblowing activities.

*(iii)*    **Walmart provided one of the reasons for the termination was Dr. Jana's meeting disruptions and disrespect to Vice President Mrs. Mehra after calling her a dictator**

106.    Walmart is misrepresenting the facts to mask the true reasons for retaliation. Dr. Jana neither disrupted the meeting nor called Mrs. Mehra a "dictator" during the meeting on October 2, 2023, Dr. Jana spoke up for self-defense when Adrian was demoting and disrespecting Dr. Jana in front of junior/senior team members in a team meeting by changing (demoting) Dr. Jana's roles and responsibilities (EXHIBIT 11).

     "LLM strategy transition – the LLM strategy will be transitioned to Kamil to lead.."

Despite Dr. Jana's repeated efforts since 09-15-2023 to understand the cause of the change of Dr. Jana's

responsibilities, Adrian ignored Dr. Jana.

107.      On September 15, 2023; Dr. Jana responded to Mr. Milbourne's email where Mr. Milbourne

first proposed that the LLM Strategy would be transitioning to Mr. Bay. Dr. Jana wrote,

> "I have already protested during the call yesterday during our 1:1. I am considering it as
> disrespectful and as an act of retaliation as LLM is purely data science topic and I am the
> Director of Data Science"

108.      Dr. Jana had a one-on-one meeting with Mrs. Mehra where Dr. Jana wanted to talk about all

these issues with Mrs. Mehra during Sept-October 2023 and asked for an hour's time. Mrs. Mehra gave

45 minutes of meeting time, but that meeting was canceled at least four times and that meeting never

happened before termination.

109.      Dr. Jana has the recording of that meeting, Dr. Jana never called Mehra "a dictator" during

the meeting. Dr. Jana asked her (***"Ridhi, one quick question for you"***) whether we are following the

leadership principle she laid out for the team in May 2023.  Dr. Jana also clearly explained what the

problem was.

> "…Ridhi, one quick question for you during the session the offsite meeting in May, you said
> this is people led.. If this people led or you are enforcing this to be everybody to follow, even if
> you don't agree. Because there are a lot of stuff.. it falls on the data science, Generative AI. I
> don't understand why this Kamil is getting there, despite the fact that this is data analytics team..
> I feel like we are enforcing a dictatorship here.. So then let's talk offline first before going to
> the general audience, because otherwise we have to say this is an authoritative regime or
> dictatorship that is imposing to follow you. What you said in the month of May that we are
> people-led, not manager-led."

110.      During the meeting on October 2, 2023 Ridhi said:
> "So Dilip, thank you for raising your concern. I know it's my understanding that the
> team has reviewed this internally at least three times. ...Okay, again, yes, so thank you
> for raising that. ....So Dilip, like I said, thank you for sharing your concern. ..let's take it
> offline and address it if you feel your point of view is not represented."

111.     The promised offline meeting never happened; Mrs. Mehra decided to terminate Dr. Jana within the next 48 hours of this incident; clearly substantiating retaliation due to Dr. Jana's protected whistleblowing activities.

**(iv)  Walmart provided the following answer at DOL as one of the reasons for Dr. Jana's termination, quoted in RED, was Dr. Jana's email to Mr. Milbourne.**

Jana makes the following comment—with font and color as represented—in response to Milbourne's assessment that a project is late:

Please READ from my previous email, it's simple English, "I propose WFP use case updates and timelines- Due Sept 8ᵗʰ

### provided we get all the answers".

So **this is NOT LATE**…

Apart from belittling and insulting his supervisor by indicating that Milbourne does not understand "simple English," Jana provides no solutions or proposals—his expectation is that Milbourne, his supervisor, "provide[]. . . all the answers." (See Jana's Exhibit 5-S at pages 2-3). This behavior was emblematic of Jana's overall performance. Despite repeated efforts by his leadership to help Jana find a path to success, Jana refused to do so.

112.     Walmart not only quoting out of context but falsifying information that "Jana provides no solutions or proposals". Dr. Jana replied Mr. Milbourne's email (EXHIBIT 11) and Dr. Jana's entire email was in RED as he specifically mentioned, "My comments are RED". Dr. Jana wanted "provided we get all the answers" to be flashing RED to indicate that Dr. Jana understood Mr. Milbourne's retaliatory intent well in advance. Mr. Milbourne, a data science leader with Bible Divinity and Bible Theology degree from Baptist Bible College with absolutely no data science background with 17 years of experience at Walmart who started as an hourly associate, was trying to mask his retaliatory behavior. Dr. Jana, with more than decades of Data Science experience, was alerted early enough to document Mr. Milbourne's retaliation effort due to Dr. Jana's protected whistleblowing activities.

113.     During April-July 2023, prior to whistleblowing activities in August-September 2023, Dr. Jana

produced results for this Workforce Planning Project ("WFP") based on available data. Adrian Milbourne was so happy with Dr. Jana's WFP related work, he even compared Dr. Jana's result with the Star wars movie and he said he never saw those kinds of results. Mrs Mehra and Mr. Milbourne approved an additional bonus for Dr. Jana in June 2023.

114.     Here is the sequence of events that demonstrates that Dr. Jana provided solutions/proposals which Walmart denies, there was no data to perform the task, it was set up for Dr. Jana's failure. Mr. Milbourne retaliated because of Dr. Jana's protected activities. Adrian asked for the datasets …which, in an ideal Walmart, would be available. The reality was that no such datasets exist at Walmart. However, even though no data exists for the tasks assigned to Dr. Jana, it was destined to fail without supporting data, as Milbourne knew from the start.

115.     On Thursday, July 27, 2023 at 2:44 PM Dr. Jana wrote to Mr. Milbourne which demonstrates the necessity of appropriate data to perform the task and its unavailability; Dr. Jana provided solutions once we have the data:

> "..we need a master table as I mentioned before to identify top attributes that could impact a stores ability to use their hours efficiently and understand causal relationships among attributes. We have few tables related to workforce management, it will take at least few months to create a master table where all attributes and target variable (defect) will be in a single table to perform machine learning models and find causal relationships among attributes. Joining tables are very easy, but joining those tables in a meaningful way to add value is tricky, we need human intelligence and experienced people, like your input. Sometimes we do not have data for all events that happens at store operation that leads to consuming more/less data, that's what Adohree mentioned today… You are an expert on those things, I need your help. I have shared a ppt with you for Credit Default model, my finance business partner's engineering team took ~10 months to create … table from .. and .. table. Once we had the .. table, we utilized it for multiple projects. We had discussion with Adohree's team (they are the SMEs in Workforce Management data) today, they mentioned that they do not know any data sets that can tell us root cause of why store uses more/less hours. … If you know any data sets that will help us to perform this task, please let me know. I'll be happy to hear

your opinion/feedback, I need your help."

116.     Thursday, July 27, 2023 at 4:30 PM one of Dr. Jana's direct report Sandeep Golkonda wrote

an email to Adrian and Dr. Jana after meeting with WFP project data experts indicating that there was

no data to perform the task

> "..we had a quick meeting with Adhoree's team about the root cause for over/under
> utilization.….Currently there is no real-time data collected for finding exactly what the
> root cause is from their team."

117.     On August 8 2023 Dr. Jana's protected Whistleblower activities started

118.     On August 25, 2023 at 8:30 pm (after returning to Bentonville from Dallas office visit for

just 2-3 hours) Adrian wrote a very well drafted email recapping items which he never discussed with

Dr. Jana during the Dallas visit, indicating a documentation effort to use it to retaliate:

> "Data Access – leveraging Kamil is good if he has access. If he doesn't have, go to Data
> Foundations team access and let me know if we need to escalate when responses are
> delayed or latent"

119.     Dr. Jana made extraordinary efforts to meet WFP project experts and data experts to expose

Mr. Milbourne's retaliatory intent. In addition to meeting Adhoree's team who are WFP data experts,

Dr. Jana met Brandon Gardner, who worked on WFP projects for more than 15 years at Walmart,

multiple times. Dr. Jana also met Jeremy Arns of the Data Foundation Engineering team multiple times

who Adrian suggested meeting. Both Brandon Gardner and Jeremy Arns told Dr. Jana privately that

there was no data for that task.

120.     Monday, August 28, 2023: Dr. Jana met with Ketan Mudda as per Mr. Milbourne's directive.

121.     Tuesday, August 29, 2023 at 1:56:01 PM:  Dr. Jana emailed Mr. Milbourne asked for clarity

on WFP work and data availability.

> *"…I had a meeting with Ketan yesterday. We have lots of questions…you do not have time to meet this week. We need to have a discussion for clarity of the work and the data sets availability.I appreciate if you can explain what's the use case in WFP, what is Ketan's teams' roles and what's our team's role and if there is any intersection. The team has a concern that our work may not be presented to the management/Leah/or other meetings... **I propose WFP use case updates and timelines – Due Sept 8th provided we get all the answers.**"*
> [Highlighted for emphasis]

122.     This email clearly demonstrated Dr. Jana's pursuit of the necessary data and the need for "discussion for clarity of the work and the data sets availability" between Dr. Jana and Mr. Milbourne since we had already seen in July that there was no data for the task Mr. Milbourne assigned Dr. Jana to complete, and no alternatives suggested by Mr. Milbourne. Dr. Jana never said Mr. Milbourne "provide[]…all answers". Walmart is lying and misleading. Answers for the data set availability would be coming from the data engineering team, not from Mr. Milbourne, as Mr. Milbourne correctly mentioned, "go to Data Foundations team access". We will see Jeremy Arns's from the Data Foundation (Data Engineering Team) response in subsequent paragraphs. The task that was assigned (Data Engineering) to Dr. Jana was outside of his job role (Data Science).

123.     Tuesday, August 29, 2023 at 2:07 PM: Dr. Jana's direct report Sandeep Golkonda wrote to Adrian, ccing to Dr. Jana after meeting Ketan, whom Adrian asked Dr. Jana to meet.  Mr. Milbourne bore the responsibility of defining the project goals for his team; however, this email illustrates that the project details were very vague and never fully understood by Mr. Milbourne or the project participants.

"The below presentation is what Ketan,Sandeep Mahajan, Eshan's teams are working with 15+ team members. .from the last square you can tell that we are trying to identify the same thing and this square came into their diagram after our last call with Ketan.
These are some of the questions that are unanswered.
- What is the deliverable from our team cause we constantly are running into the wall for trying to define our role when we are talking to them

- We don't have the capacity to pace on a daily basis with 15+ Data Engineers and scientists working on it.
- If we just build WFP defects from our end, I don't think it would be consumed by them cause we are using the same data sources again.

    …Please help us find more clarity on our role and deliverables"

124.    On Tuesday, August 29, 2023 at 2:31 PM Dr. Jana wrote to Mr. Milbourne asking clarity on work but Adrian never responded:

    "Adrian, we need little bit more clarity on "Use Case Focus and Delivery – WFP""

125.    Dr. Jana directed Sandeep Golkonda to reach out to Data Foundation team, as suggested by Mr. Milbourne.

126.    Sept 5, 2023 at 2 PM:  Dr. Jana attended a team meeting in person at the Walmart's Corporate office at Bentonville, AR where all other team members were present. During the meeting Dr. Jana raised the issue of not having appropriate data for the WFP project that Mr. Milbourne assigned Dr. Jana to do, and that such data did not exist at Walmart; the assignment did not line up with the duties outlined in Dr. Jana's Director of Data Science job application that Mr. Milbourne posted. It appeared as though Adrian was trying to set Dr. Jana up for failure and threatened him in front of all team members.

127.    Adrian told Dr. Jana in front of all team members during a meeting on Sept 5, 2023:

    "... So I feel like...we're going down a rabbit hole that we don't need..I hear your concerns. I do..... I want you guys to see this as an opportunity, not as obstacle after obstacle, after obstacle… . But I wanna make clear to this broader team that you will own a specific piece of this strategy and if in any way you feel like you can't deliver it, then you need to let me know as early as possible. And that it won't be depended on Infogain because we're not gonna use them as a crutch. We're not gonna use them as an excuse to deliver this product to the organization, our customers are too valuable. Our associates are too valuable to make excuses for not delivering a product. And so I wanna make sure that we're clear on, on the expectation for me from the expectation from the organization as well… But what that doesn't mean is that, that's gonna be an inhibitor to

you getting your work done or you delivering on your portfolio to your portfolio….. I've never worked in an organization where I don't have data was the excuse never…"

128.     Dr. Jana realized this is nothing but an act of retaliation because of his protected whistleblowing activities. Dr. Jana then organized a meeting with Brandon Gardner who has more than 15 years of experience on the WFP project and data expert Jeremy Arns in VP Aaron Berg's team. Aaron reports to Allie Hazelwood and Aaron's team was responsible for providing information about data to all teams within Allie's organization.  Dr. Jana kept Mr. Milbourne involved in all those meetings during September 2023.

129.     Tuesday, September 5, 2023 at 3:43 PM: One of Dr. Jana's direct reports reached out to Jeremy Arns of Data Foundations ccing to Dr. Jana and Mr. Milbourne. However, Jeremy Arns did not respond until Sept 20, 2023.

130.     On Wednesday, September 6, 2023, Mr. Milbourne and Dr. Jana had one-on-one meeting at Bentonville, AR where Dr. Jana updated WFP related issues of not having appropriate data

131.     On Thursday, September 7, 2023, Mr. Milbourne, Dr. Jana and Sandeep Golkonda met Jeremy Arns and Brandon Gardner for WFP related data sets. During the meeting, Mr. Milbourne did not agree with Brandon Gardner of data sets unavailability, who had more than 15 years of experience in WFP projects.

132.     On Tuesday, September 12, 2023, Dr. Jana met Brandon Gardner via zoom to gather information on WFP related work since Brandon had more than 15 years of experience at WFP to expose Mr. Milbourne's retaliatory intent

133.     Thursday, Sept 14, 2023 at 4 PM:  Dr. Jana met Jeremy Arns via zoom for WFP data

134.        Thursday, Sept 14, 2023 at 4:30 PM:  Dr. Jana met Mr. Milbourne via zoom and

updated him about Dr. Jana's conversations with Jeremy, Adhore and Brandon that there was no

appropriate data to complete the task

135.        On Thursday, September 14, 2023 at 10:52 PM, Adrian wrote,

        "WFP Timelines/Activities – Late – Original Due Sept 8th';

While acknowledging, "As we discussed last week and this week" and he was looped into all

meetings which showed that there was no appropriate data available, still Mr. Milbourne wrote,

**"Late"** for documentation purposes in retaliation.

136.    Friday, September 15, 2023 at 1:12:53 AM:  Dr. Jana wrote to Mr. Milbourne (EXHIBIT  11):

> "Please READ from my previous email, it's simple English, "I propose WFP use case
> updates and timelines – Due Sept 8th **provided we get all the answers**".
> So this is NOT LATE. You were looped in throughout the process.. We talked with
> Brandon and Jeremy on Sept 7, 2023; you do not agree with anybody (see below). They
> told us very clearly data does not have all the components to find the root cause why
> some stores are taking more/less hours because lots of manual process are involved and
> those are not captured in the data. We did not receive any data from them. I talked to
> you on Thursday, Sept 7 when I was at home office, you asked to extend date after
> talking to Brandon and Jeremy. I asked Sandeep to extend the date, he did not probably
> extend…I talked to Brandon, he has 15 years of WFP experience, he sees the same
> problem that he saw 15 years ago, the difference between demand hours and actual hours
> and you want to solve it in few weeks. You and I talked today, and you said you would
> talk to Jeremy; let's get the data first. Once we get the data, there are multiple steps, it
> all depends on the data quality. There are data cleaning, Exploratory data analysis, and
> then any modeling activity."

137.        Brandon Gardner, who has 15 years of WFP project experience, acknowledged he sees the

same problem that he saw 15 years ago at Walmart, but Mr. Milbourne wanted Dr. Jana to solve the

problem in a few weeks; it was a trap to retaliate.

138.        Tuesday, September 19, 2023 11:30 AM: Dr. Jana again met Jeremy Arns, Rory and Adhoree

for WFP data; Dr. Jana was making every effort to document because Dr. Jana realized retaliation was

imminent.

139.     Wednesday, September 20, 2023 at 4:08 PM: Jeremy Arns responded to Sandeep

Golkonda's data request (EXHIBIT 10) and asked a few questions related to data requirements.

140.     Wednesday, September 20, 2023 at 10:21 PM: Dr. Jana got an opportunity to engage Mr.

Milbourne directly and Dr. Jana requested Mr. Milbourne to respond to Jeremy's questions:

> "@Adrian Milbourne can you please help!"

141.   Thursday, September 21, 2023 8:33 AM: Mr. Milbourne responded and asked about the need

for specific data sets to perform the job. Jeremy Arns will provide the data if it is available.

142.     Monday, September 25, 2023 at 2 PM: Dr. Jana organized a meeting between Sandeep

Golkonda, Mr. Milbourne, Ketan Mudda ("Ketan") and his supervisor, Eric Blabac ("Eric"). During

the meeting Eric told Mr. Milbourne that they are not interested to collaborate; which Dr. Jana's direct

report correctly stated on August 29, 2023. Eric suggested talking to Dr. Ehsan Nazarian ("Ehsan").

Before talking to Ketan, Mr Milbourne asked Dr. Jana to talk to Ehsan, Dr. Jana already talked to Ehsan

and Ehsan told Dr. Jana that they are not the right team to collaborate.  This meeting demonstrated that

Mr. Milbourne was using Dr. Jana's assignment as a means to terminate him as the task was not

supported or needed by any business entity and was therefore not of high priority to anyone. This

demonstrates Adrian's inability to lead a Data Science team where he cannot define a project or identify

a final product user. Data Science comes to solve the problem using machine learning/artificial

intelligence.

143.   Tuesday, October 3, 2023 at 8:23 AM: Jeremy Arns sent an Excel spreadsheet about the data

sources they had which showed that there was no data available that Adrian requested.

144.     Tuesday, October 3, 2023 at 11:30:38 AM: Dr. Jana took a screenshot of Mr. Milbourne's

desired WFP project-related datasets to ensure it was readable in an email and sent it back to Jeremy

---

and Adrian to make sure everybody was on the same page and then asked Adrian whether he agreed with Dr. Jana that there were no suitable datasets (datasets Adrian suggested) available. Adrian never responded; instead he decided to fire Dr. Jana within the next 24 hours. (EXHIBIT 10)

144.     Adrian's retaliatory intent was exposed after Jeremy Arns email showed that there was no data for the WFP project but Adrian assigned that work to Dr. Jana and threatened him on September 5, 2023 (paragraph 127):

**"I've never worked in an organization where I don't have data was the excuse never"**

*[Highlighted for emphasis]*

145.     Tuesday October 3, 2023 at 10:05 pm: Dr. Jana reported Adrian's retaliation to Mrs. Mehra, Adrian's supervisor and also cced to Mrs. Bowman (HR people partner) with a Subject line: "[Retaliation][Changing roles and responsibilities] WFP" where Dr. Jana explained in great detail how Adrian was retaliating. Record shows (EXHIBIT 2), this email was utilized to fire Dr. Jana.

146.     Tuesday October 3, 2023 at 11:37 pm: Dr. Jana reported Adrian's retaliation to Mrs. Mehra, Adrian's supervisor and also cc'ed to Mrs. Bowman with the Subject line:  "[Retaliation and Discrimination]: WFP" where Dr. Jana explained in great detail including mentioning, "I promise, I can give you data science results within 1-2 weeks after I get the data"  Record shows (EXHIBIT 2), this email was utilized to fire Dr. Jana.

147.     Walmart's internal documents show that Mrs. Bowman forwarded those emails to Walmart Ethics to add into an existing ethics complaint against Dr. Jana (Dr. Jana did not know of any ethics complaint against him prior to termination). The irony is that Dr. Jana complained about Adrian's

retaliation and Walmart Ethics utilized that complaint to fire Dr. Jana. This is the same Walmart Ethics to whom Dr. Jana blew the whistle for fraud four weeks ago.

*(v)*     **Walmart wrote in their answer to the DOL, "Despite repeated efforts by his leadership to help Jana find a path to success, Jana refused to do so."**

148.   As demonstrated by the evidence presented in this document, Dr. Jana never refused to obey Mr. Milbourne's directives; he instead "went the extra mile" to meet experts that exposed Mr. Milbourne's retaliatory intent because of Dr. Jana's protected activities.  Walmart needs to substantiate what so-called help his leadership offered him, given the fact that his leadership (both Mr. Milbourne and Mrs. Mehra) has no data science knowledge and they never discussed any technical aspect of Data Science. Data science involves complicated mathematics, statistics, artificial intelligence, machine learning and modeling (e.g. Large Language Models, Generative AI, etc.) all based on large amounts of data, hence the name ***Data*** science. Walmart did not provide a single substantiated evidence of "his leadership to help Jana find a path to success" and that Dr. Jana "refused to do so".

 *(vi)*     **Walmart stated one of Dr. Jana's comment on August 23, 2023 "My grandma could do it" was disrespectful to the vendor Infogain.."While constructive criticism is acceptable  and expected in any healthy collaborative business situation, personal attack is not" and it was one of the reasons for Dr. Jana's termination.**

149.      Records show that Vendor Infogain actually was disrespecting Dr. Jana on August 8, 2023 way before August 23, 2023. Infogain not only targeted to disrespect Dr. Jana but also targeted Dr. Jana's team members; multiple incidents happened where Infogain was disrespecting Dr. Jana's team members. Here are some of those documents for substantiation:

150.        Tuesday August 8, 2023: Dr. Jana informed SVP Allie Hazelwood (person of

Supervisory Authority) about feeling disrespected by vendors during meetings where Dr. Jana raised

concerns about Infogain's poor quality of work:

> "Vendors are disrespecting me in front of everybody when I asked questions, when I
> raised concerns on the quality of the work"

151.        Friday August 11, 202: Dr. Jana informed Mr. Milbourne that Infogain was

disrespecting him:

> "During Tuesday's meeting with Infogain, I was asking a question, Sudeep stopped me by
> saying, "Let me stop you here". I did not react, I kept quiet. Several of our associates reached
> out me after the meeting, they were asking me why Sudeep was treating me that way. Going
> forward, I'll be tracking Sudeep's behavior."

152.        Evidence shows that Dr. Jana made constructive criticism repeatedly when Infogain was

producing wrong results, and was not meeting POC expectation but was ignored by the vendor Infogain

as well as Mr. Milbourne; exactly opposite to what Walmart is claiming.

153.        The true reason for the termination was not this "My grandma could do it" comment, it

was used merely as a pretext to retaliate due to Dr. Jana's protected Whistleblowing activities.

154.        September 1, 2023: Dr. Jana mentioned to Mrs. Bowman about his innocuous

"My grandma could do it" comment and Dr. Jana gave her the context of that comment. Dr. Jana also

mentioned that in Nov 2022, Dr. Jana's previous Walmart supervisor put him in Disciplinary Action,

how HR was biased and how they took action against Dr. Jana. Within two months, Walmart had to

*rescind* that unlawful Disciplinary Action. Dr. Jana also provided its context so that in the event Mr.

Milbourne  took any adverse steps against because of that comment (using it as a pretext for retaliation)

that she would understand that context beforehand.

155.    Dr. Jana explained his innocuous "grandma" comment to Mr. Milbourne (on 09-15-2023) Dr.

Jana provided the context of that comment. Dr. Jana, in fact, demonstrated that Mr. Milbourne actually

was violating Walmart's Code of Conduct by blindly approving Infogain's wrong results but it was

used against Dr. Jana to fire him:

> "My intention wasn't to disrespect anybody. Walmart is a fortune 1 company and
> there was a process to select the right vendor. I raised my concern from day 1 when we
> were selecting Infogain. We are in a professional world; we are paying tons of money
> to vendor,Infogain, they at supposed to be expert in the field. Throughout the POC,
> Infogain did numerous mistakes and very poor quality of work that demonstrates
> Infogain is incompetent for this job."

> "On Friday, **08-18-2022** I asked the same question to Abdur from Infogain during our
> daily standup. I asked what's the science behind choosing the Volume to 50% and the
> 25% for the others. This is very critical since it calculates how severe Walmart's
> problems are (Please check attached email) Abdur said there's no science involved;
> they just assumed those numbers. I asked, if Infogain changes the number next day,
> which number to trust?..."

Financial impact of misidentifying defects, economic impact due to fraud, can be found in paragraph

60-61.

156.    Evidence shows that management, Mr. Milbourne and Mrs Mehra knew the most critical defects

based on their business experience; however, Infogain could not find a single critical defect during the

POC. When Dr. Jana asked Mr. Bay what was Infogain's top defect; Mr. Bay responded, "Unknown"

indicating Mr. Bay was also aligned with Dr. Jana that Infogain was not able to identify critical defects.

However, management, Mr. Milbourne and Mrs. Mehra were blindsided and approved all of Infogain's

results to pave the way for MVP project for the next 6 months, worth a few million dollars with the

possibility of extension without any fair competition; which Dr. Jana reasonably believed to be a crime.

157.  August 17, 2023: Sudeep Halder of Infogain wrote to Adrian Milbourne,
  "Hi Adrian, in the call at 9 am, Dilip mentioned that he is not aligned **with you and Ridhi** with
  the selection of ontologies..I think Dilip is making another point of selecting ontologies based

on criticality and not on volume. Dilip, are you aligned to what Adrian is suggesting otherwise please explain your POV."

Kamil Bay agreed with Dr. Jana and wrote to Sudeep Halder that criticality should be a key factor in determining which defects to address first, as it aligns with ensuring that core functionalities and high-impact issues are resolved promptly:

> "Sudip, we must add separate ontologies for wifi, baylor, xcover..**Ridhi** mentioned these many times..we will get questioned about already identified defects..please take advantage of these known defects"

158.   Dr. Jana replied to Sudeep Halder which shows very constructive criticism,
> "..higher volume themes may or may not have critical issues that Walmart needs to act immediately. I believe to derive top 15 themes we need to incorporate criticality or impact of issues instead of just looking at just higher volume issues..issues do not mean defect, we need to define what is defect..without including criticality or impact of the issue, I do not think we can define defect..and this work is related to defect engine",

159.   This clearly demonstrates Infogain's incompetency to define a defect and while Ridhi and

Adrian blind-sided Infogains inability to deliver POC deliverables and was making every efforts to

award Infogain few million dollars of projects which is a fraud and violation of Walmarts' own Code

of Conduct ('**Act with Integrity**' and '**Strive for Excellence**')

160.      Here is the sequence of events to substantiate that Walmart is misrepresenting the facts to

mask its retaliation:

161.      Friday, August 11, 2023 at 1:26 PM: Dr. Jana made very constructive criticism and showed

the root cause of Infogain's problems why they were not able to produce results. Dr Jana wrote that

email to Mr. Milbourne with a subject: "Root Cause of Infogain's problem" and Dr. Jana provided

codes the he developed to substantiate his findings:

> "I met them, based on my understanding I tried to help them, I got the impression that they were very confident. Here is an example: Issue was "Urgent Issue at Walmart Health Center" ..Infogain created lots of duplicates with multiple Level1 for a single ... If this joining is messed up, L3/L4 will be messed up too. I believe they didn't do sanity check before going to modeling stage."

162.        Thursday August 17, 2023 at 5:07 PM: Walmart's data has a severity column but Infogain

decided to produce their own version of severity score to define how critical the defects are.

However, their results were not matching with well-known defects. Dr. Jana made very constructive

criticism and tried to help Infogain to correct their mistakes:

> "..I am not confident presenting Severity Score, as I already expressed concern, this has never
> been verified. This does not include priority (criticality) that data has, I understand you derived
> this Severity but you did not substantiate the validity of the definition of Severity..Assuming
> these three criteria that you used to calculate derived Severity Score are all correct, but still I
> am having difficulty to understand how these three (# of Stores, Time to Resolve and
> Momentum) items were added given the fact that # of Stores has no unit, Time to Resolve has
> an unit in days and Momentum has an unit of ? (not defined here, I do not know). What
> weightage each individual items has towards Severity Score and what's the scientific logic
> behind it?"

163.        Friday August 18, 2023: Dr. Jana again asked Infogain:

> "what's the science behind choosing the Volume to 50% and 25% for the others"

with no answers from Infogain.

164.        08-18-2023 to 08-22-2023: Dr. Jana had multiple meetings with Infogain and Adrian.

On one occasion Dr. Jana did a white board session with Infogain for severity score

165.        August 23, 2023 at 2:45 pm Dr. Jana made very constructive criticism:

> "... data already has a column…which identifies the issue based on criticality. We have lots of
> issues, but not necessarily all issues are defect. We are trying to develop a defect engine, first
> we need to define what is a defect…Current result..failed to capture low volume but very
> sensitive issues. As an example, Kamil mentioned few times, our management knows wifi,
> baler, xcover are one of the major defects, they are very critical. I do not care what model …you
> use, bottom-line is we need to detect the defect correctly…at the end it does not matter if it does
> not detect defect..My recommendation would be to start something very simple just by using
> severity column that is already available in ..data and then validate it.. "

166.        Infogain manipulated the result, changing the severity/criticality score for the same issue

within a week. On 08-23-2023 Dr. Jana wrote:

"As of 08-22-2023, first Ontology …had a severity score of 6.25 out of 10. If I scale up for of 08-22-2023 result to compare result with 08-18-2023 result (make the same range 0-30), we are getting severity score is 18.75 for 08-22-2023 result but original 08-18-2023 severity score was 11. Infogain changed the weight, making it more severe for 08-22-2023 result (18.75) for the same ontology …What's the scientific logic behind it? I need your help to understand this.."

**Infogain never responded.**

167.     August 23, 2023: During the meeting, Dr. Jana again asked Infogain the scientific logic behind choosing the Volume to 50% and 25% for the others, Infogain's tech lead, Abdur, told that there was no science, they just came up with random numbers. Infogain was supposed to be expert in the field, they are outside contractors. Dr. Jana had to discover Infogain's mistake by just applying his decade long Data Science knowledge without running the code since Infogain made it impossible to run Infogain's code; no Walmart members were able to run Infogain's code at that point of time. Anybody in Dr. Jana's position would find this humorous; this is not disrespectful. Dr. Jana wrote to Adrian,

"Basically, **anybody can come up with any numbers, we do not need any expert. Then I said politely, if you do not mind, can I say my grandma who is 100 years old and who does not have any data science experience, she can come up with some numbers and we can use it.** We are doing data science; our aim is to use data science to solve problems so that Walmart can benefit out of it. We are building defect engine which will identify defects (things that does not work properly) If we do not follow right approach, the result will be wrong which is the case here and that's not for the best interest of Walmart. I believe some of Walmart's core principles "**Strive for Excellence**" and "**Act with Integrity**" are being violated**. It's not disrespecting the Individual, I raised the concern and that has never been addressed**."

*(vii)*     **On or around September 12, 2023, Mr. Milbourne was fishing for evidence abusing his position to intimidate an analyst, a fresh college graduate who joined Dr. Jana's team just two months prior as a pretext for retaliation**.

168.     Mr. Milbourne hastily arranged a last-minute meeting with a former direct report who was an analyst [*name withheld for privacy*] of Dr. Jana, giving only a 15-minute notice, coercing the

analyst to find out any flaws of Dr. Jana with an intent to retaliate. After that confidential call, the analyst called Dr. Jana expressing severe stress and a hostile work environment. During this confidential call, Adrian repeatedly questioned the analyst about Dr. Jana's conduct, including allegations of hindering Analyst's duties and writing emails on behalf of the Analyst. The analyst expressed distress and confusion post-call, affirming she had no issues working with Dr. Jana, and was puzzled by Adrian's line of questioning.

169.        Dr. Jana realized this was nothing but Adrian's act of retaliation effort, Dr. Jana decided to report this incident to Mrs. Bowman. During a call with Wendy Bowman on or around Sept 20, 2023 the analyst testified to Mrs. Bowman:

> "one of the ask of that meeting was to keep it confidential I don't know why but I mean …keep it confidential.. like to keep it private like super confidential… the problem with that assignment is like probably there is no solution in data science….there were a couple of questions like if some associate is blocking me from doing my job if some associate is scripting my emails …if anyone is blocking me or if anyone is telling me not to reply to emails… So, what is strange to me because I report to Dilip and Dilip reports to Adrian and if Adrian comes and asked me those questions it's like already very confusing because there is my manager in between and he is not in the conversation.. .I don't know obviously what's being going on with the leadership.. I'm obviously a recent grad… the confusion is like hey **I just joined the company like two three months ago and I am getting a question from a senior director level like this I don't know where this is going**.. because that's like very weird to me actually and also like for those assignments this does not make sense to me honestly and apparently it does not make sense to my manager as well. So if I'm I've been to some some task that my manager is not aligned with whom should I listen to that the problem right there is a reporting chain… that assignment itself probably need to be well defined and because it doesn't make sense to me.."

170.    09-12-2023: Dr. Jana reported the toxic and hostile work environment created by Adrian Milbourne to Wendy Bowman. In addition to paragraph 169, page 3 of EXHIBIT 11 substantiates Mr. Milbourne's work assignment to Dr. Jana's direct reports without talking to Dr. Jana. Wendy Bowman did not agree with Adrian's directly assigning work to people who reported to Dr. Jana without talking to him first but the same Wendy Bowman orchestrated firing of Dr. Jana within next two weeks!

Dr. Jana replied to Mr. Milbourne**,**

"You are assigning tasks to Megha without consulting me, where you and I are not at the same page; and Megha reports to me. One of Ridhi's guiding principles she presented in May was "We will be people-enabled", are we following it here?"

This is an example of Walmart's version of "people-led"[67].This is a misleading statement to shareholders.

171.        The intent of this intimidation was very clear, Walmart decided to terminate Dr. Jana within two weeks of this incident. A fresh college graduate who joined the company 2-3 months ago worried "I don't know where this is going".

*(viii)    Walmart's Ethics Investigation and Threat Investigation against Dr. Jana after Dr. Jana's Whistleblowing activities*

172.        Despite Dr. Jana following the procedure described in Walmart's Code of Conduct as well as Walmart's internal document on how to report corruption/bribery, Walmart considered Dr. Jana as a threat and investigated and escalated Dr. Jana's conduct to Walmart's threat assessment team as a pretext to retaliate.

173.     Dr. Jana had extensive training on how to report fraud/corruption at Walmart, an Walmart Internal document (Controlled - anti-corruption-procedures-v4.0.pdf) describes how to report corruption/fraud at Walmart:

"Suspected corruption or solicitation… shall be reported to one of the following Point of Contacts: 1. Global Ethics Hotline (800-WM-ETHIC (800-963-8442)); 2. A/C Compliance

---

[6]https://corporate.walmart.com/purpose/esgreport/a-message-from-our-chief-executive-officer
[7]https://corporate.walmart.com/news/2024/06/05/walmart-announces-2024-annual-shareholders-meeting-voting-results

Department; 3. Global A/C Compliance Officer; 4. Walmart's Compliance and Ethics Office;

5. Any officer of the Company; or 6. Home Office Legal Department."

174.        While at the Walmart's Home Office at Bentonville, AR on or around Monday,

September 4, 2023; Dr. Jana decided to report this possible corruption/fraud/bribery to one of the

Walmart's Officers. Being a Director of Data Science, Dr. Jana was a Walmart Corporate Executive;

Walmart gave him unrestricted access to restricted Executive suits.

175.        Dr. Jana used his access card and entered into Executive suits and talked to CEO's

Secretary Paula Coil and asked for help on who to report to possible corruption. Paula Coil suggested

talking to Matt Miner, Walmart's Global Compliance Officer.

176.        Walmart not only considered Dr. Jana a threat, but also opened an Ethics investigation

against Dr. Jana after Dr. Jana's whistleblowing activities which was merely a pretext for retaliation

because of Dr. Jana's protected activities. Dr. Jana was unaware of threat assessment or ethics

investigation against him prior to his termination.

*(ix)       To substantiate Dr. Jana's claimed "belligerent behavior" (which Walmart submitted at*

*OALJ on June 14, 2024) as pretext to retaliate, Walmart is implying a relationship/connection where*

*such a relationship does not exist.*

177.   This is what Walmart submitted at OALJ:

11.    Jana made the following comment—with font and color as represented—in response to Milbourne's assessment that a project was late:

> Please READ from my previous email, it's simple English, "I propose WFP use case updates and timelines- Due Sept 8th
>
> **provided we get all the answers**".
>
> So, **this is NOT LATE**…

(*Id.*).

12.    After insulting his supervisor and refusing to do the work assigned to him, Jana accused Milbourne of "retaliation" when Milbourne assigned work to Jana's peer, Kamil Bay. First by asking, "May I know why?" then, on October 5, 2023, with the inflammatory "If I do not receive a response by EOD Friday, Oct 6, 2023, I'll assume you agree that you are discriminating and retaliating as I mentioned before."  Milbourne and others had by this point not surprisingly reached the decision to terminate Jana for both his failure to perform his work and his increasingly belligerent behavior.

178.    This statement refers to two separate and distinct projects with completely different contexts. The first component is related to the WFP project where Dr. Jana demonstrated (paragraph 112-147) that his comments were neither intended to show disrespect nor insubordination to Mr. Milbourne, but rather it was implied by Walmart due to their retaliatory intent.

179.    In Walmart's response above in paragraph 12, this statement is implying it is related to the WFP project whereas in reality it is related to Mr Milbourne's retaliation due to Dr. Jana's protected activities, carried out by changing Dr. Jana's roles and responsibilities to a lesser role on a different project (EXHIBIT 11)

180.    September 14, 2023; Mr Milbourne wrote,

"LLM strategy transition – the LLM strategy will be transitioned to Kamil to lead.."

181.    On September 15, 2023 Dr. Jana responded to Mr Milbourne,

---

> "I have already protested during the call yesterday during ours 1:1. I am considering it as disrespectful and as an act of retaliation as LLM is purely data science topic and I am the Director of Data Science."

182.    After repeated requests during multiple one-on-one meetings, Mr. Milbourne never answered why he changed Dr. Jana's roles and responsibilities. Any supervisory authority with non-retaliatory intent would be happy to explain why the change of roles was necessary since Dr. Jana had already raised the issue "as an act of retaliation as LLM is purely data science topic" and he is "the Director of Data Science".

183.    October 3, 2023 at 9:39 am:  Dr. Jana asked Mr. Milbourne ( EXHIBIT 11 )
        "May I know why?"

   in response to Mr. Milbourne's
        "**LLM strategy transition** – the LLM strategy will be transitioned to Kamil to lead.."

184.    Dr. Jana was terminated on October 19, 2023. However, Walmart's internal document which Dr. Jana received on  February 21, 2024 shows that the termination decision was taken on Wednesday, October 4, 2023  (EXHIBIT 1 & EXHIBIT 2).

185,    Thursday, October 5, 2023 at 12:59 PM: Dr. Jana wrote to Mr. Milbourne regarding the question he asked on October 3, 2023 related to the LLM project:

> "Can you please respond to my email? If I do not receive a response by EOD Friday, Oct 6, 2023 I'll assume you agree that you are discriminating and retaliating as I mentioned before"

186,    Walmart considered this above response as "inflammatory" and justified the termination decision, but this document will substantiate that this email response was not inflammatory.  Instead, the email expressed Dr. Jana's frustration in receiving no response or explanations from Mr. Milbourne after repeated attempts to clarify why Dr. Jana was subject to these changing roles and responsibilities within two weeks after Dr. Jana exercised his protected whistleblower activities conveyed to Jolahan Stewart.

187.    In August 2023, Dr. Jana was one of the very few associates who was invited to participate in

Sam's Club CEO Chris Nicholas's listening session where associates are encouraged to raise the

issues they face; their supervisors were not present in the listening session so that associates could

freely raise concerns. During the meeting Dr. Jana asked CEO Chris Nicholas:

> "..If you watched the Oppenheimer movie, Oppenheimer had to go through a horrible situation
> even after successfully delivering a nuclear bomb, simply because of politics…If I look at
> Walmart, the majority of Data Science leaders have limited or no Data Science experience while
> they manage highly talented data scientists. I have a handful of examples where Data Science
> managers are here because of cronyism. I have seen retaliation and discrimination against it's
> best data scientists by the manager who had no data science experience simply to protect their
> own job. Though Walmart says Walmart does not tolerate retaliation, I have seen managers are
> still here after shamefully withdrawing Disciplinary action against one of the best data
> scientists. Therefore, **Walmart's Opendoor/Ethics process is broken**. What's management's
> plan to protect employees who speak up for the best interest of Walmart?"

188.    CJ Guice from Walmart's Rapid Response Team and Shawn Cohen, the people's partner

reached out to Dr. Jana for his retaliation complaint. Shawn Cohen and Dr. Jana had multiple meetings

in August-September 2023; they discussed fraud (paragraph 64-65) and corruption but did not have a

chance to discuss retaliation.  Dr. Jana was extremely busy with the Walmart Ethics team during

September 2023 and did not have any time to file an ethics complaint against Mr. Milbourne. However,

Dr. Jana sensed that retaliation was imminent and so was trying to document everything during

September-October 2023 before submitting a formal complaint against Mr. Milbourne. EXHIBIT 13

shows that on August 16, 2023 Dr. Jana set up a meeting with Shawn Cohen for the last week of August,

2023 with a Subject, "Opendoor: Retaliation Discussion"; which did not happen. Finally, Dr. Jana

submitted an Ethics Complaint against Mr. Milbourne on October 16, 2023. EXHIBIT 1 AND

EXHIBIT 2 substantiate that Shawn Cohen, who knew Dr. Jana was about to submit an Ethics

Complaint against Mr. Milbourne, is the one who orchestrated the smooth firing process.

### G. **WALMART'S MATERIALLY FALSE, FRAUDLENT STATEMENTS AND ALTERNATION OF EVIDENCE**
(Page Number 54 - 59, Paragraph Number 189 - 196)

189.     Plaintiff believes and has evidence to show that to cover up Walmart's retaliation due to Dr. Jana's protected Whistleblower activities, Walmart and it's attorney's knowingly and willfully ("means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law") made materially false, fraudulent statements /representation and altered a document for the purpose of committing fraud against OSHA (a Federal Agency) and the Office of the Administrative Law Judges (OALJ) at the US DOL, a Federal Agency; committing further crimes[8].

190.     Walmart attorney, Mindy Sauter, who represented Walmart at OSHA and OALJ, who provided Walmart's Position Statement to OSHA and "RESPONDENT'S ANSWER" to OALJ was a federal and State of Texas prosecutor and she wrongfully imprisoned an American citizen by concealing material evidence in "..a reckless disregard for her duties and conducted the proceedings in an irresponsible manner" and committed "Prosecutorial Misconduct"[9] violating Giglio, Brady, and

---

[8] *Title 18 U.S.C. § 1001 makes it a crime to: 1) knowingly and willfully; 2) make any materially false, fictitious or fraudulent statement or representation; 3) in any matter within the jurisdiction of the executive, legislative or judicial branch of the United States.*

*Title 18 U.S.C. § 471 makes it a crime to define forgery as the creation, alteration, use, or possession of a false document with the intent to commit fraud.*

*Title 18 U.S. Code § 1324c makes it a crime to for forging, counterfeiting, altering, or falsely making of documents.*

[9] https://www.ca5.uscourts.gov/opinions/pub/15/15-10142-CR0.pdf

Napue[10]. With Walmart's own history of violations of numerous federal laws, one can easily expect Walmart and its attorneys will knowingly and willfully make materially false, fraudulent statements /representation and alter documents to cover up their crimes and true reason for the termination.

191.     Walmart and its attorney's modified/altered evidence and presented the modified documents to Federal Agencies; makes it a crime.

- On or around February 21, 2024, Walmart provided their position statement to OSHA which included a redacted email communication among Walmart management, HR and WM Ethics for Dr. Jana's termination which contained multiple attachments (EXHIBIT 1).

- On or around June 14, 2024, Walmart provided "RESPONDENT'S ANSWER" to OALJ where Walmart provided an unredacted version of EXHIBIT 1 (EXHIBIT 2)[11]. *Dr. Jana redacted a portion in EXHIBIT 2 which included a person's name to protect privacy.*

- Upon close inspection, one can find that EXHIBIT 2 is an altered version of EXHIBIT 1 which appears to be for the purpose of committing fraud, thus making it a crime under Federal Laws.

192.    Dr. Jana asserts that Walmart and its attorneys knowingly and willfully made materially false, fraudulent statements /representation which Dr. Jana reasonably believes to be a crime.

- On or around February 21, 2024 in Walmart's position statement to OSHA, Walmart stated,

  > "..while Jana did not learn of his termination until October 19 due to his being on Paid Time Off..the decision was made on October 4…Jana was apparently on PTO when the decision was made, and the Company waited until Jana returned to work in order to meet with him and present the reasons for his termination in person"

---

[10] *Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963); *Napue v. Illinois*, 360 U.S. 264 (1959)

[11] *Attorney-Client privileged materials, if any, are no longer privileged for fraudulent activities and submitted to opposite party, so it's public now for the betterment of the society and for fair justice.*

---

- On or around June 14, 2024 in Walmart's Answer to OALJ of DOL, Walmart stated,

  > "Jana was apparently on vacation when the decision was made, and Walmart waited until Jana returned to work in order to meet him and present the reasons for his termination in person"

- EXHIBIT 3 (Dr. Jana's calendar in Microsoft Outlook at Walmart) shows that Dr. Jana was not on PTO during October 4 -19, 2023; in fact Dr. Jana was very busy meeting team members and business stakeholders, meeting with Vendor Infogain and Boston Consulting Group, meeting with Google for collaboration on Generative AI and was actively conducting interviews for three open Staff Data Scientists position for Dr. Jana's team.

- Some of Dr. Jana's whistleblowing activities happened on October 6, 2023 and October 12, 2023 when Dr. Jana escalated to Greg Cathey for fraud; Dr. Jana was not on PTO/vacation.

- On Tuesday, October 17, 2023 Dr. Jana was at the Dallas office. Greg Cathey and Allie Hazelwood made an unannounced visit to the Dallas office; Dr. Jana, while working, coincidentally bumped into both Greg Cathey and Allie Hazelwood at the Dallas office. During the conversation with Allie Hazelwood to whom Dr. Jana blew the whistle on August 8, 2023, she lied by promising she would meet with Dr. Jana the week of October 23, 2023 despite the fact that Allie Hazelwood knew she was going to fire Dr. Jana on October 19, 2023. Greg Cathey informed Dr. Jana that he would be at the Dallas office for the rest of the week and promised he would meet with Dr. Jana in person at the Dallas office on October 19, 2023. On Wednesday, October 18, 2023 Dr. Jana was at Dallas office, he met his team members at the office but he could not find Allie Hazelwood or Greg Cathey. On Wednesday, October 18, 2023, Dr. Jana came to know from a reliable source that Greg and Allie cut their trip short due to some urgent meeting in Bentonville, AR; Dr. Jana believes the true reason was they did not want to meet Dr. Jana because they had already decided to fire him.

- Walmart made the following false statement to OSHA (Position Statement February 21, 2023) and OALJ (RESPONDENT'S ANSWER June 14, 2024): "..the Company waited until Jana returned to work in order to meet with him and present the reasons for his termination in person". Dr. Jana was in the Dallas office and Mr Milbourne was in the Bentonville office, the termination call occurred _**via zoom**_, and lasted little more than five minutes.

Based on all these presented facts above, plaintiff believes Walmart and its attorneys knowingly and willfully made materially false, fraudulent statements /representation which Dr. Jana reasonably maintains is a crime.

193.    Walmart stated in their position statement (on or around February 21, 2024) to OSHA and to OALJ on June 14, 2024 that

"..there is no evidence either Milbourne or Bowman was aware of Jana's complaint.."
and
"Accordingly, Jana's October 16 ethics complaint played no role in his termination…when they met with him on October 19, 2023"

EXHIBIT 4 shows that Dr. Jana sent zoom message to Wendy Bowman, HR people partner, on Monday, October 16, 2023 at 8:32 AM and informed Wendy Bowman,

"I also want to officially inform you that I submitted ethics complaint against Adrian"

Wendy Bowman responded, "Thank you for letting me know"

Based on all these facts above, plaintiff believes Walmart and its attorneys knowingly and willfully made materially false, fraudulent statements /representation which again Dr. Jana reasonably believes is a crime.

194.    Walmart stated in their position statement (on or around February 21, 2024) to OSHA that

"..his peer and co-worker, Kamil Bay, another Data Scientist"

Plaintiff maintains (with provided evidence) that Walmart manipulated and falsified documents and materially misrepresented facts during the federal investigation at OSHA of DOL with the intent of taking advantage in this case, representing Mr. Bay as Dr. Jana's fellow Data Scientist colleague. Mr. Bay worked at Walmart for more than a decade; he never achieved a data scientist position at Walmart until the day Dr. Jana was terminated on October 19, 2023. EXHIBIT 5 shows (a screen shot from Teams for Organization chart) that Mr. Bay was a Director of Analytics, NOT Director of Data Science. Kamil Bay's position as a Director of Data Analytics was not the same or similarly situated to Dr. Jana's position as a Director of Data Science and should not be used for discrimination comparison purposes as the nature and knowledge required of these two positions are significantly different. There are two different job codes at Walmart as well as DOL for Director of Data Science and Director of Analytics.

Based on the facts above, plaintiff concludes that Walmart and its attorneys knowingly and willfully made materially false, fraudulent statements /representation which Dr. Jana reasonably believes is a crime.

195.    In the position statement to OSHA on or around February 21, 2024, Walmart stated one of the reasons for Dr. Jana's termination was:

> "On September 5, 2023…Jana showed up at Company headquarters unannounced, resulting in his referral to the Threat Management Team…While the Company has an "Open Door" policy that encourages associates to voice their concerns…Jana's sudden unannounced physical presence and behavior alarming enough to result in his being referred to the Company's Threat Management group for a threat assessment"

- Dr. Jana's Company headquarters visit on September 5, 2023 was not unannounced. Dr. Jana's supervisor Mr. Milbourne invited Dr. Jana and his team for a Team Appreciation Lunch held on Tuesday, Sept 5, 2023 from 12 pm to 1 pm at Bentonville, AR. On or around the 3rd week

of August, 2023 Adrian asked all of his team members from the Dallas office to attend the team

Appreciation Lunch. Dr. Jana informed Adrian Milbourne that he would come to Bentonville,

AR for the Team appreciation lunch and he will be at Bentonville for business purposes for the

rest of that week. Dr Jana set up multiple in person meetings with Adrian Milbourne during his

Bentonville, AR visit (EXHIBIT 6)

- Mr. Shawn Cohen to whom Dr. Jana blew the whistle in the second week of August 2023 was

  fully aware that Dr. Jana will be visiting Bentonville and will meet him in person at Company

  headquarters for an hour for evidence substantiating Dr. Jana's accusations of fraud. EXHIBIT

  6 shows Dr. Jana had a meeting with Shawn Cohen on Thursday, September 7, 2023 at 2:30 pm

  (rescheduled from Wednesday, September 6, 2023) at Walmart's Corporate office in the H0-

  1FL-Corp-Affairs meeting room. EXHIBIT 7 shows that Shawn Cohen was fully aware that

  Dr. Jana was at Bentonville.

- The "Open Door" policy is not the only way to report fraud/corruption at Walmart. According
  to Walmart's own Code of Conduct[12] page # 10:

  "Talk to your manager, next-level manager, People Lead,  Ethics & Compliance, or Legal."
  Dr. Jana reported possible corruption/fraud to Mr. Cohen who was People Lead.  However,

  Mr. Cohen did not respond when Dr. Jana reached out to him about management's retaliation

  (EXHIBIT 8); substantiating a violation of Walmart's 2019 agreement with DOJ[13].

---

[12]https://www.walmartethics.com/content/dam/walmartethics/documents/co
de_of_conduct/Code_of_Conduct_English_US.pdf
[13]https://corporate.walmart.com/content/dam/corporate/documents/newsroo
m/2019/06/20/walmart-reaches-agreements-with-the-doj-and-the-sec-to-
resolve-their-fcpa-investigations/fcpa-ethics-and-compliance-fact-sheet-
final-6.20.19.pdf

---

Dr. Jana decided not to share any sensitive documents with Mr. Cohen. Dr. Jana decided to talk to Walmart Ethics & Compliance directly or report to any Walmart Officers.  Finally, Dr. Jana talked to Jelahn Stewart, Vice President of Walmart Ethics/Compliance.

- Prior to Walmart's 2019 settlement for the FCPA violation, what the DOJ wanted to know as it negotiated with Walmart was how the company would handle whistleblower allegations and other red flags. Prosecutors wanted to know that the company had a strong process that could escalate concerns, to the right ethics and compliance people, who were empowered to address those allegations seriously.

- Corrupted Walmart Ethics/Compliance acted exactly opposite to what Walmart agreed to with the DOJ to retaliate against Dr. Jana, the whistleblower. Dr. Jana used his own access card to enter into Executive suites, the only thing Dr. Jana was carrying was his laptop. Walmart never disclosed what type or level of threat Dr. Jana posed and to whom. Dr. Jana was unaware of this Threat Assessment before the termination.

- This threat assessment was just a pretext for retaliation.

196.    Therefore, plaintiff maintains that Walmart and its attorneys knowingly and willfully made materially false and fraudulent statements/representations to Federal Agency OSHA and OALJ.

## H.       PLAINTIFF REASONABLY BELIEVED FRAUD OCCURED
(Page Number 60 - 63, Paragraph Number 196 - 210)

## 196.        Subjective Belief:

Plaintiff repeats and realleges paragraphs 1 to 195 of this Complaint as if fully set forth herein for subjective belief that violation of antitrust laws and fraud against shareholders occurred.

## 197.        The Objective Belief – Totality of the Circumstances Test

To strengthen Dr. Jana's claim under SOX and CAARA protection, Dr. Jana demonstrates Totality of

the Circumstances Test as described in

      Ronnie v. Off. Depot, LLC, 81 F.4th 1345 (11th Cir. Sept. 25, 2023)[14]

to substantiate any reasonable person in Dr. Jana's position would have believed that the employer's

conduct constituted a violation of antitrust laws and fraud against shareholders.

> "To make a showing of protected activity, the complainant must put forth sufficient information
> about the alleged wrongful conduct to show that a reasonable person in his position would
> believe the wrongdoing amounted to a SOX violation. To be clear, this does not require the
> complainant to articulate the specific provision of § 1514A he alleges his employer's conduct
> violates…While doing so may strengthen his proposition, a complainant will not be penalized
> for failing to identify the specific SOX provision at issue. In determining what information
> sufficiently paints a picture of reasonable belief, we employ a totality of the circumstances test
> based on knowledge available to a reasonable person in the same factual circumstances—and
> with the same training and experience — as the complainant. Relevant to the totality of the
> circumstances is whether the employer acted with the requisite scienter, whether the
> misstatement was material, whether the misstatement was relied upon, and whether it yielded
> economic loss. In adopting a totality of the circumstances test, we also note that while the
> employee need not "definitively and specifically" prove each element of fraud, he must make
> more than a conclusory allegation."

198.    Kamil Bay (a Director), Leslie Platz (a Director), Olan Land (a Sr. Manager) knew that

Infogain's contract was for eight weeks, everybody knew Infogain's poor performance; everybody

knew Infogain should have been fired but received extension after extension and was about to get MVP

for a few million dollars for six months with possibility of renewing years to come without any

competition which was a fraud. Dr. Jana's belief was objectively reasonable because any experienced

person in this field (Leslie Platz, Kamil Bay, Olan Land) would have felt similar under the

circumstances.    Nobody    except    Dr.    Jana    reported    this    possible    fraud    to    Walmart

---

[14] https://media.ca11.uscourts.gov/opinions/pub/files/202014214.pdf

Compliance/Ethics/Supervisory Authority within Walmart. Everybody has a job at Walmart except Dr. Jana because the Respondent retaliated against Dr. Jana because of his protected activities.

199.    In one of the conversations with Kamil Bay, when Dr. Jana raised the concern about the increase of the BID price even before the start of the POC work:

> "And so far, this is what they promised us...those are the things that we considered before you and I signed off. And then what happened, they did not provide NAVIK. I don't know what the NAVIK is whether it exists or falsifying the information. And then this $180,000 got extension to you, as you said, travel money another $100,000 the time needs to be extended another $100,000. So the our EDLC dollar also got extension. You know, I didn't know that. Did you know that that's going to happen before we sign off?

200.    Kamil Bay responded, quote, **"No, but actually, I raised this..red flag...."**

201.    Before winning the BID, Infogain promised Walmart to provide their proprietary Generative AI software, NAVIK. Even after the end of POC, Infogain never provided NAVIK. Towards the end of the POC, when Dr. Jana asked Mr. Bay where's NAVIK? Mr. Bay replied, NAVIK is short form of "Not A Very Impressive Koala" (EXHIBIT 12)

202.    In another conversation, when Dr. Jana expressed his concern of Infogain's failure to deliver POC deliverables, Kamil Bay acknowledged Infogain completed 0% of the first task, 0% second task and 50% on the third task that they promised to deliver before the end of POC. This demonstrates, not only Dr. Jana but also Kamil Bay, who is a Director of Analytics, agrees that Infogain did not deliver POC deliverables.

203.    Kamil Bay also mentioned Infogain's work as a patch work; Kamil Bay and Infogain created a hype surrounding Generative AI.

205. Mr. Bay also acknowledged, Infogain is here because of politics which is clearly a fraud:

"so the only thing is more like about politics. If there was no politics…if I was ... hypothetically, if I was in Allie's shoes..I would just do the right thing, right? I would just slash.. But there is politics... I'm really worried like more to Ridhi. I am worried about her. I don't want to let her down....So I want this to succeed because of her, …I don't want to her look like oh my god, it didn't work.... that's a politics....honestly, but you're 100,000% Right. And there's just the only politics...Yeah, you're right."

206. Despite acknowledging Infogain's failure to deliver POC deliverables, on the last week of September, 2023 Kamil Bay approved Infogain's poor Data Science related work which Dr. Jana was supposed to sign off to pave the way for Infogain few million dollars of projects which was a criminal fraud (86 -103). Instead of raising the concern of fraud, Mr. Bay was aiding to commit crime. Is this an example of Walmart's version of "Act with Integrity" and "Strive for Excellence" which Walmart is very proud of?

207. Olan Land, a Sr. Manager, who has experience working at Walmart for more than 12 years and very experienced, was talking to Dr. Jana at Walmart's Home Office at Bentonville on September 26, 2023. At some point when Olan started talking about Infogain's performance and deliverables, he started whispering, probably he did not want anybody to listen as he was in the office as everybody is scared of the management. He even mentioned during the meeting that if he can get the result by himself why do we need Infogain? Olan Land also mentioned that he tried to convince Adrian multiple times, but Adrian ignored.

208. Leslie Platz, a Director in Mrs. Mehra's team once told,

"We re-got Infogain. I thought they were getting fired… And it feels my brain feels fuzzy like I can't do my best work…"

209. Even if Leslie Platz knew that Infogain was going to be fired but was getting contracts continuously; she should have complained to Walmart Ethics for fraud; but she did not.

210.      On multiple occasions (paragraph 71 - 78), Dr. Jana declined to sign off Infogain's poor work; in each case Dr. Jana provided a clear scientific explanation why he was unable to sign off. Dr. Jana's decade long experience as a Data Science leader is sufficient enough to substantiate objective belief that fraud occurred.

## I.   CAUSAL CONNECTION BETWEEN THE PROTECTED ACTIVITY AND THE ADVERSE ACTION
(Page Number 63 - 64, Paragraph Number 211 - 216)

211.      Dr. Jana's protected whistleblowing activity was a contributing factor in the employer's adverse action of dismissal of Dr. Jana on October 19, 2023, within four weeks after reporting the possible fraud to the supervisory authorities at Walmart over Dr. Jana; it has nothing to do with Dr. Jana's performance or insubordination.

212.      Dr. Jana enjoyed stellar performance reviews at Walmart.  Dr. Jana's performance reviews show Dr. Jana helped Walmart to save more than $250 million in GMV in fiscal year 2023, more than $125 million in GMV in fiscal year 2022 and more than $35 million in GMV in fiscal year 2021.

213.      Dr. Jana received no poor performance reviews nor insubordination reviews after August 8, 2023 the day Dr. Jana reported possible fraud to Allie Hazelwood, a person of Supervisory Authority over Dr. Jana till the firing date October 19, 2023.

### Direct Evidence of Retaliation

214.      Plaintiff adopts and incorporates by reference each preceding paragraph of this Complaint as if fully and completely set forth herein. Paragraphs 90-105 provide Direct Evidence of retaliation because of Dr. Jana's protected Whistleblowing activities.

### Circumstantial Evidence

215.     A contributing factor is any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision. Causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.  Walmart's knowledge of Dr. Jana's protected activity and close temporal proximity of termination sufficient enough to prove causation in this case that Dr. Jana's protected whistleblower activities were a contributing factor for termination. Dr. Jana's termination decision was taken in less than four weeks after he blew the whistle to Ethics/Compliance Vice President Jelahn Stewart.

216.     **Additional Circumstantial Evidences**

- Walmart was so desperate to fire Dr. Jana that Walmart even utilized a hearsay statement (paragraph 89) during Dr. Jana's protected activities to fire Dr. Jana

- Mrs. Mehra canceled a one-on-one meeting with Dr. Jana with some excuses for 4-5 times during Sept-Oct, 2023; at the end the meeting did not happen before firing. Dr. Jana's whistleblowing activity was around alleged violation by Mrs. Mehra.

- Walmart's attitude towards Dr. Jana changed after his protected activity.

- Employer's explanation of termination to DOL without a single substantiated evidence

## IV.   <u>PROVING EMPLOYERS RETALIATORY INTENT IS NOT NEEDED</u>
(Page Number 65, Paragraph Number 217)

217.     In a landmark ruling, on Feb 8, 2024 in Murray v. UBS case the US Supreme Court sided with Whistleblower and ruled that "A whistleblower who invokes §1514A must prove that his protected activity was a contributing factor in the employer's unfavorable personnel action, but

need not prove that his employer acted with "retaliatory intent.""[15].  However, this Complaint has substantiated multiple instances that prove the Defendant's retaliatory intent to fire Dr. Jana.

## V.    CAUSES OF ACTION

(Page Number 65 - 66, Paragraph Number 218 - 219)

### A.  COUNT ONE:    RETALIATION UNDER CAARA (US title 15 U.S.C. §7a-3)

218.    Plaintiff repeats and realleges paragraphs 1 through 217 of this Complaint as if fully set forth herein. Plaintiff substantiated Direct Evidence of Retaliation due to Plaintiff's protected Whistleblower activities. Plaintiff also meets the *prima-facie for Circumstantial Evidences* : (a) Plaintiff engaged in protected activity or conduct under Criminal Antitrust Anti-Retaliation Act ("CAARA"), 15 U.S.C. §7a-3, (b) Defendant had actual or constructive knowledge of this protected activity; (c) Plaintiff suffered an adverse personnel action; (d) Plaintiff's protected activity was a contributing factor in the defendant's decision to take an adverse personnel action against him.

### B.  COUNT TWO: RETALIATION UNDER SOX (US title 18 U.S.C. §1514A)

219.    Plaintiff repeats and realleges paragraphs 1 through 217 of this Complaint as if fully set forth herein. Plaintiff substantiated Direct Evidence of Retaliation due to Plaintiff's protected Whistleblower activities. Plaintiff also meets the *prima-facie for Circumstantial Evidences* :  (a) Plaintiff engaged in protected activity or conduct under Sarbanes-Oxley Act ("SOX"), 18 U.S.C. §1514A, (b) Defendant had actual or constructive knowledge of this protected activity; (c) Plaintiff suffered an adverse personnel action; (d) Plaintiff's protected activity was a contributing factor in the defendant's decision to take an adverse personnel action against him.

---

[15] https://www.supremecourt.gov/opinions/23pdf/22-660_7648.pdf

## VI.    DAMAGES APPLICABLE TO ALL COUNTS

220.    Plaintiff adopts and incorporates by reference each preceding paragraph of this Complaint as if fully and completely set forth herein.

## VII.    EXEMPLARY DAMAGES

221.    Plaintiff adopts and incorporates by reference each preceding paragraph of this Complaint as if fully and completely set forth herein.

222.    Plaintiff also seeks exemplary/punitive damages caused by the gross negligence and/or malice of Defendant Walmart Inc for damages and losses relating to its actions listed above.

223.    Plaintiff's injuries resulted from Defendant's gross negligence or malice which entitles Plaintiff to exemplary damages under SOX, CAARA and TEXAS CIVIL PRACTICE & REMEDIES CODE §41.003 (a).

224.    Plaintiff's intends to show the factors the jury may consider in determining the amount of exemplary which should be awarded include but not limited to:

a.  the nature of the wrong committed by Defendant Walmart Inc

b.  the degree of the culpability of Defendant Walmart Inc

c.  the character of Defendant Walmart Inc's conduct;

d.  the situation and sensibilities of the parties concerned; and

e.  the extent to which Defendant Walmart Inc's conduct offends a public sense of justice and propriety.

225.    Based on the facts herein, Plaintiff requests exemplary/punitive damages be awarded to Plaintiff by Defendant Walmart Inc.

## I.    WALMART'S MALICIOUS ACTIVITIES DURING THE PENDENCY OF THIS CASE

According to reliable sources, Walmart terminated key witnesses during the pendency of this case, risking the preservation of documents related to this case:

- Adrian Milbourne: Adrian Milbourne's 18 years of career at Walmart ended in August 2024

- Kamil Bay: Kamil Bay's 10 years of career at Walmart ended in August 2024. Prior to ending Kamil Bay's position, Walmart promoted him as a Director of Data Science on or around March- April 2024 and terminated him on or around August 9, 2024.

- Ridhi Mehra: Her entire team was dissolved and her decade long career at Walmart ended in August 2024.

- Infogain's contract for the "Defect Detection" project was terminated abruptly on December 8, 2023; Infogain was supposed to be at Walmart for a longer period of time. That was the centerpiece of this Complaint. After the termination, Dr. Jana met and shared documents with Walmart legal on the first week of November 2023; Walmart instructed Infogain on the first week of November 2023 that their contract for "Defect Detection" will be ending on December 8, 2023. Infogain contacted and met with Dr. Jana to assess whether Dr. Jana's termination played a role in the abrupt termination of the contract.

## II.    DEMAND FOR A TRIAL BY JURY

226.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.


### III.    PLAINTIFF'S DEMAND FOR PRESERVATION OF EVIDENCE AND ESI

227.    Plaintiff adopts and incorporates by reference each preceding paragraph of this Amended Complaint as if fully and completely set forth herein.

228.    Plaintiff hereby requests and demands Defendant Walmart Inc preserve and maintain all evidence pertaining to any claim or defense related to the facts and allegations making the basis of this lawsuit, or damages resulting therefrom. On May 30, 2024, Plaintiff emailed a Demand Letter for "DEMAND FOR PRESERVATION OF EVIDENCE AND ESI" to Defendant Walmart, Inc attorneys on record via email:

    Mindy Sauter: msauter@mcguirewoods.com

    Michael Elliott: melliott@mcguirewoods.com and

    Cory Ford: cford@mcguirewoods.com

229.    The Demand letter provided written notice to Defendant that they must immediately take necessary steps to preserve all "electronically stored information"("ESI") and other documents, on whatever storage media , device or location, in their possession or control (including third parties) that contain potential ESI relating to the claims and defenses contained in this Complaint, and the Defendant avoid spoliation of this ESI. The letter also includes a demand for Defendant to suspend all document retention or destruction policies, including but not limited to backup, restoration, deletion, destruction, and tape recycling.

# IV.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Dr. Jana respectfully prays defendant Walmart

Inc be summoned to appear and answer herein, and that upon a final hearing of the cause, judgement

be entered for Dr. Jana against defendant Walmart Inc

(1)     Declaring that the acts and practices complained of herein violate CAARA and SOX.

(2)     Enjoining and permanently restraining these violations of SOX and CAARA

(3)     Directing defendant to pay plaintiff back pay including lost wages (Base, Bonus, Restricted

Stock Options) and benefits that would have been paid from the date of the retaliation until the trial

date;

(4)     Directing defendant to pay plaintiff Front Pay (Base, Bonus, Restricted Stock Options, retirement

contribution, Medical Contribution, Social Security contribution etc) until retirement age;

(5)     Directing defendant to pay plaintiff uncapped compensatory damages, including damages for

loss of earning potential, emotional distress, humiliation, and pain and suffering;

(6)     Directing defendant to pay plaintiff uncapped exemplary/punitive damages;

(7)     Granting plaintiff, a tax enhancement award to offset adverse tax consequences associated with

a lump sum award of damages;

(8)     Enjoining and permanently restraining use of "people-led" by Walmart Inc and its officers and

associates; and

(9)     Granting such other and further relief as the Court deems necessary and proper

Dated: September 6, 2024

Respectfully Submitted,

DILIP JANA, Plaintiff
*Pro Se*
Telephone : 318-243-9743
**Email:** janadilip@gmail.com
800 Fairlawn St, Allen, TX, 75002

**Enclosures:**

   (1) EXHIBIT 1 – Redacted Email for Termination
   (2) EXHIBIT 2 – Unredacted and altered Email for Termination
   (3) EXHIBIT 3 – Plaintiff's Walmart Outlook Calendar (October 2023) before termination
   (4) EXHIBIT 4 – Message with HR People Partner Wendy Bowman
   (5) EXHIBIT 5 – Team Structure
   (6) EXHIBIT 6 - Plaintiff's Walmart Outlook Calendar (October 2023) before termination
   (7) EXHIBIT 7 - Message with HR People Partner Shawn Cohen
   (8) EXHIBIT 8 - Message with HR People Partner Shawn Cohen for Retaliation
   (9) EXHIBIT 9 – One of the Whistleblowing Activities
   (10)    EXHIBIT 10 – Data unavailability Email
   (11)    EXHIBIT 11 – Retaliation
   (12)    EXHIBIT 12 – Infogain's NAVIK software as per Mr. Bay