# EXHIBIT 4



elliott sauter
PLLC

February 21, 2024
*Via Email*
Department of Labor-OSHA
Office of the Whistleblower Protection Program
C/O: Federal Investigator Bernard Noel
525 S. Griffin Street, Suite 602
Dallas, TX 75202

    **Re:**    **Dilip Jana Complaint**

Investigator Noel,

    On October 19, 2024, Walmart Inc. (the "Company") terminated its employment of Dilip Jana ("Jana") as a result of Jana's poor work performance, failure of leadership, and disrespectful and disruptive behavior. Seemingly incapable of accepting any responsibility for the poor choices that lost him his job, Jana now seeks to exploit the Department of Labor's (DOL's) whistleblowing process with a baseless and speculative retaliation claim, which, in addition to being at times inconsistent and nonsensical, is wholly unmoored from fact. DOL should dismiss Jana's complaint.

    Jana's January 2, 2024, complaint against the Company (the "Complaint") is a shifting set of grievances against targets who he apparently believes have mistreated him and includes both his immediate supervisors and peer. His primary allegation is that the Company retaliated against him for raising what he calls "violation of various Anti-trust laws and suspected embezzlement," i.e., that the president of his organization, Ridhi Mehra, manipulated an external bidding process to favor a vendor called Infogain. Other than alleging that Infogain did not perform well under its contract, the only "evidence" Jana provides to back up this serious accusation is his suspicion that on a personal trip to India, Mehra—who is Indian—must have met up with Infogain to collect a kickback since her trip "lasted just a week" and she has a "5 year old child."

    None of this true. The facts are that 1) Infogain was an existing Company vendor and was recommended for the bidding process not by Mehra, but by the Company's internal procurement team, 2) Infogain was selected as part of a standard RFI process in competition with other vendors, 3) Infogain performed its duties without issue and was paid the amount it agreed to do the work for. Even if it is true that Infogain was contracted for subsequent work, that is not evidence it failed to perform under a prior agreement—rather, it shows the opposite, that the Company was happy with Infogain's work and continued to use them as a reliable vendor.

    Jana's remaining allegations are a scattershot against his supervisors and peer. He accuses his immediate supervisor, Adrian Milbourne, who reports to Mehra, of mistreatment and also of being incompetent to run the Data Science Department of which Jana was a member (a running theme of Jana's allegations is that those he reports to are less competent than he is). Jana also

accuses Milbourne of making a racial comment toward him. Once again, none of this is true. What is true is that Milbourne attempted to hold Jana accountable for his failure to complete tasks, his habit of calling into question the decisions of his supervisors in front of the team and treating his managers and co-workers in an abusive manner that went against Company policy. Jana also accuses Milbourne, as well as his peer and co-worker, Kamil Bay, another Data Scientist, of being complicit in Mehra's manipulation of the Infogain bid. As with his other claims, this comes without evidence or explanation, and likely has more to do with Jana's failure to do his own job than others' failure to do theirs.

In summary, Jana appears to take the position that his employment was terminated unfairly because he was blowing the whistle on improper or illegal activities at the Company. His position is undermined firstly because it is untrue in every respect. There is no evidence that Infogain was selected improperly, or that Infogain failed to perform the work for which it was retained. Jana's apparent unhappiness with the Infogain contract likely has much to do with the second reason his complaint fails: Jana was not terminated for whistleblowing, but because of his sub-standard performance, poor leadership, and insubordinate behavior. And while there is no evidence to support Jana's claims, there is a single fact that makes them impossible: while Jana did not learn of his termination until October 19 due to his being on Paid Time Off, the record shows that the decision was made on October 4—11 days before the October 16 ethics complaint against Milbourne that Jana says he was terminated in retaliation for making.

In other words, Jana's termination had nothing to do with an ethics complaint and everything to do with Jana's lack of performance and unprofessional behavior. The substance of these problems, as well as supporting materials are outlined below.

1. **The Company terminated Jana as a result of his poor performance and insubordinate behavior.**

    (a) *Jana disrupted meetings and accused Vice President Ridhi Mehra of being a dictator.*

Company associates who worked with Jana have consistently described Jana's behavior at meetings as disruptive, unhelpful, rude, and insubordinate. Jana often highjacked meetings by shifting their purpose to identify what he apparently viewed as leadership shortcomings, making unfounded complaints about the lack of resources available to the team, and altering the topic of conversation to deflect focus from his lack of production on requested deliverables.

On October 3, 2023, Jana attended a remote video meeting that included the entire team from the vice president level down. In this meeting, the team was discussing the progress of specific projects and workflow matters. Jana made a recording of this meeting, which he provided as his own supporting evidence to DOL. In that recording it is clear that Jana disagrees with the team's approach and decisions. Aware that both Milbourne and Mehra were at the meeting, Jana called Mehra "a dictator" and said, "this is a dictatorship." Jana shared this sentiment verbally with team members several more times on the call.

Calling your organization's leader a "dictator" during a team meeting is disrespectful and damaging to an organization, and was part of a pattern of behavior that led to Jana's termination.

### (b) *Jana sent an email to Milbourne that was inappropriate and insubordinate on its face.*

On September 14, 2023, Milbourne sent an email to Jana with the subject line: "Dilip 1:1 Deliverables." (See Jana's Exhibit 5-S at page 2). This email is a continuation of a communication Milbourne initiated on August 24, 2023, in preparation for a meeting with Jana, in which Milbourne in an evidently conscientious and professional tone attempts to outline work requirements and associated deadlines—in particular the need for Jana to fulfill his responsibilities as a team lead by hiring a team.

In an explosive response on September 15, Jana, in sometimes enlarged red font, deflects responsibility for his assigned tasks and blames Milbourne for his inability to accomplish them. Then, after refusing to do the work assigned to him, Jana incredibly accuses Milbourne of "retaliation" for assigning work to Jana's peer, Kamil Bay, that Jana apparently believes rightfully belongs to him.

Jana makes the following comment—with font and color as represented—in response to Milbourne's assessment that a project is late:

Please READ from my previous email, it's simple English, "I propose WFP use case updates and timelines- Due Sept 8th

## provided we get all the answers".

So **this is NOT LATE**…

Apart from belittling and insulting his supervisor by indicating that Milbourne does not understand "simple English," Jana provides no solutions or proposals—his expectation is that Milbourne, his supervisor, "provide[]. . . all the answers." (See Jana's Exhibit 5-S at pages 2-3). This behavior was emblematic of Jana's overall performance. Despite repeated efforts by his leadership to help Jana find a path to success, Jana refused to do so.

Unfortunately, Jana's performance and belligerent behavior only worsened as time progressed, and ultimately led to termination of his employment.

### (c) *Jana proclaimed, "My grandma could do it!" in a team meeting that included Infogain contractors.*

The Company has a strong culture of respect for the individual that is encouraged among both associates and contractors and is a core tenet of the Company's Code of Conduct.[1] It is a rule that Jana violated repeatedly.

On August 23, Jana's team participated in a video call with representatives of Infogain, which had by then been retained to assist in the completion of a data project. During the meeting, Jana was critical of the approach and contribution of the Infogain team members, and declared "My grandma could do it!," or words to that effect. While constructive criticism is acceptable and expected in any healthy collaborative business situation, personal attack is not.

---

[1] https://www.walmartethics.com/content/walmartethics/en_us/code-of-conduct.html

Milbourne subsequently counseled Jana on this episode in a one-on-one meeting, which Milbourne documented in an August 25, 2023 email to Jana memorializing a conversation about "Approach – ensure that our message is not masked by our method of delivery" and "always ensure we demonstrate respect for the individual as we engage the team." (See Jana's Exhibit 5-S at page 5). Milbourne confirmed in a subsequent email to Jana that this comment referred to their conversation about the "grandma" incident, to which Milbourne added, "I personally thought it was not a necessary comment to make and could be found insulting, but I also had another Walmart associate approach me after the meeting that was struck by the comment as well." (See Jana's Exhibit 5-T at page 3).

Jana's reaction to this constructive feedback came on September 15 at 2:11 AM, in the form of a barrage of deflections, excuses, and complaints about Infogain—as well as an attempt to ferret out the other associate who had dared report his corroborating concerns to Milbourne. What Jana's response did not contain was any acknowledgment of the impact of his insult, or that it was an insult at all. Far from demonstrating his understanding of the Company's Code of Conduct, and the expectations of the leadership role he was tasked with fulfilling, Jana's petulant response demonstrates disdain for his colleagues, ignorance of the team concept, and a total unwillingness to accept responsibility—recurring themes that contributed to Jana's termination.

### (d) *Jana showed up at Company headquarters unannounced, resulting in his referral to the Threat Management Team*

On September 5, 2023, Jana drove from Dallas, Texas to Company headquarters in Bentonville, Arkansas, apparently to follow-up on his concerns with Infogain. When he arrived, he found his way to the Global Ethics department, which deals with associate ethics complaints. While the Company has an "Open Door" policy that encourages associates to voice their concerns—a process that Jana was well versed in and made repeated use of—associates present that day found Jana's sudden unannounced physical presence and behavior alarming enough to result in his being referred to the Company's Threat Management group for a threat assessment.

### 2. There is no evidence either that Infogain failed to perform, or that there was any impropriety in its selection for work with Jana's Data Solutions team.

Jana's central accusation against the Company is his calling into question the integrity of leadership in their selection of Infogain in the bid process. He supports this by claiming that Infogain failed to perform its work satisfactorily, and that Ridhi Mehra traveled to India to collect a kick-back. There is no evidence to support either contention.

### (a) *Infogain was an established Company vendor and was recommended by the internal procurement team, NOT Ridhi Mehra.*

Infogain is a subsidiary of Absolutdata Inc. Absolutdata, Inc., signed a Master Services Agreement ("MSA") with the Company in 2019, and had been an established vendor for three years before Jana joined the Company. Jana asserts that Infogain was improperly chosen, ran up its costs, and failed to perform, but provides no supporting evidence or explanation for these assertions.

Jana was not part of the Data Solutions team when Infogain was selected and would have no knowledge of the bidding process. Infogain was recommended, along with several other

vendors, by the Company's internal procurement team—not Ridhi Mehra—and was selected as the result of an RFI process that pitted the bidders against each other in a scored competition in which Infogain prevailed. Indeed, Jana acknowledges that "Infogain [was] already in the Walmart system," but asserts that the contract should nonetheless have been given to one of his favored "very competent US vendors." (See Jana's Exhibit 5-C at page 2).

Jana also alleges that, once selected, Infogain failed to perform as promised and ran up costs. But there is no evidence to support this. Internal records show to the contrary that Infogain performed its initial and subsequent SOWs as agreed with no cost overruns.

### (b) Jana admits his accusation that Mehra was engaged in an illicit financial arrangement with Infogain is unsupported speculation.

Jana seems to realize that his displeasure with Infogain on its own is not enough to substantiate a whistleblower claim, so he includes as his sole allegation of illicit conduct his admitted, and brazenly unsupported, speculation that Ridhi Mehra accepted a bribe from Infogain. His basis for leveling this charge is that Mehra—who is Indian and has family in the country—traveled to India. Jana deems the visit "suspicious" because it "lasted just a week" and she has a "5 year old child." (See Jana's Exhibit 5-C at page 1).

Mehra did in fact travel to India sometime after the bid selection, but she went there to visit family members. It is also true that Infogain reached out to Mehra to invite her for a site visit—which on its own would not have been a violation of Company policy—but also true that she declined because, as Jana observed, her visit was short, and she did not have the time. As she explained in a July 6, 2023, email to Infogain, "Unfortunately, this is a very short trip and I have a full itinerary already and so unable to squeeze any time." (See attached Exhibit 1). The Global Ethics department reviewed Jana's complaint related to Mehra taking bribes and concluded it should be closed because there was no suggestion of a conflict of interest, kickbacks, or other unethical relationship between Mehra and Infogain. Ethics notified Jana the matter was closed on September 27, 2023.

Mehra is of course not the only associate Jana accused of wrongdoing with respect to Infogain, though she is the only associate he accuses of being part of a commercial bribery scheme. Jana levels accusations of impropriety against Milbourne and Kamil as well. These accusations are equally unsubstantiated. Contrary to Jana's allegations, the work performed by Infogain was utilized and incorporated into the defect detection process that the team was working on, and Infogain completed their assigned SOW despite Jana's continuous efforts to thwart the team's progress and completion of its task.

### 3. The Company decided to terminate Jana for cause on October 4, 2023, and there was no retaliation.

From the middle of September through October 2023, Jana's behavior towards his team and supervisors became increasingly problematic until it became clear to his leadership that he was not only failing to do his own work, he was—as a designated leader—creating a negative work environment about which other associates had begun to complain. On top of his negative attitude toward his managers and co-workers, Jana did not positively contribute to assigned tasks. When

problems arose, Jana did not take initiative to solve those problems. Instead, he would claim the problem was not of his making, not his responsibility, or both.

Anyone who displayed this behavior—let alone a team leader—would have risked termination, regardless of whether they filed a complaint with the Company. The Company decided to terminate Jana on October 4, 2023, for cause. That decision had everything to do with Jana's work product and behavior, and nothing to do with his complaints.

### (a) After months of substandard results and insubordinate behavior the Company concluded that Jana did not intend to improve his performance and terminated his employment.

The record shows that Adrian Milbourne hired Dilip Jana into a leadership role on his team in April 2023, and that he and Ridhi Mehra did everything they could to help Jana succeed. Milbourne's email exchanges with Jana show the efforts of a conscientious and mindful leader trying to mentor a subordinate who refuses to be mentored, and instead responds with excuses and vitriol. Despite the efforts of his leadership, Jana had no intention of changing his behavior and continued to mistreat people who he believed were not as smart or as valuable as he deemed himself to be.

This sentiment is captured in Milbourne's email to an internal human resources associate on October 12, a week after the decision had been made to terminate Jana, and four days before Jana made his unfounded October 16 ethics claim against Milbourne.

> I am hoping to take termination steps early next week (strongly prefer Monday) with Dilip, as even this current week we are still experiencing disruptive behavior.

(See attached Exhibit 2).

### (b) The Company informed Jana of his termination upon his return from PTO, and the retaliatory timing Jana alleges is wrong.

An internal email sent on October 4, 2023, among HR personnel, shows conclusively that the Company decided to terminate Jana's employment on that date. The email is potentially subject to the attorney-client privilege and is provided in redacted form out of an abundance of caution. It includes the non-privileged statement that the "[r]ecommendation for accountability [for Dilip Jana] . . . has escalated to 'separation' due to the latest developments," and includes as considerations for that recommendation, "disparaging, disruptive and dismissive behavior causing a toxic work environment." (See attached Exhibit 3).

Jana was apparently on PTO when the decision was made, and the Company waited until Jana returned to work in order to meet with him and present the reasons for his termination in person. On Thursday, October 12, Milbourne emailed about "tak[ing] termination steps early next week." (See attached Exhibit 2). The following Monday, October 16, Jana made an ethics complaint against Milbourne alleging mistreatment and retaliation, and three days later, on Thursday, October 19, Milbourne and Wendy Bowman (who sent the October 4 email memorializing the termination decision) met with Jana to inform him that his employment with the Company was terminated.

***Accordingly, Jana's October 16 ethics complaint played <u>no role</u> in his termination and there is no evidence either Milbourne or Bowman was aware of Jana's complaint when they met with him on October 19.***

Dilip Jana was terminated because of his own self-destructive behavior and work performance, and for no other reason.

### 4. Legal Analysis

The Sarbanes-Oxley Act of 2002 protects whistleblowers who report financial wrongdoing at publicly traded companies. 18 U.S.C. § 1514A. When a whistleblower invokes the Act and claims he was fired because of his report, his claim is "governed by the legal burdens of proof set forth in section 42121(b) of title 49, United States Code." 18 U.S.C. § 1514A(b)(2)(C).

Under that incorporated framework, a whistleblowing employee meets his burden by showing that his protected activity "was a contributing factor in the unfavorable personnel action alleged in the complaint." 49 U.S.C. § 42121(b)(2)(B)(iii). If the employee meets that burden, the employer can prevail only if it "demonstrates by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of that behavior." Id. § 42121(b)(2)(B)(iv). See <u>Murray v UBS Securities, et al</u>; No. 22-60 (2004).

Jana presents himself as a whistleblower who is engaged in protected activity and claims that he was terminated because he was making a valid complaint that exposed a fact or problem that the Company wanted to hide. None of this is true and his complaint should be dismissed. Jana's first ethics complaint against Mehra related to Infogain is totally unsubstantiated. Even taken on its face, Jana's allegation is speculative—he only guesses at Ridhi's acceptance of a bribe, for which there is zero supporting evidence and ample contrary evidence. Additionally, the work that Infogain completed for the Company was a valuable contribution to the defect detection project. The Company closed his first complaint because it found no suggestion of actual wrongdoing. Jana's second ethics complaint against Milbourne for retaliation postdates the decision to terminate him. Accordingly, apart from the complaint itself being without basis, it would be impossible for the Company to retaliate against Jana given the timeline and facts presented. Simply put, the Company's decision to terminate Jana pre-dates the Milbourne ethics complaint.

Jana has not met his initial burden in showing that the "protected activity" he engaged in was a contributing factor in his unfavorable employment decision. Every complaint that Jana lodged was given due consideration. He was never disciplined for the reports he made to ethics or for the complaints he made in listening sessions. The fact is Jana's complaints were not true. What is true is that the complaints had no bearing on the Company's decision to terminate Jana and were not a contributing factor in his termination.

The Company had every right and an abundance of reasons to terminate Jana. <u>Any</u> employee who acted like Jana when the Company employed him—who disregarded and denigrated his or her supervisor in a public forum, avoided completing work assignments, insulted team members and contractors and spent an inordinate amount of time making excuses and

assigning blame for their lack of performance—could be terminated, regardless of their claimed participation in protected activity.

In conclusion, Jana has not demonstrated that his complaints contributed in any way towards the decision to terminate his employment. The evidence clearly shows that the Company rightfully terminated Jana's employment for the reasons stated above and that he was not retaliated against. Accordingly, the Company respectfully requests that Jana's complaint be dismissed.

Sincerely,

Mindy Sauter

# EXHIBIT 1

## Subject: RE: In person Intro - While in Delhi/NCR area

**Ridhi Mehra** <Ridhi.Mehra@walmart.com>  Thu, Jul 6, 2023, 1:38 PM
to Veera Raghavan, shahida.mohammed

You are viewing an attached message. ELLIOTT SAUTER PLLC Mail can't verify the authenticity of attached messages.

Hi Veera,

Thanks for reaching out. I appreciate the invitation and would have liked to join. Unfortunately, this is a very short trip and I have a full itinerary already and so unable to squeeze any time. Am also on PTO starting next week and so minimizing my meetings/calls for next week.

Hopefully, we can connect next time.

Thanks,
Ridhi

**From:** Veera Raghavan <Veera.Raghavan@infogain.com>
**Sent:** Thursday, July 6, 2023 11:48 AM
**To:** Ridhi Mehra <Ridhi.Mehra@walmart.com>
**Cc:** Shahid A. Mohammed <ShahidA.Mohammed@infogain.com>
**Subject:** EXT: In person Intro - While in Delhi/NCR area

**EXTERNAL:** Report suspicious emails to **Email Abuse.**

Hello Ridhi,

Hope you had a good onward flight to India.

Rohit, our Chief Business Officer and Rajat, Head of Navik AI product portfolio and a key contributor to the Defect Engine roadmap can meet with you locally at a place nearby in the NCR area on Monday, 10th Jul 2023.

Alternately, we would love to have you at our Noida or Gurugram office!

Please let us know your availability and we can arrange for the same.  Sorry for the short notice.

Agenda would be primarily be to meet and greet.

Regards,

# EXHIBIT 2

**donna@elliottsauter.com**

| | |
|---|---|
| **From:** | Adrian Milbourne <Adrian.Milbourne@walmart.com> |
| **Sent:** | Thursday, October 12, 2023 5:43 PM |
| **To:** | Shawn Cohen |
| **Cc:** | Wendy Bowman; Ridhi Mehra |
| **Subject:** | Dilip Next Steps |

Hey Shawn,

I hope your week is wrapping up well.

I am hoping to take termination steps early next week (strongly prefer Monday) with Dilip, as even this current week we are still experiencing disruptive behavior.

You had mentioned wanting to use this last week to finalize leadership alignment, data security teams etc in order that Wendy and I could hold the conversation when we return from PTO.

Just wanted to confirm we are good to go. Appreciate your partnership throughout this process.

As an aside, I intend to get to Dallas this next week to be with the remaining Dallas team in person after we have the separation convo with Dilip.

Let me know if you need anything else from me.

Get Outlook for iOS

1

# EXHIBIT 3

Share | Copy link | Download | ... | Termination recommend....msg | Info | ◁

**From:** Wendy Bowman  Wendy.Bowman@walmart.com
**Sent on:** Wednesday, October 4, 2023 11:07:31 PM
**To:** Lori Chumbler  Lori.Chumbler@walmartlegal.com
**CC:** Monica Hall  Monica.Hall@walmart.com ; Shawn Cohen  Shawn.Cohen@walmart.com
**Subject:** ████████████████
**Attachments:** ████████████████

Lori and Monica,

██████████████ the latest developments with Dilip Jana. ██████████ accountability/separation for performance, and disparaging, disruptive and dismissive behavior causing a toxic work environment. Recommendation for accountability is attached, but has escalated to "separation" due to the latest developments.

████████████████████████

We have met previously with Jeff Spillyards, but Shawn asked me to reach out to both of you since Shawn has connected with you as well.

- ████████
- ████████
- ████████

Please let me know if you will be able to meet on Thursday.

Thank you,

**Wendy Bowman | HR People Partner**
**Walmart** ⁎ Walmart US Transformation & Support
*Reverse, Quality and Solutions Design*
*SERVES ARG Vice-Chair*
601 N. Walton Blvd.
Bentonville, AR 72712
(479) 321-2958
wendy.bowman@walmart.com