# EXHIBIT 5

**UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**
**COVINGTON DISTRICT OFFICE**

|  |  |
|---|---|
| *In the Matter of:* | **OALJ CASE NO.:  2024-CAR-00004** |
| **DILIP JANA,** | |
| *Complainant,* | **OSHA CASE NO.:  301028782** |
| v. | |
| **WALMART INC.,** | **CHRISTINE HILLEREN-WILKINS** |
| *Respondent.* | Administrative Law Judge |

### RESPONDENT'S ANSWER

Respondent Walmart Inc. ("Walmart") submits the following Answer as follows:

### I.    REQUEST FOR MORE DEFINITE STATEMENT

1.    The Court's April 15, 2024, Notice of Assignment and Initial Order ("NOA") requires Complainant Dilip Jana ("Jana") to set forth "a list of each protected activity Jana relies on, with the date and a detailed description of the activity." (NOA at Page 3). Jana has failed to not only meet this requirement, he has also failed to provide notice of a violation of any kind in what can best be described as a freeform venting of imagined grievances against his former employer. This has gone on long enough, and Respondent respectfully asks the Court in the interests of justice and the parties, to dismiss the Complaint.

2.    Without a clear understanding of Jana's claims, Walmart is unable to appropriately respond or formulate affirmative defenses in accordance with the Court's NOA. Thus, in the alternative, Walmart respectfully requests the Court order Jana to provide:

> a.  a simple list of the activities he contends were protected under SOX—i.e., the reports he contends he made of conduct he believed to violate SOX, and why he believes the reported conduct violated SOX.

---

**RESPONDENT'S ANSWER**                                                    **Page 1 of 18**

      b. a simple list of the activities he contends were protected under SOX—i.e., the reports he contends he made of conduct he believed to violate CAARA, and why he believed the reported conduct violated CAARA.

## II.    CONTENTIONS OF FACT AND LAW

3.    On October 19, 2024, Walmart terminated its employment Jana as a result of Jana's poor work performance, failure of leadership, and disrespectful and disruptive behavior. Seemingly incapable of accepting any responsibility for the poor choices that lost him his job, Jana, armed with a shifting and inconsistent set of theories, has sought to exploit the Department of Labor's (DOL's) whistleblowing process with a baseless retaliation claim. The DOL investigator rightly dismissed Jana's complaint, and the Court should do the same.

4.    Jana's allegations are difficult to pin down, both because they are ill-defined and because he appears to change them to fit new facts and laws as he learns about them. Jana's initial allegation appears to have been that Walmart retaliated against him for making an October 16, 2023, ethics complaint against his manager, Adrian Milbourne, and possibly because of a September 27, 2023, complaint he made to the Department of Justice (of which Walmart was unaware until the DOL complaint) alleging Walmart had committed anti-trust violations. (**Exhibit 1**, DOL Letter dated January 3, 2024, pp. 6, 9).[1] The original centerpiece of Jana's allegation was that he was punished for internally reporting that his supervisor, Adrian Milbourne, manipulated the bidding process for a contract awarded to third party vendor, Infogain, which Milbourne accomplished in partnership with Walmart Vice President Ridhi Mehra, who Jana originally

---

[1] At one point, Jana—apparently having found an article about Walmart's 2019 FCPA settlement—reformulated his September DOJ "Anti-Trust" complaint as an "FCPA" complaint in an email to DOL Investigator Bernand Noel, writing, "In the document you can see I complained about FCPA on 09-27-2023 at that point I did not know that Walmart paid $220M for a previous FCPA violation in 2019." (**Exhibit 2**, Jana's original exhibit 5-C, at 1.) Jana has since abandoned this claim, likely because it is a blatant falsehood contradicted by the September 27, 2023, email he sent to the DOJ (**Exhibit 1**, DOL letter dated January 3, 2024, at Page 8).

speculated must have been the beneficiary of the scheme through a bribe received on a trip to visit her family in India.[2]

5.      Benefiting from Walmart's response (where we pointed out, among other things, the impossibility of Jana's retaliation timeline and the absurd speculation of his bribery allegation, (**Exhibit 3**, Walmart Resp. at 1-2, 5-7)), Jana has changed tack, now seeming to generally assert that Walmart terminated him for a mix of reasons that still include complaints about the Infogain selection, retaliation for its own sake, and a general underappreciation of Jana's pedigrees in data science.

6.      But no matter the vehemence of his desire to rewrite the past, Jana cannot avoid it, and even in his cataloguing of the various wrongs he alleges were committed against him, he reveals the truth.  The truth is that the individuals Jana now maligns promoted him into a leadership role in which he faced challenges, and, rather than accept mentorship and set on a course of self-correction, he chose to take his failures out on the very people trying to help him—and who sought his help in the tasks with which he was charged—leading to a destructive spiral of increasingly disrespectful and disruptive behavior and ultimately his termination.  The record shows that Jana has only himself to blame for his failures in his job and is now wasting not only Walmart's and the Court's time in this frivolous, vexatious, and pointless litigation, but also his own.

### A.  Walmart terminated Jana as a result of his poor performance and insubordinate behavior.

#### (i)    Jana disrupted meetings and accused Vice President Ridhi Mehra of being a dictator because Mehra delegated work to his peer that Jana thought should be his own.

7.      Whenever Jana characterizes his leadership's behavior as "dictatorship" or "retaliation," a closer look exposes leaders struggling to deal with a subordinate who refuses to cooperate,

---

[2] If this seems confusing, it is. Jana variously attributed the vendor bid rigging to Milbourne, Mehra, and his colleague Kamil Bay. (*See, e.g.,* Original Petition at 14-16).

improve, and—as a leader—lead.  The clearest examples of this behavior are those Jana himself provides.

8.      As Jana recounts in his complaint, he attended and recorded a remote video meeting on October 3, 2023, that included the entire Data Solutions team of which he was a part, from Vice President Ridhi Mehra on down. (Original Petition at 29-30; 32-33).  During the meeting, Jana repeatedly referred to Ridhi's leadership as a "dictatorship," apparently because Jana suspected Mehra of routing work to Jana's peer, Kamil Bay, that Jana felt should belong to him.  "I don't understand why this [sic] Kamil is getting there, despite the fact that this is data analytics team… So, I feel like we are enforcing a dictatorship here." (*Id.*).

9.      Walmart fosters a culture of open communication and feedback, but also states as a core value "Respect for the Individual." [3]  Jana's decision to use a team meeting to publicly denounce Ridhi Mehra as a dictator was a clear violation of this policy, and one of many poor decisions that were his own and resulted in his termination.

   *(ii)  Jana sent an email to Milbourne accusing Milbourne of retaliation because Milbourne delegated work to his peer that Jana thought should be his own.*

10.     On September 14, 2023, Jana's immediate supervisor, Adrian Milbourne, sent an email to Jana with the subject line: Dilip 1:1 Deliverables. (See Original Petition Ex. C., at 2-4).   This email is a continuation of a communication Milbourne initiated on August 24, 2023, in preparation for a meeting with Jana, in which Milbourne in an evidently conscientious and professional tone attempts to outline work requirements and associated deadlines—in particular the need for Jana to fulfill his responsibilities as a team lead by hiring a team.  (*Id.* at 5-6).  In an explosive response on September 15, Jana deflected responsibility for his assigned tasks and blamed Milbourne for Jana's inability to accomplish them.  (*Id.* at 2-4).

---

[3] https://www.walmartethics.com/content/walmartethics/en_us/code-of-conduct.html

11.     Jana made the following comment—with font and color as represented—in response to Milbourne's assessment that a project was late:

> Please READ from my previous email, it's simple English, "I propose WFP use case updates and timelines- Due Sept 8[th.]
>
> **provided we get all the answers**".
>
> So, **this is NOT LATE**…

(*Id.*).

12.     After insulting his supervisor and refusing to do the work assigned to him, Jana accused Milbourne of "retaliation" when Milbourne assigned work to Jana's peer, Kamil Bay. First by asking, "May I know why?" then, on October 5, 2023, with the inflammatory "If I do not receive a response by EOD Friday, Oct 6, 2023, I'll assume you agree that you are discriminating and retaliating as I mentioned before." Milbourne and others had by this point not surprisingly reached the decision to terminate Jana for both his failure to perform his work and his increasingly belligerent behavior.

### (iii)     *Jana proclaimed, "My grandma could do it!" in a team meeting that included Infogain contractors.*

13.     Though his theory has shifted over time, a mainstay of Jana's "whistleblowing" claim has been his allegation of impropriety with respect to Walmart's use of third-party vendor, Infogain. It is clear at the very least that Jana had no love for Infogain, as evidenced by his admitted treatment of Infogain representatives at meetings, where his behavior again crossed the acceptable boundary of Walmart's core value of "Respect for the Individual," and contributed to the ultimate decision to terminate him.

14.     On August 23, 2023, Jana's Data Solutions team participated in a video call with representatives of Infogain. During the meeting, Jana launched into a personal attack on Infogain's

representatives when he declared "My Grandma could do it!" or words to that effect. (*See* Original Petition Ex. D, at 1).

15.     Adrian Milbourne subsequently counseled Jana on this episode in a one-on-one meeting. Milbourne documented this counseling in an email to Jana on August 25, 2023, in which he memorialized a conversation about "Approach – ensure that our message is not masked by our method of delivery" and "always ensure we demonstrate respect for the individual as we engage the team." (*Id.* at 5). Milbourne confirmed in a subsequent email to Jana that this comment referred to their conversation about the "grandma" incident, to which Milbourne added, "I personally thought it was not a necessary comment to make and could be found insulting, but I also had another Walmart associate approach me after the meeting that was struck by the comment as well." (*Id.* at 3).

16.     Jana's reaction to this constructive feedback came on September 15, 2023, at 2:11 AM, as a barrage of deflections, excuses, and complaints about Infogain. (*Id.* at 1). What Jana's response did not contain was any acknowledgment of the impact of his insult, or that it was an insult at all. Far from demonstrating his understanding of the Company's Code of Conduct, and the expectations of the leadership role he was tasked with fulfilling, Jana's response demonstrated disdain for his colleagues, ignorance of the team concept, and a total unwillingness to accept responsibility—i.e., part of the recurring pattern of behavior that contributed to Jana's termination.

### B. Jana had no basis to assert that there was any impropriety—let alone unlawful conduct—in Walmart's selection of Infogain for work with the Data Solutions team.

#### (i)     *Jana provides no explanation for his assertion that Infogain was improperly chosen, and points to no evidence that would support such a conclusion.*

17.     Jana's central accusation against Walmart still appears to be that he was punished for calling into question the integrity of leadership in their selection of Infogain as a vendor. Indeed, without Infogain, Jana's allegations are no more than a recounting of his grievances against his

leadership for perceived slights and failure to acknowledge and reward his announced data science credentials. But, other than contemporaneous emails in which he makes the same unsubstantiated accusations he makes now, he has yet to provide any evidence or explanation for why this would have been a reasonable conclusion with any basis in fact.

18.    Having apparently abandoned the wholly unsupported suggestion that Ridhi Mehra traveled to India to collect a bribe from Infogain, Jana's remaining "evidence" of his knowledge of improper conduct are mainly citations to conclusory statements he made in emails about the "unethical" Infogain selection process, sometimes with apparently never-fulfilled promises to provide subsequent information ("It has come to my attention that . . . (Infogain) selection was done in an unethical manner," Original Petition at 10, 20, "I believe Kamil is approving Infogain's work unethically," Original Petition at 24, 35, 101).

19.    Jana also repeatedly points to a recording Jana made of Ridhi Mehra without her awareness, which he claims shows "she [had] had already set her mind favorably for Infogain due to some reason." (*See* Original Petition at 14, 38). Even assuming that "setting her mind favorably" for a vendor could substantiate a reasonable conclusion of unlawful conduct on Mehra's part, Jana's transcription of his conversation with Mehra does not reach even that questionable bar. The transcription appears to be that of a leader seeking a subordinate's counsel in weighing the pros and cons of choosing a less expensive vendor over a more recognizable one and asking him to do some diligence to aid those deliberations.

> [I]f it was my personal business, I do like Infogain more, not because of just the cost but I think they understand the problem better...I know Deloitte, because they are consultants, they will deliver something. If you think about POC, get Infogain and then you can use our internal intelligence...My ask to you can you look at industry journals and Gartners ...to see like is if Infogain has credibility in the market.

(*See* Original Petition at 14) (ellipses in original).

> *(ii)    Jana abandoned his contention that Mehra was engaged in an illicit financial arrangement with Infogain after Walmart exposed it as unsupported speculation.*

20.    Underscoring the apparent malleability of the wrongdoing Jana claims he was terminated for raising is his apparent abandonment of his once material accusation that Ridhi Mehra accepted a bribe from Infogain to win its bid award.  His basis for this conclusion was that Mehra—who is Indian and has family in the country—traveled to India.  Jana, at least in his post-termination correspondence with the DOL investigator, deemed the visit "suspicious" because it "lasted just a week" and Mehra has a "5-year-old child."  (See **Exhibit 2**, Jana's Exhibit 5-C at page 1).

21.    As Walmart pointed out in its initial response, Mehra did in fact travel to India sometime after the bid selection, but she went there to visit family members.  (**Exhibit 3**, Resp. at 5).  It is also true that Infogain reached out to Mehra to invite her for a site visit, but also true that she declined because, as Jana observed, her visit was short, and she did not have the time.  As Mehra explained in a July 6, 2023, email to Infogain, "Unfortunately, this is a very short trip and I have a full itinerary already and so unable to squeeze any time." (**Exhibit 3**, Resp., Ex. 1, at 1).

## C.  Walmart decided to terminate Jana for cause on October 4, 2023, and there was no retaliation.

22.    From the middle of September through October 2023, Jana's behavior towards his team and supervisors became increasingly problematic until it became clear to his leadership that he was not only failing to do his own work, he was—as a designated leader—creating a negative work environment about which other associates had begun to complain.  On top of his negative attitude toward his managers and co-workers, Jana did not positively contribute to assigned tasks.  When problems arose, Jana did not take initiative to solve those problems.  Instead, he would claim the problem was not of his making, not his responsibility, or both.

23.    Walmart made the decision to terminate Jana on October 4, 2023, for "performance, and disparaging, disruptive and dismissive behavior causing a toxic work environment." (**Exhibit 4,**

---

Wendy Bowman email dated Oct. 5, 2023). Anyone who displayed this behavior—let alone a team leader—would have risked termination, regardless of whether they filed a complaint with Walmart. Walmart decided to terminate Jana on October 4, 2023, for cause. That decision had everything to do with Jana's work product and behavior, and nothing to do with his complaints.

      *(i)*     ***After months of substandard results and insubordinate behavior Walmart concluded that Jana did not intend to improve his performance and terminated his employment.***

24.    The record shows that Adrian Milbourne hired Dilip Jana into a leadership role on his team in April 2023, and that he and Ridhi Mehra did everything they could to help Jana succeed. Milbourne's email exchanges with Jana show the efforts of a conscientious and mindful leader trying to mentor a subordinate who refuses to be mentored, and instead responds with excuses and vitriol. Despite the efforts of his leadership, Jana demonstrated no intention of changing his behavior and continued to mistreat people who he believed were not as smart or as valuable as he believed he was.

25.    This sentiment is captured in Milbourne's email to an internal human resources associate on October 12, a week after the decision had been made to terminate Jana, and four days before Jana made an unfounded October 16 ethics claim against Milbourne.

> "I am hoping to take termination steps early next week (strongly prefer Monday) with Dilip, as even this current week we are still experiencing disruptive behavior."

(**Exhibit 3**, Resp., Ex. 2).

      *(ii)*     ***Despite reformulating his retaliation theory around Walmart's response to his initial complaint, Jana still cannot show his termination was caused by anything other than his poor work performance and disruptive behavior.***

26.    An internal email sent on October 4, 2023, among HR personnel, shows conclusively that Walmart decided to terminate Jana's employment on that date. It includes the statement that the [r]ecommendation for accountability [for Dilip Jana] . . . has escalated to 'separation' due to the

latest developments," and includes as considerations for that recommendation, "disparaging, disruptive and dismissive behavior causing a toxic work environment." (**Exhibit 4**, Wendy Bowman email dated Oct. 5, 2023).[4]

27.     Jana was apparently on vacation when the decision was made, and Walmart waited until Jana returned to work in order to meet with him and present the reasons for his termination in person. On Thursday, October 12, Milbourne emailed about "tak[ing] termination steps early next week." (**Exhibit 3**, Resp., Ex. 2). The following Monday, October 16, Jana made an ethics complaint against Milbourne alleging mistreatment and retaliation, and three days later, on Thursday, October 19, Milbourne and Wendy Bowman (who sent the October 4 email memorializing the termination decision) met with Jana to inform him that his employment with Walmart was terminated.

28.     Accordingly, Jana's October 16 ethics complaint played no role in his termination and there is no evidence either Milbourne or Bowman were aware of Jana's complaint when they met with him on October 19. Benefiting from Walmart's response to his original complaint, Jana offers a reformulated theory of retaliation, suggesting that the October 4 decision to terminate him was predicated on emails and actions he took in the immediately preceding days. (*See* Original Petition at 33-36). He is not entirely wrong. Many of the events he describes, including calling Ridhi Mehra a dictator in front of the entire Data Solutions team and the disrespectful and accusatory tone he took in response to professional emails from Milbourne asking him to do his job may have either factored into or reinforced the coming decision to terminate him. But any suggestion that

---

[4] This document was marked "Attorney/Client Privilege" by the original author, and Walmart provided a redacted version in its original response out of an abundance of caution. We have reassessed the document and determined that it was originally marked for privilege in good faith error. We are attaching the unredacted version herein as an Exhibit and intend on providing the attachments subject to a protective order that will be submitted after conferring with Dr. Jana. To be clear, Walmart is not waiving privilege in any context with the inclusion of Exhibit 4 or any of its submissions.

he was terminated for raising allegations of unlawful conduct is completely false and unsupported by any of the "evidence" he cites.[5]

29.     Dilip Jana was terminated because of his own self-destructive behavior and work performance, and for no other reason.

### D.  Contentions of Law

#### (i)     No alleged "whistleblower" report involved SOX-covered conduct, so no SOX Retaliation could have occurred.

30.     The Sarbanes-Oxley Act of 2002 protects whistleblowers who report financial wrongdoing at publicly traded companies. 18 U.S.C. § 1514A. In order to establish that a whistleblower report constitutes a protected activity under Section 1514, a Jana must show he "reasonably believes" that the conduct complained of constitutes a violation of the laws listed at Section 1514.

31.     As a threshold matter, to invoke the protection of Section 1514, the Jana must report conduct that falls into one of six exhaustive categories enumerated in 18 U.S.C. § 1514A(a)(1): mail fraud, wire fraud, bank fraud, securities fraud, any SEC rule or regulation, or any federal law relating to fraud against shareholders. *Ronnie v. Office Depot, LLC*, 81 F.4th 1345 (11th Cir. 2023).

32.     When a whistleblower invokes the Act and claims he was fired because of his protected activity, his claim is "governed by the legal burdens of proof set forth in section 42121(b) of title 49, United States Code." 18 U.S.C. § 1514A(b)(2)(C).

33.     Under that incorporated framework, a whistleblowing employee meets his burden by showing that his protected activity "was a contributing factor in the unfavorable personnel action alleged in the complaint." 49 U.S.C. § 42121(b)(2)(B)(iii). If the employee meets that burden, the employer can prevail only if it "demonstrates by clear and convincing evidence that the employer

---

[5] Many of the examples Jana cites in this timeline are emails where he accuses Milbourne and others of "retaliation" or acting "unethically" without substantiation. (*See* Original Petition at 33-36.) Jana appears to misunderstand these accusations as evidence of the acts themselves. They are not.

would have taken the same unfavorable personnel action in the absence of that behavior." Id. § 42121(b)(2)(B)(iv).  See *Murray v UBS Securities, et al*; No. 22-60 (2004).

### 1. A reasonable person with Jana's training and experience would not believe the alleged conduct constituted a SOX violation.

34.     Jana presents himself as a whistleblower who is engaged in protected activity and claims that he was terminated because he was making a valid complaint that exposed a fact or problem that Walmart wanted to hide.  None of this is true and his complaint should be dismissed.  Jana's first ethics complaint against Mehra related to Infogain is totally unsubstantiated.   Jana's allegations were never anything more than unsupported accusations. His sole substantive allegation of wrongdoing—which he does not mention in his Complaint—that Ridhi Mehra accepted a bribe, was pure speculation, for which there is zero supporting evidence and ample contrary evidence.

35.     Critically: Jana offers no explanation *why* he believed misconduct occurred—or why *any person with his training or experience* would believe misconduct occurred.

36.     Moreover, the general "criminal fraud" Complaint alleges does not fall within one of the six exhaustive categories of fraud enumerated in Section 1514(a)(1).

### 2. No causal connection

37.     Jana cannot meet his initial burden in showing that the "protected activity" he engaged in was a contributing factor in his unfavorable employment decision.  Every complaint that Jana lodged was given due consideration.  He was never disciplined for the reports he made to ethics or for the complaints he made in listening sessions.  The fact is Jana's complaints were not true. What is true, is that the complaints had no bearing on Walmart's decision to terminate Jana and were not a contributing factor in his termination.

38.     Walmart had every right and an abundance of reasons to terminate Jana.  Any employee who acted like Jana when Walmart employed him—who disregarded and denigrated his or her supervisor in a public forum, avoided completing work assignments, insulted team members and contractors and spent an inordinate amount of time making excuses and assigning blame for their lack of performance—could be terminated, regardless of their claimed participation in protected activity.

39.     In conclusion, Jana has not demonstrated that his complaints contributed in any way towards the decision to terminate his employment. The evidence clearly shows that Walmart rightfully terminated Jana's employment for the reasons stated above and that he was not retaliated against.   Accordingly, Walmart respectfully requests that Jana's complaint be dismissed.

### *(ii)*     **Jana's alleged "whistleblower" reports did not involve conduct prohibited by *CAARA*, so no *CAARA* retaliation could have occurred.**

40.     15 U.S.C. § 7a-3 provides     anti-retaliation protections     specifically     in     antitrust matters. *See* 15 U.S.C. § 7a-3. 15 U.S.C. § 7a-3 is a subchapter of 15 U.S.C. Chapter 1, which governs monopolies and combinations in restraint of trade.

41.     Providing the general context for the chapter, 15 U.S.C § 1 specifically prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C § 1.

42.     Jana has failed to allege in any way how his termination, or other alleged adverse actions, were the result of CAARA protected activity. In particular, he has not—and cannot in good faith— allege that any adverse action was the result of any conspiracy, and nowhere has he alleged how these actions restrained trade or commerce. *C.f. Sleem v. United States Federal Government*, 2023 WL 3143429 at *6 (E.D.N.C. Mar. 27, 2023) (dismissing *pro se* CAARA retaliation claim for,

---

*inter alia*, failure to allege in any way how dismissals and suspensions were related to any conspiracy or restraint on trade or commerce).

### III.   DENIAL OF ALLEGED PROTECTED ACTIVITIES AND ADVERSE ACTIONS

#### A.  Alleged Protected Activities

43.     Jana's Statement of Protected Activities, (Original Petition at Page 38-39), fails to point to any report Jana contends to be protected under SOX or CAARA in accordance with the Court's April 15, 2024, NOA, which requires Jana to list each protected activity Jana relies on, with the date and detailed description of the activity. (*See* NOA, dated April 15, 2024). Accordingly, Walmart is unable to reasonably provide specific denials of particular alleged protected conduct.

44.     Walmart reserves the right to amend this Answer upon clarification of Jana's allegations.

45.     Out of an abundance of caution, Walmart denies that any factual allegation set forth in Jana's Original Petition constitutes a protected activity under SOX or CAARA. No fact alleged in Jana's Original Petition definitively or specifically relates to securities law violations or other categories of fraud exhaustively identified for protection under SOX, or any protected conduct under CAARA.

#### B.  Alleged Adverse Actions

##### 1.  "Threat" – Sept. 6, 2023 (Jana's Original Petition at Page 26)

46.     Walmart denies the occurrence of any alleged conduct constituted a "threat" that could constitute an adverse action within the meaning of SOX or CAARA.

47.     Walmart denies that any alleged conduct was the result of retaliatory motive, or any other motive other than legitimate efforts by Walmart to manage an employee.

##### 2.  "Harassment and Threat" (Jana's Original Petition at Page 26)

48. Walmart denies the occurrence of any alleged conduct constituted a "threat" or "harassment" that could constitute an adverse action within the meaning of SOX or CAARA.

49. Walmart denies that any alleged conduct was the result of retaliatory motive, or any other motive other than legitimate efforts by Walmart to manage an employee.

### 3. "Demotion" – Sept. 15, 2023 (Jana's Original Petition at Page 27); Oct. 3, 2023 (Jana's Original Petition at Page 29)

50. Walmart denies the occurrence of any alleged conduct constituted a "demotion" that could constitute an adverse action within the meaning of SOX or CAARA.

51. Walmart denies that any alleged conduct was the result of retaliatory motive, or any other motive other than legitimate efforts by Walmart to manage an employee.

### 4. "Excluding from meeting" – Sept. – Oct. 2023 (Jana's Original Petition at Page 27)

52. Walmart denies the occurrence of any alleged "exclusion from meeting" that could constitute an adverse action within the meaning of SOX or CAARA.

53. Walmart denies that any alleged conduct was the result of retaliatory motive, or any other motive other than legitimate efforts by Walmart to manage an employee.

### 5. "Demotion" – Oct. 3, 2023 (Jana's Original Petition at Page 27)

54. Walmart denies the occurrence of any alleged "demotion" that could constitute an adverse action within the meaning of SOX or CAARA.

55. Walmart denies that any alleged conduct was the result of retaliatory motive, or any other motive other than legitimate efforts by Walmart to manage an employee.

### 6. "Fired" – Oct. 19, 2023 (Jana's Original Petition at Page 27)

56. Walmart admits that Jana was terminated.

57.   Walmart terminated Jana for legitimate business reasons, including substandard performance, in addition to harassing, abusive and disruptive conduct directed toward colleagues and superiors.

## IV.   OBJECTION TO JANA'S ALLEGED DAMAGES

58.   Walmart objects to Jana's claim for compensatory damages as speculative, not causally connected to any act or omission of Walmart, and unconscionable,

59.   Walmart objects to Complaints claims for front pay and back pay as not rooted in evidence and entirely speculative.

60.   Walmart objects to any claim for punitive damages on grounds that any alleged wrongful conduct was not willful, knowing, or intentional.

61.   Walmart also objects on grounds that Jana's claims for punitive damages are not limited in accordance with applicable damages caps.

62.   Jana's alleged mental anguish damages and other compensatory damages are the result of pre-existing conditions or other causes unrelated to any conduct by Walmart alleged in Jana's Original Petition.

## V.   AFFIRMATIVE DEFENSES

63.   Even if Jana engaged in SOX or CAARA protected Activity—which Jana did not— Walmart would have terminated Jana regardless of the protected activity.

64.   Walmart reserves the right to amend its affirmative defenses upon discovery of additional facts, or upon clarification of Jana's pleadings.

## VI.   EFFORTS TO CONFER IN GOOD FAITH

65.   Walmart is preparing a draft protective order for discovery in this matter and has also requested a conference in order to effectively deal with the volume and subject matter of discovery that Jana has demanded.  Walmart was prepared to mediate this matter until Jana withdrew from

the process on the same day the parties met with the assigned Mediator. There have been no stipulations in this matter.

## VII.    FINAL PRAYER FOR RELIEF

66.    Walmart respectfully request this Honorable Court dismiss the Complaint for failure to state a claim and for avoidance of further waste of judicial resources.    29 CFR § 18.70 (c).

Dated: June 14, 2024

/s/ Michael Elliott
Michael Elliott
melliott@mcguirewoods.com
Mindy Sauter
msauter@mcguirewoods.com
Cory R. Ford
cford@mcguirewoods.com
McGuireWoods LLP
2601 Olive Street, Suite 2100
Dallas, Texas 75201
Telephone: 214.932.6400
Facsimile:  214.932.6499

**ATTORNEYS FOR RESPONDENT**

## CERTIFICATE OF SERVICE

I certify that on June 14, 2024, a copy of the above document was served via the Court's

electronic filing system on the following:

Office of Administrative Law Judges
Hon. Christine Hilleren-Wilkins
5100 Village Walk, Suite 200
Covington, Louisiana 70433
OALJ-Covington@dol.gov

Dilip Jana
800 Fairlawn Street
Allen, Texas 75002
janadilip@gmail.com
Telephone: 318.243.9743


/s/ Michael Elliott
Michael Elliott

# EXHIBIT

# 1

**U.S. DEPARTMENT OF LABOR**

**Occupational Safety and Health Administration**
**525 S. Griffin Street**
**Room 602**
**Dallas, TX 75202**
**Tel: (972) 850-4145**
**Fax: (972) 850-4150**



Via Email: carrie.farthing@walmartlegal.com

January 3, 2024

Walmart, Inc.
c/o Carrie Farthing, Senior Lead Counsel
702 S. W. 8th Street
Bentonville, AR 72716

Re: Walmart, Inc./Jana/301028782

Dear Ms. Farthing:

We hereby serve you notice that a complaint has been filed on January 2, 2024, with this office by Dr. Dilip Jana. Dr. Jana is alleging retaliatory employment practices in violation of the Criminal Antitrust Anti-Retaliation Act of 2019 (CAARA), Public Law 108-237, 15 U.S.C. 1 and 15 U.S.C. § 7A-3, and the Sarbanes-Oxley Act of 2002 (SOX), 18 U.S.C. § 1514A. A copy of the complaint is enclosed.

The Occupational Safety and Health Administration (OSHA) is responsible for enforcing the Whistleblower provisions of the CAARA and SOX Acts and will conduct its investigation following the procedures outlined in 29 CFR Part 1979 and 29 CFR Part 1980. You may obtain a copy of the pertinent statute and regulations at http://www.whistleblowers.gov. Upon request, a printed copy of these materials will be mailed to you.

Under these procedures, OSHA will disclose to the parties information relevant to the resolution of the case as well as provide all parties an opportunity to fully respond. As such, both you and Complainant will receive a copy of each other's submissions to OSHA that are responsive to the above-referenced Whistleblower complaint.

***We request that any future documents you submit to OSHA be submitted electronically, if possible, using the investigator's email address of noel.bernard.j@dol.gov and whatever you submit to OSHA, you also send a copy to Complainant at the address below:***

> Dilip Jana
> 800 Fairlawn Street
> Allen, TX 75002

If the information provided contains personal, identifiable information about individuals other than Complainant, such information, where appropriate, will be redacted before disclosure. OSHA may contact the party directly for the un-redacted copy, if necessary. In addition, if a redacted version is sent to the Complainant, please include that in your submission to OSHA.

We would appreciate receiving from you within 20 days a written account of the facts and a statement of your position with respect to the allegation that you have retaliated against Complainant in violation of the Act. Please note a full and complete initial response, supported by appropriate documentation,

may help to achieve early resolution of this matter. The 20-day position statement is due by close of business (COB), January 23, 2024.

Attention is called to your right and the right of any party to be represented by counsel or other representative in this matter. In the event you choose to have a representative appear on your behalf, please have your representative complete the Designation of Representative form enclosed and forward it promptly. All communications and submissions should be made to Investigator Bernard Noel.

Your cooperation with this office is invited so all facts of the case may be considered. Voluntary adjustment of complaints can be effected by way of a settlement agreement at any time. In addition, informal Alternative Dispute Resolution (ADR) sessions can be requested. (See Attachments)

Sincerely,

Renato Uribe
Regional Supervisory Investigator

Bernard Noel
Federal Investigator
U.S. Department of Labor- OSHA
Office of the Whistleblower Protection Program
525 S. Griffin Street, Suite 602
Dallas, TX 75202
O: 972-850-4162
C: 405-850-7910
Email: noel.bernard.j@dol.gov

Enclosures:    (1) Region VI, ADR Fact Sheet & ADR Form
               (2) Designation of Representative
               (3) Copy of Complaint

## Alternative Dispute Resolution (ADR)
## Frequently Asked Questions

### *What is OSHA Region VI's ADR program?*

OSHA offers a voluntary Alternative Dispute Resolution (ADR) program in which the parties may attempt to resolve the dispute without an investigation. If the parties elect to pursue ADR, an OSHA official may help the parties achieve early resolution of the complaint before the onset of a full-scale investigation. Early resolution is a process in which the parties attempt to negotiate a settlement with the assistance of a neutral OSHA Whistleblower expert, who is not the investigator assigned to the case and is not involved in OSHA's decision-making on the merits of the case. Communications during the early resolution process are kept confidential, to the extent permitted by law, and are not disclosed to the Whistleblower Investigator or any other Department of Labor employee who is involved in the agency's decision-making on the merits of the case. If OSHA approves the parties' request for early resolution, the investigation will be stayed pending the outcome of the early resolution process. If the parties decline to pursue ADR or if they pursue ADR, but fail to reach a settlement agreement, the investigator identified in the opening letter will proceed with an investigation. *However, even if attempts at ADR fall through, the parties, with the assistance of the investigator, may enter into a settlement agreement at any time during the course of the investigation.*

### *What are the benefits of ADR?*

ADR allows the parties to resolve the complaint in a mutually satisfactory manner and is faster than an investigation. The process may also allow the parties to preserve or repair the employment relationship. If you do not reach a settlement agreement through an ADR session, OSHA will investigate the complaint like any other.

### *How do I sign up for OSHA's ADR Program?*

If you would like to pursue ADR, please return the attached "Request for ADR" form within ten (10) business days of your receipt of this letter. If both parties request ADR, an OSHA official will be contacting you to facilitate an ADR session.

### *What happens if I want to pursue ADR but the other party does not agree?*

OSHA Region VI's ADR program is voluntary. Both Complainant and Respondent must agree to participate. If either party does not wish to participate, the OSHA investigator will proceed with an investigation.

### *What happens if both parties ask for ADR?*

If both parties request ADR, an OSHA official will contact each party separately to coordinate a mutually agreed upon date, time, location and format for the ADR session. If the parties agree upon a framework, an OSHA official will then facilitate the ADR session. (This facilitator will be someone other than the investigator identified in the opening letter.) If the parties reach a settlement during the ADR session, the OSHA official will draft or review a proposed settlement agreement following the procedures outlined in the Whistleblower Investigations Manual (the Manual, available at *www.whistleblowers.gov*, Chapter 6, Remedies and Settlement Agreements.)

### *Does attempting ADR delay the OSHA investigation?*

Respondent must provide its position statement within 20 days of receiving OSHA's opening letter unless the parties reach a signed settlement agreement prior to that date. Attempting early resolution does not confer an extension of time in which Respondent may submit its position statement unless OSHA feels that such an extension would benefit the ADR process.

### *How much does this process cost?*

There is no charge to participate.

### *How can I learn more about OSHA's ADR program?*

Please contact the investigator of record identified in your opening letter.

## REQUEST FOR ADR FORM

Case: Walmart, Inc./Jana/301028782

The Occupational Safety and Health Administration (OSHA) offers a voluntary program under which the Complainant and Respondent may resolve a Whistleblower complaint outside of the investigative process, through early resolution. Early resolution is a process in which the parties attempt to negotiate a settlement with the assistance of a neutral OSHA Whistleblower expert, who is not the investigator assigned to the case and is not involved in OSHA's decision-making on the merits of the case. Communications during the early resolution process are kept confidential, to the extent permitted by law, and are not disclosed to the Whistleblower Investigator or any other Department of Labor employee who is involved in the agency's decision-making on the merits of the case. If OSHA approves the parties' request for early resolution, the investigation will be stayed pending the outcome of the early resolution process.

If the complaint is not resolved during the early resolution process, either party may share information and documents that were disclosed during the early resolution process with the assigned Whistleblower Investigator.

If you are interested in participating in early resolution, please email this form to noel.bernard.j@dol.gov or call the Whistleblower Investigator at Bernard Noel @ 972-850-4162.

_____ I am interested in pursuing ADR as an alternative to OSHA's investigation.

_____        _____
Signature                              Date


_____        _____
Print Full Name                        Daytime Phone Number


_____
Email address

**U.S. DEPARTMENT OF LABOR**

Occupational Safety and Health Administration
525 Griffin Street
Room 602
Dallas, TX 75202
Tel: (972) 850-4145
Fax: (972) 850-4150



# DESIGNATION of REPRESENTATIVE FORM

**PLEASE COMPLETE THE INFORMATION IN THE BOXES BELOW.  USE BLUE OR BLACK INK.
RETURN THIS FORM TO OSHA AS SOON AS POSSIBLE.**

**RE**:   Walmart, Inc./Jana/301028782

**The designated representative named below will represent the party named below in this matter. Generally, OSHA will communicate with and send any correspondence to the designated representative. Additionally, the designated representative agrees to accept service of any subpoena on behalf of the party.**

| Party's Name (Type or print in the box below) | Representative's Name (Type or print in the box below) |
|---|---|
|  |  |
| **Signature (Sign below)** | **Street Address or P.O. Box (Type or print in the box below)** |
|  |  |
| **Date (Type or print in the box below)** | **City, State, ZIP (Type or print in the box below)** |
|  |  |
| **Telephone (Type or print in the box below)** | **FAX (Type or print in the box below)** |
|  |  |
| **E-mail Address (Type or print in the box below)** ||
|  ||

| **From:** | Solis-Lewis, Ruth - OSHA |
|---|---|
| **To:** | R6-11C - OSHA |
| **Subject:** | Anti-Trust Whistle Blower Complaint |
| **Date:** | Tuesday, January 2, 2024 1:39:35 PM |

Dilip Jana was in our office this afternoon and stated that he filed a Anti-Trust complaint with the
DOJ in September 27, 2023 and was terminated on October 19, 2023 as a result of his complaint to
DOJ. He is claiming to be a Whistle Blower and would like to file a complaint. He was with the
Walmart Corporate office in Bentonville, AR and also worked out of Dallas, Texas.
Mr. Jana's contact information is 318-243-9743.
Email: janadilip@gmail.com
He would like to speak with someone from your office.
*Ruth Solis-Lewis*
*Assistant Area Director*
*US Department of Labor / OSHA*
*Dallas Area Office*
*1100 E. Campbell Rd., Suite 250*
*Richardson, Texas 75081*
*Telephone: 214-283-1504*
*Facsimile: 972-952-1338*

| | |
|---|---|
| **From:** | Mabee, Michael - OSHA |
| **To:** | R6-11C - OSHA |
| **Subject:** | Assign for Screening (Possible CAARA and SOX) |
| **Date:** | Tuesday, January 2, 2024 3:32:03 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | 20240102145404290.pdf |

Complaint filed in person at the Regional Office on 1/2/2024.

**Complainant:**

Dr. Dilip Jana

800 Fairlawn St.

Allen, TX 75002

Phone number: 318-243-9743

Email: janadilip@gmail.com

**Respondent:**

Walmart, Inc.

Corporate Office

702 S.W. 8th Street

Bentonville, AR 72716

Complainant was the "Director of Data Science" for Walmart, Inc. corporate HQ. He started with RP on 3/2/2020 as Principal Data Scientist. CP was promoted to Director of Data Science on 4/8/2023. CP states he reported embezzlement, fraud, and antitrust violations internally to RP and to the U.S. Department of Justice several times from August to October 2023. CP was terminated on 10/19/2023. The reason CP was given for the termination was "underperformance." (He states his past performance evaluations were good and there is no basis for "underperformance.") Attached emails were provided by CP today.

Michael Mabee

Assistant Regional Administrator - WPP

U.S. Department of Labor - OSHA

525 S. Griffin Street, Room 602

Dallas, TX 75202

(972) 850-4158

www.whistleblowers.gov

 Gmail

Dilip Jana <janadilip@gmail.com>

---

## Violation of Antitrust Laws by Walmart Inc :: Dilip Jana

2 messages

---

**Dilip Jana** <janadilip@gmail.com>
To: antitrust.atr@usdoj.gov
Cc: Dilip Jana <janadilip@gmail.com>

Wed, Sep 27, 2023 at 10:39 PM

This is Dr. Dilip Jana from 800 Fairlawn St, Allen, TX 75002. My phone number is: 318-243-9743. I am over 18 years old. I am a Walmart Home Office employee based out of Walmart's Dallas Tech Hub.

I have information regarding possible violation of various Anti-trust laws and suspected embezzlement. I am not an attorney, I am suspecting in good faith based on my experience. I am reporting a possibility of a violation. I have evidence which I could not attach in this email because of the size of those documents, however, I'll be happy to provide you those documents through Google Drive, ICloud, Dropbox or I can upload those documents in your portal once I get instruction on how to submit those documents.

I'll be happy to provide more information if we talk. I have attached a file for initial report for your review.

> **09-27-2023-Walmart-Antitrust-Violation-Embezzlement.pdf**
> 10137K

---

**Dilip Jana** <janadilip@gmail.com>
To: antitrust.complaints@usdoj.gov

Wed, Oct 4, 2023 at 2:05 PM

[Quoted text hidden]

--
Thanks
Dilip

> **09-27-2023-Walmart-Antitrust-Violation-Embezzlement.pdf**
> 10137K



Dilip Jana <janadilip@gmail.com>

---

## Unethical Practices Leading to My Termination
6 messages

---

**Dilip Jana** <janadilip@gmail.com>                                                    Fri, Nov 3, 2023 at 11:02 AM
To: mcmillon.doug@walmart.com
Cc: Paula.coil@walmart.com
Bcc: Dilip Jana <janadilip@gmail.com>

**Dear Doug,**

    Unfortunately my position was abruptly terminated on Thursday, 10-19-2023 (3 days after I submitted an ethics complaint about my manager). It is with a heavy heart that I am sending you this email, because the last 3.5 years at Walmart have been my most fulfilling years personally and professionally. I believe that my termination was out of malice and is not aligned with the Walmart culture or principles that I embrace.

Therefore, I am reaching out to clearly identify the unethical initiatives, bring light to dangerous leaders who are firing maliciously, and ultimately to reevaluate my termination.

Below is a timeline of events:

**Fired** (10-19-2023)
Fired 3:30 pm.

**Submitted Ethics Complaint** (10-16-2023)
I submitted an ethics complaint about my manager (**WMT331526**). I notified HRBP about this complaint.

**Escalated Unethical Vendor Selection to Walmart Executives** (10-06-2023)
I reached out to Greg Cathy and Allie Hazelwood, with a subject line, "Awarding MVP to Infogain: Unethical" where I explained the situation.

**Received Message About Closed Walmart Ethics Investigation**(09-27-2027)
I received an email from ethics. "Thank you for speaking up...the case is now closed... We partnered with the business, as needed, to address these concerns."

**Received Message About Limited Walmart Ethics Investigation** (09-25-2023)
I was visiting the Home Office at Bentonville and offered more evidence to Walmart Ethics and details, and the response was "No clarity is needed from you at this point...no additional action is needed from you at this time."

**Submitted Corruption and Antitrust Violations Ethics Complaint** (09-05-2023)
I talked to Paula Coil, Doug's Executive Assistant, and asked for help to report possible corruption by my previous Vice President. Paula then suggested that I talk to Matt Miner. I messaged Matt Miner's Executive Assistant, Shanna Morris, and Shanna introduced me with Jelahn Stewart (VP, Ethics). I reported possible antitrust violations to Jelahn Stewart.

**Addressed Unethical Disciplinary Action** (08-08-2023)
During Chris Nicholas's listening session, I expressed concerns that Walmart managers with no data science experience were ineffectively managing and leveraging highly specialized data scientists, and putting some Walmart employees on unethical disciplinary action.

**Identified Unethical Vendor Selection** (08-08-2023)

I reached out to Allie Hazelwood (SVP) to inform her ...that vendor (Infogain) selection was done in an unethical manner... and my management started retaliating against me."

I sincerely hope that upon reviewing the details provided, there will be a thorough re-evaluation of the circumstances surrounding my termination. I am open and willing to discuss this matter at your earliest convenience to provide any further information that may be required.

Thank you once again for your time and consideration.

Regards,
Dr. Dilip Jana
Ex-Walmart Director of Data Science
Walmart WIN #226329135

Ph: 318-243-9743
EMail: janadilip@gmail.com

---

**Dilip Jana** <janadilip@gmail.com>                                      Fri, Nov 3, 2023 at 11:07 AM
To: chris.nicholas@samsclub.com
Bcc: Dilip Jana <janadilip@gmail.com>

**Dear Chris,**
    Unfortunately my position at Walmart was abruptly terminated on Thursday, 10-19-2023 (3 days after I submitted an ethics complaint about my manager). It is with a heavy heart that I am sending you this email, because the last 3.5 years at Walmart have been my most fulfilling years personally and professionally. I believe that my termination was out of malice and is not aligned with the Walmart culture or principles that I embrace.
[Quoted text hidden]

---

**Dilip Jana** <janadilip@gmail.com>                                      Fri, Nov 3, 2023 at 11:15 AM
To: kieran.shanahan@walmart.com
Cc: "Allison.Mcbride@walmart.com" <Allison.Mcbride@walmart.com>
Bcc: Dilip Jana <janadilip@gmail.com>

**Dear Kieran,**
[Quoted text hidden]

---

**Dilip Jana** <janadilip@gmail.com>                                      Fri, Nov 3, 2023 at 11:36 AM
To: furner.john@walmart.com
Cc: "Gaby.Fullen@walmart.com" <Gaby.Fullen@walmart.com>
Bcc: Dilip Jana <janadilip@gmail.com>

**Dear John,**
    Unfortunately my position at Walmart was abruptly terminated on Thursday, 10-19-2023 (3 days after I submitted an ethics complaint about my manager). It is with a heavy heart that I am sending you this email, because the last 3.5 years at Walmart have been my most fulfilling years personally and professionally. I believe that my termination was out of malice and is not aligned with the Walmart culture or principles that I embrace.

Therefore, I am reaching out to clearly identify the unethical initiatives, bring light to dangerous leaders who are firing maliciously, and ultimately to reevaluate my termination.

Below is a timeline of events:

**Fired** (10-19-2023)
Fired 3:30 pm.

## Submitted Ethics Complaint (10-16-2023)
I submitted an ethics complaint about my manager (**WMT331526**). I notified HRBP about this complaint.

## Escalated Unethical Vendor Selection to Walmart Executives (10-06-2023)
I reached out to Greg Cathy and Allie Hazelwood, with a subject line, "Awarding MVP to Infogain: Unethical" where I explained the situation.

## Received Message About Closed Walmart Ethics Investigation(09-27-2027)
I received an email from ethics. "Thank you for speaking up…the case is now closed… We partnered with the business, as needed, to address these concerns."

## Received Message About Limited Walmart Ethics Investigation (09-25-2023)
I was visiting the Home Office at Bentonville and offered more evidence to Walmart Ethics and details, and the response was "No clarity is needed from you at this point…no additional action is needed from you at this time."

## Submitted Corruption and Antitrust Violations Ethics Complaint (09-05-2023)
I talked to Paula Coil, Doug's Executive Assistant, and asked for help to report possible corruption by my previous Vice President. Paula then suggested that I talk to Matt Miner. I messaged Matt Miner's Executive Assistant, Shanna Morris, and Shanna introduced me with Jelahn Stewart (VP, Ethics). I reported possible antitrust violations to Jelahn Stewart. Jelahn Stewart also appreciated my courage to speak up and she also assured me not to worry about any retaliation
[Quoted text hidden]

---

**Dilip Jana** <janadilip@gmail.com>                                                        Fri, Nov 3, 2023 at 11:41 AM
To: donna.morris@walmart.com
Cc: "stephen.alston@walmart.com" <stephen.alston@walmart.com>
Bcc: Dilip Jana <janadilip@gmail.com>

**Dear Donna,**

　　Unfortunately my position at Walmart was abruptly terminated on Thursday, 10-19-2023 (3 days after I submitted an ethics complaint about my manager). It is with a heavy heart that I am sending you this email, because the last 3.5 years at Walmart have been my most fulfilling years personally and professionally. I believe that my termination was out of malice and is not aligned with the Walmart culture or principles that I embrace.

Therefore, I am reaching out to clearly identify the unethical initiatives, bring light to dangerous leaders who are firing maliciously, and ultimately to reevaluate my termination.

Below is a timeline of events:

**Fired** (10-19-2023)
Fired 3:30 pm.

## Submitted Ethics Complaint (10-16-2023)
I submitted an ethics complaint about my manager (**WMT331526**). I notified HRBP about this complaint.

## Escalated Unethical Vendor Selection to Walmart Executives (10-06-2023)
I reached out to Greg Cathy and Allie Hazelwood, with a subject line, "Awarding MVP to Infogain: Unethical" where I explained the situation.

## Received Message About Closed Walmart Ethics Investigation(09-27-2027)
I received an email from ethics. "Thank you for speaking up…the case is now closed… We partnered with the business, as needed, to address these concerns."

## Received Message About Limited Walmart Ethics Investigation (09-25-2023)

#: 513

· I was visiting the Home Office at Bentonville and offered more evidence to Walmart Ethics and details, and the response was "No clarity is needed from you at this point…no additional action is needed from you at this time."

· **Submitted Corruption and Antitrust Violations Ethics Complaint** (09-05-2023)
I talked to Paula Coil, Doug's Executive Assistant, and asked for help to report possible corruption by my previous Vice President. Paula then suggested that I talk to Matt Miner. I messaged Matt Miner's Executive Assistant, Shanna Morris, and Shanna introduced me with Jelahn Stewart (VP, Ethics). I reported possible antitrust violations to Jelahn Stewart. Jelahn Stewart also appreciated my courage to speak up and she also assured me not to worry about any retaliation.
[Quoted text hidden]

---

**Dilip Jana** <janadilip@gmail.com>                                                                              Fri, Nov 3, 2023 at 11:53 AM
To: "rachel.brand@walmart.com" <rachel.brand@walmart.com>, "matt.miner@walmart.com" <matt.miner@walmart.com>
Cc: "shanna.morris@walmart.com" <shanna.morris@walmart.com>
Bcc: Dilip Jana <janadilip@gmail.com>

**Dear Rachel and Matt,**
[Quoted text hidden]

# EXHIBIT

# 2

| From: | Dilip Jana |
|---|---|
| To: | Noel, Bernard J - OSHA |
| Subject: | Fwd: Violation of Antitrust Laws by Walmart Inc :: Dilip Jana |
| Date: | Friday, January 5, 2024 4:44:47 PM |
| Attachments: | image.png |
| | image.png |
| | 09-27-2023-Walmart-Antitrust-Violation-Embezzlement.pdf |

CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.

Dear Noel,

   I am forwarding the email I sent to the DOJ on Wed, Sep 27, 2023. I could not attach any exhibits. I was extremely busy, the draft was not perfect either but it had enough information I believe. I am sending you the exact same file that I sent to the DOJ. I'll send you. clean & updated version next week

In the document you can see I complained about FCPA on 09-27-2023 at that point I did not know that Walmart paid $220M for a previous FCPA violation in 2019.

I just came to know about this incident a few days ago.

*https://fcpablog.com/2019/06/20/walmart-pays-282-million-for-fcpa-resolution/*

I want to draw your attention to what CEO Doug McMillon said in the news in 2019 and what has been done to me when I complained in 2023. I'll send you CEO Doug McMillon's public statement and Walmart's ethics document that was violated in my case. I do not know the laws, but I'll provide you with tangible evidence.

I am going to send EXHIBITS to you next week to substantiate:

1) Before the vendor selection, a Walmart internal sourcer introduced vendor Infogain (an **Indian** boutique vendor) to my previous Vice President (she was an Indian Citizen, I do not know her current Citizenship status).
2) Vice President's preference to Infogain (Vendor) to influence on my VENDOR selection decision making process (I am the only one Data Science SME in the team and the work VENDOR will do is related to Data Science) even before I joined the team
3) Increase of initial bid price multiple times even before start of the work for the same Statement of Work (SoW).
4) Right after giving the contract to the vendor Infogain, the Vice President's suspicious visit to India lasted just for a week. She has a 5 year old child. Normally people
4) Despite failure to deliver promised SoW results and very poor performance, management's efforts to give long term (6 months to few years) projects to Infogain for a few millions of dollars
5) Management manipulated urgency of the work purely to give the project to the vendor

Infogain. Since Infogain is already in the Walmart system, Infogain was going to get those projects. So keeping the initial bid low and Vice President's preference, Infogain won the bid by eliminating very competent US vendors. Once Infogain is in the Walmart System, they will continuously get projects for years to come.

6) on 08-08-2023 I informed Allie Hazelwood (Chain of Command: Adrian Milbourne-> Ridhi Mehra->Allie Hazelwood-> Greg Cathy-> Kieran Shanahan-> John Furner-> CEO Doug McMillion)  for unethical vendor selection

7) Allie Hazelwood asked HR Director Shawn Cohen to talk to me. I complained to Shawn Cohen (HR Director) about procurement fraud, bid rigging etc around 12th of Aug 2023. Shawn told me if the Vice President has done that the Vice President will be in big trouble. I did not provide any evidence to Shawn Cohen at that point of time.

7) Around 17th of Aug, 2023 I was scared, management's behavior changed. I informed Shawn Cohen. I realized the information was leaking.

8) 09-05-2023 to 09-09-2023: I was visiting Bentonville, Walmart's Corporate office.

   a) I decided to report this corruption to one of the officers, as per Walmart's policy, to keep it very confidential. I went to CEO Doug McMillions office and asked Paula Coil, Dough's secretary for help. She asked me to talk to Matt Miner who is an EVP of Walmart Ethics. I messaged Matt's secretary, she came to talk to me and she took me to Jelahan Stewart's office. Jelahan Stewart is the Vice President of Ethics. Monica Hall, a manager also was there. After I reported the incident to Jelahan Stewart, Jelahan asked me to provide evidence to Monica Hall.

   b) I was not getting any feedback from Monical Hall. When I offered more evidences around 25th of Sept, 2023, Monica Hall informed me they do not need any more evidences

9) 09-27-2023: I received an email from Monica Hall that the case was closed and they can not disclose the outcome of the investigation.

10) 09-27-2023 I informed DOJ (end of this email)

11) 10-02-2023: My roles and responsibilities changed, Ridhi and Adrian announced that in the team meeting. I spoke up (I have recordings). Ridhi offered offline meeting with me, that never happened and I was fired

12) Around 10-03-2023 to 10-06-2023: I sent multiple emails to Adrian, ccing to Ridhi and HRBP Wendy Bowman for Adrian's retaliation and discrimination, giving vague and ambiguous projects. I also sent a few emails related to Kamil Bay (He worked with Ridhi before, Kamil Bay is the Data Analytics Director) unethical approval of Infogain's data science related work without my approval ( I am the data science SME) and Kamil's Data Science related work etc. Ridhi then emailed me saying that she had escalated to the appropriate department. HRBP then informed me that Ridhi informed Walmart Ethics. I was expecting a call from Walmart Ethics to provide any evidence, but that never happened, I was fired. I'll demonstrate how Kamil Bay was aiding Ridhi and Adrian despite he knew the vendor selection was not ethical and vendor's poor performance (all video edidances)

13) 10-06-2023: I emailed Allie Hazelwood (Allie was on maternity leave) and Greg Cathy recommending to stop funding Infogain. On 10-07-2023 Greg Cathy responded to my email saying he has instructed to pause work with Infogain

14) Around 8th of Oct, 2023 I received communication from Adrian to meet with the Infogain manager and plan for future work. To abide by his command, I met Infogain teams and

discussed projects ( I have videos). On 09-05-2023 during a meeting, my peers when Kamil Bay raised Infogain's data scientists competency, Ridhi told Infogain's data scientists' resume and she asked us to consider Infogain as additional resources. Around 8th of Oct, 2023 when I was getting instruction from Adrian to work with Infogain, my position was:

   i) Infogain's contract ended (it was supposed to be for 8 weeks from 3rd week of June 2023. Then they extended multiple times for the same SoW. I had a meeting with Infogain Vice President, he informed me that the contract ended on the last day of Sept, 2023. Then Infogain got one week of extension for the first week of Oct, 2023 and Infogain was not getting paid (I have recording)

  ii)  I asked both Adrian and Ridhi the status of Infogain's contract. I did not get any response.  Later I asked Kamil to revoke Infogain's computer access.  I received an email from Adrian stating that Infogain was still under contract. I am th eDirector of Data Science, Adrian and Ridhi kept Kamila and I out of those contracts.

   ii) I did not receive Infogain's manager's resume as Ridhi promised on 09-05-2023.

   iii) During the meeting with Allie on 08-08-2023, she mentioned to me that anything data science related stuff with vendors, she was under the impression that I had approval. In fact that's not the case. Kamil Bay (He worked with Ridhi before, Kamil Bay is the Data Analytics Director) was approving Infogain's data science related work without my approval. I wanted to make sure I document well.

15) Around 10th of Oct, 2023 I contacted Allie's secretary, Pam Rutherford, for a meeting with Allie. Pam mentioned that Allie will be back to office (after her maternity leave) on 10-16-2023 and then she will find a time to meet with Allie.

   Around 10th of Oct 2023, I met Mike Bayer of Boston Consulting Group (BCG). Mike and I used to have regular meetings. I informed Mike about Infogain's performance and Mike also prepared a powerpoint presentation together with Rishi & Adrian, which was basically a manipulation of urgency of the work to give the work to Infogain.
BCG was advising Allie. The dynamics is Ridhi got approval from BCG, which is basically Allie; then Ridhi will give the work to Infogain, despite I already finished some of the work (I have email and video evidences)

Mike's supervisor, Aaron, talked to Allie and Mike told me that Allie was in the process of reorganizing the team (audio/video evidence). I thought Allie would put me in another group; I did not imagine I'd be fired within a week.

16)  Around 12th of Oct, 2023 I wrote another email to Greg and Allie, I never received any response.

17) On 10-16-2023 I filed an ethics complaint against Adrian (retaliation, discrimination changing roles and responsibilities etc). I informed HRBP Wendy Bowman that I submitted ethics complaint against Adrian

18) On 10-17-2023 I received an email from Adrian that showed Kamil presented a Data Science related work to Greg and Greg was very impressed. I did not know what meeting it was, I was never invited to that meeting. I've multiple evidences how Adrian was retaliating.

https://www.forbes.com/sites/sap/2014/01/21/data-scientist-sexiest-job-of-the-century/?sh=762fd57674b6

This is Greg Cathy's educational background (copied from Linkedin) for data science leader:

**Education**


**Ouachita Baptist University**
BA, Psychology and History
1991 - 1995

This is Adrian's educational background (copied from Linkedin) for data science leader. MBA
in one year?

Education


**John Brown University**
Master of Business Administration - MBA  · Business Administration and Management,
General
2017 - 2018


**Baptist Bible College**
Masters  · Biblical Counseling
2007 - 2011


**Baptist Bible College**
Master of Divinity (MDiv)
2007 - 2011


**Baptist Bible College**
Bachelor of Arts  · Pastoral Theology
2003 - 2007


**Baptist Bible College**
Minor  · Business Management
2003 - 2007

**Baptist Bible College**
Masters  · Masters of Divinity
2007 - Present

19) On 10-17-2023 I went to Walmart's Dallas office. All of a sudden I met Greg Cathy. Greg
Cathy works from the Bentonville office. I asked him whether he read my last emails; he
responded yes. I then asked if he and I could meet at the Dallas office. He said he will be at
the Dallas office for the entire week and he could meet me on Thursday, Oct 17, 2023. I
contacted his secretary to set up a meeting for Thursday, Oct 19, 2023.

I also met Allie Hazelwood (Allie works from the Bentonville office) on the same day at the
Dallas office. That means both Allie and Greg were visiting the Dallas office. When I asked
about meeting with Allie, she told me Pam will set up a meeting once she's back to office.
That never happened, I was fired.

One of my friends met Greg Cathy at the Dallas office on 10-17-2023 and set up a meeting
with Greg Cathy for Wednesday, Oct 18 morning. Greg Cathy's secretary informed my friend

in the afternoon of 10-17-2023 that Greg can not meet her because of an urgent meeting.

20) 10-18-2023: I went to the Dallas office. I presented my team's work at Ridhi's team meeting (Ridhi was absent) and Adrian said, "Awesome", I have recordings.
21) I went to the Dallas office on both 10-18-2023 and 10-19-2023; I did not see Greg. On 10-19-2023 I received a meeting invitation from Adrian for 3:30 pm and I was fired citing poor performance.

21) 11-05-2023 I reached out to Walmart CEO Doug McMillon (you have that email). Few days later Walmart legal contacted me, they wanted to have materials related to my ethics complaint on 10-16-2023 as well as my complaint to CEO Doug McMillon. They mentioned that it was part of the reevaluation of my termination. I submitted some audio/video documents on 11-15-2023. On the 3rd week of Nov, 2023 I came to know from one of my friends at Walmart that Walmart instructed all vendor contracts to be cancelled in Walmart US. The vendor Infogain also had to leave all of a sudden, their last date of work was 12-08-2023. When I was there, Infogain and Adrian & Ridhi were planning the next 12 months roadmap, I had all the audio/video recordings. All of a sudden the vendor Infogain had to go? Something isn't right...

22) I met the Infogain Vice President in Dec 2023 in Allen, TX (he lives in Allen, TX) and he provided me with lots of information about irregularities. I have those recordings.


## Team Dynamics:

Adrian, Allie were very good friends, Adrian acknowledged to me before. They have been working at the Walmart Bentonville office for more than 17 years. Adrian used to report to Allie before Ridhi was hired. Ridhi has been working at Walmart at the Bentonville office for more than a decade and was promoted to Vice President in 2022. Ridhi's husband was a Vice President at Walmart before moving to Walgreens. They are all well connected.

*In 2019 Walmart paid $220M for violating FCPA, I just came to know at the end of Dec 2023*. When I emailed DOJ on Sept 2023, I complained about FCPA (please check the attachment)

*https://fcpablog.com/2019/06/20/walmart-pays-282-million-for-fcpa-resolution/*

Greg Cathy was the CEO of Sam's Club Mexico in 2019 before moving back to US Walmart.

---------- Forwarded message ---------
From: **Dilip Jana** <janadilip@gmail.com>
Date: Wed, Oct 4, 2023 at 2:05 PM
Subject: Violation of Antitrust Laws by Walmart Inc :: Dilip Jana
To: <antitrust.complaints@usdoj.gov>

---------- Forwarded message ---------
From: **Dilip Jana** <janadilip@gmail.com>
Date: Wed, Sep 27, 2023 at 10:39 PM
Subject: Violation of Antitrust Laws by Walmart Inc :: Dilip Jana
To: <antitrust.atr@usdoj.gov>
Cc: Dilip Jana <janadilip@gmail.com>

This is Dr. Dilip Jana from 800 Fairlawn St, Allen, TX 75002. My phone number is: 318-243-9743. I am over 18 years old. I am a Walmart Home Office employee based out of Walmart's Dallas Tech Hub.

I have information regarding possible violation of various Anti-trust laws and suspected embezzlement. I am not an attorney, I am suspecting in good faith based on my experience. I am reporting a possibility of a violation. I have evidence which I could not attach in this email because of the size of those documents, however, I'll be happy to provide you those documents through Google Drive, ICloud, Dropbox or I can upload those documents in your portal once I get instruction on how to submit those documents.

I'll be happy to provide more information if we talk. I have attached a file for initial report for your review.

--
Thanks
Dilip

--
Thanks
Dilip

# EXHIBIT

# 3



**elliott sauter**
PLLC

February 21, 2024
*Via Email*
Department of Labor-OSHA
Office of the Whistleblower Protection Program
C/O: Federal Investigator Bernard Noel
525 S. Griffin Street, Suite 602
Dallas, TX 75202

   *Re: Dilip Jana Complaint*

Investigator Noel,

  On October 19, 2024, Walmart Inc. (the "Company") terminated its employment of Dilip Jana ("Jana") as a result of Jana's poor work performance, failure of leadership, and disrespectful and disruptive behavior. Seemingly incapable of accepting any responsibility for the poor choices that lost him his job, Jana now seeks to exploit the Department of Labor's (DOL's) whistleblowing process with a baseless and speculative retaliation claim, which, in addition to being at times inconsistent and nonsensical, is wholly unmoored from fact. DOL should dismiss Jana's complaint.

  Jana's January 2, 2024, complaint against the Company (the "Complaint") is a shifting set of grievances against targets who he apparently believes have mistreated him and includes both his immediate supervisors and peer. His primary allegation is that the Company retaliated against him for raising what he calls "violation of various Anti-trust laws and suspected embezzlement," i.e., that the president of his organization, Ridhi Mehra, manipulated an external bidding process to favor a vendor called Infogain. Other than alleging that Infogain did not perform well under its contract, the only "evidence" Jana provides to back up this serious accusation is his suspicion that on a personal trip to India, Mehra—who is Indian—must have met up with Infogain to collect a kickback since her trip "lasted just a week" and she has a "5 year old child."

  None of this true. The facts are that 1) Infogain was an existing Company vendor and was recommended for the bidding process not by Mehra, but by the Company's internal procurement team, 2) Infogain was selected as part of a standard RFI process in competition with other vendors, 3) Infogain performed its duties without issue and was paid the amount it agreed to do the work for. Even if it is true that Infogain was contracted for subsequent work, that is not evidence it failed to perform under a prior agreement—rather, it shows the opposite, that the Company was happy with Infogain's work and continued to use them as a reliable vendor.

  Jana's remaining allegations are a scattershot against his supervisors and peer. He accuses his immediate supervisor, Adrian Milbourne, who reports to Mehra, of mistreatment and also of being incompetent to run the Data Science Department of which Jana was a member (a running theme of Jana's allegations is that those he reports to are less competent than he is). Jana also

accuses Milbourne of making a racial comment toward him. Once again, none of this is true. What is true is that Milbourne attempted to hold Jana accountable for his failure to complete tasks, his habit of calling into question the decisions of his supervisors in front of the team and treating his managers and co-workers in an abusive manner that went against Company policy. Jana also accuses Milbourne, as well as his peer and co-worker, Kamil Bay, another Data Scientist, of being complicit in Mehra's manipulation of the Infogain bid. As with his other claims, this comes without evidence or explanation, and likely has more to do with Jana's failure to do his own job than others' failure to do theirs.

In summary, Jana appears to take the position that his employment was terminated unfairly because he was blowing the whistle on improper or illegal activities at the Company. His position is undermined firstly because it is untrue in every respect. There is no evidence that Infogain was selected improperly, or that Infogain failed to perform the work for which it was retained. Jana's apparent unhappiness with the Infogain contract likely has much to do with the second reason his complaint fails: Jana was not terminated for whistleblowing, but because of his sub-standard performance, poor leadership, and insubordinate behavior. And while there is no evidence to support Jana's claims, there is a single fact that makes them impossible: while Jana did not learn of his termination until October 19 due to his being on Paid Time Off, the record shows that the decision was made on October 4—11 days before the October 16 ethics complaint against Milbourne that Jana says he was terminated in retaliation for making.

In other words, Jana's termination had nothing to do with an ethics complaint and everything to do with Jana's lack of performance and unprofessional behavior. The substance of these problems, as well as supporting materials are outlined below.

1. **The Company terminated Jana as a result of his poor performance and insubordinate behavior.**

   **(a) *Jana disrupted meetings and accused Vice President Ridhi Mehra of being a dictator.***

Company associates who worked with Jana have consistently described Jana's behavior at meetings as disruptive, unhelpful, rude, and insubordinate. Jana often highjacked meetings by shifting their purpose to identify what he apparently viewed as leadership shortcomings, making unfounded complaints about the lack of resources available to the team, and altering the topic of conversation to deflect focus from his lack of production on requested deliverables.

On October 3, 2023, Jana attended a remote video meeting that included the entire team from the vice president level down. In this meeting, the team was discussing the progress of specific projects and workflow matters. Jana made a recording of this meeting, which he provided as his own supporting evidence to DOL. In that recording it is clear that Jana disagrees with the team's approach and decisions. Aware that both Milbourne and Mehra were at the meeting, Jana called Mehra "a dictator" and said, "this is a dictatorship." Jana shared this sentiment verbally with team members several more times on the call.

Calling your organization's leader a "dictator" during a team meeting is disrespectful and damaging to an organization, and was part of a pattern of behavior that led to Jana's termination.

### (b) *Jana sent an email to Milbourne that was inappropriate and insubordinate on its face.*

On September 14, 2023, Milbourne sent an email to Jana with the subject line: "Dilip 1:1 Deliverables." (See Jana's Exhibit 5-S at page 2). This email is a continuation of a communication Milbourne initiated on August 24, 2023, in preparation for a meeting with Jana, in which Milbourne in an evidently conscientious and professional tone attempts to outline work requirements and associated deadlines—in particular the need for Jana to fulfill his responsibilities as a team lead by hiring a team.

In an explosive response on September 15, Jana, in sometimes enlarged red font, deflects responsibility for his assigned tasks and blames Milbourne for his inability to accomplish them. Then, after refusing to do the work assigned to him, Jana incredibly accuses Milbourne of "retaliation" for assigning work to Jana's peer, Kamil Bay, that Jana apparently believes rightfully belongs to him.

Jana makes the following comment—with font and color as represented—in response to Milbourne's assessment that a project is late:

Please READ from my previous email, it's simple English, "I propose WFP use case updates and timelines- Due Sept 8ᵗʰ

## provided we get all the answers".

So **this is NOT LATE**…

Apart from belittling and insulting his supervisor by indicating that Milbourne does not understand "simple English," Jana provides no solutions or proposals—his expectation is that Milbourne, his supervisor, "provide[]. . . all the answers." (See Jana's Exhibit 5-S at pages 2-3). This behavior was emblematic of Jana's overall performance. Despite repeated efforts by his leadership to help Jana find a path to success, Jana refused to do so.

Unfortunately, Jana's performance and belligerent behavior only worsened as time progressed, and ultimately led to termination of his employment.

### (c) *Jana proclaimed, "My grandma could do it!" in a team meeting that included Infogain contractors.*

The Company has a strong culture of respect for the individual that is encouraged among both associates and contractors and is a core tenet of the Company's Code of Conduct.[1] It is a rule that Jana violated repeatedly.

On August 23, Jana's team participated in a video call with representatives of Infogain, which had by then been retained to assist in the completion of a data project. During the meeting, Jana was critical of the approach and contribution of the Infogain team members, and declared "My grandma could do it!," or words to that effect. While constructive criticism is acceptable and expected in any healthy collaborative business situation, personal attack is not.

---

[1] https://www.walmartethics.com/content/walmartethics/en_us/code-of-conduct.html

Milbourne subsequently counseled Jana on this episode in a one-on-one meeting, which Milbourne documented in an August 25, 2023 email to Jana memorializing a conversation about "Approach – ensure that our message is not masked by our method of delivery" and "always ensure we demonstrate respect for the individual as we engage the team." (See Jana's Exhibit 5-S at page 5). Milbourne confirmed in a subsequent email to Jana that this comment referred to their conversation about the "grandma" incident, to which Milbourne added, "I personally thought it was not a necessary comment to make and could be found insulting, but I also had another Walmart associate approach me after the meeting that was struck by the comment as well." (See Jana's Exhibit 5-T at page 3).

Jana's reaction to this constructive feedback came on September 15 at 2:11 AM, in the form of a barrage of deflections, excuses, and complaints about Infogain—as well as an attempt to ferret out the other associate who had dared report his corroborating concerns to Milbourne. What Jana's response did not contain was any acknowledgment of the impact of his insult, or that it was an insult at all. Far from demonstrating his understanding of the Company's Code of Conduct, and the expectations of the leadership role he was tasked with fulfilling, Jana's petulant response demonstrates disdain for his colleagues, ignorance of the team concept, and a total unwillingness to accept responsibility—recurring themes that contributed to Jana's termination.

### (d) Jana showed up at Company headquarters unannounced, resulting in his referral to the Threat Management Team

On September 5, 2023, Jana drove from Dallas, Texas to Company headquarters in Bentonville, Arkansas, apparently to follow-up on his concerns with Infogain. When he arrived, he found his way to the Global Ethics department, which deals with associate ethics complaints. While the Company has an "Open Door" policy that encourages associates to voice their concerns—a process that Jana was well versed in and made repeated use of—associates present that day found Jana's sudden unannounced physical presence and behavior alarming enough to result in his being referred to the Company's Threat Management group for a threat assessment.

### 2. There is no evidence either that Infogain failed to perform, or that there was any impropriety in its selection for work with Jana's Data Solutions team.

Jana's central accusation against the Company is his calling into question the integrity of leadership in their selection of Infogain in the bid process. He supports this by claiming that Infogain failed to perform its work satisfactorily, and that Ridhi Mehra traveled to India to collect a kick-back. There is no evidence to support either contention.

### (a) Infogain was an established Company vendor and was recommended by the internal procurement team, NOT Ridhi Mehra.

Infogain is a subsidiary of Absolutdata Inc. Absolutdata, Inc., signed a Master Services Agreement ("MSA") with the Company in 2019, and had been an established vendor for three years before Jana joined the Company. Jana asserts that Infogain was improperly chosen, ran up its costs, and failed to perform, but provides no supporting evidence or explanation for these assertions.

Jana was not part of the Data Solutions team when Infogain was selected and would have no knowledge of the bidding process. Infogain was recommended, along with several other

vendors, by the Company's internal procurement team—not Ridhi Mehra—and was selected as the result of an RFI process that pitted the bidders against each other in a scored competition in which Infogain prevailed. Indeed, Jana acknowledges that "Infogain [was] already in the Walmart system," but asserts that the contract should nonetheless have been given to one of his favored "very competent US vendors." (See Jana's Exhibit 5-C at page 2).

Jana also alleges that, once selected, Infogain failed to perform as promised and ran up costs. But there is no evidence to support this. Internal records show to the contrary that Infogain performed its initial and subsequent SOWs as agreed with no cost overruns.

### (b) Jana admits his accusation that Mehra was engaged in an illicit financial arrangement with Infogain is unsupported speculation.

Jana seems to realize that his displeasure with Infogain on its own is not enough to substantiate a whistleblower claim, so he includes as his sole allegation of illicit conduct his admitted, and brazenly unsupported, speculation that Ridhi Mehra accepted a bribe from Infogain. His basis for leveling this charge is that Mehra—who is Indian and has family in the country—traveled to India. Jana deems the visit "suspicious" because it "lasted just a week" and she has a "5 year old child." (See Jana's Exhibit 5-C at page 1).

Mehra did in fact travel to India sometime after the bid selection, but she went there to visit family members. It is also true that Infogain reached out to Mehra to invite her for a site visit—which on its own would not have been a violation of Company policy—but also true that she declined because, as Jana observed, her visit was short, and she did not have the time. As she explained in a July 6, 2023, email to Infogain, "Unfortunately, this is a very short trip and I have a full itinerary already and so unable to squeeze any time." (See attached Exhibit 1). The Global Ethics department reviewed Jana's complaint related to Mehra taking bribes and concluded it should be closed because there was no suggestion of a conflict of interest, kickbacks, or other unethical relationship between Mehra and Infogain. Ethics notified Jana the matter was closed on September 27, 2023.

Mehra is of course not the only associate Jana accused of wrongdoing with respect to Infogain, though she is the only associate he accuses of being part of a commercial bribery scheme. Jana levels accusations of impropriety against Milbourne and Kamil as well. These accusations are equally unsubstantiated. Contrary to Jana's allegations, the work performed by Infogain was utilized and incorporated into the defect detection process that the team was working on, and Infogain completed their assigned SOW despite Jana's continuous efforts to thwart the team's progress and completion of its task.

### 3. The Company decided to terminate Jana for cause on October 4, 2023, and there was no retaliation.

From the middle of September through October 2023, Jana's behavior towards his team and supervisors became increasingly problematic until it became clear to his leadership that he was not only failing to do his own work, he was—as a designated leader—creating a negative work environment about which other associates had begun to complain. On top of his negative attitude toward his managers and co-workers, Jana did not positively contribute to assigned tasks. When

problems arose, Jana did not take initiative to solve those problems. Instead, he would claim the problem was not of his making, not his responsibility, or both.

Anyone who displayed this behavior—let alone a team leader—would have risked termination, regardless of whether they filed a complaint with the Company. The Company decided to terminate Jana on October 4, 2023, for cause. That decision had everything to do with Jana's work product and behavior, and nothing to do with his complaints.

### (a) After months of substandard results and insubordinate behavior the Company concluded that Jana did not intend to improve his performance and terminated his employment.

The record shows that Adrian Milbourne hired Dilip Jana into a leadership role on his team in April 2023, and that he and Ridhi Mehra did everything they could to help Jana succeed. Milbourne's email exchanges with Jana show the efforts of a conscientious and mindful leader trying to mentor a subordinate who refuses to be mentored, and instead responds with excuses and vitriol. Despite the efforts of his leadership, Jana had no intention of changing his behavior and continued to mistreat people who he believed were not as smart or as valuable as he deemed himself to be.

This sentiment is captured in Milbourne's email to an internal human resources associate on October 12, a week after the decision had been made to terminate Jana, and four days before Jana made his unfounded October 16 ethics claim against Milbourne.

> I am hoping to take termination steps early next week (strongly prefer Monday) with Dilip, as even this current week we are still experiencing disruptive behavior.

(See attached Exhibit 2).

### (b) The Company informed Jana of his termination upon his return from PTO, and the retaliatory timing Jana alleges is wrong.

An internal email sent on October 4, 2023, among HR personnel, shows conclusively that the Company decided to terminate Jana's employment on that date. The email is potentially subject to the attorney-client privilege and is provided in redacted form out of an abundance of caution. It includes the non-privileged statement that the "[r]ecommendation for accountability [for Dilip Jana] . . . has escalated to 'separation' due to the latest developments," and includes as considerations for that recommendation, "disparaging, disruptive and dismissive behavior causing a toxic work environment." (See attached Exhibit 3).

Jana was apparently on PTO when the decision was made, and the Company waited until Jana returned to work in order to meet with him and present the reasons for his termination in person. On Thursday, October 12, Milbourne emailed about "tak[ing] termination steps early next week." (See attached Exhibit 2). The following Monday, October 16, Jana made an ethics complaint against Milbourne alleging mistreatment and retaliation, and three days later, on Thursday, October 19, Milbourne and Wendy Bowman (who sent the October 4 email memorializing the termination decision) met with Jana to inform him that his employment with the Company was terminated.

*Accordingly, Jana's October 16 ethics complaint played <u>no role</u> in his termination and there is no evidence either Milbourne or Bowman was aware of Jana's complaint when they met with him on October 19.*

Dilip Jana was terminated because of his own self-destructive behavior and work performance, and for no other reason.

### 4. Legal Analysis

The Sarbanes-Oxley Act of 2002 protects whistleblowers who report financial wrongdoing at publicly traded companies. 18 U.S.C. § 1514A. When a whistleblower invokes the Act and claims he was fired because of his report, his claim is "governed by the legal burdens of proof set forth in section 42121(b) of title 49, United States Code." 18 U.S.C. § 1514A(b)(2)(C).

Under that incorporated framework, a whistleblowing employee meets his burden by showing that his protected activity "was a contributing factor in the unfavorable personnel action alleged in the complaint." 49 U.S.C. § 42121(b)(2)(B)(iii). If the employee meets that burden, the employer can prevail only if it "demonstrates by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of that behavior." Id. § 42121(b)(2)(B)(iv). See Murray v UBS Securities, et al; No. 22-60 (2004).

Jana presents himself as a whistleblower who is engaged in protected activity and claims that he was terminated because he was making a valid complaint that exposed a fact or problem that the Company wanted to hide. None of this is true and his complaint should be dismissed. Jana's first ethics complaint against Mehra related to Infogain is totally unsubstantiated. Even taken on its face, Jana's allegation is speculative—he only guesses at Ridhi's acceptance of a bribe, for which there is zero supporting evidence and ample contrary evidence. Additionally, the work that Infogain completed for the Company was a valuable contribution to the defect detection project. The Company closed his first complaint because it found no suggestion of actual wrongdoing. Jana's second ethics complaint against Milbourne for retaliation postdates the decision to terminate him. Accordingly, apart from the complaint itself being without basis, it would be impossible for the Company to retaliate against Jana given the timeline and facts presented. Simply put, the Company's decision to terminate Jana pre-dates the Milbourne ethics complaint.

Jana has not met his initial burden in showing that the "protected activity" he engaged in was a contributing factor in his unfavorable employment decision. Every complaint that Jana lodged was given due consideration. He was never disciplined for the reports he made to ethics or for the complaints he made in listening sessions. The fact is Jana's complaints were not true. What is true is that the complaints had no bearing on the Company's decision to terminate Jana and were not a contributing factor in his termination.

The Company had every right and an abundance of reasons to terminate Jana. <u>Any</u> employee who acted like Jana when the Company employed him—who disregarded and denigrated his or her supervisor in a public forum, avoided completing work assignments, insulted team members and contractors and spent an inordinate amount of time making excuses and

assigning blame for their lack of performance—could be terminated, regardless of their claimed participation in protected activity.

In conclusion, Jana has not demonstrated that his complaints contributed in any way towards the decision to terminate his employment. The evidence clearly shows that the Company rightfully terminated Jana's employment for the reasons stated above and that he was not retaliated against. Accordingly, the Company respectfully requests that Jana's complaint be dismissed.

Sincerely,

Mindy Sauter

# EXHIBIT 1

# Subject: RE: In person Intro - While in Delhi/NCR area

**Ridhi Mehra** <Ridhi.Mehra@walmart.com>                    Thu, Jul 6, 2023, 1:38 PM
to Veera Raghavan, shahida.mohammed

You are viewing an attached message. ELLIOTT SAUTER PLLC Mail can't verify the authenticity of attached messages.

Hi Veera,
Thanks for reaching out. I appreciate the invitation and would have liked to join.
Unfortunately, this is a very short trip and I have a full itinerary already and so unable to squeeze any time. Am also on PTO starting next week and so minimizing my meetings/calls for next week.

Hopefully, we can connect next time.

Thanks,
Ridhi

**From:** Veera Raghavan <Veera.Raghavan@infogain.com>
**Sent:** Thursday, July 6, 2023 11:48 AM
**To:** Ridhi Mehra <Ridhi.Mehra@walmart.com>
**Cc:** Shahid A. Mohammed <ShahidA.Mohammed@infogain.com>
**Subject:** EXT: In person Intro - While in Delhi/NCR area

EXTERNAL: Report suspicious emails to **Email Abuse.**

Hello Ridhi,

Hope you had a good onward flight to India.

Rohit, our Chief Business Officer and Rajat, Head of Navik AI product portfolio and a key contributor to the Defect Engine roadmap can meet with you locally at a place nearby in the NCR area on Monday, 10th Jul 2023.

Alternately, we would love to have you at our Noida or Gurugram office!

Please let us know your availability and we can arrange for the same.   Sorry for the short notice.

Agenda would be primarily be to meet and greet.

Regards,

# EXHIBIT 2

**donna@elliottsauter.com**

| | |
|---|---|
| **From:** | Adrian Milbourne <Adrian.Milbourne@walmart.com> |
| **Sent:** | Thursday, October 12, 2023 5:43 PM |
| **To:** | Shawn Cohen |
| **Cc:** | Wendy Bowman; Ridhi Mehra |
| **Subject:** | Dilip Next Steps |

Hey Shawn,

I hope your week is wrapping up well.

I am hoping to take termination steps early next week (strongly prefer Monday) with Dilip, as even this current week we are still experiencing disruptive behavior.

You had mentioned wanting to use this last week to finalize leadership alignment, data security teams etc in order that Wendy and I could hold the conversation when we return from PTO.

Just wanted to confirm we are good to go. Appreciate your partnership throughout this process.

As an aside, I intend to get to Dallas this next week to be with the remaining Dallas team in person after we have the separation convo with Dilip.

Let me know if you need anything else from me.

Get Outlook for iOS

# EXHIBIT 3

⤴ Share    ⊖ Copy link    ↓ Download    ···    ✉ Termination recommend....msg    ⊟ Info    |    ◁

| | |
|---|---|
| **From:** | Wendy Bowman  Wendy.Bowman@walmart.com |
| **Sent on:** | Wednesday, October 4, 2023 11:07:31 PM |
| **To:** | Lori Chumbler  Lori.Chumbler@walmartlegal.com |
| **CC:** | Monica Hall  Monica.Hall@walmart.com  ; Shawn Cohen  Shawn.Cohen@walmart.com |
| **Subject:** | ████████████ |
| **Attachments:** | ██████████████████ |

Lori and Monica,

 the latest developments with Dilip Jana. ███

accountability/separation for performance, and disparaging, disruptive and dismissive behavior causing a toxic work environment. Recommendation for accountability is attached, but has escalated to "separation" due to the latest developments.

We have met previously with Jeff Spillyards, but Shawn asked me to reach out to both of you since Shawn has connected with you as well.

- ████
- ████
- ████
- ████

Please let me know if you will be able to meet on Thursday.

Thank you,

**Wendy Bowman | HR People Partner**
**Walmart** ⁎ **Walmart US Transformation & Support**
*Reverse, Quality and Solutions Design*
**SERVES ARG Vice-Chair**
601 N. Walton Blvd.
Bentonville, AR 72712
(479) 321-2958
wendy.bowman@walmart.com

# EXHIBIT

# 4

## Phillips, Maurin L.

| | |
|---|---|
| **From:** | Wendy Bowman |
| **Sent:** | Wednesday, October 4, 2023 6:08 PM |
| **To:** | Lori Chumbler |
| **Cc:** | Monica Hall; Shawn Cohen |
| **Subject:** | Attorney/Client Privilege |
| **Attachments:** | [Retaliation] [Unrealistic Expectation]: Trace; [Unethical]: Sign off for POC; [Retaliation and Discrimination]: WFP; [ Retaliation ][Changing roles and responsibilities] WFR ⬛⬛⬛ Concerns Raised; Recommendation.docx |

Lori and Monica,

We would like to discuss the latest developments with Dilip Jana. Wondering if these accusations should be added to the existing ethics case, or a separate case opened as well? Would also like to discuss accountability/separation for performance, and disparaging, disruptive and dismissive behavior causing a toxic work environment. Recommendation for accountability is attached, but has escalated to "separation" due to the latest developments.

Adrian Milbourne, his supervisor, would like to be included in the conversation, unless not recommended. We have met previously with Jeff Spillyards, but Shawn asked me to reach out to both of you since Shawn has connected with you as well.

Discuss:

- Outbursts and disrespect at team meetings
- Emails attached with many allegations
- Recap of conversation with one of his Direct Reports from his Manager
- Recommendation and justification for accountability level

Please let me know if you will be able to meet on Thursday.

Thank you,

**Wendy Bowman | HR People Partner**
**Walmart**  Walmart US Transformation & Support
*Reverse, Quality and Solutions Design*
*SERVES ARG Vice-Chair*
601 N. Walton Blvd.
Bentonville, AR 72712
(479) 321-2958
wendy.bowman@walmart.com