# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF: | § § § | |
| DILIP JANA | § | Civil Action No. 4:24-cv-00698-SDJ-BD |
| *Plaintiff,* | § § | |
| v. | § § | |
| WALMART, INC., | § § | |
| *Defendant.* | § | |

## AFFIDAVIT OF IMPEACHMENT OF ADRIAN MILBOURNE

PLAINTIFF'S SWORN AFFIDAVIT OF IMPEACHMENT OF ADRIAN MILBOURNE *Submitted pursuant to 28 U.S.C. § 1746 in support of* Plaintiff's opposition to Defendant Walmart Inc.'s Second Motion for Protective Order

Pursuant to 28 U.S.C. § 1746, I, Dilip Jana, the undersigned, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge:

**I. Introduction and Purpose**

1. This affidavit is submitted in support of Plaintiff's opposition to Defendant Walmart Inc.'s Second Motion for Protective Order. Specifically, it seeks to impeach the credibility, reliability, and admissibility of the June 3, 2025 declaration submitted by Adrian Milbourne (Dkt. 63-5).

---

**AFFIDAVIT OF IMPEACHMENT OF ADRIAN MILBOURNE**  Page 1 of 5
*Jana v. Walmart, Inc.*

2. This affidavit addresses Walmart's false objections and evasive response to Interrogatory No. 21 and provides sworn impeachment of Mr. Milbourne's declaration as it relates to Walmart's FeedbackAlly vendor survey from August 2023.

## II. Background and Factual Record

3. On or around September 13, 2023, Adrian Milbourne held a closed-door meeting with me and Kamil Bay at Walmart's Dallas office.

4. During this meeting, Mr. Milbourne read aloud internal associate feedback collected through Walmart's FeedbackAlly portal concerning the performance of vendor Infogain during the "Defect Engine" project.

5. Mr. Milbourne personally initiated the FeedbackAlly survey around August 2023 prior to extending Infogain's contract.

6. The feedback discussed included complaints about Infogain's technical competence, communication breakdowns, delivery failures, and internal conflict—all directly relevant to this litigation.

7. Despite repeated requests, Mr. Milbourne refused to share the written results. Walmart has never produced these survey responses during OSHA, DOL, or federal proceedings—including its April 2025 Initial Disclosures or Rule 34 document responses.

## III. Interrogatory No. 21 and Walmart's Obstruction

8. On March 28, 2025, I served **Interrogatory No. 21**, requesting Walmart to disclose the verbatim or summarized FeedbackAlly responses evaluating Infogain's performance.

9. On April 28, 2025, Walmart refused to answer, claiming the interrogatory was "compound," "**vague**," "**irrelevant**," and improperly assumed "Plaintiff's opinions." No facts, summaries, or documents were provided. Walmart did not invoke any valid privilege or provide a privilege log.

10. I, the Plaintiff, submitted feedback in the August 2023 FeedbackAlly survey regarding Infogain and retained a screenshot of my own submission prior to sending it. This screenshot is attached hereto as **EXHIBIT F-1**. Additionally, during a September 13, 2023 in-person meeting, Mr. Adrian Milbourne read aloud several verbatim employee submissions from that same survey—including my own. A recording of that meeting is submitted as **EXHIBIT F-2**, and a true and accurate transcription is attached as **EXHIBIT F-2-A**. At timestamp **(02:12)** in **EXHIBIT F-2-A**, Mr. Milbourne states: *"What should Infogain remain?" The answer was: 'Nothing. They should reverse everything.'*—which matches the content of my feedback submission shown in **EXHIBIT F-1**.

## IV. Contradictions in Adrian Milbourne's Declaration

11. In his June 3, 2025 sworn declaration (Dkt. 63-5), Mr. Milbourne stated:

> "Walmart routinely documents and **collects vendor performance metrics and vendor critiques from relevant employees**… Public disclosure of records detailing vendor feedback… would severely impair Walmart's business relationships with vendors." (¶ 8)

---

**AFFIDAVIT OF IMPEACHMENT OF ADRIAN MILBOURNE**  Page **3** of **5**
*Jana v. Walmart, Inc.*

12. This is demonstrably false and misleading. Mr. Milbourne openly disclosed those same survey responses orally to subordinates without invoking any privilege or confidentiality.

13. The feedback was not redacted, withheld, or presented with warnings. In fact, Plaintiff mocked Infogain's NAVIK platform by saying, "Not A Very Impressive Koala," as recorded in **EXHIBIT F-2** as well as in the Complaint (Dkt 13, EXHIBIT 12). At timestamp **(00:51)** in **EXHIBIT F-2-A** "Plaintiff: He said, "Infogain dropped the NAVIK today—'Not A Very Impressive Koala.'""

14. His public treatment of the material contradicts the claim that such information is "confidential" or poses reputational harm to Walmart.

**V. Prejudice to Plaintiff**

15. Walmart's refusal to produce the FeedbackAlly responses—despite Milbourne's oral disclosure—has substantially prejudiced Plaintiff's ability to:

- Impeach Walmart's rationale for renewing Infogain's contract;
- Substantiate Plaintiff's whistleblower disclosures;
- Prove retaliation linked to procurement objections;
- Prepare for depositions or trial cross-examination of Adrian Milbourne.

16. Without the full survey record, Plaintiff cannot subpoena or depose relevant Walmart employees meaningfully.

17. Walmart's Interrogatory No. 21 response was not only evasive—it directly conflicts with Mr. Milbourne's personal conduct and sworn statement, warranting impeachment and sanctions.

---

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 18th day of June, 2025, in Allen, TX.

Respectfully Submitted,

*Dilip Kumar Jana*
DILIP JANA, Plaintiff
*Pro Se*
Telephone : 318-243-9743
Email: janadilip@gmail.com
800 Fairlawn St, Allen, TX, 75002

---

**AFFIDAVIT OF IMPEACHMENT OF ADRIAN MILBOURNE**   Page 5 of 5
*Jana v. Walmart, Inc.*

Defendant's counsel on **June 18, 2025**.

4. I subsequently transcribed this recording, and the document labeled "TRANSCRIPT OF EXHIBIT F-2" is a true, accurate, and complete representation of the content of that audio recording. I will make the full audio recording available to the Court or opposing counsel upon request. A copy of the excerpt transcript is attached hereto as EXHIBIT F-2-A.

5. The transcript faithfully captures the verbal statements made during that meeting and is offered to assist the Court in evaluating the accuracy of statements made in Adrian Milbourne's June 3, 2025 declaration (Dkt. 63-5) and Walmart's objections to Interrogatory No. 21.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 18th day of June, 2025, in Allen, Texas.

Dated: June 18, 2025

Respectfully Submitted,

*Dilip Kumar Jana*
DILIP JANA, Plaintiff
*Pro Se*
Telephone : 318-243-9743
Email: janadilip@gmail.com
800 Fairlawn St, Allen, TX, 75002

# EXHIBIT F-2-A

## TRANSCRIPT OF EXHIBIT F-2

# TRANSCRIPTION OF EXHIBIT F-2.*m4a*

*(September 13, 2023 – Feedbackally Meeting)*

Transcript of Audio Recording: INFOGAIN-FEEDBACK-Adrian.m4a

Recorded September 13 2023 | Duration: Approx. 8 minutes (Transcript excerpts)

Transcribed by Plaintiff (Dilip Jana) | Submitted under Fed. R. Civ. P. 37 and FRE 1002

**Participants**:

- **Adrian Milbourne** – Senior Director, Walmart
- **Kamil Bay** – Director of Analytics, Walmart
- **Plaintiff** – Dilip Jana - Director of Data Science, Walmart

---

**(00:01)** Adrian Milbourne: …you had any feedback on it before? It's like an internal survey.

**(00:06)** Kamil Bay: Oh yeah, internal survey one?

**(00:08)** Adrian Milbourne: Yeah, it's like a… yeah, internal survey.

**(00:18)** Plaintiff: I have to tell you some story.

**(00:25)** Plaintiff: I was asking him, "Hey, where is the NAVIK?" Because before the POC, during the bidding process—

**(00:34)** Plaintiff: —Infogain showed that they have a proprietary software called NAVIK.

**(00:39)** Plaintiff: And throughout the POC, we didn't see that NAVIK anywhere.

**(00:43)** Plaintiff: I was asking him, "Hey, where is the NAVIK?"

**(00:46)** Plaintiff: Kamil came up with a very good explanation.

**(00:51)** Plaintiff: He said, "Infogain dropped the NAVIK today—'Not A Very Impressive

Koala.'"

**(00:57)** [Laughter]

**(01:43)** Adrian Milbourne: So question one is—what should we keep doing?

**(01:56)** Adrian Milbourne: Not with Infogain, but what should Infogain keep doing?

**(01:57)** Adrian Milbourne: And then, what should Infogain change?

**(02:00)** Adrian Milbourne: The first response—pretty simple: data science, analytics.

**(02:12)** Adrian Milbourne: "What should Infogain remain?" The answer was: "Nothing. They should reverse everything."

**(02:42)** Adrian Milbourne: Stop changing topics.

**(02:44)** Adrian Milbourne: Be honest. Please do not mislead.

**(02:46)** Adrian Milbourne: Number five—reduce meetings.

**(02:52)** Adrian Milbourne: First produce results. Share the results with the DS/DA team.

**(02:55)** Adrian Milbourne: Let DS/DA run the code to validate feedback. Go to Kyle's team.

**(03:23)** Adrian Milbourne: Number six… So the next one:

**(03:38)** Adrian Milbourne: "What should Infogain keep doing?" Understand the problem.

**(03:41)** Adrian Milbourne: Spend ample time understanding the problem.

**(03:43)** Adrian Milbourne: They have a very good understanding of the problem.

**(03:45)** Adrian Milbourne: Keep engagement.

**(03:46)** Adrian Milbourne: Keep the Walmart team updated and engaged in the process.

**(04:01)** Adrian Milbourne: They have to use some ideas very fast. I was fine with myself, but I figured it out.

**(04:05)** Adrian Milbourne: Number five—distribution of work.

(04:06) Adrian Milbourne: Infogain tried to work on other data sources, but couldn't finish.

(04:09) Adrian Milbourne: I think they should keep trying to keep up with other data sources.

(04:12) Adrian Milbourne: Since they're general data engineers and scientists,

(04:15) Adrian Milbourne: A lot could be done and validated in parallel.

(04:18) Adrian Milbourne: Team size—

(04:20) Adrian Milbourne: Wow, I just got on a call with 20-plus people from Infogain and Walmart.

(04:40) Adrian Milbourne: There were multiple instances where they didn't share the information transparently.

(04:43) Adrian Milbourne: Summarization was done; a single defect was recorded for all defects.

(04:47) Adrian Milbourne: Prioritization and optimization were totally different from what's shown on the slides.

(04:50) Adrian Milbourne: Don't waste Walmart's time.

(04:52) Adrian Milbourne: We were talking about the same thing and pushing Walmart to agree on things we weren't convinced on.

(04:57) Adrian Milbourne: Talking to the point—everyone on the team experienced that and didn't answer questions to the point.

(05:02) Adrian Milbourne: So we had to find a response that didn't answer the questions…

(05:09) Adrian Milbourne: Non-manipulation. Taking advantage of the relationship between senior managers, data analysts, and data scientists.

(05:16) Adrian Milbourne: They didn't agree with what they said. When asked for X-covers, the

Walmart team was insulted.

**(05:22)** Adrian Milbourne: Also, "on-the-highway" calculations were done for severity.

**(05:26)** Adrian Milbourne: False reporting of data science—part two.

**(05:28)** Adrian Milbourne: Leadership—when asked for a model for Level 3 and Level 4,

**(05:30)** Adrian Milbourne: They said "95%…" Very bad false reporting.

**(05:37)** Adrian Milbourne: When asked for the algorithm they used,

**(05:38)** Adrian Milbourne: They said "very fancy algorithm."

**(05:41)** Adrian Milbourne: When I saw the code, it was a standard algorithm.

**(05:44)** Adrian Milbourne: It didn't have a response.

**(05:46)** Adrian Milbourne: Number six—don't overpromise and underdeliver.

**(05:58)** Adrian Milbourne: No proper structure. There was no proper structure for the project.

**(06:01)** Adrian Milbourne: Most of the results were "out of class," even when the goal was clearly defined.

**(06:07)** Adrian Milbourne: The Walmart team could not execute what they built.

**(06:21)** Adrian Milbourne: Do not try to divide the Walmart team.

**(06:23)** Adrian Milbourne: Same things—like Leslie's team.

**(06:24)** Adrian Milbourne: They don't let me…

**(06:31)** Adrian Milbourne: …go into it.

**(06:40)** Adrian Milbourne: Number five—for things they can't do, they get upset at their teammates.

(06:44) Adrian Milbourne: Negative ability to provide switched responses when required.

(06:49) Adrian Milbourne: This one—Infogain's operation on their own.

(06:52) Adrian Milbourne: They both did not succeed.

(06:54) Adrian Milbourne: One of the challenges in seeing this project…

(07:02) Adrian Milbourne: …interrupts the necessity of substantial intervention with their approach.

(07:08) Adrian Milbourne: Furthermore, it seems the notable disparity between their level of communication…

(07:11) Adrian Milbourne: …actually worked out a little bit excessive and somewhat taught rather than tangible.

(07:20) Adrian Milbourne: So that was it. We got four responses—

(07:24) Adrian Milbourne: One, two, three, four from the team.

(08:01) Adrian Milbourne: I don't know, but I was disappointed in that one in particular.

(08:05) Adrian Milbourne: I don't want to come too hard because I'm thankful that this person responded.

(08:11) Adrian Milbourne: But we've got to root that out—that attitude, at least.

(08:17) Adrian Milbourne: I've never worked on any project where we didn't have growing pains—

(08:20) Adrian Milbourne: Especially in the first eight weeks of the project.