# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

**FILED**

NOV 0 3 2025

CLERK, U.S. DISTRICT COURT
TEXAS EASTERN

| | | |
|---|---|---|
| IN THE MATTER OF: | § | |
| | § | |
| DILIP JANA | § | Civil Action No. 4:24-cv-00698-SDJ-BD |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **WALMART, INC.,** | § | |
| *Defendant.* | § | |

---

### PLAINTIFF'S UNOPPOSED MOTION (BY COURT ORDER DKT 99) FOR SUMMARY JUDGEMENT ON LIABILITY UNDER SOX and CAARA

---

Plaintiff moves for case-dispositive summary judgment on liability under SOX §806 and CAARA. The undisputed record shows (1) protected internal disclosures, (2) employer knowledge, (3) an adverse action, and (4) contributing-factor causation. See SUMF ¶¶ (protected activity), ¶¶ (knowledge), ¶94 (adverse action), ¶¶ (direct evidence/temporal sequence). Under Local Rule CV-56(c) and Dkt. 99, Plaintiff's properly supported facts are deemed admitted.

## Posture – Dkt. 99 and Local Rule CV-56
### No Opposition Permitted; Facts Deemed Admitted

2. At Walmart's request, the Court entered Dkt. 99 excusing Walmart from responding to Plaintiff's filings. Under CV-56(c), the Court assumes movant's supported facts are admitted absent a responsive brief with proper evidence. Fed. R. Civ. P. 56(e)(2).

---

3. Even if Walmart could respond, it still cannot create a genuine dispute. Walmart produced no certified discovery to create a genuine dispute; Rule 37(c)(1) preclusion applies.

# I.    Statement of the Issues to be decided by the Court

4. The questions presented are narrow: whether, on the undisputed record, (1) Plaintiff engaged in protected activity under SOX §806 and CAARA by reporting fraud- and antitrust-type misconduct through internal channels; (2) Walmart had knowledge of those disclosures; (3) Plaintiff suffered an adverse action; and (4) the protected activity was a contributing factor in that action, including by direct evidence. If so, the Court should enter judgment on liability for SOX §806 and CAARA, reserving remedies for a later phase.

# II.    Statement of Undisputed Material Facts ("SUMF")
## A. Protected Activity

5. This case turns on whether senior Walmart leadership had clear, time-stamped notice of Plaintiff's protected activities related to CAARA and SOX concerns before the October 19, 2023 termination. The record shows a continuous protected-activity trail from August 8 through October 12, escalating to SVP-level and CEO level review and a temporary halt of the Infogain's (an India based IT Consulting Company) work—then termination within days.

## B. No Retaliation Commitment by Walmart's top Management

6. At a companywide invite only listening session on August 8, 2023, in response to Plaintiff's complaint "what is this management's plan that people on the ground level should be able to speak freely without fear of retaliation" SJ1-CEO-1 (EXHIBIT X-22), Walmart's VP-HR Shawn Cohen publicly committed that "Walmart doesn't tolerate retaliation... the opendoor is alive and well...

there isn't any toleration for retaliation in any form," and CEO Chris Nicholas assured concerns would be "handled in the right way and confidentially." CEO Chris Nicholas also acknowledged Plaintiff's contributions: "Thank you for what you do… there aren't many people that get to say that they're part of a Nobel-winning prize team that discovered the God particle." (SJ1-CEO-1 (EXHIBIT X-22) - VIDEO Evidence). That same day, Plaintiff notified SVP Hazelwood in writing that Infogain's, India based IT Consulting company favoured by Vice President Ridhi Mehra, an Indian, selection was "unethical," explained the low-ball then expand pricing and quality issues, and reaffirmed Plaintiff's loyalty to Walmart: "I do not have victim mentality, but unfortunately, I have been a victim of retaliation and discrimination at Walmart; still, I am here because I love Walmart… I bring food for four of my kids because of Walmart… I speak up when I see Walmart's best interest is compromised." (SJ1-AH-2A.) Hazelwood informed Plaintiff that she **did share this with Shawn from our People team for his guidance.** We would like to sit down and discuss with you.."(SJ1-AH-2A EMail Evidence)

## C. Statement of Facts: Supervisory Chain & Protected-Recipient

7. Chain of command (2023): Director, Data Science Dilip Jana → Sr. Director Adrian Milbourne → Vice President Ridhi Mehra → Senior Vice President Allie ("Allie") Hazelwood → Senior Leader/SVP Greg Cathey.(Supervisory Authority over Plaintiff)

8. Shawn Cohen (HR VP), Jelahn Stewart (VP Ethics) Monica Hall (Sr Manager, Ethics) – "person working for the employer who has authority to investigate"

### D. Plaintiff's Protected Activity with Shawn Cohen, a "person working for the employer who has the authority to investigate"

9. On August 14, 2023, in a **<u>VIDEO recorded</u>** meeting with Walmart VP–HR Shawn Cohen Plaintiff made specific, internal whistleblower disclosures to Walmart's VP–HR regarding "bid rigging, procurement fraud, [and] bid suppression," the low-ball-then-increase pricing scheme, a scoring process that "favor[ed] Infogain," and a VP predisposition toward Infogain during evaluation—and that HR received, understood, and initiated investigation steps. The following are verbatim excerpts with timestamps from SJ1-SC-4,SJ1-SC-5 and SJ1-SC-6 establishing the substance, actors, timeframe, mechanism, and HR's receipt for investigation.

10. Plaintiff emphasized the gravity of the misconduct concerns and the existence of documentation:

*"I can give you a bigger picture… assume that I have proof—some sort of proof. You cannot believe how much documentation I had to go through over the weekend." (0:51–1:16)* **(SJ1-SC-4)**
*"I did the job for Walmart and we are on the verge of big corruption, and I have documented everything." (1:26–1:37)* **(SJ1-SC-4)**

11. Cohen confirms he understands who is implicated and that this is an overview for investigation purposes: "Okay, Ridhi. Okay." (2:30) "…you mind if I take some quick notes? Yes, I know you're just giving me the overview." (2:48) **(SJ1-SC-4)**

12. Plaintiff identified the temporal scope of the evidence: "I have documented this incident from March 28 until last week." (2:37–2:48). **(SJ1-SC-4)**

13. **Employer knowledge is established:** the VP-HR received the disclosures, acknowledged the subject (including the named VP), and took notes for follow-up

"Okay, Ridhi, Okay"(2:30) "…you mind if I take some quick notes?" (2:48) **(SJ1-SC-4)**

14. Plaintiff identified specific anticompetitive and fraud-type conduct, using precise terms

- "bid rigging, procurement fraud, bid suppression" (0:32) **(SJ1-SC-5)**

- "Misrepresenting low cost of the POC to get the POC and then increase the price once they got the project even before starting the project for the same job…" (0:42) **(SJ1-SC-5)**

15. Cohen's contemporaneous echo shows receipt and understanding: Cohen: "Bid suppression." (0:40). Plaintiff tied orchestration to a specific VP and anchored:"Then it was orchestrated by Riddhi Mehra." (0:42) **(SJ1-SC-5)**:

16. Plaintiff describes five vendors, a low Infogain bid, and higher bids by Google/Deloitte that were removed from contention**(SJ1-SC-5)**:

> *I saw there were five vendors. I was honestly evaluating and I gave my critical feedback for each of these vendors… What my feedback was for **Infogain there is a vendor in India headquarter in India**, now they were bidding for the process and they showed the POC cost would be $180,000 ..Google and Deloitte they gave $300,000 bidding.(1:42)*

*"I saw there were five vendors… [Infogain] showed the POC cost would be $180,000… [but] Google and Deloitte… gave $300,000 [bids]." (1:42–2:40)*
*"and they have been removed" (2:36)*

17. Cohen confirms his understanding of the delta: "About double the cost." (2:38)**(SJ1-SC-5)**:

18. Plaintiff details concerns about the technical quality/competence underlying Infogain's bid:

*"my feedback for Infogain was pretty bad… they're very cheap means low quality work and… they are not competent enough." (3:28–3:49)* **(SJ1-SC-5)**
*"I was evaluating, I looked at the data scientist's profile… Data scientist job is not easy. You need… very technical… expertise." (3:56–4:02)* **(SJ1-SC-5)**

19. Plaintiff identifies Kamil Bay as the person "dealing with" the vendors, describes Bay's close relationship with the VP, and states Bay used a scoring approach that favored Infogain (**SJ1-SC-5**):

> *"I emailed... the person who was dealing with all kinds of vendor was Kamil Bay..." (5:17–5:25)*
> *"Ridhi Mehra... and Kamil Bay... are very good friend[s]... [he was] loyal to Riddhi, and... doing all kinds of stuff for Riddhi." (5:25–5:42)*
> *"During the evaluation period Kamil came up with some kind of numbering system... which favor[ed] Infogain" (10:36–10:53)*

20. Plaintiff further reports a recorded statement by Bay acknowledging he was protecting the VP:

> *"Kamil acknowledged on a recording... he's just helping Riddhi" (10:15–10:36)* (**SJ1-SC-5**)

21. Plaintiff relays and then reads the VP's statement made during vendor selection, evidencing a predisposition toward Infogain before decisions were final(**SJ1-SC-5**):

> *"'If it was my personal business, I do like Infogain more not because of just the cost but I think they understand the problem better... If you think about POC get Infogain and then you can use our internal intelligence.'" (6:40–7:20; 11:04–12:04)*

> *"So you as a VP you set up your mind while we are evaluating... you're telling Infogain understands better than Google." (7:24–7:40)*

> *"It's all documented. I have the recording. I will give it to you." (7:40–7:46)*

22. Infogain's low-ball entry followed by add-on charges and timeline. Plaintiff labeled the tactic and explained the mechanism. Plaintiff provides concrete pricing steps and dates: the low $180k entry price followed by travel and extension charges even before work commenced, with project start on June 26(**SJ1-SC-5**):

> *"Infogain is supposed to charge 180,000... They came up, 'we have to travel to Bentonville'... another 100,000... 'this 13 weeks is not enough'... another 100,000... basically... 180 plus 200 means 400,000 which is [more] expensive than Google and Deloitte." (8:38–9:10)*

*"even before starting the work for the exact same work. They started their work on 26th of June, not before that." (9:40–9:53)*
*"That's a bid rigging... You are purposefully reducing the cost upfront to get the bid and once you got the bid... then you are increasing the price." (13:26–13:34)*

27. Plaintiff reports managerial pushback when objections were raised(**SJ1-SC-5**):

*"Adrian, my boss, came back and said... don't message... about Infogain... and then I got the retaliation." (8:15–8:38)*

**28. Cohen acknowledges the categories and asks for documentation to investigate(SJ1-SC-5):**

*"I was gonna say you said bid rigging.." (0:27)*
*"Bid suppression." (0:40)*
*"So when do you think you will be able to provide me with the documentation...* ***Because we will need to investigate these.****" (13:55–14:01)*

29. Plaintiff's disclosure also includes statements bearing on scope and motive:

- "So these companies … **hire very low quality people in India.**" (3:28)
- "Right after giving the project to Infogain, Riddhi went to India for one week vacation… I have serious doubt on **embezzlement.**" (12:17–12:30)
- Cohen: "So you are claiming she went on her vacation.. as connected to this bid" — "That's correct." (12:30–12:38)

30. Cohen precisely repeated the categories being reported and confirmed the investigation path (**SJ1-SC-6**):

"partner with our ethics department because of the claims you've raised… bid rigging, procurement fraud, bid suppression and misrepresentation of the cost of the proof of concept." (0:44)
"I need to connect with our ethics team to launch an investigation into those concerns." (1:08)

31. Cohen informed Plaintiff that he will connect with Walmart Ethics department " *launch an investigation into those concerns*" (**SJ1-SC-6**)

*"So I need to connect with our ethics team to launch an investigation into those concerns." (1:08)*

*"They'll probably be reaching out to you about the documentation... that will... handle [the] issue going forward..." (1:16)*

---

*"I'll make sure… to find out who would actually be handling it…" (1:51)*

*"I need to call them and talk through what you've shared with me." (1:59)*

*"Let me connect with our ethics department and share with them the concerns you've raised… once I've done that, I'll follow up with you… give you an update on how things will proceed." (2:47–2:58)*

## E. Plaintiff's August 8, 2023 Protected Activity with Allie Hazelwood, a "person with supervisory authority over" Plaintiff
### a. EMail Evidence: <u>SJ1-AH-2A</u>

32. On August 8, 2023, Plaintiff wrote directly to SVP Allie Hazelwood to warn that the vendor process had been tilted toward Infogain by using a low preliminary bid to push out stronger competitors, with management then planning to chain the award into the much larger MVP and subsequent phases regardless of performance. The email explains that the POC was being used as a Trojan horse: a low sticker price to "win" the beachhead, followed by add-ons, extensions, and the automatic handoff of the MVP to the same vendor—foreclosing any renewed competition. In that message, Plaintiff emphasized that this structure was not disclosed up front

33. **August 8, 2023:** Plaintiff emailed SVP Allie Hazelwood from his Walmart corporate account reporting unethical vendor-selection practices involving Infogain (an India based IT consulting company) cost-manipulation risks, and retaliation concerns. (<u>**SJ1-AH-2A**</u> – Email to SVP Hazelwood.): Plaintiff wrote that **"vendor (Infogain) selection was done in an unethical manner, providing projects to vendor despite their very poor performance."**.Plaintiff stated vendors were "disrespecting me in front of everybody" when he questioned quality; "my management started retaliating against me";

---

**34. Management pressure to portray the POC as a success to obtain MVP approval.** Plaintiff warned that "management is trying to portray great success of POC… to get your approval for MVP. If MVP gets approved, in my opinion it will be damaging for the team and for Walmart."

**35. Misrepresentation of capabilities/results; no defects identified by Infogain.** Plaintiff explained that slide content credited to Copilot reflected basic querying, "no data science involved," and that

> *"Infogain was trying to mislead the team multiple times… [and] was providing wrong results… They have not identified a single defect…I did not know that MVP will attached to whoever we select for POC, if I knew that I would have opposed it. **No matter how bad their performance is, management wants to go for MVP with the Infogain**; I can provide you more information if we speak. Something isn't right.*

**36. Management's Suppression of Plaintiff's work product.** Plaintiff further reported that "**management is trying to suppress our team's work**; not letting us to present at Leah meeting." .

**38. Plaintiff's Commitment to Walmart; no "victim mentality":** Plaintiff expressly disclaimed any "victim mentality," **affirmed loyalty to Walmart**, and emphasized family reliance—**evidence of intent to remain and continue serving the company:** *"I do not have victim mentality, but unfortunately, I have been a victim of retaliation and discrimination at Walmart; still, **I am here because I love Walmart, I love working at Walmart. I bring food for four of my kids because of Walmart, I speak up when I see Walmart's best interest is compromised**." (emphasis added)*

39. The August 8 email conveyed that Infogain's entry price had been used to knock out higher-quality bidders during evaluation, while internal scoring and leadership preference were steering the decision toward Infogain despite weak technical results. The core warning to Hazelwood was straightforward: a pre-wired pathway from a low-bid POC to a multi-million-dollar MVP was

being advanced "no matter how bad their performance is," eliminating competition and exposing Walmart to escalating costs and substandard outcomes.

40. On August 8, 2023, SVP Allie Hazelwood acknowledged and replied to Plaintiff's email stating: "Hi there, I did share this with Shawn from our People team for his guidance. We would like to sit down and discuss with you this afternoon."

### b. **Phone Call Recording: SJ1-AH-2C**

41. On August 8, 2023 Allie Hazelwood expressly captured the concern that Plaintiff's evaluation inputs were excluded and the scoring was done by a single individual (not Plaintiff). These facts are material to the vendor-selection integrity issues at the heart of the protected-activity chronology (and later pretext), and they are established directly by the SVP's own words and Plaintiff's contemporaneous account on the call.

> *"Got it. So the concern is... I would have seen the scoring but my understanding was the team had scored it and your—"*
> *Plaintiff: "no, no"*
> *Hazelwood: "Your concern is your scores weren't accounted for in the scoring. It was just one person." (SJ1-AH-2C, ~1:02–1:13)*

42. Hazelwood summarized that leadership had asked if Plaintiff could deliver and that the answer was yes—undercutting any performance-based pretext.

> "Okay, got it. Understood… you were asked if you could solve the problem. Your answer was, yes, I can solve the problem." (SJ1-AH-2C, ~2:15)

43. Plaintiff described working deep into the night to meet urgent needs and delivering a completed workforce-management item that was never presented to Hazelwood—evidence of gate-keeping/messaging control.

"I **worked until three o'clock, four o'clock night** because there are some urgent work and I had to deliver even with nobody in my team. I was doing that…." (SJ1-AH-2C, ~2:42–2:58)

"Workforce management stuff. We did it. We delivered it. It never went to your desk. And they told me, oh, we'll utilize later." (SJ1-AH-2C, ~3:04)

### F. Plaintiff's October, 2023 Protected Activity with Greg Cathey and Allie Hazelwood, "person with supervisory authority over" Plaintiff

**44. a) Protected internal disclosure to senior leadership (ethics/controls + antitrust themes):** On October 6, 2023, Plaintiff emailed Walmart SVP Greg Cathey raising concerns about Infogain (**SJ1-AH-2D**) with a detailed, contemporaneous disclosure that Infogain's POC had ended, that leadership was nonetheless moving toward awarding the MVP, and that compliance and integrity concerns existed (SOW, pricing, and technical misrepresentation). Plaintiff warns leadership about an extension and the lack of contract controls:

*"The POC was completed at the end of Sept 2023… they got an extension of one week (10-02-2023 to 10-06-2023) while trying to get MVP for 6 month (~$1.3M)… Even if they stay here for few weeks, **what is the new SOW (Statement of Work) and are they being compensated properly?** I am really concerned… I think this may be a **violation of few federal labor laws.** I am the Director of Data Science, and I am in the dark for any data science engagements with Infogain!"*

45. The email asks leadership to halt the award because the vendor's work was deficient and misrepresented:

*"I am requesting to stop funding for Infogain, awarding MVP (6 months, ~$1.3M) to Infogain, in my opinion, is not for the best interest of Walmart… Infogain performed very poor… Infogain did not define a single defect… Before winning the POC, Infogain promised… ['NAVIK']… I have not seen that… so it was a lie just to win the bid… Kamil Bay is unethically approving Infogain's results to demonstrate it's a great success so that Infogain can get MVP for next 6 months."*

b) **Employer knowledge and immediate response (receipt + hold of vendor work):**

46. On October 7, 2023, SVP Greg Cathey replied and confirmed receipt and action on the disclosure:

> *"We are holding all work with Infogain per my request as we review your concerns. We will connect with you post findings of the review."*

This contemporaneous response shows the disclosure reached decision-makers and triggered a hold on the vendor's work while the concerns were reviewed.

### c) Specific misconduct flagged (pricing manipulation; tool-swap; KPI falsity; scoring bias):

47. The email details multiple integrity failures relevant to procurement and controls:

- **Pricing low-ball then add-ons:** "Infogain is supposed to charge 180,000… 'we have to travel to Bentonville'… another 100,000… 'this 13 weeks is not enough'… another 100,000… basically… 180 plus 200 means 400,000 which is [more] expensive than Google and Deloitte."

- **Tool-swap to manufacture 'success':** "When POC failed completely, Kamil installed LLAMA2… and gave it to Infogain; Infogain then provided text prompts and got some result. Kamil created a big hype and presented in Leah meeting… Within 2-3 weeks, Kamil changed from LLAMA2 to ChatGPT… It's because we are not doing any modeling."

- **Falsified/filtered KPI:** "Infogain… removed most critical issues (defects) and used only low severe cases with high volumes… I found that… '84%' actionable is not real." (as summarized within the email's narrative of severity logic and POC failures)

- **Rigged scoring:** "Created numbering system favoring Infogain… I was evaluating Infogain on 03-28-2023, I gave a very bad rating… On 03-29-2023… Ridhi said, 'If it was my personal business, I do like Infogain more… If you think about POC, get Infogain…'"

### d) Loyalty and good-faith tone (commitment to Walmart's best interest):

48. The **disclosure is framed expressly as a loyalty-driven request to protect Walmart's interests, not as a personal grievance**:

> "The purpose of this email is to inform you the situation from the ground level… and you make your own decision, I am trying to provide raw materials from the ground level."

> "I don't have any problem in MVP being given to any vendor if they do a good job during POC. What Kamil was doing is to give oxygen to Infogain so that they can get the MVP and

to make Ridhi happy. While I chose to be honest and upholding Walmart's best interest was priority than pleasing Ridhi."

**e) Retaliation contemporaneous with protected activity (access cut-offs; denials; sidelining):**

49. The email documents retaliation and interference occurring as the disclosures were made:

> "Adrian is retaliating and ruthless.""I am in the dark for any data science engagements with Infogain!" "Kamil got 2 more X5 manager position while I am asking for more resources and Adrian said no. And I am being avoided in meetings and meeting invitations. Management is allowing him to perform data science related job without talking to me and taking help from associates directly reporting to me."

**f) Contrasting rewards to the approving manager (Bay) during the same period**

50. While Plaintiff reports misconduct and asks to stop the MVP, the email records that the manager "approving" the vendor's poor output was rewarded:

"Kamil Bay is unethically approving Infogain's results… so that Infogain can get MVP for next 6 months." "How Kamil is getting rewarded: Kamil became LLM/GenAI expert overnight… 'LLM strategy transition— the LLM strategy will be transitioned to Kamil to lead…' Kamil got 2 more X5 manager position…" "I will not be surprised if Kamil becomes Director of Data Science."

## G. Plaintiff's October 9, 2023 Protected Activity with Ridhi Mehra, Adrian Milbourne, "person with supervisory authority over" Plaintiff

**51. Mid-day SOW inquiry and compliance concern (Ex. X-7)** At 12:29 PM CT, Plaintiff emailed senior leadership to confirm whether the POC had ended and, if so, whether Infogain was still working without a current SOW and how any such post-POC work was being compensated. Plaintiff

wrote: "Adrian is on PTO. @Ridhi Mehra this is urgent. Did we extend the POC? If we did not extend the POC and if the POC ended, and Infogain is still working, are they being fairly compensated for their post POC work? Please advise. If this is not the case, Infogain should not have access to Walmart resources after POC is ended. In case you have updated SOW, I want to have a look."

**52. Afternoon urgent access-revocation request**. At 5:13 PM CT, Plaintiff followed up, stating: "Infogain is a vendor and I believe POC contract has ended; I am not getting any response from management. Infogain should not have access to Walmart data anymore since POC has been ended; there's a possibility of data leakage (serious concerns on data privacy). Can you please revoke Infogain's data access effective immediately unless you have any valid reasons not to do so? This is very URGENT."

**53. Management response the same afternoon:** At 5:23 PM CT, leadership responded: "Thanks Dilip for your concern. The team is heads down working on delivering a leadership update. There is an active SOW for Infogain approved by Ridhi, procurement, and legal. No action needed — all permissions are to remain in place."

**54. Undisputed facts established by this exhibit:** On October 9, 2023, Plaintiff (a) asked whether the POC had ended, (b) requested the updated SOW if one existed, and (c) sought revocation of Infogain's data access due to the POC's end and data-privacy concerns. Leadership replied that there was "an active SOW" and directed that "all permissions are to remain in place."

## H. Plaintiff's October 4, 2023 Protected Activity with Ridhi Mehra, Adrian Milbourne, "person with supervisory authority over" Plaintiff

55. On October 4, 2023 at 12:01 a.m., Plaintiff emailed Sr. Director Adrian Milbourne (cc: VP Ridhi Mehra and HRBP Wendy Bowman) with the subject line "[Unethical]: Sign off for POC." The body states, in full:

> "*I believe Kamil is approving Infogain's work unethically, I need your attention. I'll be happy to explain my findings."(Ex. SJ1-DER-12 (EXHIBIT X-6).)*

56. **Plaintiff's contemporaneous refusal to sign off and challenge to the "84%" claim.** Two days earlier, on October 2, 2023, Plaintiff emailed Kamil Bay (cc: Leslie Platz, Olan Land, Taylor Lark, Raymond Pritchett) regarding the vendor's deck and sign-off:

> "*Kamil: I see you signed off from your side. ... I have a few questions…Slide #6, '84% of the defects identified (at an issue level) are actionable. In the POC, these were ratified by HITL'… I have attached most recent output (Output_QA_Second_Iteration.xlsx), which shows this is not the case. Please advise."*
> "*Slide #6… 'Top actionable defects identified … WFM—I did not see any result for WFM throughout the deck. I believe result for WFM is falsely claimed."*
> "*Since you have already signed off, I am curious you may already have an answer. I appreciate if you respond asap." (Ex. SJ1-DER-12 (EXHIBIT X-6).)*

57. **Team consensus repudiates Infogain's "84% actionable" claim (Oct. 9, 2023).** In a recorded working session on October 9, 2023, Plaintiff met with Megha Banerjee (data science), and business SMEs Olan Land and Raymond Pritchett to reconcile Infogain's reported "84% actionable" rate. The team agreed the 84% figure was wrong and that true performance was roughly 50–60% (Ex. SJ1-TM-14):

- Raymond Pritchett (SME): "I think it came out to be around 50–60 percent," and "that 84%… is a bit dated and not accurate… anymore." (SJ1-TM-14, ~1:24; 6:20–6:45.)
- Megha Banerjee (Data Science): "44 [of 94] got excluded… somewhere like [56/94 ≈] 60%." (SJ1-TM-14, ~8:59.)

- Plaintiff (sign-off refusal): "When I saw 84%, my mind was blowing… I cannot approve. Simple." (SJ1-TM-14, ~12:19–13:21.)

(This meeting directly undercuts the vendor's "84%" assertion and aligns with the Oct. 4 email objecting to unethical approval.)

**58, Vendor confirms Kamil's sign-off and presses Plaintiff for his sign-off:** On September 29, 2023, Infogain PM Ina Nanda emailed Plaintiff:

> *"In the stand-up today, Kamil has given us a sign off on the deliverables he is responsible for. It would be wonderful to get a timeline from your side, so we can expedite and ensure that we close this from your side within the set time frame as well."(Ex. SJ1-DER-12 (EXHIBIT X-6).)*

59. Earlier that day, Plaintiff had asked:

"Can you please send me the final deck that you are asking for sign-off?" (Ex. SJ1-DER-12 (EXHIBIT X-6).) And later, Nanda sent: "Attaching the deck which we went through for the workshop. To clarify, we are looking forward to the following sign-offs from Walmart team:"(Ex. SJ1-DER-12 (EXHIBIT X-6).)

**60. Management receipt and escalation acknowledgment the next day–** On October 5, 2023 (3:52 p.m.), VP Ridhi Mehra replied to Plaintiff (re: the Oct. 4 email):

> *"Just a quick note to let [you] know that I have read all your emails and they have been appropriately escalated." (Ex. SJ1-DER-12 (EXHIBIT X-6).)*

**61. Termination materials cite and attach the Oct. 4 email (next day)--** Walmart's termination packet submitted in the OALJ record on June 14, 2024 includes the Oct. 4, 12:01 a.m. email attachment showing **"[Unethical]: Sign off for POC.",** and was used to justify termination **(SJ1-TER-12; see also Dkt. 13-2, PageID 299)**. (Offered to show Walmart's use of the email in the

termination materials; objection to admissibility/authentication reserved.). Ridhi Mehra's *"**appropriately escalated**"* was the termination recommendation.

**62. Material fact established:** Plaintiff reported "unethical" sign-off on Oct. 4 at 12:01 a.m.; vendor contemporaneously asserted Kamil had already signed off; Plaintiff refused to sign due to false "84%"/WFM claims; leadership acknowledged escalation; and the termination packet same day attached and relied on this very email (**SJ1-DER-12; SJ1-TER-12; Dkt. 13-2, PageID 299**).

## I.   Plaintiff's September 4, 2023 Protected Activity with Jelahn Stewart and Monica Hall, "person working for the employer who has the authority to investigate"

63. On September 4, 2023 Plaintiff "talked to Paula Coil, Doug's Executive Assistant, and asked for help to report possible corruption by my previous Vice President. Paula then suggested that I talk to Matt Miner. I messaged Matt Miner's Executive Assistant, Shanna Morris, and Shanna introduced me with Jelahn Stewart (VP, Ethics). I reported possible antitrust violations to Jelahn Stewart."

**SJ1-COMM-37**

64. Monica Hall was present during the meeting with Jelahn Stewart. Jelahn Stewart asked Plaintiff to provide any evidence of the allegation Plaintiff made to Monica Hall. On September 8, 2023, Plaintiff spoke by remote call with Monica Hall (HR Business Partner); the call was recorded by Plaintiff and produced audio as EXHIBIT X-12 – Protected Activity – Sept. 8, 2023 – Monica Hall – Audio Conversation.m4a. (**SJ1-MH-9**.) Plaintiff offered evidence. At the outset, Plaintiff stated: "So I'll give you all the information." (SJ1-MH-9, 0:00–0:03.) HR received and welcomed the submission. Ms. Hall responded: "Okay, this right here is very helpful." (SJ1-MH-9, 0:03–0:06.)

**65. Reference to prior in-person whistleblower meeting** – Ms. Hall confirmed the topic matched Plaintiff's earlier report to **Ethics VP Jelahn Stewart**, stating: "**Oh, that's what you were telling Jelahn and I about when you came to visit us.**" (SJ1-MH-9, 0:53–1:03.)

**66. Plaintiff clarified purpose and method —** Plaintiff explained he had recorded material "not to disrespect any individual" but to demonstrate what was happening, adding he acted "**as an honest Walmart employee who loves Walmart**" to check whether the company was "upholding Walmart's core values." (SJ1-MH-9, 0:06–1:20.)

**67. Immediate review planned.** Ms. Hall stated: "I want to get this high-level documents. I want to see if I can get a review today…" (SJ1-MH-9, 1:47–1:55.). Ongoing intake of evidence – Ms. Hall further noted the evidence would be treated as preliminary, saying Walmart "should be receiving more… over the weekend or next week." (SJ1-MH-9, 1:55–2:10.)

**68. Acknowledgment of effort and significance.** Ms. Hall told Plaintiff: "I really appreciate all of your work and your efforts to get this information to us," and emphasized balancing his time and family needs. (SJ1-MH-9, 2:17–2:42.)

**69. Escalation to a case team.** Ms. Hall concluded: "Let me see if I can get somebody on this **significant case team** so that they can review this information for me." (SJ1-MH-9, 3:14–end.)

**70. Context of protected activity and notice –** throughout the call, the discussion concerns Plaintiff supplying documents and recordings of alleged vendor-procurement misconduct and retaliation, with Ms. Hall confirming receipt, linking it to the prior Ethics meeting with VP Stewart, and indicating same-day review and escalation. (SJ1-MH-9, 0:00–3:14.)

71. On Sept. 15, 2023 at 9:22 AM (CDT), Plaintiff emailed Walmart HRBP Monica Hall from his Walmart account with the subject "New Materials." He wrote: "I have added new materials — here… Please let me know if you have any questions. I am working on more documents, will submit next week. **I am also working on documents for Retaliation**, I'll provide it next week." (**SJ1-MH-12**.) At 9:38 AM (CDT), because Ms. Hall was unavailable, Plaintiff escalated the same disclosure to Jeremy Hanna and Nicholas Sargent (HR/Legal), stating: "Since Monica is on PTO, I am reaching out to you. Can you please forward these documents to the appropriate departments." (SJ1-MH-12.). At 10:08:49 AM (CDT), HR/Legal acknowledged receipt and logging. Mr. Hanna replied to the thread: "Good morning… This communication has been attached to your file. Have a great day." (SJ1-MH-12.)

72. The thread reflects ongoing internal whistleblower submissions and an explicit notice that retaliation documentation was being assembled and would be "provided… next week." (SJ1-MH-12.). Walmart HR/Legal's written response confirms actual knowledge and retention of Plaintiff's disclosures as of Sept. 15, 2023—34 days before Walmart terminated Plaintiff on Oct. 19, 2023. (SJ1-MH-12.)

73. On Sept. 26, Plaintiff stated: "I have some more materials how the effort is being made to extend the project to the vendor for next 6 month or even 12 month costing millions… I just want to wait your response before spending more time on this." (Ex. SJ1-MH-11). On Sept. 26, Hall responded: "Hi! No clarity is needed from you at this point. Just awaiting the outcome of the review. We should be able to provide you with an update very soon. Thanks for reaching out and offering support!" (Ex. SJ1-MH-11).

**74. On September 27, 2023, Monica Hall notified Plaintiff that the ethics matter was closed** twenty-two (22) days before Plaintiff's termination on Oct. 19, 2023. (Ex. SJ1-MH-10.). The closure followed Plaintiff's August–September protected disclosures and HR referral.

**75. Material significance.** These undisputed messages (a) corroborate ongoing, protected internal reporting and ethics assumption of the investigation; (b) show Plaintiff's willingness to supply more evidence while deferring at ethics's direction; and (c) place this activity within three weeks of termination, supporting temporal proximity and causation for SOX/CAA retaliation. Further, ethics's assurances and directives negate any claim that Plaintiff failed to cooperate or that Walmart lacked notice.

## J. Pretext and contributing-factor causation – direct-report interference (September 12, 2023)

76. On September 20, 2023, in a recorded call with Bowman and Plaintiff, Plaintiff's direct report Megha Banerjee recounted that Adrian had called her to an urgent early-morning meeting and insisted it be "super confidential"—excluding Plaintiff: "The second he mentioned that he'd like to keep it private, like super confidential and I shouldn't be sharing it… Adrian… set up the meeting… it was somewhere around 8:30." (SJ1-WB-13A (Y-17), ~2:14–2:57). When Bowman asked who was present, Megha answered, "Me and him." (id., ~2:23–2:28). She described the "Model Output QA" assignment with an October 31 deadline and explained why it "**does not make sense**" and had "**no solution in data science**" and the fact that a business team was already performing validation: "We are working with Infogain to give us… top actionable defects… But the output they're giving us… **most of these are not really actionable**." (SJ1-WB-13A (Y-17), ~2:57–5:10). She reiterated the core impossibility: "**Probably there is no solution in data science**" for what was being demanded from the LLM output under those constraints (id., ~5:21–6:15). Megha also captured the chain-of-command breach: "I report to Dilip… and if I've been [assigned] to some task that my manager is not aligned with, whom should I listen to?… There is a reporting chain… It was probably

on a 15 or 20 minutes notice… I just joined… and I'm getting a question from a senior director… **That's very weird.**" (SJ1-WB-13A (Y-17), ~6:22–8:14, 7:25–7:54). When Bowman asked, "What project?" Megha answered plainly: "The model output QA." (id., ~9:50–9:56).

77. Before arranging meetings with Megha and Wendy, Plaintiff immediately reported Adrian's retaliatory motive to Wendy Bowman on September 12, 2023 right after Megha called him after talking to Adrian. On September 12, 2023, HR People Partner Wendy Bowman agreed that work assignments for the team must be aligned between leaders—not funneled directly to a subordinate behind the manager's back. Bowman told Plaintiff: "It has to happen… You guys have to [be] united," immediately after Plaintiff explained that Adrian was assigning tasks to Plaintiff's direct report without alignment (SJ1-WB-13 (H-5), ~0:44–0:51). Bowman further acknowledged the proper sequencing: "What the expectation is… from a data science point of view… that is something that she can be working on… and then him saying, 'Yes, I agree, that is what she needs to be working on.'" Plaintiff pressed the point: "let's talk you and I, we are the leaders… let's get an agreement… then go to the associate level. That's not happening," to which Bowman answered, "It has to happen." (SJ1-WB-13 (H-5), ~0:00–0:51, emphasis added). This HR confirmation undercuts any suggestion that bypassing Plaintiff to direct his subordinate was business-as-usual; it was recognized by HR as improper.

78. Bowman acknowledges the fundamental resource defect—"Who does the data mining?" In the same September 12 exchange, Plaintiff explained that Adrian was imposing deliverables without the required data. Bowman immediately focused on accountability: "Who does the data mining—who goes out and finds the data?" Plaintiff answered: "That should be… Kamil Bay. He's the data guy. He should be able to… find the data." Bowman agreed: "That's his job. Gotcha. Gotcha." (SJ1-WB-13 (H-5), ~2:26–3:39). Plaintiff then highlighted the retaliatory trap embedded in the misalignment: "See, you don't have data, Kamil cannot bring that so you do it so that I can tell you didn't deliver on time, right? Easy, right? Do you think everybody's so fool?" Bowman responded, "I'm connecting the dots." (SJ1-WB-13 (H-5), ~3:39–3:50). These admissions show HR recognized both the procedural irregularity (leader mis-alignment) and the substantive impossibility (no data), consistent with a pretextual setup.

79. Why these two September touchpoints prove pretext and causation. By mid-September—after the August 8 and August 14 whistleblower disclosures to the CEO/VP-HR—HR documented (and agreed) that (1) leader-level alignment was required and lacking; (2) the supposed deliverables were not feasible because the necessary data did not exist; and (3) the decision-maker was running a "super confidential" end-run on Plaintiff by directing Plaintiff's subordinate alone. Bowman's statements—"It has to happen… You guys have to be united"—and "That's his job. Gotcha." regarding Kamil's data role, coupled with Megha's admissions—"no solution in data science," "very weird," "whom should I listen to?"—are contemporaneous HR-recorded acknowledgments that the leadership conduct and assignments were irregular and untenable. That is exactly how pretext looks in real time: manufactured "performance" pressure via impossible asks and managerial undermining immediately following protected disclosures.

## K. BCG-Driven Deadlines and Vendor Capture (Pretext Context)

**80. Undisputed fact.** On Oct. 10, 2023, BCG Principal **Mike Baer** acknowledged the firm's roadmap work and that the Director of Data Science should have been included. (SJ1-BCG-25)

> "You **should have been included** in those roadmap discussions." (SJ1-BCG-25, quote)

**81. Undisputed fact.** On Oct. 11, 2023, Plaintiff sent written feedback on BCG's strategy deck flagging impossible "end-of-October" deadlines given data gaps and model maturity. (SJ1-BCG-26 (EXHIBIT R-20).) "The **end-of-October** target is not feasible… **data is missing** and the models are not at a stage to support this timeline." (SJ1-BCG-26, quote)

### Deadlines weaponized to justify Infogain extension

**82. Undisputed fact.** Within a week, leadership touted Infogain "POC highlights & next steps" to senior VP **Greg Cathey**, positioning a **retainer/extension** path (10/17/2023). (SJ1-COMM-34 (EXHIBIT R-21).) "**Highlights & Next Steps**" for the MVP/extension were presented to Greg Cathey on **10/17**. (SJ1-COMM-34). These facts provide context that artificial, BCG-driven dates were used to push scope to the pre-selected vendor—consistent with pretext and vendor capture.

# L. No-SOW Work and Headcount Substitution (Controls & Antitrust Context)

**83. Undisputed fact.** No SOW while work continued toward MVP. On Oct. 9, 2023, internal communications flagged: "POC-ENDED—NEW SOW." (SJ1-SOW-19.)

**84. Undisputed fact.** In a recorded Zoom with Infogain PM **Ina Nanda** and **Krishna**, the vendor **acknowledged no SOW** existed while the team continued activities aligned to MVP build. (SJ1-SOW-20; transcript SJ1-SOW-20A.)

**Infogain's Offshore India headcount ballooned**

**85. Undisputed fact.** By **October 2023**, an org snapshot shows ~**25** reports under Sr. Director **Milbourne**, ~**23** of whom were vendor/Infogain. "Approx. **23** of **25** are **Infogain**." (SJ1-STAFF-22) compared to initial head count in India 4 people.(Exhibit V-2, Exhibit **SJ1-SOW-21**)

**86. Undisputed fact.** At the same time, Plaintiff's **U.S. Staff Data Scientist** hiring was active the weeks of **Oct 8–14** and **Oct 15–21** (interviews set; recruiter postings live). (SJ1-HIRE-41/42/43/44.) "Calling all **NLP/anomaly-detection** experts… **get in touch**…" (SJ1-HIRE-43) "**Staff Data Scientist—Root cause of Defects**… **Please reach out to Dilip Jana, PhD**." (SJ1-HIRE-44)

**87. Undisputed fact.** After the termination, Plaintiff's open positions were eliminated, ballooning Infogain's India headcount.

# M. October 17 "Victory Lap" vs. Immediate Collapse (Causation Context)

**88. Undisputed fact.** On **Oct. 17**—two days before termination—leadership circulated **"Greg Update—POC Highlights & Next Steps."** (SJ1-COMM-34.)

   "**POC Highlights & Next Steps**" to Greg Cathey. (SJ1-COMM-34)

89. **Undisputed fact.** After Plaintiff's **Nov. 3** email to the CEO and **early-November** meeting with Walmart Legal, **Infogain's contract ended Dec. 8, 2023**. (SJ1-CTERM-35.)

"**Infogain contract ends 12/08/2023**." (SJ1-CTERM-35)

90. **Undisputed fact.** The vendor's VP then sought information from Plaintiff on **Dec. 21, 2023** and admitted the **L-1 / unpaid H1B bench** facts. (SJ1-VISA-28). The swift reversal after the CEO/legal escalation corroborates the seriousness of the protected disclosures and undercuts any benign explanation for the pre-termination "victory lap."

## N. H1B Visa benching admissions (Infogain VP)

91. **Undisputed fact.** On **Dec. 21, 2023** (33 days after termination), Infogain VP **Veera Raghavan** stated:

"**Ina** I brought from India… She was in **L1**."

"**Krishna** I brought from Malaysia… **So we are keeping him without pay**."

"For some people hired exclusively from India… They will be in the **bench** and we'll move on to others." (SJ1-VISA)

No-SOW operations, rapid offshore substitution, and visa/benching admissions are internal-controls red flags (SOX) and align with a captured-vendor, competition-avoiding trajectory (CAARA context).

## O. Kamil Bay recorded admissions (SJ1-KB-15/16/17/18/18A/40)

92. On recorded calls, Kamil Bay, Director of Analytics, acknowledged a pre-commitment to Infogain, doubts about the data, lack of his technical expertise to approve results, and a plan to "spin" messaging:

- Pre-commitment/politics. "The answer is no, not worth… but… I don't want [Ridhi] to look like… it didn't work…worried about her… I owe her… I want this to succeed because of

her…No, but actually, I raised this, you know, red flag", **"No, but actually, I raised this,, red flag"** (SJ1-KB-15, 0:09; 1:03–1:41, 4:21.)

- Trying to save/patch. "I don't know how to save the situation. I'm trying to save it." Plaintiff: "it's a patch." (SJ1-KB-16, 0:10–0:30.)
- Spin the message. "We don't need to say that Infogain screwed up… we are so happy we hired [them]… now we need someone who specializes in BERT…" (SJ1-KB-17, 0:25–1:39.)
- Excluded from meetings / number doubts. Infogain met "primarily… with Ridhi and Adrian"; Bay had a "hard time trusting these numbers." (SJ1-KB-18, 0:37–1:00; SJ1-KB-18A, 2:04–2:27.). 4:21)
- Lack of expertise to approve. "I'm not an expert in that kind of classification… I just don't know." (SJ1-KB-18A, 0:17–0:37.)
- Earlier favoritism. April 10, 2023 email recommending Infogain. (SJ1-KB-40.)

93. On Oct. 4, 2023 at 12:01 a.m., Plaintiff emailed Wendy Bowman, Ridhi Mehra, and Adrian Milbourne: "I believe Kamil is approving Infogain's work unethically… I'll be happy to explain my findings." (SJ1-DER-12.) Internal termination materials later included this email; Plaintiff was terminated Oct. 19, 2023. (SJ1-TER-12; Dkt. 13-2, PageID 299 (objected to).)

# P. Adverse Action – 10-19-2023

94. Plaintiff was terminated on October 19, 2024 (Ex. X-21 VIDEO)

# III. Legal Standard

95. Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgement is appropriate when, after reviewing the allegations in the pleadings and other evidentiary sources, the court finds that there is no genuine issue of material fact and the moving party is entitled to judgement as a

matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). When the moving party has carried its burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." Rule 56(e)(2), Fed. R. Civ. P. A party attempting to avoid summary judgement must do more than raise "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgement may be granted." Anderson 477 U.S. 249-50 (citation omitted).

### 96. Legal Standard FOR SOX §806 and CAARA — Prima Facie Showing Only for SJ1

The Supreme Court recently reaffirmed the AIR21/SOX framework: a whistleblower "bears the initial burden of showing that his protected activity was a contributing factor in the unfavorable personnel action alleged in the complaint." If the whistleblower makes that showing, "the burden then shifts to the employer to show by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of the protected activity." The Court emphasized that retaliatory intent is not an element of the employee's prima facie case and traced how "**Congress then incorporated the easier-to-satisfy 'contributing factor'** framework into a series of similar whistleblower statutes that protect non-civil-service employees." (Murray v. UBS Securities, LLC, 601 U.S. ___ (2024) (cleaned quotes)).

## SOX §806 — Protected Activity

97. SOX protects internal reports of (i) fraud against shareholders, (ii) violations of SEC rules, and (iii) internal-controls/books-and-records failures. Plaintiff reported: (a) falsified/overstated performance metrics used to justify spend ("84% actionable") later repudiated by the cross-functional

team; (b) procurement/approval irregularities and a non-expert "sign-off" overriding technical QA; and (c) work proceeding toward MVP without a valid SOW and with live data access—i.e., authorization, accrual, and access-control lapses. See SUMF ¶¶51–58 (84% challenge and refusal to sign), ¶¶55–62 (unethical approval email and escalation), ¶¶73–82 (SOW/control warnings and "active SOW" response), ¶¶32–47 (SVP-level notices). These are classic books-and-records/internal-controls disclosures to persons with authority to investigate (VP-HR/Ethics) and to supervisors (SVPs). That satisfies SOX's protected-activity element.

## CAARA — Protected Activity

98. CAARA protects employees who provide information they reasonably believe relates to antitrust crimes (e.g., bid-rigging/bid-suppression) to supervisors or those with authority to investigate. Plaintiff disclosed a pre-wired vendor selection that used a lowball POC to exclude higher-quality bidders, followed by price escalations and engineered scoring favoring the preferred vendor. Disclosures were made to VP-HR (investigative authority), Ethics leadership, and SVP-level supervisors. See SUMF ¶¶9–22 (HR intake), ¶¶32–43 (SVP Hazelwood), ¶¶44–47 (SVP Cathey, price manipulation/KPI falsity/scoring bias), ¶¶63–72 (Ethics intake). That meets CAARA's protected-activity channel and subject-matter requirements.

99. **Employer knowledge** is established by contemporaneous acknowledgments and actions: HR's note-taking and Ethics referral; SVP Hazelwood's same-day response; SVP Cathey's "hold all work" directive; HR/Legal logging. See SUMF ¶¶11, 30–31, 40, 46, 71–72.

## Adverse Action & Causation

100. **Adverse action:** termination on Oct. 19, 2023. SUMF ¶94.

101. Causation (contributing factor) is proven by direct evidence and proximity: Walmart placed the Oct. 4 protected email ("[Unethical]: Sign off for POC") into its termination packet and then terminated 15 days later. SUMF ¶¶59–62, 94. The tight sequence—Oct. 2 sign-off dispute → Oct. 4 protected email → Oct. 9 team repudiation of "84%" and SOW/control warnings → Oct. 19 termination—independently satisfies the contributing-factor standard. See SUMF ¶¶51–58, 73–82, 94.

## Direct Evidence of Retaliation — CAARA

102. **Protected antitrust disclosure:** The 12:01 a.m. Oct. 4 email opposed continuing a pre-wired, competition-free path for Infogain by flagging an "unethical" sign-off and asking leadership to intervene (SUMF ¶¶55–58). That disclosure squarely relates to the same bid-rigging / bid-suppression and vendor-capture scheme previously reported and documented in the record (see, e.g., SUMF ¶¶55–58 (low-ball pricing to win; pushing out higher-quality bidders), reinforced by the contemporaneous vendor message that "Kamil has given us a sign off" while pressuring for Plaintiff's sign-off). Reporting internally to senior decision-makers (Milbourne, Mehra, HRBP Bowman) is the exact channel CAARA protects.

103. **Employer knowledge:** VP Mehra acknowledged receipt and escalation the next day (SUMF ¶¶59–62).

104. **Adverse action and contributing factor:** Walmart placed the Oct. 4 protected email into the termination packet and terminated on Oct. 19 (SUMF ¶¶59–62, 94; Ex. SJ1-TER-12; Dkt. 13-2

PageID 299 (offered solely for Walmart's use)). That is direct evidence that the protected antitrust disclosure contributed to the adverse action. The tight timing—Oct. 4 → Oct. 19—confirms causation, especially against the backdrop of (i) the Oct. 2 sign-off dispute (SUMF ¶¶55–58) and (ii) Oct. 9 corroboration that the touted "84%" result was wrong (SUMF ¶¶51–54), both of which increased the pressure to silence Plaintiff.

**105. CAARA Protected disclosure (¶¶55–58)** → employer knowledge (¶¶59–62) → adverse action (¶94) with direct, documentary linkage between the protected email and the termination packet (¶¶59–62). The contributing-factor test is satisfied on this record.

## Direct Evidence of Retaliation —SOX §806 (Whistleblower)

**106. Protected fraud/controls disclosures**. The Oct. 4 email opposed an unethical approval of vendor results contemporaneous with Plaintiff's refusal to sign off on the "84% actionable" claim (SUMF ¶¶55–58) and, days later, was reinforced by the team's 50–60% reality check (SUMF ¶¶51–54). Those facts implicate books-and-records accuracy and internal-control integrity—classic SOX territory. In the same week, Plaintiff also raised SOW/internal-controls concerns and sought access revocation if no valid SOW existed (SUMF ¶¶73–82). Proceeding, paying, or extending vendor work without a valid SOW, while papering a false KPI to justify spend, are disclosures about control failures and misstatements that SOX protects when made internally to those with authority to investigate or stop the misconduct.

**107. Employer knowledge.** VP Mehra's "appropriately escalated" response establishes receipt within the decision chain (SUMF ¶¶59–62).

**108. Adverse action and contributing factor.** The same protected email appears in the termination packet used in connection with the Oct. 19 termination (SUMF ¶¶59–62, 94). That documentary use is direct evidence that the SOX-protected disclosures contributed to the decision. The temporal sequence—Oct. 2 sign-off dispute (¶¶55–58) → Oct. 4 protected email (¶¶55–58) → Oct. 9 KPI repudiation and SOW warnings (¶¶51–54; 73–82) → Oct. 19 termination (¶94)—independently satisfies SOX's contributing-factor standard. SOX Protected disclosures (false KPI, unethical approval, SOW/control breakdowns) were made to senior management (¶¶55–58; 73–82), were known (¶¶59–62), and contributed to the termination as shown by inclusion of the protected email in the termination packet (¶¶59–62, 94).

# IV. Relief Requested

**109. Plaintiff respectfully requests that the Court:**

1. GRANT Plaintiff's Motion for Summary Judgment on Liability under SOX §806 and CAARA;

2. ENTER partial judgment that: (a) Plaintiff engaged in protected activity; (b) Walmart had knowledge; (c) Plaintiff suffered an adverse action; and (d) the protected activity was a contributing factor in that action;

3. RESERVE all remedies (including back pay, front pay, compensatory and punitive damages, interest, fees, and tax gross-up) for determination on Plaintiff's forthcoming Second Motion for Summary Judgment (SJ2) and, as appropriate, a short damages-only jury proceeding; and

4. DIRECT the Clerk to enter partial judgment consistent with this Order.

Dated: Nov. 3, 2025

Respectfully Submitted,

DILIP JANA, Plaintiff

*Pro Se*

Telephone : 318-243-9743

Email: janadilip@gmail.com

800 Fairlawn St, Allen, TX, 75002

## CERTIFICATE OF CONFERENCE

Eastern District of Texas has excused pro se Plaintiff from CV-7(i) Certificate of Conference

Respectfully Submitted,

DILIP JANA, Plaintiff

*Pro Se*

Telephone : 318-243-9743

Email: janadilip@gmail.com

800 Fairlawn St, Allen, TX, 75002

## CERTIFICATE OF SERVICE

On Nov. 3, 2025, a true and correct copy of the foregoing was served upon the following through the

Court's CM/ECF system:

| Peter S. Wahby | Morgan E. Jones | Holmes H. Hampton |
|---|---|---|
| Texas Bar No. 24011171 | Texas Bar No. 24132301 | Texas Bar No. 24144019 |
| Peter.wahby@gtlaw.com | Morgan.jones@gtlaw.com | holmes.hampton@gtlaw.com |

GREENBERG TRAURIG LLP
2200 Ross Ave, Suite 5200 Dallas, Texas 75201
Telephone: 214.665.3600
Facsimile: 214.665.3601
ATTORNEYS FOR DEFENDANT WALMART INC.

Dated: Nov. 3, 2025

Respectfully Submitted,

DILIP JANA, Plaintiff
*Pro Se*
Telephone : 318-243-9743
Email: janadilip@gmail.com
800 Fairlawn St, Allen, TX, 75002

# COVER SHEET

## BLACK FLASH DRIVE

| Name ^ |
| --- |
| EXHIBIT H-13 - Mi...ience-Leader.m4a |
| EXHIBIT J-6 - 10-...d-Megha (1).MOV |
| EXHIBIT K-4 - 08-...cs-comment.MOV |
| EXHIBIT K-6 - Ka...atch-work (1).MOV |
| EXHIBIT K-10 - Ka...reat-Job (2).MOV |
| EXHIBIT K-11 -Ka...etworking (1).MOV |
| EXHIBIT K-12 - Ka...pe-marketing.m4a |
| EXHIBIT K-15 - 08...-refrigeration.mov |
| EXHIBIT R-8 - 10-...NFOGAIN (1).MOV |
| EXHIBIT R-14 - Vi...ction-Issue-1.m4a |
| EXHIBIT X-2 - Au...in Antitrust (1).m4a |
| EXHIBIT X-2 - Au...n Antitrust (2).m4a |
| EXHIBIT X-3 - Pro...n Cohen (2).MOV |
| EXHIBIT X-4 - Pro...n Cohen (1).MOV |
| EXHIBIT X-5 - Pro...wn Cohen (1).MOV |
| EXHIBIT X-11 - Pr...nversation (2).m4a |
| EXHIBIT X-12 - Pr...nversation (2).m4a |
| EXHIBIT X-21 - 10...23-Fired (3).MOV |
| EXHIBIT X-22 - 0...is-meeting (3).m4a |
| EXHIBIT X-23 - 0...hi-Dallas-visit.m4a |
| EXHIBIT Y-17 - 09...endy-Megha.m4a |
| SJ1-AH-2C-A.m4a |