# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

FILED

NOV 0 3 2025

CLERK, U.S. DISTRICT COURT
TEXAS EASTERN

IN THE MATTER OF:  §
                   §
DILIP JANA         §     Civil Action No. 4:24-cv-00698-SDJ-BD
     *Plaintiff,*  §
                   §
v.                 §
                   §
WALMART, INC.,     §
     *Defendant*.  §

---

### Plaintiff's Second Unopposed (by Court Order Dkt 99) Motion for Summary Judgment for Damages

---

Plaintiff, Dr. Dilip Jana,  respectfully moves for unopposed (by Court Order **Dkt 99**) case-dispositive second summary judgment motion ("SJ2") on liability under Criminal Antitrust Anti-Retaliation Act ("CAARA") and Sarbanes-Oxley Act of 2002 ("SOX"), and for entry of damages on the papers. This motion addresses step two of the burden-shifting framework: after Plaintiff's prima facie showing IN First Summary Judgement Motion, Walmart must prove—"**by clear and convincing evidence**"—that it "would have taken the same unfavorable personnel action in the absence of" the protected activity. See 49 U.S.C. § 42121(b)(2)(B)(ii), (iv),  Murray v. UBS Securities, LLC, 601 U.S. ___ (2024).

### Posture (Dkt. 99 and Local Rule CV-56)

---

1. The Court's Dkt. 99 order precludes Walmart from filing any response to this motion. **Effect of Dkt. 99—No Opposition Permitted; Facts Deemed Admitted.** Walmart's own request (See Dkt 85):

> *"Court…enter an order excusing Walmart from any obligation to respond to all pending and future filings by Plaintiff.."*

and the Court excused Walmart from responding to Plaintiff's pending and future motions (Order Dkt. 99). Accordingly, Walmart has waived the ability to contest this relief and Walmart is barred from opposing this motion. Under the Court's local summary-judgment rule (CV-56(c)), "**the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy,**" and the Court "**will not scour the record in an attempt to unearth an undesignated genuine issue of material fact.**"

## I.    Statement of the Issues to be decided by the Court

2. Whether Walmart's initial disclosures (Ex. **SJ2-26A-1**) —containing no documents/ESI, no "category and location" descriptions, and a "still investigating" qualifier—created no Rule 26(a)(1)(A)(ii) baseline capable of later "supplementation" under Rule 26(e).

3. Whether Walmart's interrogatory (**SJ2-R33-2**) and RFP responses (**SJ2-R34-3**)—comprising objections without sworn factual answers (Rule 33(b)(3)–(5)) and without a certified, request-by-request production or privilege log (Rules 34(b)(2), 26(b)(5)(A))—fail the Rules and therefore cannot create any genuine dispute of material fact under Rule 56.

4. Whether the July 18 paralegal-sent, password-protected ZIP (**SJ2-JULY18-4**) —served without a Rule 26(g)(1) attorney signature, without a certificate of service, and without identification of any discovery category—must be stricken under Rule 26(g)(2) and precluded under Rule 37(c)(1); and, alternatively, whether even if considered, those uncertified/unauthenticated materials fail to create a

genuine dispute or to satisfy Walmart's clear-and-convincing burden under 49 U.S.C. § 42121(b)(2)(B)(ii), (iv),  Murray v. UBS Securities, LLC, 601 U.S. ___ (2024).

5. Whether, given (i) Dkt. 99 (no opposition permitted), (ii) Local Rule CV-56(c) (properly supported facts deemed admitted absent a compliant response), and (iii) the absence of admissible defense evidence after Rules 26(g)(2) and 37(c)(1), Walmart can—as a matter of law—make the required clear-and-convincing showing of a non-retaliatory basis for the termination; and, because it cannot, whether the Court should (a) grant summary judgment on liability (SOX §806 and CAARA) and (b) enter back pay now on the unrebutted record.

**6.** Whether the record establishes the amount of lost wages and benefits from the termination date through the **back-pay** cutoff in the Back-Pay Computation (salary, bonus, equity/stock, and benefits components), and whether prejudgment interest should run on that sum.

7. Whether reinstatement is infeasible and, if so, whether **front pay** should be reserved for a later evidentiary determination (jury or court, as applicable) after liability is entered.

8. Whether categories such as emotional distress, reputational harm, and other non-economic losses (**Compensatory damage**) are triable and should be reserved for the jury on amount.

9. Whether the summary-judgment record (including the punitive-damages affidavit and cited exhibits) establishes, as a matter of law, entitlement to seek exemplary damages on the pleaded Texas claim(s) (fraud/malice/gross negligence), with amount reserved for the jury under Chapter 41.

10. Whether a tax gross-up to offset adverse lump-sum tax effects is available and should be reserved for determination with front pay/compensatory/punitive amounts at trial.

11. The applicable rate and accrual for any monetary judgment entered on SJ2.

12. Whether taxable costs should be awarded under Rule 54(d), with quantification deferred to a post-judgment bill of costs.

## II.    Statement of Undisputed Material Facts ("SUMF")

**A. Initial disclosure baseline = zero; July 18 cannot "supplement" nothing**

13. On ~Apr. 7, 2025, Walmart's Initial Disclosures identified no documents or ESI or no path (Ex. SJ2-ID-A1 within SJ2-DECL-1-ID (Tabs A–D)).

14. Plaintiff objected on May 2 and July 1, 2025 (Dkts. 62, 70) (Exs. SJ2-ID-A2/A3).

15. On July 18, 2025, Walmart sent a "supplement" by paralegal email—no Rule 26(g) signature/certification (Ex. SJ2-ID-B; see Dkt. 96-1, PageID 1404–05; Dkt. 118, PageID 1690–91).

16. Plaintiff issued multiple Rule 26(g) notices—no cure followed (Exs. SJ2-ID-C1–C5).

17. On Oct. 6, 2025, the Court: "There was zero documents initially. So how could you supplement zero?" (Tr. 26:15–16) (Ex. SJ2-ID-D).

**B. Forensic impeachment of July 18 "set" (Exhibits 1–3)**

18. Tab A (Exs. 1–3): Exhibit 1 (OSHA redacted, ~Feb. 22, 2024); Exhibit 2 (OALJ unredacted, June 14, 2024); Exhibit 3 (Walmart's July 18, 2025 rendition). (SJ2-DECL-2-FRAUD, Tab A).

19. Plaintiff's sworn forensic series—C00 (affidavit filed with Dkt. 109), C01 (affidavit filed with Dkt. 111), and C1–C7—establish:

- o The purported "native" .eml lacks normal SMTP/Exchange headers, while some attached .eml items do—consistent with post-hoc assembly.
- o Multiple attachments share uniform 10/20/2024 modification timestamps, inconsistent with a 10/04/2023 send.
- o Recommendation.docx shows ~106 revisions, last by Adrian Milburn, again inconsistent with a contemporaneous transmission.

  (All within SJ2-DECL-2-FRAUD, Tab C (C00, C01, C1–C7); Dkt. 118 summary in Tab B.)

## C. Privilege flip-flop (pattern/scienter)

20. OSHA (Feb. 2024): Withheld as privileged (Ex. SJ2-PRIVILEGE-OSHA).

21. OALJ (June 14, 2024): Earlier privilege called a "good-faith error"; unredacted produced; attachments promised subject to protective order (Ex. SJ2-NO-PRIVILEGE-OALJ).

22. Federal (Apr. 28, 2025): Privilege/work-product asserted across 15 Interrogatories (Ex. SJ2-PRIVILEGE-FEDERAL-Interrogatory, Dkt. 72-1) and 12 RFPs (Ex. SJ2-PRIVILEGE-FEDERAL-RFP, Dkt. 62-2).

23. June 25, 2025 (Dkt. 65): "Privilege log in process" (Ex. SJ2-PRIVILEGE-FEDERAL-MPO).

24. June 27, 2025: Protective Order entered (Ex. SJ2-PRIVILEGE-FEDERAL-PO).

25. July 10, 2025 (Dkt. 76): Walmart: it "has not yet withheld any responsive documents on the basis of privilege." (Ex. SJ2-NO-PRIVILEGE-FED-DKT76).

**D. Rule 33 / Rule 34 failures**

26.    Interrogatories: No sworn answers, no party verification—only objections (see SJ2-PRIVILEGE-FEDERAL-Interrogatory, Dkt. 72-1; counsel's admission reflected in the SJ2 record).

27. RFPs: Objections-only "responses"; no custodians/Bates ranges/dates; no 26(b)(5)(A) log; no request-tethered production even after the protective order (SJ2-PRIVILEGE-FEDERAL-RFP, Dkt. 62-2).

**E. Performance & reinstatement infeasibility; damages foundation**

28. Performance/trajectory: 2023 annual review ("> $250M GMV"), awards, patent progress, and third-party letters (SJ2-DECL-5-PERFORMANCE; E-series; P-7; P-9; P-10 (sealed)).

29. Tenure comparators: M-series (Hazelwood M3/M4; Cathey M7/M8/M9; Furner M-10/M11; Tab E Milburn affidavit) (SJ2-DECL-7-FRONTPAY Tabs A–E).

30. Post-termination outreach, no reinstatement: W-series (quotes in Tab D) show CEO/Legal intake then "case closed." (SJ2-DECL-7-FRONTPAY, Tab D: W-7, W-8, W-10, W-11, W-13, W-14, W-15, W-16, W-18).

31.    Compensatory: ER visits (SJ2-MED-ER-1/2/3) and Aubrey Goodson declaration (SJ2-DECL-AUBREY) on post-termination health/household harms.

# III. Argument

## A. The July 18 Set must be Precluded and Struck; Without It, Walmart Cannot Carry a by Clear and Convincing Defense

### a.  Rules 26(g), 26(a)/(e), 34, and 37(c)(1) require exclusion and striking.

32.  **Unsigned, uncategorized transmission:** The July 18, 2025 set arrived by paralegal email, password-protected, with no attorney Rule 26(g) signature, no certificate of service, and no identification of any discovery category (initial disclosure, Rule 26(e) supplement, or Rule 34 response). Under Rule 26(g)(1) "every disclosure" must be signed by counsel; Rule 26(g)(2) says other parties have no duty to act on an unsigned disclosure/response and the court must strike it unless a signature is promptly supplied after notice. Notice was given (7/21, 7/24, 8/4); no prompt cure was served.

33. **No baseline to supplement:** A Rule 26(e) "supplement" presupposes a valid Rule 26(a)(1)(A)(ii) baseline. Walmart's "initial disclosures" in April produced no documents and gave no "description by category and location." There was nothing to "supplement." A paralegal email cannot retroactively become a Rule 26(e) supplement.

34. **Automatic preclusion.** Independently, Rule 37(c)(1) bars the use of information not disclosed as required by Rule 26(a) or (e) "to supply evidence on a motion, at a hearing, or at a trial," absent a showing of harmlessness or substantial justification. Walmart has shown neither.

**Result:** the July 18 set must be struck (Rule 26(g)(2)) and is precluded (Rule 37(c)(1)).

### b. With the July 18 set excluded, Walmart lacks admissible proof to meet its heavy burden.

35. In retaliation frameworks like SOX § 806, once the employee meets the prima facie showing and the record reflects protected activity and adverse action, the employer bears the heightened burden to prove—by clear and convincing evidence—that it would have taken the same action even absent the protected activity. That standard demands credible, contemporaneous, admissible proof (e.g., sworn decision-maker testimony, authenticated personnel and performance records, consistent policies contemporaneously applied).Here, the record shows: (i) No signed, rule-compliant initial disclosures of documents/ESI, (ii) No sworn interrogatory answers identifying decision-makers, reasons, or evidence, (iii) No Rule 34(b)(2) productions tied to requests, and no privilege log, (iv) The only attempted corpus of "evidence" is the July 18 paralegal dump—which is precluded and stricken under the Rules above. Without admissible documents or sworn discovery supporting a legitimate, non-retaliatory termination rationale, Walmart cannot—as a matter of law—carry a clear and convincing defense. The standard is not "some evidence"; it is highly persuasive evidence that leaves the fact-finder firmly convinced. There is none.

### c. Even if the July 18 set were considered arguendo, it cannot satisfy a clear-and-convincing burden.

36. Even setting preclusion aside (it should not be), the July 18 materials suffer foundational defects (lack of Rule 26(g) signature, no Rule 34 mapping, no authentication) and forensic anomalies flagged in the record (missing email transport headers, later modification timestamps on attachments). Materials that are unauthenticated and internally inconsistent cannot, as a matter of evidentiary law, produce the "firm belief or conviction" that is the hallmark of the clear-and-convincing standard. At best for Walmart, such materials create speculation—not the kind of reliable proof the law requires to

defeat summary judgment. Because (1) the July 18 set is struck and precluded under the Federal Rules, and (2) no other admissible, rule-compliant discovery supports a non-retaliatory rationale, Walmart cannot meet its clear-and-convincing burden. The defense therefore fails as a matter of law, and the Court should grant the summary judgement.

### D. With No Admissible Evidence (and Facts Deemed Admitted), Walmart Cannot Meet Its Clear-and-Convincing Burden

37. Walmart has no certified initial-disclosure production, no Rule 33 facts, no Rule 34 production, and a stricken July 18 set. Discovery is closed two weeks ago on October 13, 2025. Under CV-56(c) and Dkt. 99, Plaintiff's supported facts are admitted and the record is unopposed. Walmart therefore cannot meet the high clear-and-convincing burden. Summary judgment on liability under SOX §806 and CAARA should enter.

38. Forensic impeachment = independent inadmissibility.

SJ2-DECL-2-FRAUD (Tabs A–C) shows the July 18 package is a post-litigation curation, not a contemporaneous system export:

- No SMTP lineage in the supposed "native" .eml;
- Uniform 10/20/2024 modification timestamps across attachments—impossible for an authentic 10/04/2023 transmission;
- Recommendation.docx with ~106 revisions (last by Adrian Milburn).
  Because Walmart offered no Rule-33 answers or 30(b)(6)/declarant to authenticate or explain these anomalies, it cannot lay a Rule 901 foundation or surmount Rule 403 risks (confusion/misleading). Independently of 26(g)/37(c), the set is inadmissible.

39. "Initial disclosure" label (Oct. 6) does not salvage it.

On Oct. 6, Walmart characterized the July 18 set as initial disclosure; but the Court recognized the fatal defect: "There was zero documents initially. So how could you supplement zero?" (SJ2-ID-D). If July 18 is the initial disclosure, then Walmart still violated 26(a) (no signature/certification, no categories/locations), and it arrives months late—after the deadlines and after Plaintiff's objections. Either way, it is out.

## B. Walmart has no Rule-compliant evidence to meet a clear-and-convincing defense

1. Interrogatories (Rule 33).

40. Walmart served no sworn narrative answers and no party verification—only objections. Objections are not evidence. With discovery closed, the failure is incurable. Walmart therefore has no admissible record identifying decision-makers, dates, independent reasons, comparators, or contemporaneous support.

2. RFPs (Rule 34).

41. Walmart's objections-only "responses" named no custodians, no Bates ranges, no production dates, and no statement whether items were withheld; and it served no privilege log under Rule 26(b)(5)(A). This violates the core of Rule 34(b)(2)(B)–(C). Without a request-tethered production, there is nothing for Walmart to rely on.

3. Privilege flip-flop confirms strategy, not substance.

42. The OSHA→OALJ→federal sequence (SJ2-PRIVILEGE Tabs A–G) shows "privilege" deployed to delay/obscure, then disclaimed ("no documents withheld"), to pave the way for the July 18 curation. That pattern underscores scienter and extinguishes any claim of substantial justification.

Result: Walmart has no admissible evidence to meet a clear-and-convincing "same-action" defense. Summary judgment for Plaintiff is required.

## C. Damages Should Be Entered Now on the Papers (No Opposition Permitted)

43. Back Pay (plus 6% retirement match; prejudgment interest; less unemployment).

Adopt Plaintiff's sealed schedule (SJ2-PLDIS-8) through June 30, 2026 (primary), including: (i) base/bonus/equity as charted; (ii) 6% employer retirement contribution on eligible base; (iii) prejudgment interest (simple) from a reasonable midpoint; and (iv) minus $15,000 unemployment.

Alternative: If the Court prefers a Nov. 30, 2025 cutoff for back pay, use Plaintiff's alternate numbers; the overall restoration (back-then-front) remains materially the same.

**44. Back pay:** With Dkt. 99 in place and no admissible defense evidence, the Court may adopt Plaintiff's back-pay sums as set out in Plaintiff's Initial Disclosure, **SJ2-PLDIS-8 (sealed)** (pp. 11–14; total back pay at p. 14), which Plaintiff served on Walmart on April 7, 2025, and enter judgment now. **The back-pay amount is less than 0.00003% of Walmart's FY2025 annual revenue.** Plaintiff provided a similar calculation in his OALJ initial disclosures in April–May 2024; Walmart has long been familiar with those figures and has never rebutted them. The back-pay figure assumes a trial date of June 30, 2026. Without altering the calculation, front pay should begin on July 1, 2026. In the event the Court prefers the back pay at an earlier date, Plaintiff will promptly supply the calculation.

**45. Front Pay In Lieu of Reinstatement:** Plaintiff adequately pleaded substantial front pay in the Complaint (Dkt. 13 ¶¶ 228–234) and again provided a detailed front-pay analysis in Plaintiff's Initial Disclosure, SJ2-PLDIS-8 (sealed) (pp. 14–20). Plaintiff incorporates by reference the arguments and evidence in Dkt. 13 ¶¶ 228–234 and SJ2-PLDIS-8 (sealed) (pp. 14–20) in support of an award of front pay until retirement, including Plaintiff's strong promotional trajectory and performance record. Plaintiff's annual review states: "The work that you steered for Walmart forensics team… the anomaly detection work, which in FY23 delivered finance-verified more than $250 million in GMV through the end of January 2023." (Affidavit SJ2-PERF-26; Video Evidence SJ2-PERF-26M; Transcript SJ2-PERF-26T at 1:09). Plaintiff is also one of the authors (SJ2-Higgs-1 (filed under seal); SJ2-Higgs-2) of the 2012 experimental discovery of the Higgs boson; Sam's Club CEO Chris Nicholas publicly acknowledged this contribution: "Thank you for what you do. And by the way, that's incredible. I think we've met. I mean, there aren't many people that get to say that they're part of a Nobel-winning prize team that discovered the God particle." (SJ2-CEO-1 at 2:38).

46. Plaintiff worked at Walmart for approximately four years with excellent performance reviews, demonstrating the relative security of the position and the likelihood of continued employment through retirement. See Dkt. 13   234 ("Dr. Jana was a loyal Walmart employee, upholding Walmart s culture and values and wanted to retire from Walmart.."). Plaintiff repeatedly expressed a desire to remain at Walmart while raising protected concerns. For example, on August 8, 2023, Plaintiff emailed SVP Allie Hazelwood:

> *"I do not have a victim mentality, but unfortunately, I have been a victim of retaliation and discrimination at Walmart; still, I am here because I love Walmart, I love working at Walmart. I bring food for four of my kids because of Walmart, I speak up when I see Walmart's best interest is compromised."*

47. In a recorded call the same day, Plaintiff explained the hours and commitment:

> *"Believe me or not... I worked until three o'clock, four o'clock [at] night because there are some urgent work[s] and I had to deliver even with nobody in my team... I can do that."* (SJ2-AH-2C at 2:42). . In a video-recorded call with HR VP Shawn Cohen on August 8, 2023, Plaintiff stated: "I have done the job... because I love Walmart." (SJ2-SC-5 at 0:03). Plaintiff also voiced concern about retaliation and offered to show materials to senior leadership: "I'll be happy to come to Bentonville to show you what I have, but I may not be able to give all documents to Walmart until I get confirmation from upper management like Doug or John Furner or somebody like that." (SJ2-SC-6 at 0:14).

48. In a September 8, 2023 recorded call with Monica Hall, Plaintiff reiterated: "I love Walmart... as an honest Walmart employee who loves Walmart [I have] a responsibility to check whether we are upholding Walmart's core values... So there's no other intention, just to make sure we're on the same page." (SJ2-MH-9 at 0:06–0:57).

49. These records establish (i) a senior-level, specialized role with a strong upward trajectory; (ii) excellent performance and company-acknowledged contributions; (iii) clear evidence of Plaintiff's intent to remain at Walmart through retirement; and (iv) reputational and employability impacts that make reinstatement infeasible and a long-horizon front-pay remedy necessary. Courts may consider an employee's long-term commitment and the practical realities of re-employment when determining the length of front pay—including through retirement where warranted. See, e.g., Seimark Assocs., Inc. v. Ehrlich, 467 Mass. 525, 545 (2014) (recognizing that front pay turns on the period reasonably necessary to restore the plaintiff to the position he would have occupied absent the unlawful conduct, including long-term projections where supported by the record).

**50. Benchmark:** In Haddad v Walmart case 455 Mass, at 103-104 Haddad was a store pharmacist employee and jury awarded 19 years of front pay. Here Plaintiff was a corporate executive with

excellent track records with enormous potential to be C-suit executive and deserves front pay until retirement.

**51. A. Reinstatement Is Infeasible On This Record:** Chain-of-command conflict. The protected disclosures were made to—and about decisions by—the same leaders who would control any return to work. Your emails and recordings show disclosures to/implicating the exact reporting line (e.g., Sr. Director, VP, and SVP), with escalation to higher leadership. That "old antagonism" and direct supervisory conflict is a classic reason courts decline reinstatement and award front pay instead. See, e.g., the Fifth Circuit recognizing that front pay is appropriate where "discord and antagonism… would render reinstatement ineffective" or impracticable. CEO escalation led only to a litigation response. After termination you appealed directly to the CEO seeking re-evaluation and a route back; the matter was routed to Legal, which engaged only to gather materials for defense and offered no reinstatement path. That posture—no remediation, no return-to-work proposal—signals reinstatement is not realistic. Demonstrated hostility and a continuing adversarial stance. The company sought a protective order, then served an uncertified data dump and resisted Rule-compliant discovery for months. That entrenched adversarial posture toward a whistleblower makes a productive reunion unrealistic. Courts decline reinstatement where the relationship has become too acrimonious to resume. The Fifth Circuit has repeatedly approved front pay in these circumstances.

**52. Public litigation footprint would shadow any return.** Plaintiff's protected-activity emails to senior leadership, HR/Ethics recordings, and the forensic disputes are now in the public record. That visibility creates persistent distrust inside the same chain of command—precisely the scenario front pay is designed to address.

**53. Legal standard:** Front pay is an equitable remedy awarded when reinstatement is infeasible; it is designed to place the plaintiff "in the position [they] would have been in" but for the retaliation. The Supreme Court has emphasized that front pay is equitable (and, in Title VII, not subject to the statutory damages cap). The Fifth Circuit recognizes district courts have broad discretion to award front pay where reinstatement is impractical due to hostility, elimination of the position, or the passage of time. Reinstatement here would be counterproductive and risky; front pay is the necessary substitute.

**54. B. Factors Supporting an "Until-Retirement" Front-Pay Award:** Courts assess front pay by weighing practical factors; the following support a long horizon here (i) **Executive-track specialization:** Plaintiff's role involved highly specialized data/ML leadership with few comparable, immediately open roles. The Fifth Circuit allows front pay to bridge the realistic time to reach parity when reinstatement is unavailable and the market for comparable roles is narrow. (ii) **Documented upward trajectory pre-retaliation:** Equity comp trending sharply upward and expanding responsibilities evidence a career path cut short. Where a plaintiff was on a rising track, courts permit longer front-pay periods to restore likely future earnings. (iii) **Reputational harm and market stigma:** This dispute arose inside a small leadership circle and is now reflected in public filings; senior employers often avoid candidates tied to internal-controls disputes. Courts recognize that reputation-based headwinds can extend the period reasonably required to secure comparable employment, justifying longer front pay. (iv) **Geographic and organizational realities:** Comparable director-level tech/analytics roles typically require months-long executive hiring cycles and often relocation; without reinstatement, the economic gap persists even with diligent mitigation. The Fifth Circuit emphasizes that front pay is discretionary and fact-specific; district courts may tailor the

duration to these realities. (v) **Employer posture forecloses a return.** The CEO escalation producing only a litigation response—and the company's sustained discovery stance—show continuing friction incompatible with a safe, effective return. The Fifth Circuit approves front pay where "hostility" or "intolerable" relations make reinstatement pointless. Pollard v. E.I. du Pont, 532 U.S. 843, confirms front pay is an equitable remedy (and not subject to Title VII damages caps). Fifth Circuit cases (e.g., discussions collected in the Migis line and Julian v. City of Houston) approve front pay where reinstatement is infeasible due to hostility/antagonism and grant district courts broad remedial discretion.   Brunnemann v. Terra Int'l, a Fifth Circuit decision frequently cited for front-pay discretion when reinstatement is impractical.   **Haddad v. Wal-Mart Stores, Inc**. (Mass. SJC) is persuasive authority that explains when reinstatement is unrealistic and a substantial front-pay award is warranted to restore parity (especially useful because it addresses your opponent specifically). Given the infeasibility of reinstatement and the factors above, the Court should award front pay through the end of Plaintiff's expected working life (reduced to present value and subject to mitigation offsets), which is the only measure that realistically restores the career trajectory but for the retaliation.

**55. Front Pay:** Reinstatement is infeasible; front pay is the equitable substitute. Plaintiff submits his Initial Disclosure (sealed) which has detailed calculation of Front pay damages: SJ2-PLDIS-8 (p20). The record supports entitlement now; Plaintiff requests the amount be reserved for the jury (short damages-only phase). In the alternative—only if the Court prefers a number now—adopt SJ2-PLDIS-8 (pp20 FRONT PAY AMOUNT $ ██████ redacted) on this unopposed record. Assumptions and detailed forecasting analysis for promotion, base, bonus, stock options is available

on pp 5-10 SJ2-PLDIS-8 (Plaintiff's Initial Disclosure). This front pay amount is about 0.03% of Walmart's FY25 revenue.

56. Reinstatement is not realistic here:

- Chain-of-command antagonism: Plaintiff's protected reports concerned (and were directed to) the same leadership that would govern his return.
- CEO/Legal outreach → "case closed": The W-series shows good-faith escalation followed by intake and closure, not reinstatement.
- Public, adversarial posture: Protective-order battles, unsigned "dump," and curation disputes show entrenched hostility.

  Courts award front pay where reinstatement is impractical and a leadership-track career has been derailed (e.g., Pollard v. E.I. du Pont, 532 U.S. 843 (front pay is equitable); Fifth Circuit discretion when hostility renders reinstatement ineffective; persuasive Haddad v. Wal-Mart approving long-horizon front pay).

  Evidence:

- Trajectory—"> $250M GMV" review, awards, patent progress, and third-party letters (SJ2-DECL-5-PERFORMANCE; E-series; P-7; P-9; P-10).
- Tenure comparators—Hazelwood (M3/M4), Cathey (M7/M8/M9), Furner (M-10/M11), Milburn affidavit (Tab E) (SJ2-DECL-7-FRONTPAY Tabs A–E).
- Market stigma—Public filings, internal-controls dispute, and small leadership circle.

  Ask: Award front pay through retirement, amount reserved for the jury (or adopt SJ2-PLDIS-8 now).

## Compensatory Damages (Non-Backpay / Non-Front-Pay)

57. ER visits (SJ2-MED-ER-1/2/3), therapy, and household impacts (SNAP; foreclosure stress; children)—competent lay testimony (SJ2-DECL-AUBREY) plus medical paper. This is classic compensable emotional-distress and life-impact harm.

4) Punitive/Exemplary on the state claim (fraud or malice; clear and convincing).

58. Texas permits exemplary damages upon clear and convincing proof of fraud or malice. The record shows both:

- Fraud/fabrication: Header-less "native," 10/20/2024 modification clustering, and 106-revision Recommendation.docx, all tied to Walmart's litigating position (SJ2-DECL-2-FRAUD Tabs A–C).
- Malice: The privilege flip-flop—OSHA concealment → OALJ "good-faith error" → federal "privilege log coming" → "no privilege withheld"—used to secure secrecy and then inject an unsigned, curated set.
  Combined with reprehensibility (health/financial vulnerability documented by SJ2-DECL-AUBREY and SJ2-MED-ER-1/2/3), the punitive threshold is satisfied. (See also inherent-power cases recognizing sanctions where parties "defile the judicial process," e.g., Chambers v. NASCO, 501 U.S. 32; Hazel-Atlas, 322 U.S. 238.)

59. Walmart's retaliatory acts caused concrete, compensable harm beyond lost wages. The chain is undisputed on this record: (1) Plaintiff engaged in protected activity, (2) managers implicated by those disclosures escalated toward termination within days, (3) Plaintiff was terminated on October 19, 2023, and (4) the company thereafter adopted an adversarial, litigation-only posture that

foreclosed internal remediation and poisoned Plaintiff's professional standing. The resulting harms include reputational injury, emotional distress, and out-of-pocket economic losses (benefits/health coverage, equity/bonus components, job-search/mitigation costs, and other consequential damages). See SJ2-PLDIS-8 (sealed) (pp. 14–20) (detail and quantification), incorporated by reference.

## B. Economic Consequential Losses (Beyond Backpay)

60. Lost bonus / equity / benefits value. Plaintiff's pre-termination trajectory included material equity accretion and performance-linked compensation (see Complaint Dkt 13 ¶¶ 228–234). Termination eliminated: (a) annual bonus opportunity; (b) equity vesting value; (c) 401(k) match and retirement accruals; and (d) employer-sponsored benefits (health, dental, vision, life).

Proof: Compensation plan docs and prior grants (Complaint Dkt 13 ¶¶ 228–234); payroll/benefits records (SJ2-PLDIS-8 (sealed) pp. 15–16.

61. Credit/finance costs tied to sudden separation. Interest/late-fee penalties, borrowing costs, and related charges reasonably flowing from the sudden loss of income and benefits. Proof: Foreclosure/Bankruptcy; affidavits with exhibits (**SJ2-PLDIS-9 (sealed)** ).

## 62. C. Reputational Harm and Emotional Distress: Professional reputation/standing.

Plaintiff's career was executive-track and highly specialized. The termination amidst ongoing internal-controls disputes—now reflected in public filings—materially diminished marketability.

Proof: Applications and rejections; recruiter correspondence showing "too controversial" or "risk" subtext; decline in interview volume compared to pre-termination

63. Documented excellence abruptly derailed: Walmart's own performance feedback recognized Plaintiff's contributions—e.g., "the anomaly detection work… delivered finance-verified more than $250 million in GMV through the end of January 2023" (Aff. SJ2-PERF-26; Video SJ2-PERF-26M; Transcript SJ2-PERF-26T at 1:09)—and the Sam's Club CEO acknowledged Plaintiff's scientific stature: "there aren't many people that get to say that they're part of a Nobel-winning prize team that discovered the God particle" (SJ2-CEO-1 at 2:38). That public record of excellence magnifies the reputational injury of a retaliatory termination. Proof: SJ2-PERF-26 / 26M / 26T; SJ2-CEO-1.

64. Emotional distress and family impact. Plaintiff (a parent of five minor children) experienced anxiety, sleep disruption, humiliation, and fear tied to sudden loss of income/benefits and the prolonged adversarial posture. Walmart even pointed to Plaintiff's survival-oriented GoFundMe to obtain a protective order, turning hardship into litigation leverage (██████████████████████). Proof: Plaintiff declaration;  medical/therapy records; GoFundMe records and contemporaneous communications (██████████).

65. Quantification note (non-economic): Courts commonly accept either a per-diem approach (daily rate × days since termination) or a lump-sum approach grounded in testimony and corroborating records (sleep loss, anxiety, humiliation, family strain).

66. The record supports entitlement now; Plaintiff requests the amount be reserved for the jury (short damages-only phase). In the alternative—only if the Court prefers a number now—adopt 2024 Foncia v Walmart[1] case on this unopposed record with a multiplier Plaintiff's salary (SJ2-PLDIS-8 Sealed)/Foncia's salary ~x4. Plaintiff's compensatory ask of $40,000,000 reflects documented

---

[1] https://news.bloomberglaw.com/litigation/wal-mart-must-pay-driver-34-7-million-for-defamation-jury-says

emotional distress, reputational/market injury at a senior level, out-of-pocket medical, and consequential financial harm, anchored to a scaled comparator (Foncia).

## EXEMPLARY/PUNITIVE DAMAGES

67. Plaintiff adequately pleaded substantial exemplary/punitive damage in the Complaint (Dkt. 13 ¶¶ 228–234) and again provided a detailed front-pay analysis in Plaintiff's Initial Disclosure, SJ2-PLDIS-8 (sealed) (pp. 22–24). Plaintiff incorporates by reference the arguments and evidence in Dkt. 13 ¶¶ 228–234 and SJ2-PLDIS-8 (sealed) (pp. 22–24) in support of an award of exemplary/punitive damage. The record supports entitlement now; Plaintiff requests the amount be reserved for the jury (short damages-only phase). In the alternative—only if the Court prefers a number now—adopt on this unopposed record. he reprehensibility showing is substantial: Aubrey Goodson's sworn observations (SJ2-DECL-AUBREY ¶¶2–6) document severe emotional, physical, and financial harms and the post-termination spiral, while the scienter record (SUMF ¶¶19–34; SJ2-PRIVILEGE Tabs A–G) demonstrates intentional, deceptive litigation conduct. Together they meet the clear-and-convincing threshold for exemplary damages; the amount can be reserved for the jury."

68. Texas law authorizes exemplary damages on a showing, by clear and convincing evidence, of fraud, malice, or gross negligence. Tex. Civ. Prac. & Rem. Code § 41.003(a). The summary-judgment record establishes those predicates as a matter of law; only the amount requires a jury. See id. § 41.009; BMW of N. Am., Inc. v. Gore, 517 U.S. 559 (1996) (amount constrained by due-process guideposts, not entitlement). **First,** the retaliation sequence is undisputed and egregious. After protected disclosures up the chain of supervisory authority (SVP Hazelwood and SVP Cathey) and

HR (VP Cohen), termination followed within days. See SJ2-AH-2B (Oct. 6, 2023 report) and SJ2-AH-2D (Oct. 7, 2023 acknowledgment that "We are holding all work with Infogain per my request as we review your concerns"), with termination 13 days later on Oct. 19. The non-retaliatory story was never backed by sworn, corporate facts under Rule 33 and was unsupported by any Rule 34 production. **Second**, the litigation conduct crossed from hard-fought to **deceptive**. Walmart sought a protective order by telling the Court that Plaintiff's survival efforts "on **GoFundMe**, Reddit, and potentially other sites online" "underscore the necessity of a protective order to prevent the dissemination of confidential discovery materials online." (Dkt. 65 at PageID 1003). The Court granted the motion (Dkt. 66). Behind that shield, Walmart then injected an uncertified July 18 "supplemental" transmission—emailed by a paralegal, untethered to any discovery category, and lacking a Rule 26(g) signature—followed by shifting positions on privilege (promised log, none produced; later deny any withholding). See, e.g., Dkts. 94, 106, 108 (Rule-based objections); Dkt. 76 (no documents withheld). The ministerial Rule 26(g) duty was not met; "the court must strike" an unsigned disclosure absent a prompt cure. Fed. R. Civ. P. 26(g)(2). That baseline violation is uncontested. **Third**, independent forensic anomalies corroborate fabrication/spoliation concerns: multiple versions of the same Oct. 4, 2023 email with inconsistent timestamps and signature blocks; missing transport/authentication headers in .eml; later-dated modification metadata. See Dkts. 109 & 111 (hashes, header analyses, and side-by-side comparisons). This is not a mere adequacy-of-search dispute; it reflects manipulation of evidence and misuse of a protective order—conduct that strikes at the integrity of the judicial process. Chambers v. NASCO, Inc., 501 U.S. 32, 44–46 (1991). **Fourth**, the pattern predates this Court. In OSHA/OALJ, Walmart withheld materials for months under privilege markings it later recanted as a "good-faith error," then continued to toggle positions. The

same obstruction-then-pivot tactic reappears here (promised privilege log (Dkt. 65), reliance on that promise in Dkt. 66, followed by denial of any withholding in Dkt. 76). The record thus shows repeated and knowing misconduct, not isolated oversight. **Fifth**, reprehensibility and need for deterrence are acute. This court ordered Ordered on March 6, 2025 in it's "ORDER GOVERNING PROCEEDINGS" (Dkt 50): "Before commencing the Rule 26(f) conference, counsel must discuss settlement options with their clients, including whether an offer or demand should be made at the Rule 26(f) attorney conference." During 26(f) conference on March 24, 2025 "Plaintiff asked Peter if there is any lower/upper bound of the offer from Walmart, Peter then asked Plaintiff if he still believes he should be awarded 200 million dollars." See Dkt 54, PageID 781. **Exhibit SJ2-26F-CONF** Walmart knew the scale of the damage. During the call Plaintiff informed Walmart that his home was in the foreclosure process: "Plaintiff said he would be sending discovery requests sometimes that week as he was sick and he was extremely stressed out because of his home foreclosure process."See Dkt 54, PageID 783. (**Exhibit SJ2-26F-CONF**)

69. Plaintiff prosecuted this case pro se while supporting five minor children, enduring bankruptcy to stop foreclosure and documented health impacts. Walmart—an enterprise of extraordinary scale—deployed a multi-lawyer team yet chose not to provide a single sworn factual interrogatory answer, a single request-tethered Rule 34 production, or a certified Rule 26(g) Initial disclosure. Walmart's history and resources show that compensatory sums alone will be internalized as a cost of doing business; meaningful punishment and deterrence require exemplary damages calibrated to its size and the nature of the misconduct.

70. On this record, the entitlement element of Chapter 41 is satisfied as a matter of law: the undisputed facts, together with the inferences compelled by Dkts. 65/66/76/94/106/108/109/111 and

the SJ1 exhibits, constitute clear and convincing evidence of fraud/malice (retaliation coupled with evidence manipulation and court-process abuse). The Court should hold that Plaintiff may recover exemplary damages on the state-law claims at trial, with the amount to be set by the jury subject to constitutional guidepost

# IV. Requested Relief

Plaintiff respectfully requests an order that:

1. Grants SJ2 and holds Walmart failed, as a matter of law, to meet its clear-and-convincing defense;

2. Strikes the July 18 set under Rule 26(g)(2) (no cure) and/or precludes it under Rule 37(c)(1);

3. Awards back pay per SJ2-PLDIS-8 (sealed) through June 30, 2026 (or, alternatively, through Nov. 30, 2025), including a 6% retirement match, prejudgment interest.

4. Awards front pay through retirement, amount reserved for the jury (or adopted now from SJ2-PLDIS-8);

5. Awards compensatory damages supported by SJ2-MED-ER-1/2/3 and SJ2-DECL-AUBREY;

6. Awards punitive/exemplary damages on the state claim based on the fraud/malice record (SJ2-DECL-2-FRAUD; SJ2-PRIVILEGE Tabs A–G); and

7. Grants all further just relief.

Date: Nov. 3, 2025

Respectfully Submitted,

DILIP JANA, Plaintiff
*Pro Se*
Telephone : 318-243-9743
Email: janadilip@gmail.com
800 Fairlawn St, Allen, TX, 75002

## CERTIFICATE OF CONFERENCE

Eastern District of Texas has excused pro se Plaintiff from CV-7(i) Certificate of Conference

Respectfully Submitted,

DILIP JANA, Plaintiff
*Pro Se*
Telephone : 318-243-9743
Email: janadilip@gmail.com
800 Fairlawn St, Allen, TX, 75002

## CERTIFICATE OF SERVICE

On Nov. 3, 2025, a true and correct copy of the foregoing was served upon the following through the

Court's CM/ECF system:

Peter S. Wahby                    Morgan E. Jones                  Holmes H. Hampton
Texas Bar No. 24011171           Texas Bar No. 24132301           Texas Bar No. 24144019
Peter.wahby@gtlaw.com            Morgan.jones@gtlaw.com           holmes.hampton@gtlaw.com

GREENBERG TRAURIG LLP
2200 Ross Ave, Suite 5200 Dallas, Texas 75201
Telephone: 214.665.3600
Facsimile: 214.665.3601
ATTORNEYS FOR DEFENDANT WALMART INC.

Dated: Nov. 3, 2025

Respectfully Submitted,

DILIP JANA, Plaintiff
*Pro Se*
Telephone : 318-243-9743
Email: janadilip@gmail.com
800 Fairlawn St, Allen, TX, 75002