# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION



| | | |
|---|---|---|
| **DILIP JANA** | § | |
| *Plaintiff* | § | **FEB 1 3 2026** |
| v. | § | CLERK, U.S. DISTRICT COURT |
| **WALMART, INC.,** | § | TEXAS EASTERN |
| *Defendant.* | § | Civil Action No. 4:24-cv-00698-SDJ-BD |

---

### Plaintiff's Freestanding Motion for Case Dispositive Sanctions (Default Judgment) – Under Fed. R. Civ. P. 37 And Court's Inherent Authority

---

*1. Pro se* Plaintiff Dr. Dilip Jana moves for case-dispositive sanctions—default judgment—under Fed. R. Civ. P. 37(e)(2)(C) and Rules 37(b) and 37(d), the Court's inherent authority, and for entry of damages and other relief requested in this whistleblower retaliation action arising under the Criminal Antitrust Anti-Retaliation Act ("CAARA") and the Sarbanes-Oxley Act of 2002 ("SOX"). Walmart publicly declares: *"**Act with Integrity** … We do the right thing. We are honest, fair, and transparent..We earn trust."*[1] Yet this motion demonstrates the ***opposite:*** altered/unstable termination evidence and verification-avoidance aimed at avoiding liability by this trillion-dollar company against its former employee. The contrast is stark: in Plaintiff's last annual review, his supervisor credited *"The work that you steered for Walmart forensics team… the anomaly detection work, which ..delivered finance-verified more than $250 million in GMV..."* (Exs. 4-B, 4-C). Walmart promoted Plaintiff in April 2023 (Ex. 4-G), then terminated him on October 19, 2023 shortly after his protected whistleblower activity (Sept. 8–Oct. 12, 2023).

---

[1] https://www.walmartethics.com/content/walmartethics/en_us/code-of-conduct.html

---

2. **Recusal motions (Dkt 138, 142) as to the assigned judicial officers remain pending**. Plaintiff files this motion to preserve rights and to prevent further prejudice from continued delay and continuing reliance on the disputed July 18 production posture. Plaintiff respectfully requests that the Court resolve the pending recusal motions before adjudicating any case-dispositive sanctions request.

3. Plaintiff requests that the Court decide this motion for terminating sanctions **before** resolving merits-dispositive motions, because the motion concerns integrity of core ESI and Walmart's verification blockade; deciding merits first would allow the case to proceed on a record whose authenticity and provenance Walmart refuses to stabilize.

4. **No consent to magistrate dispositive ruling:** Plaintiff has not consented under 28 U.S.C. § 636(c). Plaintiff requests treatment under § 636(b)(1) by Report and Recommendation to the District Judge.

5. **No technical-strike ambush:** If the Court identifies any technical deficiency, Plaintiff requests leave to cure rather than striking the motion, as striking a case-dispositive sanctions motion on technical grounds would impose substantial prejudice in light of the prolonged stay and pending integrity disputes

### Notice re Defendant's "Unless Ordered" Briefing Position and Request for Order Directing Response (Dkts. 99, 153)

6. Walmart has filed a notice stating it "will not file a response brief … unless the Court orders Walmart to file a response," citing Dkt. 99. (Dkt. 153 at 1, PageID 3195). Although Defendant invokes Dkt. 99 to decline responsive briefing absent a Court order, Defendant continues to seek affirmative merits relief by motion (e.g., Dkt. 137) and to litigate against Plaintiff's filings (e.g., Dkts.

127, 129). Dkt. 99 did not prohibit merits responses; it provided only that responses were not required unless ordered. Plaintiff therefore requests an order directing Walmart to respond to this Motion within fourteen (14) days of service of this Motion, with no extensions absent extraordinary circumstances shown. If no response is filed, Plaintiff requests the record reflect that Walmart's silence followed Plaintiff's request for a response order and service of this Motion. Walmart cannot later attribute its silence to the Court where Plaintiff requested an order requiring a response and Walmart had notice and an opportunity to be heard.

## I. INTRODUCTION

7. This case has been trapped in **gatekeeping litigation** for more than a year because Walmart has **not** provided rule-compliant discovery and has **not** stabilized the evidentiary record for the case-dispositive its own termination evidence. Walmart's productions have proceeded without a lawful Rule 26(a) category baseline, without Rule 26(g) certification, and without Rule 33 sworn clarification sufficient to resolve the authenticity and integrity dispute concerning the central termination record—the October 4, 2023 Wendy Bowman email and related artifacts that Walmart itself used as its termination narrative across OSHA, OALJ, and this Court. (Ex. 0E ¶¶1–4, 19–23, 29–35, 40–41; Ex. 0B ¶¶39–74.)

8. The record reflects a deliberate, repeatable method: privilege/protective-order gating; objection-only interrogatory posture; uncategorized and uncertified "dump" productions; and refusal of the least burdensome stabilizing mechanisms that would resolve the authenticity and chain-of-custody dispute (including a sworn custodian/IT declaration or chambers-only inspection). (Ex. 0C ¶¶21–23, 27–29, 32; Ex. 0E ¶¶29–35, 40–41; Ex. 0A ¶¶13–16, 20–22, 33.)

9. Plaintiff requests case-dispositive sanctions—default judgment—on **one or more independent grounds** set out in Counts I–IV below. Each Count stands alone and is supported by the global record findings of willfulness/bad faith, prejudice, and the ineffectiveness of lesser measures as documented in Exhibits 0A–0E. Plaintiff relies extensively on sworn declaration exhibits (each cited by paragraph number to conserve space and avoid repetition): (a) Exhibit 0A (visual discrepancy record; screenshot comparison set; narrow verification requests) (Ex. 0A ¶¶1–92); (b) Exhibit 0B (chronology of Walmart's refusal posture; YES/NO demands; conferral record; July 18 baseline reset) (Ex. 0B ¶¶1–157); (c) Exhibit 0C (privilege gating across OSHA/OALJ/federal; privilege log representations; later disclaimer; Rule 26(b)(5)(A) hook) (Ex. 0C ¶¶1–32); (d) Exhibit 0D (Court's "Gate 1 / Gate 2" framing; lesser-measure cure intended to "solve this problem"; failure mode) (Ex. 0D ¶¶1–90); (e) Exhibit 0E (attribution to Walmart across venues and defense firms; persistence of the same corporate posture) (Ex. 0E ¶¶1–46); and (f) (damages calculations) (Exhibit 0F, 0F-1 and 0F-2).

## II. LEGAL STANDARD — CASE-DISPOSITIVE SANCTIONS

**10. A. Rule-Based Sanctions Authorities Invoked in Counts I–IV:** Plaintiff seeks case-dispositive sanctions under Fed. R. Civ. P. 37 and related discovery rules. The specific rule authorities and standards relied upon— including Rules 37(e)(2)(C), 37(b)(2)(A)(vi), 37(d) (as informed by Rule 37(a)(4)), and the Rule 26(e)/26(g) framework—are set forth and applied in detail within Counts I–IV and incorporated herein by reference.

**11. B. Fifth Circuit Governing Standard for Litigation-Ending Sanctions:** The Supreme Court has emphasized that

---

> *"the most severe in the spectrum of sanctions … must be available to the district court in appropriate cases … not merely to penalize … but to deter those who might be tempted to such conduct in the absence of such a deterrent." Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 643 (1976). [NHL Deterrence]*

12. The Fifth Circuit likewise recognizes that dismissal/default is severe and due-process-implicating: "dismissal is a severe sanction that implicates due process," and is a "***draconian remedy***" and "***remedy of last resort.***" F.D.I.C. v. Conner, 20 F.3d 1376, 1380 (5th Cir. 1994) (quoting Batson v. Neal Spelce Assocs., Inc., 765 F.2d 511, 515 (5th Cir. 1985)). [Conner Gate] Accordingly, "*dismissal with prejudice typically is appropriate only if the refusal to comply results from willfulness or bad faith and is accompanied by a clear record of delay or contumacious conduct*," and the misconduct "*must substantially prejudice the opposing party*." Conner, 20 F.3d at 1380 (quoting Coane v. Ferrara Pan Candy Co., 898 F.2d 1030, 1032 (5th Cir. 1990)). [Conner Gate] Dismissal/default is "usually improper if a less drastic sanction would substantially achieve the desired deterrent effect." Conner, 20 F.3d at 1381 (citing Coane, 898 F.2d at 1032). [Conner Gate] And where noncompliance stems from "honest confusion" or "sincere misunderstanding," dismissal is generally improper: "if the refusal to comply results from honest confusion or sincere misunderstanding of the order … dismissal is almost always an abuse of discretion." Brinkmann v. Dallas Cnty. Deputy Sheriff Abner, 813 F.2d 744, 748 (5th Cir. 1987). [Brinkmann Limitation]

13. At the same time, the Fifth Circuit has repeatedly held that litigation-ending sanctions are not an abuse of discretion where the record shows flagrant bad faith and repeated noncompliance.

> *"When a defendant demonstrates flagrant bad faith and callous disregard of its responsibilities, the district court's choice of the extreme sanction is not an abuse of discretion." Emerick v. Fenick Indus., Inc., 539 F.2d 1379, 1381 (5th Cir. 1976); Tech. Chem. Co. v. IG-LO Prods. Corp., 812 F.2d 222, 224–25 (5th Cir. 1987). [Emerick/Tech. Chem.]*

14. The Fifth Circuit has also emphasized that "discovery delays are serious, especially when they are part of a pattern," and that "*[k]nowingly ignoring an obligation, especially multiple times, may alone be enough to find bad faith.*" Calsep A/S v. Dabral, 84 F.4th 304, 315 (5th Cir. 2023). [Calsep Pattern/Bad-Faith Markers] "Noncompliance is doubly problematic when the lower court issues—like it did here—a warning." Id. [Calsep Pattern/Bad-Faith Markers] And repeated failures culminating in failure to comply with a court discovery order support default. Tech. Chem., 812 F.2d at 224–25. [Emerick/Tech. Chem.] See also Bell v. Texaco, Inc., 493 F. App'x 587, 593 (5th Cir. 2012) (per curiam) (litigation-ending sanctions appropriate where "Plaintiffs' repeated failure to comply with discovery orders, even after being warned of the possibility of sanctions and personally instructed on how to comply, constituted willful noncompliance"). [Bell Willful-Noncompliance Example]

15. Citation Key (Legal Standard Shorthand). [NHL Deterrence] = Nat'l Hockey League, 427 U.S. at 643; [Conner Gate] = Conner, 20 F.3d at 1380–81; [Brinkmann Limitation] = Brinkmann, 813 F.2d at 748; [Emerick/Tech. Chem.] = Emerick, 539 F.2d at 1381; Tech. Chem., 812 F.2d at 224–25; [Calsep Pattern/Bad-Faith Markers] = Calsep, 84 F.4th at 315; [Bell Willful-Noncompliance Example] = Bell, 493 F. App'x at 593.

## III. GLOBAL CONNER FACTORS FOR ALL COUNTS

### A. Willfulness / bad faith + clear record of delay / contumacious conduct

16. Under the Fifth Circuit's "last resort" framework, the question is whether Walmart's course reflects willfulness/bad faith and a clear record of delay/contumacious conduct, rather than "honest confusion," and whether the misconduct has substantially prejudiced Plaintiff. [Conner Gate];

[Brinkmann Limitation]. This record is not a series of isolated disputes. It is one integrated chronology with one recurring effect: Walmart repeatedly avoids rule-anchored truth-testing on central evidence, then reframes the resulting gatekeeping as "waste." (See, e.g., Ex. 0B ¶¶69–74; Ex. 0D ¶¶52–56, 63.) That is exactly the kind of patterned delay and knowing disregard the Fifth Circuit treats as "serious" and probative of bad faith. [Calsep Pattern/Bad-Faith Markers]. Where a party demonstrates "flagrant bad faith and callous disregard" of discovery responsibilities, the extreme sanction is not an abuse of discretion. [Emerick/Tech. Chem.]. Deterrence is also a core purpose of severe sanctions when parties would otherwise be tempted to obstruct. [NHL Deterrence].

### 1. The case begins with "no discovery," not "honest confusion."

17. This case did not start with the normal Rule 26 sequence (conference → baseline disclosures → early adversarial development). It started with months of functional "no discovery," followed by a discovery posture that required repeated gatekeeping motions and conferrals just to obtain rule-anchored positions. (Ex. 0E ¶¶19–24 (April 7 "zero-document" disclosures; "will produce… upon… protective order"); Ex. 0E ¶¶32–35 (June 9 "first production" while still seeking PO; no Rule 26(g) signature; rebranding in reply).) That front-loaded delay is a marker of a "clear record of delay" under Conner: Walmart's first move was to postpone adversarial testing and condition production on procedural insulation. [Conner Gate]; [Calsep Pattern/Bad-Faith Markers].

### 2. When discovery opened, Walmart shifted from "no discovery" to "no sworn positions" and "no production," using protective-order/privilege gating and a "supplement-on-zero" reset.

18. Once discovery began, Walmart did not transition into ordinary merits discovery. It transitioned into verification avoidance on the predicates that stabilize the record.

---

**19. Interrogatories (no sworn answers):** Walmart served objections-only papers, not oath-bound corporate answers; the record shows n**ot a single interrogatory was answered under oath. Every item was met with objections.** (Ex. 0B ¶17.) The record confirms this was not accidental: Walmart later admitted it **"did not substantively answer"** interrogatories "in light of its objections." (Ex. 0B ¶27; see also Ex. 0E ¶29.) That deliberate "no-answers" strategy is the opposite of "honest confusion," and fits Calsep's bad-faith marker: knowingly ignoring obligations, repeatedly. [Brinkmann Limitation]; [Calsep Pattern/Bad-Faith Markers]. (Count III addresses the Rule 33 / Rule 37(d) consequences.)

**20. Initial disclosures / production gating (no production unless PO).** Walmart's baseline posture began at Rule 26(a)(1)(A)(ii): **_no_** "copy—or a description by category and location" of documents/ESI it may use. The record reflects a "zero-document" baseline and conditioning production on a protective order. (Ex. 0C ¶¶21–24; Ex. 0E ¶¶21–24.) That is discovery gating: delaying production while expanding the procedural envelope around evidence before evidence is produced.

**21. "Supplement-on-zero" reset:** That "zero baseline" matters because supplementation presupposes something to supplement. The Court later captured the resulting defect as Gate 1: **"supplement what?"** and **"There was zero documents initially. So how could you supplement zero?"** (Ex. 0D ¶¶52, 63.) Walmart's approach—treat later production events as operative "supplements" untethered to a Rule 26(a)(1)(A)(ii) baseline—reflects baseline-reset conditioning, not good-faith compliance. (Ex. 0D ¶¶52–56, 63; Ex. 0E ¶¶32–36.)

**22. Privilege-log leverage → "withheld nothing" pivot.** Exhibit 0C/0E further show the Court's protective-order ruling credited the representation that "although Walmart has yet to serve its privilege log, it is in the process of doing so," followed by Walmart's later filing that it "has not yet withheld any responsive documents on the basis of privilege." (Ex. 0C ¶¶30–31; Ex. 0E ¶¶30–31.) Those positions cannot both be benign as deployed; either way, the sequence reflects strategic posture shifting rather than rule-anchored transparency. (Id.) [Conner Gate]; [Brinkmann Limitation]; [Calsep Pattern/Bad-Faith Markers].

**3. Protective-order leverage was obtained through a reply ambush that weaponized Plaintiff's hardship, and that secrecy then became the platform for the July 18 "diffuse this situation" insulation sequence.**

23. Plaintiff's record position is that Walmart used reply-stage material to secure broad secrecy, then used that secrecy as the container for disputed production events and to resist sworn, rule-anchored testing. (See Ex. 0E ¶¶33–35 (June 9 "dump" used and rebranded in reply; Court granted PO without enforcing Rule 26(g)(2) or addressing signature objection); Ex. 0C ¶¶30–35 (protective-order ruling posture).) That episode matters because it supplies a coherent mechanism: obtain secrecy through procedural advantage, then treat later productions as "fixed" while resisting oath-bound verification.

**4. Walmart's own words complete the pattern: "good faith / cooperate" → "diffuse this situation" → "confirm under oath" → "must cease."**

24. Walmart cannot plausibly characterize this as "honest confusion" when its own words reflect a deliberate sequence.

25. First, Walmart represented it would cooperate in good faith (Dkt. 65; see Ex. 0E ¶42–45 (conferral rhetoric vs actual practice)). Next, Exhibit 0B preserves Plaintiff's narrow off-ramp: a sworn YES/NO verification demand; Plaintiff "did not ask for rhetoric," but demanded a direct sworn

answer format. (Ex. 0B ¶¶16, 70.). Then, on July 18, 2025, Walmart paired a claimed cure with immediate procedural insulation—while promising oath-bound confirmation later—stating in Dkt. 85 (PageID 1273 ¶6) that it produced "native format" and would "confirm under oath," but sought Court intervention to stop "waste." (See Ex. 0E ¶37.) Exhibit 0B identifies the "claimed cure + insulation" structure as a bad-faith marker. (Ex. 0B ¶¶51–57.) [Calsep Pattern/Bad-Faith Markers]; [NHL Deterrence].

26. Finally, on July 21, Walmart flipped from "confirm under oath" to hostility toward oath-bound verification—denying any duty to clarify authenticity and insisting the "under-oath" pressure "must cease" (Dkt. 88, PageID 1314). Exhibit 0B captures why this is dispositive: Walmart attempted to convert July 18 into the assumed baseline ("metadata intact"), conditioned any "supplementation" on that baseline ("subject to objections"), disclaimed any duty to clarify authenticity, and demanded the oath-bound dispute "must cease." (Ex. 0B ¶¶58–68; see also Ex. 0E ¶37.) That is baseline-reset conditioning + verification avoidance—not "good faith cooperation." [Brinkmann Limitation]; [Calsep Pattern/Bad-Faith Markers].

5. Exhibits 0B, 0C, 0D, and 0E corroborate one inference: coherent strategy, not confusion.

27. Exhibit 0B crystallizes the through-line: Walmart avoided the simplest sworn YES/NO, then ran a sequence that preserved uncertainty while resisting checkable verification. (Ex. 0B ¶¶69–74.) Exhibit 0C corroborates the structural method: protective-order/privilege gating, posture shifts, and production events untethered from the mandatory Rule 26(a) baseline. (Ex. 0C ¶¶21–24, 30–35.) Exhibit 0D shows the Court recognized the same Gate 1/Gate 2 defect and attempted a narrow cure to "solve this problem." (Ex. 0D ¶¶52, 56, 63, 69–70.) Exhibit 0E ties these patterns across forums and

counsel teams to the same client—Walmart—supporting attribution and intent. (Ex. 0E ¶¶3–4, 18,
21–24, 29–35, 37, 41.)

28. Viewed as the story actually unfolded, this is a sustained method: delay and gating at the baseline,
refusal of sworn positions, protective-order/privilege leverage and posture shifts, followed by a
"produce + insulate" sequence that promised "confirm under oath" and then demanded oath-bound
pressure "must cease," culminating in Court intervention needs to stabilize what should have been
routine discovery. (Ex. 0B ¶¶51–57, 58–68, 69–74; Ex. 0D ¶¶52, 56, 63, 69–70; Ex. 0C ¶¶21–24,
30–31; Ex. 0E ¶¶21–24, 29–35, 37, 41.) That integrated chronology supports findings of
willfulness/bad faith and a clear record of delay/contumacious conduct—and it is not a Brinkmann
"honest confusion" case. [Conner Gate]; [Brinkmann Limitation]; [Calsep Pattern/Bad-Faith
Markers]; [Emerick/Tech. Chem.]; [NHL Deterrence].

### B. Substantial Prejudice

29. The Fifth Circuit requires not just willfulness/bad faith and a clear record of delay/contumacious
conduct, but substantial prejudice to the opposing party. [Conner Gate]. The prejudice here begins
with what **Count I** puts at the center of the case: the key termination evidence itself is not stable
across the versions now in the record, and that is not something "more discovery" can fix after the
fact. If the main termination artifact Walmart relies on is disputed on integrity and authenticity, then
**Plaintiff cannot responsibly prepare a trial plan**—witness examinations, depositions, themes, or
motions in limine—because the case is being forced to proceed on shifting evidence rather than one
reliable termination record. (See Count I; see also Ex. 0B ¶¶69–74; Ex. 0E ¶41.)

30. The prejudice is also process-destroying. Walmart's posture diverted the case away from merits discovery and into repeated threshold fights about basics—whether there is a lawful baseline, what productions "went to," and whether anything is enforceably certified—then Walmart portrayed the very filings needed to stabilize the record as "waste." See Ex. 0B ¶¶51–57, 58–68, 69–74; Ex. 0C ¶¶21–24, 30–35; Ex. 0D ¶¶52, 58, 63, 69–70; Ex. 0E ¶¶21–24, 29–35, 37, 41.

31. This prejudice is substantial and not curable by "we'll do it later," because Walmart's course removed the basic building blocks that make discovery usable; first, Walmart refused to provide sworn, binding Rule 33 positions—serving objections-only papers and later admitting it "did not substantively answer"—which prevented Plaintiff from narrowing issues and preparing depositions around oath-bound admissions/denials when it mattered (Ex. 0B ¶¶17, 27; Ex. 0E ¶¶26–29); second, Walmart paired a "zero-document" baseline with "protective-order first" gating and shifting privilege posture, delaying production and clouding what was withheld and why, so Plaintiff could not timely test completeness or challenge withholding decisions in a workable sequence (Ex. 0C ¶¶21–24, 30–31; Ex. 0E ¶¶21–24, 30–31); third, after July 18 Plaintiff was forced to litigate what the production even is—what it "went to," whether it is a valid "supplement," and whether it is certified—rather than litigating merits, creating the loop of produce in a disputed posture → force gatekeeping → complain the gatekeeping is "waste" (Ex. 0B ¶¶51–57, 58–68; Ex. 0D ¶¶52, 58, 63; Ex. 0E ¶37); and fourth, even after Plaintiff attempted a narrow off-ramp through conferral for an oath-bound clarification tied to the Court's directives, Walmart's sequence—silence → promise → refusal—confirmed that cooperative steps would not cure the uncertainty and that the case would remain stuck on foundational predicates instead of moving to merits discovery (Ex. 0E ¶41; see also Ex. 0B ¶¶69–74).

32. The Court's own handling confirms the prejudice is real and escalating: it identified the classification/baseline defect first ("supplement what?" / "There was zero documents initially. So how could you supplement zero?") and only then the accountability defect ("you didn't certify what you're supposed to"), and it chose a narrow, lesser, record-stabilizing measure—written "assurance" tied to accuracy—because that "seems like that would solve this problem." (Ex. 0D ¶¶52, 58, 63, 69–70.) That is the Court acknowledging the dispute is about whether the Court can rely on an enforceable discovery record at all—and why the ongoing instability of the key termination evidence and the "supplement zero" posture make trial preparation impossible and not fixable by simply "reopening discovery." (Id.; see also Ex. 0B ¶¶69–74; Ex. 0E ¶41.)

## C. Lesser sanctions are ineffective / reopening discovery will not cure

33. This record already reflects repeated attempts at lesser, stabilizing measures, and they did not work(See Ex. 0D ¶¶ 5-80). From the beginning, Walmart's Rule 26(a)(1)(A)(ii) "baseline" (Ex. 2-A) was functionally null—no documents, no category/location description, no usable path—and that failure cannot be retroactively "fixed" by calling later events "supplements." Once a party's initial disclosure is zero, the case is forced into threshold gatekeeping ("supplement what?"), and reopening discovery does not cure the past-due baseline defect; it only rewards the party that chose not to comply when compliance was required (See Count II). The same is true for interrogatories (Ex. 2-D): objections-only papers with no sworn answers are not something Walmart can "supplement" into existence later—there is nothing to supplement (See Count III). Walmart produced zero documents on Plaintiff's Rule 34 RFPs, Plaintiff later withdrew RFP request following Walmart's privilege abuse

(See Ex. 0C). In that posture, an order to "reopen discovery" is not a remedy; it is a reset that converts noncompliance into leverage.

34. The Court also tried narrower corrective tools tied to the July 18 event, and Walmart still preserved the same uncertainty instead of stabilizing the record (See Count II). Discovery disputes multiplied into repeated motion practice, including the July 30, 2025 order staying discovery and granting Walmart's request to avoid responding to filings unless ordered.  And Walmart has now made that posture explicit: it is "opposed" to Plaintiff's requested relief, but will not file response briefing unless the Court orders it (See Dkt 2-S Dkt 153), while invoking the discovery stay (Dkt 99, Ex. 2-R) as a reason relief is "inappropriate."  That is not a good-faith path toward cure. It is a continuation of the same delay/avoidance mechanism—refuse to engage unless compelled, then use the resulting lack of adversarial testing as a reason the Court should do nothing.

35. Because the central termination document (See Ex, OA ¶¶10–15 is compromised (Count I), Walmart's objections-only, unsworn interrogatory posture is not a curable sequencing defect (Count III), Walmart's zero document in it's Initial Disclosure and  inability to Supplement Initial Disclosure (See Ex 0D ¶¶8-16,41-80)—it is a litigation-ending integrity failure: there are no sworn positions to bind Walmart on authenticity/integrity, and no lesser sanction can restore a reliable record; default is warranted. On this record, lesser measures (warnings, additional chances, reopening discovery, or more gatekeeping hearings) will not restore a reliable baseline or produce sworn, enforceable positions; they will only extend the same contumacious delay posture the Fifth Circuit treats as the predicate for terminating sanctions. Conner, 20 F.3d at 1380.

## IV. ARGUMENT FOR DEFAULT JUDGMENT

## COUNT I: Rule 37(e)(2)(C) — ESI Spoliation (Terminating Sanctions)

**A. Face-of-the-Document Integrity Conflicts (Screenshots A–C): Same "Bowman Email," Different Artifacts — Core Evidence Instability Supporting Rule 37(e)(2)(C) Terminating Sanctions**

36. Count I is not speculative and does not require forensic testimony at the threshold. Walmart itself treats the October 4, 2023 Wendy Bowman email as the same termination record across OSHA (around Feb. 21, 2024), OALJ June 14, 2024 (, Ex. 1-G, 0A¶¶10–15), and this Court (Ex. 1-U, 1-V) July 18, 2025 production (Ex. 2-H) , and then represented that its July 18, 2025 production is the "native" version "with all attachments included, and metadata intact." (Ex. 2-O, 2-P). Plaintiff presents the Court with side-by-side, "same-region" comparisons (Screenshots A–C, Ex. 1-F, Ex. 1-D) drawn from those venues so the Court can verify the inconsistencies by direct inspection(Ex. 0A ¶¶23–29, 30–73.) by simply 100-200% zooming Ex. 1, 2, 3 (same purported Bowman email)

37. A single Outlook/Exchange system-of-record email item does not legitimately morph like this across proceedings when it is preserved and exported consistently. Ordinary export workflows do not produce different sent-time presentations, different label schemes, and different header-encoding behavior across venues. The record shows reconstruction and substitution—not stable preservation – including: (i) a nearly **five-hour discrepancy** in the displayed "Sent" time; (ii) "**Sent on**" versus "**Sent**" label changes; (iii) seconds appearing in some versions but disappearing in another; (iv) **"CC" versus "Cc"** capitalization shifts; (v) different header geometry/column spacing; and (vi) the July 18 header text behaving as nonstandard, non-copyable glyph output. These are not routine variations. They are re-rendering / reconstruction indicators that appear when a record is regenerated

### The Court Can See Reconstruction / Re–Rendering on the Face of the Record

Exhibit 3-A Header: Bowman EMail – Produced on July 18, 2025 Federal Court

| | |
|---|---|
| From: | Wendy Bowman [Wendy.Bowman@walmart.com] |
| Sent: | 10/4/2023 11:07:31 PM |
| To: | Lori Chumbler [Lori.Chumbler@walmartlegal.com] |
| CC: | Monica Hall [Monica.Hall@walmart.com]; Shawn Cohen [Shawn.Cohen@walmart.com] |
| Subject: | Attorney/Client Privilege |

Exhibit 2-A Header: Bowman EMail – Produced on June 14, 2024 OALJ

| | |
|---|---|
| From: | Wendy Bowman |
| Sent: | Wednesday, October 4, 2023 6:08 PM |
| To: | Lori Chumbler |
| Cc: | Monica Hall; Shawn Cohen |
| Subject: | Attorney/Client Privilege |

Exhibit 1-A Header: Bowman EMail – Produced on February 22, 2024 OSHA

| | |
|---|---|
| From: | Wendy Bowman   Wendy.Bowman@walmart.com |
| Sent on: | Wednesday, October 4, 2023 11:07:31 PM |
| To: | Lori Chumbler   Lori.Chumbler@walmartlegal.com |
| CC: | Monica Hall   Monica.Hall@walmart.com ; Shawn Cohen   Shawn.Cohen@walmart.com |
| Subject: | ▆▆▆▆▆▆▆▆▆ |

instead of preserved as a stable system-of-record export. The screenshots embedded in this Motion show a simple, *dispositive fact*: the October 4, 2023 Wendy Bowman termination email—the central termination record (See Ex. OA ¶¶10-15)—exists in materially different artifact forms across OSHA, OALJ, and this Court.

**38. Count I** therefore begins from what is already proven on the face of this Motion: Walmart has not maintained a single, stable termination-email artifact across the versions it used in federal

proceedings and then produced in this case. That artifact instability is the spoliation predicate, and it is not cured by later rhetoric, relabeling, or "assurances.". Because this is the central termination record, and because the record shows reconstruction/substitution indicators in plain view, terminating sanctions under Rule 37(e)(2)(C) are necessary to restore fairness and deter this misconduct.

**39. Screenshot B (Signature panel):** Signature rendering differences (presentation/styling/artifacts) corroborate that the "same email" is not appearing as one stable export of one mailbox item across venues. (Ex. 0A ¶¶60–63.)

**40. Screenshot C (Body/layout):** The body text and layout behavior diverge at the same location, including the specific "Wondering" placement point (immediately after "…with Dilip Jana." in the July 18 version but not in the corresponding OSHA location), plus line-wrap/structure differences and visible emphasis differences in a readable control segment. (Ex. 0A ¶¶64–73.) These are practical integrity warnings: when the same email artifact is exported consistently, the same regions do not oscillate in this way. These Screenshots A–C are offered to show **evidence instability**: Walmart asks the Court to treat the July 18 set as the "native" cure that diffuses/moots the dispute, yet the record shows materially inconsistent artifacts for the same purported email across proceedings—visible without expert testimony. (Ex. 0A ¶¶11–22, 30–73.) [NHL Deterrence].

**B. Bridge: Face-of-Document Anomalies vs. System-of-Record Integrity (PDF vs. Native EML)**

41. The "face-of-document" versions (PDF/renderings used in OSHA/OALJ and also produced here) are not interchangeable with a native email artifact. A PDF is typically a visual snapshot and does not reliably carry transmission provenance, MIME structure, or a faithful attachment package; by

contrast, a genuine "native" .eml should preserve routing headers and the attachment set that allegedly traveled with the message. (Ex. 0A ¶¶80–84.) Therefore, once Screenshots A–C show visible instability, the controlling integrity question becomes whether the July 18 "native" package is a true system-of-record export with normal provenance and attachment integrity.

**42. C. Forensic Findings:** Plaintiff presents forensic analysis of Walmart's July 18 production artifacts demonstrating reconstruction/substitution indicators and objective integrity defects. As set out in Exhibit 0A, the July 18 PDF rendering metadata reflects an OCR/document-generation pipeline (including "Tesseract") and a July 16, 2025 creation timeframe—more than 20 months after the October 2023 termination—which is inconsistent with a contemporaneously preserved 2023 email export (Dkt. 111; Ex. 0A ¶¶85–90). The purported "native" .eml likewise reflects system-of-record anomalies, including the reported absence of ordinary transmission/routing/authentication headers (e.g., "Received Header Count 0") and attachment timestamp irregularities occurring after the parent email date—integrity defects inconsistent with a genuine server-transmitted message (Dkt. 109; Ex. 0A ¶¶91–101). Although Dkt. 109 was denied and the Court directed Plaintiff to proceed through the Protective Order's confidentiality-challenge protocol, the Court did not adjudicate the merits of Plaintiff's forensic showing; the forensic anomalies documented in Dkt. 109 therefore remain live in the record and bear directly on the authenticity and reliability of Walmart's July 18 purported "native" package.

### D. Rule 37(e)(2) Intent to Deprive

**Record facts + incorporated findings show a deliberate verification blockade around core termination ESI**

43. Plaintiff incorporates by reference the Willfulness/Bad Faith + clear record of delay/contumacious conduct findings and chronology in ¶¶16–28, the Substantial Prejudice showing in ¶¶29–32 and Lesser Sanctions are ineffective (¶¶33-35). Those sections establish that this record is not "honest confusion," but a repeatable method of delay, oath-avoidance, baseline reset, and procedural insulation that has materially prejudiced Plaintiff. Those same facts are also the circumstantial proof of intent required by Rule 37(e)(2)..

**1. Early notice + refusal to lock a sworn YES/NO position when it mattered.**

44. The integrity dispute is not new. Plaintiff placed the discrepancy between Exhibit 1 (Feb. 21, 2024 OSHA redacted Bowman Email) and Exhibit 2 (June 14, 2024 OALJ unredacted Bowman Email) in the operative complaint, and Plaintiff repeatedly demanded the narrowest possible clarification—a binary YES/NO whether those versions reflect the same preserved original or altered iterations. Walmart alone controls the mailbox/system-of-record and chain-of-custody facts, and nothing prevented Walmart from answering that binary question in an oath-bound posture. Yet when Rule 33 answers were due (April 28, 2025), Walmart provided no sworn corporate answers at all and later acknowledged it "did not substantively answer" interrogatories. That refusal to take a sworn YES/NO position on Walmart's own central termination narrative—when the Rules required sworn positions—is probative of intent because it preserves deniability while preventing ordinary truth-testing. (See ¶¶19–21, 25–28; ¶¶31–33; and record cites to Dkt. 72-1 / Ex. 2-D.)

**2. Baseline-reset conditioning: "supplement" only after embedding the Bowman Email in the July 18 dump, then attacking oath-bound verification.**

45. The sequencing reinforces the inference. Walmart was already circulating the Bowman Email (Exhibits 1 and 2) across proceedings well before April 7, 2025 (initial disclosures due), and Walmart

had already used it as its termination narrative; nothing prevented Walmart from producing and clearly identifying the same termination email promptly in rule-compliant form if it was an unaltered preserved original. Instead, Walmart delayed producing the Bowman Email in this case until after obtaining a Protective Order and then embedded it in the July 18, 2025 **uncategorized, uncertified** production package. Walmart then attempted to convert that dump into the assumed baseline by proposing to "supplement" interrogatory (Dkt 85, 88) responses based on the July 18 **"as-produced"** package—despite its earlier objections-only and no answer posture that left nothing to "supplement," under Rule 26(e). Walmart's own words confirm controlled ambiguity rather than compliance. On July 18, Walmart represented that it produced the Bowman Email "in native format" and promised it would "confirm under oath" that the "**as-produced** email was not materially altered," (Dkt. 85, PageID 1273 ¶6.) Three days later, Walmart pivoted: it called Plaintiff's Interrogatories 2–4 "**improper**," disclaimed any duty to "**clarify the authenticity**," of Walmart's own production Ex. 1 & 2 and demanded that Plaintiff's "handwringing… with under-oath testimony must cease," *even while* stating it "intends to supplement" Interrogatories 1–4 **based on the Bowman Email production "subject to objections."** (Dkt. 88, PageID 1314.) That contradiction—invoking oath-bound supplementation as a cure, then condemning oath-bound authenticity pressure once verification becomes checkable—is circumstantial proof of intent to deprive.

### 3. Post-production non-response + "trial-by-ambush" characterization + misuse of stay/Dkt. 99 as a verification shield.

46. Walmart later used "discovery stay" and Dkt. 99's "unless ordered" framework as a practical shield against even minimal verification engagement, including Plaintiff's December 22, 2025 CV-7(h) conferral that expressly disclaimed any request for new discovery and instead sought

integrity confirmation tied to already-produced artifacts. A discovery stay does not logically prevent clarification of what Walmart already produced, nor does it excuse refusal to answer a narrow integrity conferral about the authenticity predicate of a centerpiece termination record while Walmart is actively litigating to strike Plaintiff's timely Summary Judgment Motions (Dkt 137, 143). This record of selective silence and controlled timing supports the Rule 37(e)(2) inference: Walmart chose to preserve ambiguity around the core termination ESI while forcing Plaintiff to litigate on Walmart's preferred "as-produced" artifacts. (See ¶¶33–35). Under Fifth Circuit standards, case-dispositive sanctions are improper [Brinkmann Limitation] where the record shows "honest confusion" rather than willful obstruction, but are permitted where the record shows willfulness/bad faith, a clear record of delay/contumacious conduct, substantial prejudice, and the ineffectiveness of lesser measures. [See Brinkmann; Conner] Here, the incorporated findings in ¶¶16–35 satisfy those predicates, and the same pattern—refusal of sworn YES/NO clarity, baseline-reset conditioning, and verification blockade—supplies the circumstantial proof of intent to deprive required by Rule 37(e)(2) for the Rule 37(e)(2)(C) remedy.

### Count I Conclusion — Rule 37(e)(2)(C) is the fitting remedy; (A) and (B) are unnecessary here

47. Rule 37(e)(2) provides three remedies upon a finding of intent to deprive. Subparts (A) and (B) address adverse presumptions and jury instructions. They are unnecessary here because Walmart has affirmatively used the Bowman Email as the central termination justification across venues and invokes it to defend liability under the AIR21/SOX framework, where the employer's defense turns on reliable proof by clear and convincing evidence that it would have taken the same adverse action absent protected activity 49 U.S.C. § 42121(b)(2)(B)(i)–(ii); Murray v. UBS, 601 U.S. ___ (2024).

Where the producing party has made the disputed ESI the centerpiece of its defense and then blocks sworn, rule-anchored stabilization of authenticity and chain-of-custody predicates, the case cannot be fairly tried on shifting artifacts and post-hoc **"as-produced"** baselines.

48. Conversely, this is not a record of "honest confusion" or "sincere misunderstanding," where dismissal would be improper. [Brinkmann Limitation]. Where a defendant demonstrates flagrant bad faith and repeated noncompliance culminating in discovery-order failure, the extreme sanction is not an abuse of discretion. [Emerick/Tech. Chem.]. And discovery delays are serious when they are part of a pattern; knowingly ignoring obligations multiple times may alone support bad faith. [Calsep Pattern/Bad-Faith Markers]. Accordingly, because the integrity failure concerns case-dispositive evidence and because Walmart's refusal posture preserves an authentication impasse that a ***pro se*** litigant cannot break without Court intervention, the record supports Rule 37(e)(2)(C) relief. This Count is an independent basis for default judgment, separate from Count II, III and IV.

## COUNT II
## Rule 37(b)(2)(A)(vi) — Terminating Sanctions for Disobedience and Evasion of Court's Discovery Directive

49. Plaintiff incorporates by reference the global willfulness/bad-faith and clear-record findings (Willfulness/Bad Faith ¶¶16–28) and the substantial-prejudice findings (Prejudice ¶¶29–35).

### A. The Court issued a clear, time-certain, record-stabilizing directive to "solve this problem," and Walmart did not implement it

50. At the October 6, 2025 hearing on Plaintiff's Motion to Strike the July 18 production (Dkt. 94), the Court adopted a two-gate framework and identified Gate 1 first—classification/baseline—before addressing certification. The Court then distilled the defect in plain terms: **"There was zero**

documents initially. So how could you supplement zero?" (Ex. 0D ¶¶10, 59.) The Court entered Dkt. 117 (Ex. 2-T) to enforce that time-certain cure: "**Defendant Walmart, Inc. must submit written confirmation of its July 18, 2025, production certification within seven days of the docketing of this order.**" (see also Ex. 0D ¶¶65–70.) Plaintiff preserved that the ordered submission did not appear as required on the docket.(Ex. 2-U, Dkt 123  Ex. 0D ¶¶69-73.)

### B. Dkt. 124 does not cure the violation — the Order required a docket submission, and the "confirmation" still does not answer Gate 1 ("supplement zero")

51. Walmart later filed Dkt. 124 (Ex. 2-V) claiming Plaintiff was "*mistaken*," asserting Walmart "promptly submitted" a written confirmation to Plaintiff "within hours," and suggesting counsel did not understand that the Court "also ordered" filing with the Court. But the operative directive was not private transmission; it was a court-record mechanism: Walmart **"must submit"** written confirmation within seven days. (Ex. 2-T; Ex.5-B, 0D ¶¶65–70.) The Court chose a testable, record-stabilizing lesser measure—a submission on the docket—because doing so "**seems like that would solve this problem**." (Ex. 5-B, Ex. 0D ¶¶65–66.)

### C. Walmart did not implement the ordered cure as an accuracy-stabilizing submission

52. The Court's directive was a narrow step to "solve this problem" by requiring a written submission tied to "accuracy" and classification—issued in the face of the Court's own restatement of Plaintiff's gatekeeping objection: "*There was zero documents initially. So how could you supplement zero?*" (Ex.5-B, 0D ¶63; see also ¶¶58–70.). **Gate 1 (category/baseline defect):** Rule 26(e)(1) presupposes that a party "has made a disclosure under Rule 26(a)" and then must "supplement or correct" that disclosure. Where the required Rule 26(a)(1)(A)(ii) baseline ("copy—or a description by category and location—of all documents [and] ESI" the party may use) was never supplied in compliant form

(Ex. 2-A), a later "supplement" label cannot manufacture a discovery category out of "zero.".Walmart did not answer that Gate 1 defect. In open court (Ex. 5-B), Walmart responded with assurances that reasserted the "supplement" label and leaned into "certified" rhetoric: "*It's a supplement… [a] seal of approval… subject to the Court's penalties…*" (Ex. 0D ¶65.), "*…everything rest assured is certified under the federal rules… I buried my signature…*" (Ex. 0D ¶67.) Then, after the Order, Walmart's writing again pivoted to Gate 2 rhetoric ("incident to… certified") without curing Gate 1. (Ex. 0D ¶76.) Thus, even assuming arguendo the writing had been docketed on time(it is not), it still did not supply what the Court ordered to "solve this problem":(Ex. 5-B) a record-stabilizing cure tied to the Court's Gate-1 classification/baseline defect – July 18 "Supplemental production" does not belong to any discovery category.

**53. Gate 2 (non-rule "continuous certification" rhetoric cannot substitute for Gate 1 compliance):** Rule 26(g)(1) requires signature discipline for "every disclosure" and a certification formed after reasonable inquiry that the disclosure is "complete and correct as of the time it is made." Rule 26(g) does not recognize a non-rule "***continuous certification***" theory that "relates back" to an earlier signature – which was not Rule 26(g)(1) complaint at the first place because of zero baseline Rule 26(a)(1)(A)(ii) and "investigation remains ongoing" not " complete and correct as of the time it is made"-- to validate a later, uncategorized production event. Walmart's "incident to / certified" position (in court and in writing) is therefore not a cure; it is a rhetorical substitution that leaves Point Number One ("supplement zero") and Two (Certification) unresolved. (Ex. 0D ¶¶52-76.).

**54. Conclusion :** Rule 37(b)(2)(A)(vi) authorizes default judgment when a party fails to obey a court order to provide or permit discovery. Here, the Court identified Gate 1 first ( "supplement zero") and

then selected a narrow, testable lesser measure intended to "solve this problem" through a written submission **tied to accuracy, classification, Certification, "accurate"(Ex. 5-B p24),**"solve this problem" **.** (Ex. 0D ¶¶9–13, 65–66.) Walmart did not implement the ordered cure as directed, and even its later filing does not cure Gate 1; it pivots to Gate-2 certification rhetoric and extra-rule "continuous certification" assurances. (Ex. 0D ¶¶11–13, 56–63, 76.) With willfulness/bad faith and substantial prejudice incorporated (Willfulness/Bad Faith ¶¶16–28; Prejudice ¶¶29–35), terminating sanctions are authorized and appropriate under Rule 37(b)(2)(A)(vi). [Conner Gate]; [Brinkmann Limitation]; [NHL Deterrence]; [Calsep Pattern/Bad-Faith Markers]; [Emerick/Tech. Chem.].

This Count is an independent basis for default judgment, separate from Count I, III and IV.

## Count III – Rule 37(d)(3) and Rule 37(b)(2)(A)(vi)
## Terminating Sanctions for Failure to Serve Sworn Interrogatory Answers

55. Plaintiff incorporates by reference the willfulness/bad-faith and clear-record findings (¶¶16–28) and the substantial-prejudice findings (¶¶29–35), and relies on Exhibit 0B for the interrogatory timeline, date-certain cure demand, and Walmart's admissions. (Ex. 0B ¶¶16–27, 69–74.) This Count is an independent basis for default judgment, separate from Count I, II and IV.

### A. Walmart served no sworn Rule 33 answers when due; Rule 37 treats this as a failure to answer.

56. Plaintiff served interrogatories on March 28, 2025; responses were due April 28, 2025. Walmart served papers styled "Objections and Answers," but served no corporate answers verified under oath—"[n]ot a single interrogatory was answered under oath. Every item was met with objections." (Exhibit 2-D). Rule 33 requires answers "under oath" and signed by the person making them. Fed. R. Civ. P. 33(b)(3), (b)(5). Rule 37(a)(4) provides that an evasive or incomplete answer "must be treated

as a failure to answer." Walmart's objections-only posture therefore operates as a failure to answer, not a technical defect.

### B. There was no protective-order "safe haven" to justify objections-only non-answers, and Walmart admitted the refusal was intentional.

57. Walmart cannot attribute its objections-only posture to protective-order uncertainty. Walmart filed a protective-order motion on April 3, 2025 that was denied May 1, 2025, then filed again on June 3, 2025, with an order entered June 27, 2025. Thus, from May 1 to June 3, and again after June 27, there was no protective-order "safe haven" that excused Walmart from serving sworn interrogatory answers; yet Walmart still did not serve sworn corporate answers. Plaintiff also provided date-certain notice and demanded cure (Ex. 3-A) after receiving no sworn answers. (Ex. 0B ¶¶18–26.) Walmart later removed any claim of inadvertence by admitting that, "in light of its objections, [Walmart] did not substantively answer" interrogatories. (Ex. 2-G, 2-P, Ex. 0B ¶27.) That admission is case dispositive and establishes willfulness and fits the global pattern at ¶¶16–28.

### C. Rule 37(d) is triggered; default is authorized; lesser measures cannot cure.

58. Rule 37(d)(1)(A)(ii) applies when a party, after being properly served with interrogatories, fails to serve its answers. Fed. R. Civ. P. 37(d)(1)(A)(ii). Because Walmart served no sworn answers and later admitted it "did not substantively answer," the Rule 37(d) trigger is satisfied. (Ex. 0B ¶¶17, 27.) Rule 37(d)(3) authorizes sanctions and incorporates Rule 37(b)(2)(A), including "rendering a default judgment." Fed. R. Civ. P. 37(d)(3); 37(b)(2)(A)(vi). A prior order compelling answers is not required for Rule 37(d) sanctions; the Rule targets the failure to serve answers in the first place, and Plaintiff satisfied the good-faith conferral requirement through his written conferral and cure deadline. (Ex. 3-A, Ex. 0B ¶¶18–25.). Nor can Walmart rebrand first-time compliance as "supplementation": where

there were no sworn answers, there is nothing to supplement under Rule 26(e), and the prejudice is structural because Plaintiff was denied binding positions needed to narrow issues and prepare depositions when it mattered. (¶¶29–35; Ex. 0B ¶¶69–74.) On this record, no lesser sanction (deadlines, warnings, or "reopening discovery") cures the absence of sworn answers or deters the refusal posture. Default judgment is therefore warranted under Rule 37(d)(3), incorporating Rule 37(b)(2)(A)(vi), as an independent ground.

## COUNT IV

### The Fifth Circuit's Four-Part Default-Judgment Standard Is Satisfied

59. The Fifth Circuit requires four findings before a district court may enter default judgment as a discovery sanction: (1) willfulness or bad faith accompanied by a clear record of delay or contumacious conduct; (2) attribution to the party (not merely counsel); (3) substantial prejudice; and (4) the ineffectiveness of lesser sanctions to achieve deterrence. Conner, 20 F.3d at 1380 ( Coane, 898 F.2d at 1032). Each factor is satisfied on this record, as shown below and in the incorporated exhibits.

**60. (1) Willfulness / bad faith + clear record of delay / contumacious conduct and (2) Prejudice:** Plaintiff incorporates by reference the Court's sanctions factors already set out in this Motion—specifically, Plaintiff's showing of (1) willfulness/bad faith and a clear record of contumacious delay (¶¶16–28) and Plaintiff's showing of  (2) substantial prejudice (¶¶29–32). Plaintiff relies on those paragraphs and the exhibits cited there (including Exhibits 0B–0E) as the factual predicate for Count IV, and does not repeat that chronology here.

61. (3) **Attribution to the party:** The sanction-triggering conduct is attributable to Walmart itself, not an isolated misstep by any individual lawyer, because it concerns corporate-controlled evidence,

corporate discovery decisions, and corporate positions taken in Walmart's name and for Walmart's benefit. **See Ex. 0E** (pattern across OSHA → OALJ → this Court; same termination artifact; same "protective-order first / produce later" gating; and the same refusal to provide oath-bound verification even when requested narrowly and repeatedly). That attribution is reinforced by the cross-forum / cross-counsel continuity: different defense firms appear at different stages, yet the same client-level posture persists—invoking privilege to withhold the termination record and attachments; re-labeling positions when convenient; transmitting "native" packages through corporate channels while resisting sworn custodian declarations; and maintaining the position that Walmart has no duty to provide the oath-bound verification Plaintiff requested for the central termination evidence. See Ex. 0E (Walmart's consistent positions and refusals described as a client-level pattern rather than a one-off attorney error). Conner, 20 F.3d at 1380; see Ex. 0E.

(4) **Lesser sanctions are ineffective:**. Plaintiff incorporates by reference ¶¶33-35. This Count is an independent basis for default judgment, separate from Count I, II and III.

### V. Merits Context – Protected Activities
### (Not Required for Rule 37 Relief Count I-V)

This is a whistleblower retaliation action under CAARA and SOX. Although Rule 37 sanctions do not require adjudicating the merits, the discovery misconduct at issue is materially prejudicial because it centers on the integrity, traceability, and categorization of the limited documents Walmart relies upon to justify termination and to contest protected activity, knowledge, and causation. Plaintiff has already submitted record evidence supporting protected activity and related elements in connection with Defendant's motion-to-dismiss proceedings and in summary-judgment briefing, which Plaintiff incorporates by reference. (See, Dkt. 127, all exhibits).

## VI. DAMAGES

Plaintiff requests that the Court enter default judgment as to liability and award only back pay and related wage-based economic components proven by the Jana damages affidavit and exhibits (through April 30, 2026) at this stage. Plaintiff does not ask the Court now to determine, set, or enter any dollar amount for front pay, compensatory damages, punitive damages, or any other damages pleaded in the Operative Complaint (Dkt. 13). Plaintiff has demanded a jury trial and expressly preserves all remaining damages categories for the jury. Nothing in this back-pay submission constitutes any waiver, reduction, concession, or request to cap any other damages category prior to the jury's verdict. **Back Pay / Wage-Based Economic Loss Amount Requested (through 04/30/2026):** Plaintiff requests entry of judgment awarding the following wage-based economic-loss amounts supported by Exhibit 0F-1 and its attached calculation model: (1) Lost base salary + bonus (through 04/30/2026): $1,019,476.67 (Ex. 0F-1 ¶65), (2) RSU / equity component (shares-first; valued at $129/share): $1,212,409.79 (Ex. 0F-1 ¶65), (3) Benefits: $122,337.20 (Ex. 0F-1 ¶65), (4) Tax offset / gross-up: $1,382,639.29 (Ex. 0F-1 ¶75), (5) Prejudgment interest: $103,884.80 (Ex. 0F-1 ¶80). Total requested wage-based economic loss: **$3,841,222.98 as of April 30, 2026**. Plaintiff further requests post-judgment interest as authorized by law.

**VII. REQUESTED RELIEF:** Plaintiff respectfully requests case-dispositive sanctions—entry of default judgment—on any one or more independent grounds, without commingling. To preserve clarity for appellate review, Plaintiff requests that the Court state expressly that each ground below independently supports entry of default judgment, and that the ruling does not depend on any single ground: (1) Count I (ESI Spoliation): Enter default judgment under Fed. R. Civ. P. 37(e)(2)(C); (2) Count II : Enter default judgment under Fed. R. Civ. P. 37(b)(2)(A)(vi); (3) Count III (Failure to

Serve Sworn Discovery Responses): Enter default judgment under Fed. R. Civ. P. 37(d)(1)(A)(ii) and 37(d)(3), incorporating Rule 37(b)(2)(A)(vi); (4) Count IV (Fifth Circuit Litigation-Ending Sanction Standard): Enter default judgment as a litigation-ending sanction under the Fifth Circuit's governing standard for dismissal/default (as set out in Count IV), including express findings on willfulness/bad faith + clear record of delay/contumacious conduct, attribution to the party, substantial prejudice, and ineffectiveness of lesser sanctions. (5) Back-Pay Judgment (Economic Loss): Enter judgment awarding the wage-based economic-loss amounts stated in Section VI (supported by Exhibit 0F, 0F-1,2), together with post-judgment interest as authorized by law. Because Plaintiff seeks default judgment as a sanction after a clear record of delay and contumacious discovery conduct (Counts I–IV), Plaintiff requests denial of any stay beyond Rule 62(a). Alternatively, any stay pending appeal should be conditioned on: (i) immediate payment to Plaintiff of 25% of the wage-based economic-loss judgment (or registry deposit with immediate disbursement of 25%); (ii) Court-approved security for the balance plus interest/costs; and (iii) expedited appellate steps (prompt transcript orders and a motion to expedite). These conditions prevent further delay and effectuate Rule 1;(6) Jury Trial on Remaining Damages: After entry of default judgment on liability and entry of the back-pay award, set all remaining damages issues for jury trial consistent with Plaintiff's jury demand, including front pay, compensatory damages, and punitive damages, as authorized by law. (7) Injunctive and Declaratory Relief: After entry of default judgment, enter Plaintiff's requested equitable relief, including appropriate injunctive and declaratory relief to prevent ongoing harm and to restore integrity to the proceeding; and permanently restraining Walmart Inc., and its officers/agents/employees, from representing Walmart as a "people-led" company (or materially

similar representations) in a manner that masks, denies, or is inconsistent with the retaliatory conduct adjudicated in this case.

Dated: February 13, 2026

Respectfully Submitted,

DILIP JANA, Plaintiff
*Pro Se*
Telephone : 318-243-9743
Email: janadilip@gmail.com
800 Fairlawn St, Allen, TX, 75002

## CERTIFICATE OF SERVICE

On February 13, 2026, a true and correct copy of the foregoing was served upon the following

through the Court's CM/ECF system:

| Peter S. Wahby | Morgan E. Jones | Holmes H. Hampton |
|---|---|---|
| Texas Bar No. 24011171 | Texas Bar No. 24132301 | Texas Bar No. 24144019 |
| Peter.wahby@gtlaw.com | Morgan.jones@gtlaw.com | holmes.hampton@gtlaw.com |

GREENBERG TRAURIG LLP
2200 Ross Ave, Suite 5200 Dallas, Texas 75201
Telephone: 214.665.3600
Facsimile: 214.665.3601
ATTORNEYS FOR DEFENDANT WALMART INC.
Dated: February 13, 2026

Respectfully Submitted,

DILIP JANA, Plaintiff
*Pro Se*
Telephone : 318-243-9743
Email: janadilip@gmail.com
800 Fairlawn St, Allen, TX, 75002