UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

DILIP JANA                          §
                                    §
v.                                  §        CIVIL NO. 4:24-CV-698-SDJ
                                    §
WALMART, INC.                       §

## MEMORANDUM REJECTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Dilip Jana, proceeding *pro se,* has sued Defendant Walmart, Inc., alleging that Walmart violated the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, and the Criminal Antitrust Anti-Retaliation Act, 15 U.S.C. § 7a-3, when it terminated his employment. (Dkt. #13 ¶¶ 4–5). Walmart moved to dismiss both claims under Federal Rule of Civil Procedure 12(b)(6). (Dkt. #22).

Before the Court is the Magistrate Judge's Report and Recommendation, (Dkt. #107), recommending that the Court deny Walmart's dismissal motion. Walmart filed objections to the Magistrate Judge's report, (Dkt. #112), and Jana submitted a response to Walmart's objections, (Dkt. #116). After full consideration, the Court **SUSTAINS** Walmart's objections, **REJECTS** the Report and Recommendation, and **GRANTS** Walmart's motion to dismiss.

## I. BACKGROUND

Jana is a data scientist with a master's degree in physics and a PhD in nuclear and particle physics. (Dkt. #13 ¶ 30). He began working for Walmart in March 2020 as a Principal Data Scientist. (Dkt. #13 ¶ 1). In April 2023, Walmart promoted Jana to Director of Data Science. (Dkt. #13 ¶ 1). In this new role, and during the relevant

1

time frame, Jana reported directly to Adrian Milbourne, a Senior Director at Walmart. (Dkt. #13 ¶ 62). Milbourne, in turn, reported to Ridhi Mehra, a Vice President at Walmart. (Dkt. #13 ¶ 62).

## A. Walmart Works with Infogain on a Data Science Project

Shortly after his promotion, Jana participated in the vendor selection process for a data science project that was intended to identify certain operational defects in Walmart's retail stores. (Dkt. #13 ¶¶ 40, 42–43). Milbourne advised Jana that Walmart was soliciting bids from third-party analytics providers for the project, and that Kamil Bay, a Walmart Director of Analytics who also reported to Milbourne, was leading the bid-evaluation process. (Dkt. #13 ¶ 40). Milbourne asked Jana to provide Bay with Jana's input as to the strengths and weaknesses of the potential vendors. (Dkt. #13 ¶ 40).

Walmart received five initial bids for the project, including one from Infogain, an India-based company, and a joint bid from Deloitte and Google. (Dkt. #13 ¶¶ 42–43). Infogain's initial bid projected a cost of $180,000 to complete a Proof of Concept ("POC"), while the Deloitte–Google bid for a POC projected $300,000. (Dkt. #13 ¶¶ 42–43). Jana preferred the Deloitte–Google bid as he believed Infogain lacked qualified data scientists. (Dkt. #13 ¶ 44).

For her part, Mehra tried to alleviate Jana's concerns about Infogain, telling him that she preferred Infogain for the project because they would be less expensive and "underst[ood] the problem better." (Dkt. #13 ¶ 45). According to Jana, Mehra "praised Infogain repeatedly," which "raised suspicions" for Jana because Walmart

was in the midst of its vendor selection process for the data science project "with other reputable vendors like Google/Deloitte." (Dkt. #13 ¶ 45). In Jana's view, Mehra also "showed early interest in Infogain before all vendor presentations were complete." (Dkt. #13 ¶ 46). Jana also questioned the fairness of Bay's system for vendor evaluation, which Jana felt was "biased towards Infogain." (Dkt. #13 ¶ 47). Despite Jana's concerns, Walmart selected Infogain. (Dkt. #13 ¶ 47). Jana characterizes the selection of Infogain for the data science project as "Antitrust procurement fraud with unlawful manipulation of a procurement process to obtain an unfair advantage during the procurement process, after eliminating the most competent vendors like Google/Deloitte." (Dkt. #13 ¶ 48).

Jana goes on to assert that, after Infogain was selected, it began charging significantly more than initially projected. (Dkt. #13 ¶ 50). Specifically, while Infogain's initial bid for the POC was for $180,000, after Infogain was retained this increased to $270,000, and then, according to Jana, ultimately reached "nearly 1 million dollars," a price that was "much higher" than Deloitte–Google's bid. (Dkt. #13 ¶ 50). In Jana's view, Infogain "misrepresented their bid to unfairly eliminate the other vendors with approval from [Mehra] suggesting violation of antitrust laws." (Dkt. #13 ¶ 50). He also complains about a six-month extension of Infogain's work on the data science project. According to Jana, the extension was designed "to continue fraudulent activities." (Dkt. #13 ¶¶ 52–53).

Jana also alleges that Infogain underperformed and failed to deliver promised results. (Dkt. #13 ¶¶ 55–56). For example, Jana maintains that Infogain failed to

3

present to Walmart a proprietary software product called NAVIK, which Infogain had offered to provide to Walmart during Infogain's bid presentation. (Dkt. #13 ¶¶ 55–56). Jana's superiors, Mehra and Milbourne, did not view Infogain's failure to deliver the NAVIK software as a significant problem, but Jana considered it "a textbook style of fraud." (Dkt. #13 ¶ 56). Jana goes on to suggest that Infogain failed to complete or only partially completed deliverables associated with its POC work. *See* (Dkt. #13 ¶ 58) (stating that Bay confirmed that "Infogain completed 0% for the first two projects and 50% for the third project at the end of POC"). Finally, Jana alleges that, despite Infogain's deficient performance, Mehra and Milbourne gave Infogain additional contract work worth millions of dollars. (Dkt. #13 ¶¶ 56–57).

Jana provides no specific factual allegations indicating whether, and if so how, either the POC or the data science project was a failure. Nor does he provide any specific factual allegations about how Infogain's alleged failures impacted Walmart's business, whether through loss of cost savings or otherwise. He makes only the conclusory statement that the data science project Infogain was working on "related to store defects" and, "[w]ith over 4500 Walmart stores" in the United States, "[m]isidentifying or failing to detect critical defects could result in billions of dollars in lost revenue and wasted resources annually." (Dkt. #13 ¶ 60). Jana's reference to potential losses of "billions of dollars" is untethered to any specific factual assertion of a failure or omission of Infogain on the data science project or any other project.

**B. Jana's Complaints Concerning Infogain**

Between August and October of 2023, Jana made several complaints about Walmart's work with Infogain. These complaints are referenced in his complaint as the underpinning of his suit against Walmart. Each complaint will be described in turn.

### i. August 8, 2023, complaint to Allie Hazelwood

Jana alleges that on August 8, 2023, he reported "possible fraud" to Allie Hazelwood, a Senior Vice President at Walmart and Mehra's supervisor. (Dkt. #13 ¶ 62). Jana explained to Hazelwood that by "possible fraud" he meant that "vendor [Infogain] selection was done in an unethical manner, providing projects to vendor despite their very poor performance." (Dkt. #13 ¶ 62).

Hazelwood followed up with Jana on his complaint and he elaborated, telling Hazelwood that (1) Bay favored selecting Infogain as a vendor and Bay's rating of potential vendors was biased in favor of Infogain, (2) Infogain raised its fee amount after being awarded the contract for the data science project, (3) Walmart was continuing its relationship with Infogain despite Jana's belief that Infogain was providing deficient performance, and (4) on occasion, Walmart and Infogain did not confirm in writing certain amendments to the Statement of Work, Walmart's contract with Infogain, until after the work subject to such amendment had been performed. (Dkt. #13 ¶ 63). Jana does not explain how the events underlying these complaints may be considered fraud.

### ii. August 14, 2023, complaint to Shawn Cohen

Jana further alleges that, on August 14, 2023, he reported "possible fraud" to Shawn Cohen, Vice President of Human Resources at Walmart. (Dkt. #13 ¶ 64). According to Jana, he advised Cohen that "we [Walmart] are in a verge of big corruption," and that Jana was particularly concerned about "procurement fraud, bid rigging, bid suppression and misrepresentation of low cost to get the POC for the vendor [Infogain]," all "orchestrated by [Mehra]." (Dkt. #13 ¶ 64). Cohen responded that he would relay Jana's complaint to Walmart's ethics team to "launch an investigation." (Dkt. #13 ¶ 65).

Thereafter, in early September 2023, Jana met with Jelahn Stewart, a Vice President of Ethics at Walmart. (Dkt. #13 ¶ 66). Jana reiterated to Stewart the concerns he had expressed to Cohen, including an allegation of "possible embezzlement" involving Infogain and Mehra, with no specific facts asserted concerning such "embezzlement." (Dkt. #13 ¶ 66). Stewart told Jana that Monica Hall, a Senior Manager of Ethics at Walmart, would handle Walmart's investigation into Jana's complaints. (Dkt. #13 ¶ 66).

A few days later, on September 8, 2023, Jana and Hall discussed Jana's complaints, and Jana shared with Hall documents that Jana maintained were evidence of "procurement fraud, bid rigging, possible fraud to shareholders, [and] FCPA [Foreign Corrupt Practices Act] violations." (Dkt. #13 ¶ 67). The "documents," however, were just narrative descriptions authored by Jana in which he described purportedly illegal conduct by Walmart employees. (Dkt. #13 ¶¶ 67–68). Specifically,

6

Jana stated that "Infogain portrayed of a false image that they are cheaper during the bidding process," and that Google was "unfairly eliminated" from the bidding process. (Dkt. #13 ¶ 67). Jana also opined that Mehra "intentionally supported" the selection of Infogain as a vendor as part of a bribery and embezzlement scheme. (Dkt. #13 ¶ 67). But the only specific facts stated by Jana in support of this conclusion were that "Infogain is an India based IT company" and that Mehra "was/is an Indian citizen." (Dkt. #13 ¶ 68).

On September 27, 2023, Hall advised Jana that Walmart's investigation into Jana's complaints had been closed. (Dkt. #13 ¶¶ 69, 83). Jana does not identify any action taken by Walmart at the time the investigation was closed.[1]

### iii. October 4, 2023, complaint to Milbourne, Mehra, and Wendy Bowman

Jana also alleges that, on October 4, 2023, he sent a message to Milbourne, Mehra, and Wendy Bowman (a Walmart Human Resources employee), in which Jana stated that Bay was "approving Infogain's work unethically." (Dkt. #13 ¶ 75). There is no explanation of how Bay's conduct was "unethical" or fraudulent; however, based on other portions of Jana's operative complaint, it appears Jana is referencing his allegation that Bay recognized Infogain's deficient performance but still signed off on its work. *See, e.g.*, (Dkt. #13 ¶ 100). The next day, Mehra responded to Jana's

---

[1] Jana alleges that Walmart terminated its contract with Infogain in December 2023 and subsequently terminated Milbourne, Bay, and Mehra's employment in August 2024. However, Jana does not allege that these terminations were related to any misconduct on the part of Infogain, Milbourne, Bay, or Mehra. Instead, Jana suggests that the terminations constituted "malicious activities" by Walmart "risking the preservation of documents related to this case." (Dkt. #13 ¶ 240).

message, stating that "all [of Jana's emails] have been appropriately escalated." (Dkt. #13 ¶ 103).

On October 16, 2023, Jana submitted a complaint to Walmart's Ethics Department "about [Milbourne's] retaliation effort and how [Milbourne] was aiding [Mehra] for bid rigging, procurement fraud, and violation of other federal laws." (Dkt. #13 ¶ 79). The same day, Jana informed Bowman that he had submitted the above-described ethics complaint, which Bowman acknowledged. (Dkt. #13 ¶ 80).

### iv. October 6, 2023, complaint to Greg Cathey

Jana asserts that, on October 6, 2023, he "reported fraud" to Greg Cathey, a Senior Vice President at Walmart. (Dkt. #13 ¶ 76). In this message, Jana suggested to Cathey that awarding Infogain a new contract beyond the POC for the data science project would be "a violation of a few federal labor laws." (Dkt. #13 ¶ 76). In support of this assertion, Jana posed a question to Cathey: "[A]re they [Infogain] being compensated properly?" (Dkt. #13 ¶ 76).

The next day, Cathey told Jana that Walmart would "hold[] all work with Infogain" while Walmart reviewed Jana's concerns. (Dkt. #13 ¶ 77).

\* \* \* \*

On October 19, 2023, Jana was terminated by Walmart. (Dkt. #13 ¶¶ 87–88). He was told that the cause for termination was insubordination and underperformance. (Dkt. #13 ¶ 88). Jana's operative complaint does not allege any specific facts concerning actions taken by Walmart concerning the complaints he made on October 4, 2023, and October 6, 2023. *See supra* Part I.B.iii–iv.

## C. Jana's Lawsuit

Three months after his termination, Jana filed a charge with the Department of Labor's Occupational Safety and Health Administration, which dismissed his complaint. (Dkt. #13 ¶¶ 12, 16). Jana appealed to the Department of Labor's Office of Administrative Law Judges, but before a hearing could be held, he elected to proceed in federal court. (Dkt. #13 ¶¶ 17–20).

Jana alleges that Walmart violated the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514A, and the Criminal Antitrust Anti-Retaliation Act ("CAARA"), 15 U.S.C. § 7a-3, when it terminated his employment. (Dkt. #13 ¶¶ 4–5). Jana has amended his complaint twice, and the operative Second Amended Complaint, with attachments, spans over 100 pages. (Dkt. #13). Walmart moved to dismiss both claims under Rule 12(b)(6). (Dkt. #22). Jana filed a response, (Dkt. #29), Walmart filed a reply, (Dkt. #30), and Jana filed a sur-reply, (Dkt. #31).

The Magistrate Judge issued a Report and Recommendation, recommending that the motion be denied. (Dkt. #107). Walmart timely objected to the report, (Dkt. #112), and Jana responded, (Dkt. #116).

## II. LEGAL STANDARD

## A. Review of Magistrate Judge's Report and Recommendation

When a party objects to a magistrate judge's report and recommendation, the district court must review the contested portions de novo. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(3). The district court "may accept, reject, or modify, in whole or in

part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

**B. Rule 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for dismissal of a complaint when the plaintiff has failed to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a Rule 12(b)(6) motion, "[t]he court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). Under Federal Rule of Civil Procedure 8(a)(2), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although a plaintiff is not required to establish a favorable probability that the defendant is liable, the plausibility standard demands "more than a sheer possibility." *Id.*

10

In assessing a motion to dismiss under Rule 12(b)(6), the court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (cleaned up). A plaintiff, however, must allege specific facts, not conclusory allegations. *Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir. 1989). Conclusory allegations and unwarranted factual deductions will not suffice to prevent a motion to dismiss. *United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 379 (5th Cir. 2003); *see also Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007) (explaining that courts will not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions"). Thus, the court, drawing on its judicial experience and common sense, must undertake the "context-specific task" of determining whether the plaintiff's allegations "nudge" their claims against the defendant "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 679, 683.

### III. DISCUSSION

The Court sustains Walmart's objections to the Report and Recommendation. Jana has not plausibly alleged that he engaged in protected activity under SOX or CAARA. Accepting all of Jana's well-pleaded factual allegations as true, and putting aside Jana's conclusory allegations, unwarranted factual inferences, and legal conclusions, he has not alleged facts sufficient to demonstrate that a reasonable person in his position would have believed that Walmart committed shareholder fraud or violated antitrust laws. Accordingly, the Court rejects the Report and Recommendation and grants Walmart's motion to dismiss.

## A. The SOX Claim

### i. A SOX claim must meet the objective-reasonableness test.

The Sarbanes-Oxley Act makes it illegal for publicly traded companies to retaliate against an employee who reports suspected fraud, or who assists in a fraud investigation or enforcement proceeding. 18 U.S.C. § 1514A. To state a retaliation claim under SOX, a plaintiff must allege that (1) he engaged in protected activity, (2) the employer knew that he engaged in the protected activity, (3) he suffered an adverse action, and (4) the circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action. *Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 475–476 (5th Cir. 2008). Walmart's motion challenges only the first element: whether Jana engaged in protected activity. (Dkt. #22 at 16).

Under SOX, "protected activity" is defined as reporting conduct that the plaintiff reasonably believes constitutes (1) mail fraud, (2) wire fraud, (3) bank fraud, (4) securities fraud, (5) a violation of any SEC rule or regulation, or (6) a violation of any provision of federal law relating to fraud against shareholders. *Allen*, 514 F.3d at 475. Thus, "SOX prohibits a publicly-traded company from retaliating against an employee who reports information to a supervisor 'regarding any conduct which the employee reasonably believes constitutes a violation' of one of the six enumerated categories." *Id.* at 477 (quoting 18 U.S.C. § 1514A).

An employee's belief that he engaged in protected activity must be both subjectively and objectively reasonable. *Id.* "The objective reasonableness of a belief is evaluated based on the knowledge available to a reasonable person in the same

12

factual circumstances with the same training and experience as the aggrieved employee." *Id*. While SOX protects "an employee's reasonable but mistaken belief that an employer engaged in conduct that constitutes a violation of one of the six enumerated categories," the objective reasonableness of an employee's belief may be decided as a matter of law where no genuine issue of material fact exists. *Id*.

Jana does not allege facts implicating the first five categories of SOX violations. Instead, he relies on the sixth, "catch-all" category relating to fraud against shareholders. In cases involving the sixth category, "the employee must reasonably believe that his or her employer acted with a mental state embracing intent to deceive, manipulate, or defraud its shareholders." *Id*. at 480.

The standard for evaluating an employee's SOX claim has evolved at the Department of Labor's Administrative Review Board ("ARB") and in the federal courts. As the Fifth Circuit has explained, "[t]he ARB at one time interpreted SOX retaliation protections to attach only if the employee's communications related 'definitively and specifically to the subject matter of the particular statute under which protection is afforded.'" *Wallace v. Tesoro Corp.*, 796 F.3d 468, 479 (5th Cir. 2015) (quoting *Platone v. Flyi, Inc.*, ARB Case No. 04–154, 2006 WL 3246910, at *8 (ARB Sept. 29, 2006) (quotation omitted)). The Fifth Circuit adopted that requirement in *Allen*. *Id*. (citing *Allen*, 514 F.3d at 476–77). But in 2011, the ARB abrogated *Platone* in *Sylvester v. Parexel Int'l LLC*, holding that a plaintiff "need only show that he or she reasonably believes that the conduct complained of constitutes a violation of the laws listed at Section 1514" and that the plaintiff must have an

13

"objectively reasonable" belief that the challenged conduct violates SOX. No. 07-123, 32 IER Cases 497, 2011 WL 2517148, at *11–12 (U.S. Dept. of Labor May 25, 2011) (en banc). Thus, *Sylvester* rejected the requirement that a plaintiff's allegations approximate all the elements of the underlying violation and instead focused on whether the plaintiff's belief, based on the facts known to him at the time, was objectively reasonable. Several circuit courts have adopted the *Sylvester* standard for SOX claims. *See, e.g.*, *Beacom v. Oracle America, Inc.*, 825 F.3d 376, 380 (8th Cir. 2016); *Rhinehimer v. U.S. Bancorp Inves., Inc.*, 787 F.3d 797, 806 (6th Cir. 2015); *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 220–21 (2d Cir. 2014); *Wiest v. Lynch*, 710 F.3d 121, 131–32 (3d Cir. 2013).

In *Wallace*, the Fifth Circuit acknowledged that it had not reconsidered the standard since *Sylvester* was issued, but also noted that it had "quoted with approval *Sylvester*'s statement that SOX's 'critical focus is on whether the employee reported conduct that he or she reasonably believes constituted a violation of federal law.'" 796 F.3d at 479 (quoting *Villanueva v. U.S. Dep't of Labor*, 743 F.3d 103, 109 (5th Cir. 2014)). The *Wallace* court concluded that it "need not decide" whether the standard articulated in *Platone* or *Sylvester* should govern, because the lower court decision at issue in *Wallace* was premised on the more lenient *Sylvester* standard. *See id.*

Here, the Court concludes that Jana cannot meet the objective-reasonableness standard articulated in *Sylvester*, and therefore, *a fortiori*, he cannot meet the more taxing standard of *Platone*. This is sufficient to require dismissal of his SOX claim.

14

### ii. Jana's SOX claim fails.

To support his SOX claim, Jana asserts several bases for his belief that Walmart's relationship with Infogain constituted shareholder fraud. First, Jana alleges that Walmart's bid process for the data science project, as well as its contracting procedure during its relationship with Infogain, were improper. Second, Jana contends that, despite Infogain consistently underperforming its obligations and exceeding its cost projections, Walmart continued to award new work to Infogain. And third, Jana speculates that his supervisor, Ridhi Mehra, may have engaged in embezzlement or bribery connected with Infogain. Each of these purported bases for Jana's belief will be addressed in turn.

Jana maintains that Walmart's bidding process for the data science project, taken together with its contracting procedure during its relationship with Infogain, demonstrate that Walmart engaged in shareholder fraud. As to the bid process, Jana maintains that Infogain submitted a bid that he believes was "fraudulent" because, after being awarded the POC for the data science project, Infogain increased its estimated cost substantially, from $180,000 to $270,000, and later up to "nearly 1 million dollars." Jana further asserts that his colleague Kamil Bay and his supervisors, particularly Mehra, were biased in favor of Infogain and improperly selected Infogain for the data science work. Jana also alleges that, on occasion, Walmart and Infogain did not confirm in writing certain amendments to the Statement of Work for the data science project until after the work subject to such amendment had been performed. *See supra* Part I.A–B.

15

Jana's allegations concerning Walmart's bid process and enforcement of the terms of its Statement of Work with Infogain fall well short of asserting facts sufficient to demonstrate that Jana's belief that Walmart committed shareholder fraud was objectively reasonable. "The specific shareholder fraud contemplated by SOX is that in which a public company—either acting on its own or acting through its contractors—makes material misrepresentations about its financial picture in order to deceive its shareholders." *Brown v. Colonial Sav. F.A.*, No. 4:16-CV-884-A, 2017 WL 1080937, at \*3 (N.D. Tex. Mar. 21, 2017) (cleaned up). Where "allegations of fraud are too far removed from potentially harming the shareholders of a public company," a plaintiff has not adequately alleged protected activity under SOX. *Id.* at \*4. Courts have dismissed SOX claims where the activities complained of by a whistleblower are "two or three steps removed from potentially affecting a shareholder's investment." *Id.* (cleaned up). *See also Gibney v. Evolution Mtg. Research, LLC*, 25 F.Supp. 3d 741, 748 (E.D. Pa. 2014) (explaining that, "[n]othing in the text of § 1514A . . . suggests that SOX was intended to encompass *every* situation in which any party takes an action that has some attenuated, negative effect on the revenue of a publicly-traded company, and by extension decreases the value of a shareholder's investment").

That is the case here. Even assuming Walmart personnel improperly favored Infogain in conducting the bid process for the data science project and failed to follow proper procedures for documenting amendments to Walmart's work with Infogain, such misconduct is multiple steps removed from making material misrepresentations

16

about Walmart's financial picture to its shareholders. Jana's Complaint lacks any allegation that Walmart made *any* representations to its shareholders connected with the Infogain contract or the data science project, much less that any such representations were materially false.

Jana's second set of allegations—that notwithstanding its deficient performance on the data science project, Infogain's work on the project was extended for six months and it was awarded additional work worth "millions of dollars"—are also insufficient to support an objectively reasonable belief that shareholder fraud occurred. At the outset, disagreement with internal business decisions does not amount to a reasonable belief that shareholder fraud is occurring. *Verfuerth v. Orion Energy Sys. Inc.*, 879 F.3d 789, 794 (7th Cir. 2018) ("The securities laws do not require companies to notify shareholders about every managerial hiccup or internal policy disagreement[.]"). Next, even if true, the alleged fact that Infogain was underperforming its obligations to Walmart but nonetheless continued to obtain work from Walmart worth "millions of dollars" does not approach the level of materiality necessary to support an objectively reasonable belief that shareholder fraud occurred. Courts have consistently held that where allegations of fraud are "too far removed from potentially harming the shareholders of a public company" or involve conduct that is "trivial" in relation to the company's overall financial picture, the plaintiff has not adequately alleged protected activity under SOX. *Brown*, 2017 WL 1080937, at *3–4; *see also Nielsen v. AECOM Technology Corp.*, 762 F.3d 214, 222 (2d Cir. 2014)

17

(holding that allegations involving a "trivial matter in terms of its relationship to shareholder interests" did not support a SOX claim (cleaned up)).

For omissions of information in reports to shareholders to be "material" and rise to the level of shareholder fraud, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (cleaned up). Here, Jana alleges, at most, that Infogain improperly secured work with Walmart that was worth "a few million dollars." (Dkt. #13 ¶ 56). But Jana also acknowledges the size and scope of Walmart's business, describing Walmart as an "omnichannel retailer with more than 10,500 stores" and "over 2.5 million employees globally," with annual revenue in 2024 of "[$]648 billion." (Dkt. #13 ¶¶ 10, 23). These assertions are consistent with Walmart's public data. *See* Walmart Annual Report 2024. No reasonable investor would view the alleged misconduct related to a contract of this size as significantly altering "the total mix of information" about Walmart. Instead, the Infogain contract is clearly "a trivial matter" in terms of Walmart's relationship to its shareholder's interests.

An instructive decision on this issue is *Beacom v. Oracle America, Inc.*, a case that involved Oracle, a publicly traded international corporation in the computer software and hardware business. 825 F.3d at 378. In *Beacom*, the plaintiff alleged a SOX claim premised on his belief that, following the implementation of an improper methodology for predicting sales revenue in one of Oracle's business units, inaccurate

sales-revenue forecasts of up to $10 million dollars had occurred. *Id.* at 378–81. The *Beacom* plaintiff maintained that this amounted to shareholder fraud supporting a SOX retaliation claim. The Eighth Circuit disagreed. It noted that the business unit at issue comprised a small portion of Oracle's business, "generating only 0.4% of Oracle's $31 billion in revenue," and the sub-unit particularly impacted by the alleged fraud "generated only 0.19% of Oracle's revenue." *Id.* at 378. Under the circumstances, the *Beacom* court concluded that the SOX claim failed the objective-reasonableness test, stating that Oracle's business unit "missed its projections by no more than $10 million," and that plaintiff, an Oracle salesperson and shareholder, "would understand that $10 million is a minor discrepancy to a company that annually generates billions of dollars." *Id.* at 381. "These facts compel the conclusion that [plaintiff's] belief that Oracle was defrauding its investors was objectively unreasonable, even under the less-stringent *Sylvester* standard." *Id.*

A similar analysis applies here. Assuming Jana's factual allegations are true that Infogain obtained work worth "millions of dollars" on the data science project and other project work, notwithstanding a fraudulent bid and documented underperformance, the alleged fraudulent conduct implicates a minuscule portion of Walmart's business. Although there is no allegation that Jana is a Walmart shareholder like the *Beacom* plaintiff, he is a well-educated man who served in an executive position for Walmart as Director of Data Science. Further, his operative complaint demonstrates his understanding that Walmart generates hundreds of billions of dollars in global revenue and has millions of employees. (Dkt. #13 ¶¶ 10,

19

23). Indeed, Walmart's 2024 revenue was more than twenty times greater than Oracle's revenue referenced in *Beacom*. Like the *Beacom* plaintiff, Jana would understand that "a few million dollars" is a minor discrepancy to a company that generates well over $600 billion in annual revenues.

The analysis is not altered by Jana's fleeting reference in his operative complaint to "billions of dollars" in losses to Walmart based on Infogain's allegedly deficient work. This conclusory allegation and unwarranted inference is supported only by Jana's assertion that the data science project Infogain was working on "related to store defects" and, "[w]ith over 4500 Walmart stores" in the United States, "[m]isidentifying or failing to detect critical defects could result in billions of dollars in lost revenue and wasted resources annually." (Dkt. #13 ¶ 60). Jana's reference to potential losses of "billions of dollars" is untethered to any specific factual assertion of a particular failure or omission of Infogain on the data science project or any other project. Across 75 pages of his Second Amended Complaint, Jana provides not a single specific factual allegation as to any "defect" in Walmart's stores that was undetected or misidentified in Infogain's work. Likewise, Jana makes no specific allegation about the impact of such a failure or omission on even a single Walmart store, much less across all or a portion of Walmart's stores in the United States. Jana's suspicion that Infogain's purportedly defective work "could" result in massive lost revenue for Walmart is not a specific factual allegation that Walmart *actually* suffered any lost revenue or "wasted resources." In short, Jana's brief reference to Walmart facing the alleged possibility of "billions of dollars" in losses because of its retention of Infogain,

absent any specific supporting factual allegations identifying any such losses, is the kind of speculative, unwarranted factual inference and conclusory allegation that courts have made clear will not defeat a motion to dismiss. *See Ferrer*, 484 F.3d at 780 (explaining that courts will not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions").

Finally, Jana alleges that his supervisor, Walmart Vice President Ridhi Mehra, was involved in an embezzlement or bribery scheme against Walmart with Infogain. (Dkt. #13 ¶ 68). Embezzlement involves "the fraudulent appropriation to his own use or benefit, of property or money entrusted to [an individual] by another, by a clerk, agent, trustee, public officer, or other person acting in a fiduciary character." *United States v. Christiansen*, 958 F.2d 285, 287 (9th Cir. 1992); *see also United States v. Chimal*, 976 F.2d 608, 613 n.5 (10th Cir. 1992) (same). The allegations in support of this claim are purely speculative. Jana's theory appears to be that Mehra's perceived favoritism toward Infogain for the data science project, combined with the fact that Infogain is an India-based company, Mehra is an Indian citizen, and she made a trip to India after Infogain was retained by Walmart, all somehow add up to a charge that Mehra and Infogain were involved in an embezzlement and bribery scheme implicating shareholder fraud. Jana states, in relevant part, as follows: "[Mehra's] India visit . . . right after signing the contract with Infogain who she favorably selected is suspicious for suspected embezzlement, bribery/corruption . . . Infogain is an India based IT company . . . [Mehra] was/is an Indian citizen (I do not know her current citizenship status)."). (Dkt. #13 ¶ 68). These

21

assertions are unsupported by any specific facts that Mehra was involved in a bribe, that Infogain offered or delivered a bribe, or that Mehra took any action as a fiduciary that implicates embezzlement. Put simply, Jana's "suspicions" are not facts, and they provide no support whatsoever for his claim that he reasonably believed shareholder fraud was occurring.

Further, even if Jana's allegations of bribery or embezzlement involving Mehra and Infogain were assumed to be true, such allegations involve embezzlement from Walmart, not fraud by Walmart against its shareholders. *See Brown*, 2017 WL 1080937, at *3 (noting that a fraud "committed against the public company" is "a scenario not covered by SOX") (quoting *Gibney*, 25 F.Supp.3d at 747–48)). For this additional reason, Jana's allegations concerning his suspicions of bribery and embezzlement by Mehra and Infogain fail to meet the objective-reasonableness test for a SOX claim.

*    *    *    *

Jana's allegations in support of his SOX claim of shareholder fraud are objectively implausible. Jana complains about internal procurement decisions and a vendor relationship that he viewed as problematic and mismanaged by Walmart executives. But he does not allege facts supporting an objectively reasonable belief that Walmart concealed information from its shareholders, that Walmart misrepresented its financial condition, or that Walmart acted with an intent to deceive its shareholders—all key elements of shareholder fraud. Further, the data science contract and any further work awarded to Infogain was not material to

22

Walmart's shareholders. According to Jana, Infogain's work with Walmart was worth at most "a few million dollars," a minuscule amount for a corporation with an annual revenue well exceeding $600 billion. No reasonable person in Jana's position could believe that Infogain's failure to perform its obligations under the agreement and the alleged cost overruns could materially impact Walmart's relationship with its investors. Finally, Jana's speculative allegations that Mehra conspired with Infogain to embezzle from Walmart cannot support an objectively reasonable belief that shareholder fraud occurred because Jana's "suspicions" are not facts, and in any event such a scenario is not covered by SOX.

The Court concludes that even accepting all of Jana's well-pleaded allegations as true, as opposed to his conclusory allegations, "suspicions," and unwarranted factual inferences found throughout his operative complaint, no reasonable person in Jana's position would have believed that Walmart's conduct constituted shareholder fraud. Jana has therefore failed to allege that he engaged in protected activity under SOX, and his SOX claim must be dismissed.

## B. The CAARA Claim

CAARA protects employees from retaliation for reporting conduct that the employee reasonably believes violates antitrust laws. 15 U.S.C. § 7a-3(a)(1). The statute defines "antitrust laws" as 15 U.S.C. §§ 1 and 3, which are provisions of the Sherman Act that prohibit "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1; *see* 15 U.S.C. § 7a-3(a)(3)(A). Congress has stated that CAARA is to be "governed by the

legal burdens of proof set forth in section 42121(b) of Title 49," 15 U.S.C. § 7a-3(b)(2)(C), the same burden-shifting framework that governs SOX claims. Accordingly, the Court will apply to Jana's CAARA claim the same objective-reasonableness standard that it applied to his SOX claim.

To state a claim under section 1 of the Sherman Act, a plaintiff must show that the defendant (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market. *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 409 (5th Cir. 2007). Jana alleges that he reported "bid rigging," "bid suppression," and "procurement fraud" related to Walmart's selection of Infogain as a vendor. (Dkt. #13 ¶¶ 64, 66). Jana believes that Mehra engaged in bid rigging and procurement fraud by giving "a long-term project to vendor Infogain despite Infogain's failure" to fulfill its commitments to Walmart. (Dkt. #13 ¶ 79). Jana also believes that another Walmart employee, Kamil Bay, engaged in procurement fraud by developing a "vendor evaluation numbering system" that "seemed biased towards Infogain." (Dkt. #13 ¶¶ 47–48). However, Jana misunderstands what constitutes bid rigging and procurement fraud. Bid rigging occurs when two or more firms conspire "to submit collusive, noncompetitive, rigged bids." *U.S. v. Young Bros., Inc.*, 728 F.2d 682, 687 (5th Cir. 1984) (cleaned up). Meanwhile, "procurement fraud" or "procurement collusion" refers to bid-rigging practices in the context of government contracts. *See Procurement Collusion Strike* Force, Antitrust Division, U.S. Department of Justice, https://www.justice.gov/atr/procurement-collusion-strike-force (last visited June 1, 2026). Jana has not alleged any facts suggesting that he

24

had an objectively reasonable belief that Infogain colluded with any competing vendors to submit noncompetitive bids or that Walmart's relationship with Infogain involved any government contracts. Therefore, Jana's belief that Walmart employees and Infogain were engaged in "bid rigging" or "procurement fraud" was not objectively reasonable, and his CAARA claim must be dismissed.

## C. Walmart's Affirmative Defense

Walmart argues that even if Jana engaged in protected activity, the Complaint alleges facts demonstrating that Walmart would have terminated Jana's employment regardless of any protected activity. (Dkt. #22 at 25–29). Specifically, Walmart contends that the Complaint describes multiple instances of Jana's insubordination and disruptive conduct, including Jana's characterization of his supervisor's management style as "an authoritative regime or dictatorship" and other acts of unprofessional behavior. (Dkt. #22 at 26–28). Walmart also asserts that an email attached to the Complaint shows that Walmart terminated Jana based on his "toxicity" rather than his whistleblowing. (Dkt. #22 at 28–29). The Magistrate Judge concluded that the Complaint does not demonstrate beyond doubt that Walmart would have fired Jana even without his whistleblowing. (Dkt. #107 at 11–12).

Because the Court concludes that Jana has failed to allege that he engaged in protected activity under SOX or CAARA, the Court need not reach Walmart's affirmative defense.

### D. Unclean Hands Doctrine

Jana argues that Walmart's motion should be denied under what he calls the "clean hand doctrine." (Dkt. #29 ¶¶ 84–86). The Court construes Jana's argument as invoking the unclean hands doctrine. Jana contends that Walmart is "altering evidence" and "changing the reasons for [Jana's] termination . . . to cover up the true reasons for the termination." (Dkt. #29 ¶ 86). Jana further argues that, because Walmart engaged in fraudulent conduct, the Court should deny Walmart's motion to dismiss. This argument fails.

The doctrine of unclean hands is an equitable defense that bars relief to a party who has acted inequitably in the matter at issue. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). The doctrine requires that "he who comes into equity must come with clean hands." *Id.* (cleaned up). However, the doctrine applies only where the plaintiff seeks equitable relief, not legal relief. *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 794 (5th Cir. 1999). Here, Walmart is not seeking equitable relief; it is asking the Court to dismiss Jana's Complaint under Rule 12(b)(6).

Moreover, the litigation misconduct that Jana alleges—the purported altering of documents after litigation began—does not implicate the unclean hands doctrine. The doctrine addresses inequitable conduct related to the transaction or occurrence that is the subject of the litigation. *Precision Instrument*, 324 U.S. at 814–15. Jana's "unclean hands" allegations concern Walmart's litigation conduct, not Walmart's actions relating to his termination. Allegations of litigation misconduct may be

26

addressed through a request for sanctions under the Federal Rules or through the Court's inherent power. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

For these reasons, Jana's unclean hands argument provides no basis for denial of Walmart's dismissal motion.

**E. Leave to Amend**

Should the Court grant Walmart's motion to dismiss, Jana requests leave to file an amended complaint. The Court finds that further amendment is not warranted. This case has been pending since August 2024, and Jana has already filed three complaints totaling over 200 pages of allegations. (Dkt. #1, #10, #13). Further, Jana provides no basis for further amendment apart from stating that "[t]he Court should freely grant leave to amend when justice so requires." (Dkt. #29 ¶ 87). Moreover, the Court finds that further amendment would be futile because Jana can prove no set of facts in support of his claim which would entitle him to relief. *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 873 (5th Cir. 2000) ("The court may not dismiss a complaint under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." (cleaned up)).

Because Jana has already twice amended his complaint and further amendment would be futile, the Court denies Jana's request for leave to amend. *Eckels v. Johnson*, 235 F.3d 1340, 2000 WL 1672789, at *1 (5th Cir. Oct. 17, 2000) (unpublished table decision) (per curiam) ("The district court did not abuse its

discretion in denying Eckels' request to amend his complaint because Eckels had previously amended his complaint . . . and, most importantly, he proffered only conclusional allegations in support of his request to amend and did not establish a factual basis for an amendment.").

## IV. CONCLUSION

For the foregoing reasons, Defendant Walmart Inc.'s Objections to the Report and Recommendation, (Dkt. #112), are **SUSTAINED**. The Court **REJECTS** the Magistrate Judge's Report and Recommendation, (Dkt. #107).

It is therefore **ORDERED** that Defendant Walmart Inc.'s Rule 12(b)(6) Motion to Dismiss Plaintiff's Second Amended Complaint, (Dkt. #22), is **GRANTED**. Plaintiff Dilip Jana's case is **DISMISSED with prejudice** pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

**So ORDERED and SIGNED this 22nd day of June, 2026.**

_____

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE

28